**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| **JOHN DOE,** | **Civil Action No.: 1:20-cv-01343(GHW)** |
| **Plaintiff,** | **AMENDED COMPLAINT** |
| **v.** |  |
| **NEW YORK UNIVERSITY,** | **Jury Trial Demanded** |
| **Defendant.** |  |

PLAINTIFF JOHN DOE[1], by his attorneys Warshaw Burstein, LLP, as and for his

Amended Complaint against Defendant NEW YORK UNIVERSITY, ("NYU" or "Defendant"),

respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This Title IX discrimination and related state lawsuit is brought on behalf of

Plaintiff John Doe ("John" or "Plaintiff"), a permanently expelled former student at New York

University ("NYU").

2.      John was a junior student at NYU when he was expelled over allegations that he

stalked and harassed his ex-girlfriend, Jane Roe[2], following the breakdown of the couple's toxic

relationship. The allegations did not involve sexual intercourse, and John was found "not

---

[1] Plaintiff filed a Motion to proceed pseudonymously that was granted by this Court.
[2] "Jane Roe" is a pseudonym. Plaintiff will identify students by pseudonyms to protect their confidentiality.
NYU knows the identity of all of the students so identified.

responsible" for non-consensual sexual contact. The conduct at issue took place during a three-week period of time at the end of the couple's 2.5-year relationship.

3.      NYU's review of the couple's long-term relationship during its Title IX process was fatally flawed. While the conduct at issue purportedly arose during the breakdown of the couple's relationship in New York, John was forced to participate in the process while studying abroad in Australia. In light of the couple's complex relationship and Jane's dubious credibility, John's school-appointed advisor told Plaintiff that "under no circumstance will [he] be expelled." John relied on his advisor's representation due to his advisor's lengthy role in the process and considerable experience in Title IX adjudications at NYU.

4.      Based on these assurances, John did not seek legal counsel. Defending the charges from abroad presented time-zone challenges and critical text message evidence was unavailable to John, just 20 years old, who was in over his head and did not even realize it until he was expelled.

5.      During his appeal process, John was back in the United States and retained the help of a lawyer who helped John uncover critical evidence challenging Jane's credibility. Public records requests exposed significant lies Jane told John to manipulate him during their relationship, including an alleged gang rape she reported to the NYPD and ultimate conviction and jail sentence of the assailants *that never happened*. Now that he was home, John was able to check his hard drive for backups of hundreds of text messages refuting Jane's claims of stalking and harassment, which Jane had previously deleted from John's phone. Yet, NYU ignored John's new evidence and arguments and affirmed the hearing decision, making John's expulsion final.

6.      NYU selectively enforced its policies against John, a male student, and failed to do

so in equal fashion against Jane, a female student, in violation of Title IX of the Education Amendments of 1972. Text messages and video footage demonstrated that Jane sexually harassed and physically assaulted John on numerous occasions during their 2.5-year relationship. Many of these occasions were documented in text messages, WhatsApp messages and Facebook messages. Yet, when John sought to file a Title IX complaint against Jane, NYU advised that he must wait to file his complaint until the end of Jane's Title IX process. Following the conclusion of Jane's Title IX process, John attempted to file his Title IX complaint against Jane. But NYU rejected John's filing and stated, "the case is already closed." To add insult to injury, NYU's Title IX adjudicator, Craig Jolley, stated, "I hope that you are able to put this matter behind you and I sincerely wish you well in your future endeavors."

7.      John has been greatly damaged by NYU's actions: his education and future career in medicine have been severely compromised due to his "expulsion" record. Additionally, as a result of NYU's actions and inactions, John has suffered, emotional and reputational damages; economic injuries; and the loss of educational and career opportunities.

## THE PARTIES

8.      John Doe is a natural person residing in New York, New York.

9.      John Doe was a junior student at NYU at the time he was expelled.

10.      NYU is a non-profit corporation duly organized and existing by virtue of the laws of the State of New York that conducts business in the State of New York.

## JURISDICTION AND VENUE

11.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C.

§ 1331, 28 U.S.C. and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

12.     This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of New York and conducts business within the State of New York.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     John Doe's Background

14.     John was always a high-achieving student. He was involved in Boy Scouts and earned the rank of Eagle Scout. He competed in many academic tournaments as the captain of his team and ranked highly. He also received academic and athletic awards in high school.

15.     His life-long goal was to become a doctor, and he participated in academic activities toward that end.

16.     John was a high-achieving student in college. He worked at three prestigious labs over the course of his undergraduate studies. He earned a grant to pursue this research. He also earned multiple scholarships and earned a spot on the Dean's List.

17.     John also values community service and has served as a medical volunteer in New York City and Sydney.

**B.      John Doe's Relationship with Jane Doe**

18.      John and Jane first met at age 17 years old as high school seniors attending the same internship program hosted at a prestigious university in the summer of 2015.

19.      In addition to their mutual attraction, John and Jane shared a common Asian Indian culture and immigrant background. But, according to Jane, her family was much more conservative and over-protective as compared with John's family. At home, Jane's mother would often share a bed with Jane and kept constant surveillance over Jane's whereabouts and online activity. Jane presented herself as very religious, humble and virtuous.

20.      John and Jane exchanged numbers and remained in touch after the summer program ended.

21.      Eventually, John and Jane began a long-distance relationship. John and Jane lived in different parts of Connecticut.

22.      This was the first serious romantic relationship in life for John and, to his knowledge, the first for Jane.

23.      The primary method of communication between John and Jane was via text message and WhatsApp.

24.      John and Jane communicated so frequently that they began to fall in love and even developed pet names for each other. They professed their love for each other through text messages, WhatsApp and Facebook messenger. John and Jane even discussed the prospect of marriage in the future.

25.      John told his parents about his budding relationship with Jane. Based on what he

described, John's parents believed Jane was a nice Indian girl who came from a very conservative Indian family. After hearing how controlling Jane's parents were, John's parents felt bad for Jane.

26.    At some point during the summer, Jane's father became aware of the couple's relationship and demanded that Jane end the relationship.

27.    Jane told John that her parents checked her phone all the time.

28.    John told Jane they should comply with her father's wishes, but Jane insisted that they continue the relationship in secrecy. Jane continued to reach out to John.

29.    As a result, John and Jane created aliases to communicate with each other via social media to continue their long-distance relationship.

30.    During the summer, John and Jane only had the opportunity to meet in person again once at an amusement park in August 2015. Their relationship primarily took place via phone and Facebook messenger.

31.    In December 2015, John's grandmother passed away in England. It was during this time when Jane decided to confide in John about being raped by a family friend during elementary school despite the fact that John was emotionally distraught about losing his grandmother. Although this was a vulnerable time in John's life, John felt compelled to refocus his attention on Jane and her needs.

32.    As John and Jane began receiving college acceptance letters, it became clear that John would be attending a university in Connecticut ("CT University") and Jane would attend NYU.

33.    John was admitted as a student at CT University in Fall 2016.

34.     Jane was admitted as a student at NYU in Fall 2016.

35.     While the couple kept in touch, the viability of their long-distance relationship was no longer the focus for John.

## C. **John's Freshman Year at CT University**

36.     At the beginning of his freshman year, John thrived at CT University. He was in a selective Scholars program, received a scholarship and was in the Honors Program. He made many new friends and excelled academically.

37.     While he still cared for Jane, he had no interest in visiting her at NYU and communication between the couple began to decrease.

38.     Then, in October 2016, John received a text message from Sally Soe from Jane's cellular phone to tell him that "something bad" happened to Jane.  Sally initially claimed Jane had been assaulted.  Then, Sally and Jane told John that Jane was gang-raped by four NYU students who abducted, gagged and drugged Jane before violently raping her. Although John had never heard about or from Sally before, Sally claimed to be one of Jane's friends and a current NYU student.

39.     Sally, however, was actually Jane utilizing a false identity to manipulate John.

40.     All actions taken by Sally were, in reality, actions taken by Jane.

41.     All messages sent by Sally were, in reality, messages sent by Jane.

42.     All statements made by Sally were, in reality, statements made by Jane.

43.     John felt devastated for Jane and immediately texted Sally to encourage Jane to report the rape to NYU and the local police authorities.

44.     Sally encouraged John to visit Jane and support her.

45.     John told his parents about Jane's situation and they agreed that John could visit Jane at NYU to support her.

46.     After John visited Jane at NYU, the couple resumed regular communication and John encouraged Jane to report the rape to NYU and the local police authorities.

47.     A few weeks later, Jane claimed she reported the students to NYU and the four students were expelled. Jane also claimed that there was a criminal trial and that the four students were found guilty and sent to prison.

48.     John was very sympathetic to Jane's situation and made great efforts to support her over the course of their freshman year.

49.     To provide emotional support, John visited Jane at NYU 4-5 times during the academic year at mutually agreed-upon dates.

50.     During John's visits to NYU, Jane and John got along very well when the two of them were together.  However, when Jane saw people she knew, she would become distant and would physically push John away from her. This was very different from the person she was over video chats, text message, WhatsApp or Facebook messenger.

51.     John would ask why Jane behaved that way and Jane would explain that her behavior was meant as a "joke" and that she "did not mean it." But it was clear Jane still wanted to keep their relationship secret from her family and even her friends.

52.     John also dismissed her inconsistent behavior as part of Jane's recovery from her recent rape. Jane would repeatedly explain that her erratic behavior was part of her "condition" as

a rape survivor. Similarly, Sally would attribute Jane's behavior to her history of rape and her "bad" home situation. According to Jane and Sally, Jane's parents were controlling and mean to Jane.

53.    John was sympathetic to Jane's situation and offered to have his mother talk to Jane as a "motherly figure." John's mother reached out to Jane to offer support on two occasions. Jane insisted on hiding any trace of their conversations from her parents, so Jane and John's mother agreed to speak via Skype.

54.    Out of concern for Jane, both John and his mother contacted NYU's Student Health Center to anonymously report the incident and provide counseling and support for Jane.

55.    However, Jane expressed that she was not interested in seeking counseling or therapy and, in fact, Jane became angry with John for reaching out to the Student Health Center.

56.    John and his mother were surprised by Jane's reaction but did not push the issue because they did not want to cause Jane distress.

57.    Jane became very dependent on John during this time. John supported Jane through all of her panic attacks and emotional breakdowns over phone calls, text message, WhatsApp and Facebook messenger, which occurred multiple times during the day and often woke him up in the middle of the night while he was attending CT University.

58.    Through his efforts to support Jane, John's academics became severely disrupted and his grades began to suffer because of Jane's frequent calls and texts.

**D.  Sally's Role in Plaintiff and Jane's Relationship**

59.    Sally represented herself as a good friend of Jane's and knew very intimate details

of Jane's family and personal life. Jane regarded Sally in the same way.

60.     However, Sally's friendship to Jane was intrusive; she repeatedly interjected herself into Plaintiff and Jane's relationship.

61.     During their freshman year, Sally used a temporary burner phone number to continue contacting John, on Jane's behalf, whenever Jane was supposedly too distressed to reach out to John herself.

62.     When Jane wouldn't respond to John's texts, Sally would make excuses for Jane's behavior and claim Jane was having a hard time.

63.     Sally would also contact John through Facebook messenger. Preferring to speak to Jane himself, John attempted to block Sally's Facebook messages many times to no avail. Sally continued to use different Facebook profiles to contact John.

64.     To get his attention, Sally would tell John that Jane was having a panic attack or emotional breakdown because she knew he would respond to help Jane.

65.     Whenever John would ask to meet Sally or speak with her on the phone, Sally would refuse. Sally would make excuses for why she was absent when John was visiting Jane in New York.

66.     At times, Jane would mention Sally, and John would once again ask to meet her. However, Jane would always provide an excuse as to why Sally was unavailable.

67.     Conveniently, Sally was only in New York when John was no longer in town.

68.     At times, Sally involved herself in Plaintiff and Jane's relationship by encouraging John to have a sexual relationship with Jane as a way to support Jane through her multiple panic

{1231192.1 }                                           10

attacks.

69.     John found Sally's messages inappropriate, especially in light of what Jane just went through. However, Sally continued to insist that having a sexual relationship with Jane was what Jane wanted and that it would help Jane recover from her trauma.

70.     Sally's inappropriate messages made John uncomfortable.

71.     However, because Sally and Jane regarded each other as very close friends, John did not question Sally's motives.

72.     John and Jane began a consensual intimate relationship, but this did not include intercourse.  Sally continued to push and bully John to become more sexual with Jane and texted him explicit details about how to do this.

73.     Sally tried to interfere with John's relationship with his roommate at NYU by telling John to "sexile" his roommate to have sex with Jane.

74.     Sally's persistence and behavior related to John's relationship with Jane made him uncomfortable.

75.     Sally's domineering ways manifested itself in other ways. Sally bullied John via text message and Facebook messenger. Sally would tell John to "F--- off," that John was not attractive or that Jane was too good for him.

76.     Under NYU's Title IX policy, Sexual Harassment is defined as follows:

Sexual Harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when one or more of the following conditions are present:

   (i)  Submission to or rejection of such conduct is either an explicit or implicit term

or condition of an individual's employment or advancement in employment, evaluation of academic work or advancement in an academic program or basis for participation in any aspect of a NYU program or activity (quid pro quo);

(ii.) Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual (quid pro quo); or

(iii) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective – a reasonable person's view – and subjective – the Complainant's view – standard (hostile environment).

77.     Jane's actions, through her alter ego Sally, constituted Sexual Harassment under NYU's Title IX policy.

78.     Jane's actions, through her alter ego Sally, occurred both before John was enrolled at NYU and after he enrolled at NYU.

79.     NYU's Title IX policy applies to conduct that occurs on NYU premises.

80.     NYU's Title IX policy applies to conduct that occurs outside of the context of any NYU education program or activity but has continuing adverse effects on NYU premises or any NYU education program or activity.

81.     Jane's actions, through her alter ego Sally, that occurred before John was enrolled at NYU occurred on NYU premises.

82.     Jane's actions, through her alter ego Sally, that occurred before John was enrolled at NYU had continuing adverse effects on NYU's premises that unreasonably impacted John's living environment at NYU.

83.     Jane's actions, through her alter ego Sally, that occurred when John was enrolled

at NYU had the purpose of unreasonably interfering with John's living environment.

84.    Jane's actions, through her alter ego Sally, that occurred when John was enrolled at NYU had the effect of unreasonably interfering with John's living environment.

85.    Jane's actions, through her alter ego Sally, that occurred when John was enrolled at NYU were unwelcome sexual advances that had the effect of creating an intimidating, hostile, and/or offensive living environment for John.

**E.    John Doe's Admission to NYU**

86.    After months of traveling back and forth to visit Jane at NYU to support her, John decided to look into transferring to NYU. Jane supported John's interest in applying to NYU and advised him of the different programs NYU had to offer. Jane assisted John with his application essay to NYU.

87.    It turned out NYU had a highly rated Global Health Program, research opportunities and a varied study abroad program, which interested John and would help John achieve his academic goals. John also wanted to be closer to Jane to help support her.

88.    In fact, John's admissions essay to NYU specifically referenced Jane's brutal gang rape as one of the reasons he sought admission to NYU in order to support her better. Jane read John's essay before he submitted it to NYU.

89.    John was admitted to NYU as a transfer student for the fall 2017 semester.

90.    Now that John attended the same school as Jane, Jane visited John in his dorm room nearly every day between September 2017 and March 2018. Jane slept over in John's dorm room almost every night.

91.     John's roommate and two suitemates observed the couple's relationship and the frequency of Jane's visits to their room. Jane was friendly with John's roommate and suitemates while visiting John.

92.     John began to make new friends at NYU, and Jane would occasionally hang out with John and his friends in public.

93.     Whenever Jane spent time with John and his friends, she denied being in a relationship with John. According to Jane, she still needed to keep their relationship secret from her parents, which meant she needed to keep the relationship secret from John's friends too.

94.     However, John never met Jane's friends and, according to Jane, Sally had transferred out of NYU after freshman year. John never did get to meet Sally even though he made multiple efforts to meet and speak with her.

F.     **Jane Manipulates John and Becomes Physically and Emotionally Abusive**

95.     Over the course of 2.5 years, Jane sent John many messages to put him down and make fun of his appearance. John objected to Jane's cruelty, but because of Jane's proclaimed history of sexual assault, John continued to stand by her.

96.     When John told Jane that his grandfather was diagnosed with cancer, Jane texted John and swore at him for not helping her with the catering for her club event.

97.     Jane also physically abused John by punching or slapping him on at least five different occasions between fall 2017 and spring 2018. Jane's punches and slapping were not precipitated by any physical violence by John, nor did John ever respond to Jane's violence in kind.  Dozens of text messages confirm John's objections to Jane's physical abuse and Jane's

admission of guilt.  On at least one occasion, Jane responded to John's complaints regarding her physical abuse by threatening John with additional physical violence if he so much as came near her.  Again, John dealt with Jane's threats and physical abuse in light of her alleged gang rape.

98.     In addition to communicating using pseudonyms at Jane's request to hide their relationship from Jane's parents, Jane continuously demanded all passwords to John's various social media accounts, including WhatsApp and Facebook. John complied to make Jane happy.

99.     Inexplicably, Jane would regularly access John's social media accounts and delete messages between them for no apparent purpose. At one point, Jane grabbed John's cell phone out of his hand in order to delete messages from his phone. Jane deleted all of the couple's WhatsApp and Facebook messages on his phone.

100.    Later, John realized Jane purposefully deleted these messages to avoid accusations of wrongdoing once she filed her Title IX complaint against John.

G.     **Jane Turns All of John's Friends Against Him**

101.    In spring 2018, Jane began to tell John's friends to stay away from John. John did not understand Jane's motives.

102.    Eventually, John discovered that Jane had been spreading lies about John "doing bad things to Jane" to John's friends.

103.    John was confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends. John had only been a supportive and devoted partner to Jane over the course of 2.5 years.

104.    Jane denied spreading any lies about John.

105.     John's friends began to distance themselves from John as a result of Jane's lies.

106.     John felt isolated and alienated from everyone around him and began to fall into depression.

107.     John messaged Jane to meet him in person to discuss her actions and motivations.

108.     Jane agreed to meet but when John appeared for the meeting, Jane was nowhere to be found. This happened on multiple occasions. Jane's non-appearances only frustrated John more because the couple agreed to talk about Jane's actions and their relationship.

109.     John struggled to deal with his entire social circle and romantic relationship unraveling before his eyes.

110.     All of John's friends turned against him. One of John's male friends even sent him a video clip calling him a "motherf---er" in Hindi.  John's friends told him to stay away and never contact them again.

111.     John's grades were failing. After a strong start to the semester, his grades began to drastically spiral downwards.

112.     John had nobody to talk to or confide in.

**H.     Jane Files Title IX Complaint Against John**

113.     On April 22, 2018, NYU issued a no-contact directive based on a report made by Jane.

114.     The no-contact directive did not provide any information regarding Jane's allegations.

115.     Instead, it simply stated that an "incident . . . " occurred on April 22, 2018 through

electronic means of communication" and that "During this incident it is alleged that you have initiated multiple communications which have made the other person uncomfortable."

116.    The no-contact directive then informed John that he could not contact Jane but did not state that Jane was the person who John had supposedly made "uncomfortable."

117.    John was advised that the no-contact directive was mutual and required Jane to equally abide by the no-contact directive.

118.    The no-contact directive did not prohibit John from contacting third parties about Jane.

119.    The no-contact directive also indicated that an NYU staff member would be contacting John "in the coming days to discuss next steps in this process."

120.    However, NYU did not provide any additional information regarding the no-contact order or further information on the process that it was initiating against John until after John requested clarification of the no-contact directive on April 26, 2018.

121.    Eventually, on May 22, 2018, John learned that Jane had filed four allegations of sexual harassment against John that allegedly took place over the course of their 2.5-year relationship.

122.    NYU appointed an investigator, Samuel Hodge ("Investigator Hodge"), to investigate Jane's allegations.

123.    Upon information and belief, this would be Investigator Hodge's first Title IX case at NYU.

124.    According to Jane, the alleged misconduct allegedly took place over a two-year

period of time while John was a student at both CT University and NYU.

125.    John was surprised and upset that Jane could accuse him of such actions in light of his support and devotion to her over the course of their 2.5-year relationship. NYU advised John that he was entitled to a student support facilitator upon request. John requested a student support facilitator, and Allen McFarlane ("Advisor McFarlane") was assigned to John's case.

126.    When John met with Advisor McFarlane about the allegations on June 25, 2018, Advisor McFarlane told John, "Under no circumstances will you be expelled."

127.    Advisor McFarlane made the same representation to John's mother over the phone in fall 2018.

128.    Advisor McFarlane told John that the worst-case scenario would be a one-semester suspension based on the allegations pending against John.

129.    Advisor McFarlane told John's mother that the worst-case scenario would be a one-semester suspension based on the allegations pending against John.

130.    On July 10, 2018, Investigator Hodge met with John to discuss Jane's allegations, as well as John's response to the allegations.

131.    Investigator Hodge relayed Jane's allegations in a very simplistic manner and focused on two pieces of evidence Jane submitted to the Title IX office. At no point did Investigator Hodge advise John that Jane had submitted over 100 pages of evidence against John, nor did he show John the more than 100 pages of evidence against him.

132.    During the investigation process, John told Investigator Hodge that Jane belittled him in public because of his appearance.

133.     During the investigation process, John told Investigator Hodge that Jane humiliated him when she said that John "looked gay" while John and Jane were hanging out with John's friends.

134.     Under NYU's Title IX policy, Sexual Harassment is defined as follows:

Sexual Harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective – a reasonable person's view – and subjective – the Complainant's view – standard (hostile environment).

135.     Under NYU's Title IX policy, Gender Harassment is defined as follows:

Gender-Based Harassment includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

136.     Jane's behavior constituted Sexual Harassment under NYU's Title IX policy.

137.     Jane's behavior was verbal unwanted conduct of a sexual nature, namely, questioning John's sexuality.

138.     Jane's behavior humiliated John, her intimate partner, in front of his friends.

139.     Jane's behavior was part of a campaign to alienate John from his friends.

140.     Jane's behavior had the purpose of unreasonably interfering with John's living environment.

141.     Jane's behavior had the effect of unreasonably interfering with John's living environment.

142.   Jane's behavior created an intimidating, hostile, and/or offensive living environment by humiliating John in front of his friends based on her perception of his sexuality based on his appearance.

143.   Jane's behavior constituted Gender-Based Harassment under NYU's Title IX policy.

144.   Jane verbally harassed John based on her perception of his sexual orientation based on his appearance.

145.   Investigator Hodge did not investigate Jane's sexual harassment of John.

146.   Investigator Hodge did not mention Jane's sexual harassment of John in the Investigation Summary Report.

147.   Investigator Hodge did not investigate Jane's gender-based harassment of John.

148.   Investigator Hodge did not mention Jane's gender-based harassment of John in the Investigation Summary Report.

149.   During the investigation process, John identified three individuals at CT University who could provide information regarding John's relationship with Jane and the impact of Jane's false gang rape claim that was helpful to his defense of the allegations pending against him..

150.   One of the individuals that John identified at CT University was the Assistant Dean for Victim Support who assisted John in obtaining academic accommodations as a result of the vicarious trauma that John suffered as a result of Jane's false story about being gang raped.

151.   Another individual that John identified at CT University was his biology professor who had knowledge of the impact that Jane's false gang rape story had on John, including the need

for academic accommodations.

152.    The third individual that John identified at CT University was his honor's program advisor, who had knowledge of the impact that Jane's false gang rape claim had on John and assisted John in obtaining academic accommodations.

153.    NYU did not seek to interview these three individuals from CT University despite the knowledge that they had information helpful to John.

154.    NYU did not interview these three individuals despite the knowledge that they had information helpful to John.

155.    During the investigation process, John also identified his mother as an individual who had information helpful to his defense.

156.    NYU did not seek to interview John's mother despite the knowledge that she had information helpful to John.

157.    NYU did not interview John's mother despite knowledge that she had information helpful to John.

158.    During the investigation process, John told Investigator Hodge about Sally's involvement in his relationship with Jane.

159.    Investigator Hodge did not investigate any of the information that John provided regarding Sally.

160.    In July, John also received a text message from Sally stating that Jane had more evidence against John but was not going to submit it to NYU and did not want to get John in trouble.

161.    During the investigation process, John informed Investigator Hodge about Sally's text message.

162.    Investigator Hodge did not perform any investigation or follow-up related to Sally's text message.

163.    During the investigation process, John informed NYU's Title IX Coordinator, Mary Signor, about Sally's text message.

164.    Signor did not perform any investigation or follow-up related to Sally's text message.

165.    John relied on the representations made by Investigator Hodge, reassurances by Advisor McFarlane and texts from Sally when assessing what evidence he needed to provide to NYU in his defense.

166.    At the time, John believed Jane had permanently deleted the couple's communications and could not offer such messages to Investigator Hodge.  John could only offer the messages he had left in his phone, which were minimal.

167.    John advised Investigator Hodge that he could offer screenshots of some electronic conversations with Jane, photographs of John and Jane during his trips to New York (prior to his admission to NYU), a timeline, emails, some text messages with Jane and videos of conversations between John and Jane.

168.    After meeting with Advisor McFarlane, John provided such evidence to Investigator Hodge.

169.    In August 2018, John went to study abroad in Sydney, Australia for the fall 2018

semester.   During his study abroad program, John worked as a research assistant and held an internship at an Australian hospital.

170.     On October 23, 2018, John received NYU's Investigation Summary Report, which outlined the charges, interviews conducted, and evidence gathered. John was shocked by the sheer volume of cherry-picked text messages and WhatsApp messages provided by Jane.

171.     After NYU issued the Investigation Summary Report, Advisor McFarlane told John that he would not be expelled even if he were found responsible for the violations outlined in the report.

172.     After the issuance of the Investigation Summary Report, Advisor McFarlane told John that the worst-case scenario would be a one-semester suspension based on the allegations pending against him.

173.     As a result of Advisor McFarlane's representations, John did not retain an attorney during the hearing and investigation process.

174.     Following the issuance of the Investigation Summary Report, John quickly realized why Jane made great efforts to delete her messages from his cell phone during their relationship.

175.     John also realized he had been materially misled by Investigator Hodge and Sally.

176.     In the October 23, 2018 Investigation Summary Report, the number and scope of allegations against John had more than doubled. Jane now asserted nine separate allegations against John for sexual harassment, sexual assault, sexual exploitation, stalking and violation of a no-contact directive between fall 2016 to spring 2018.

177.     John felt blindsided yet again. Not only did Jane allege more than what Investigator

Hodge discussed with John during the July 10 meeting, but Jane also submitted more evidence than what Investigator Hodge made reference to – hundreds of pages more than what John expected.

178.    Additionally, certain photographs of John were included in the Investigation Summary Report multiple times.

179.    During the Title IX process, Jane claimed John followed her into Washington Square Park on May 2, 2018.

180.    However, John explained that Jane was actually following him in Washington Square Park on May 2, 2018.

181.    Whenever John walked to another location in the Park, Jane followed and took photographs of him.

182.    Jane provided these photographs to NYU.

183.    The photographs that Jane provided purportedly depicting John stalking Jane was unnecessarily reproduced six times in the Investigation Summary Report.

184.    The superfluous repetition of the photographs comprised nearly 70 pages of the Investigation Summary Report.

185.    This repetition of the photographs was prejudicial to John, as it provided a false impression that John had engaged in a prolonged instance of stalking Jane and/or repeatedly stalked Jane when, in reality, Jane was stalking John when the photographs were taken.

186.    Text messages purporting to show that John violated NYU's Title IX policies were also needlessly repeated throughout the Investigation Summary Report.

187.   The text messages that appear in the Investigation Summary Report were selectively edited by Jane to make John look bad.

188.   NYU did not verify that the text messages provided by Jane were complete and accurate messages.

189.   The repetition of the selectively edited text messages was prejudicial to John, as it made it appear that he had sent Jane hundreds of offensive messages.

190.   Advisor MacFarlane noted the unusual repetition of the photographs and text messages during conversations with John.

191.   Advisor McFarlane noted the unusual repetition of the photographs and text messages during conversations with John's mother.

192.   In the Investigation Summary Report, Jane's witnesses provided false testimony and testimony that contradicted Jane's own claims. In one instance, Jane's witness stated that John "physically shook" Jane, but no such event occurred, and Jane never made such a claim.

193.   John knew there were Facebook messages and text messages that refuted Jane's evidence, but he believed Jane already deleted those messages and was unaware that the deleted messages were backed up on his hard drive at home in Connecticut. Since he was studying abroad in Australia, John did not have access to his hard drive to confirm whether the deleted messages were recoverable. John was unable to access text messages to refute Jane's cherry-picked messages.

194.   Based on his July 10, 2018 meeting with Investigator Hodge, John was unaware he would even need to rely on more evidence in response to the charges because Investigator Hodge

inaccurately described the amount of evidence Jane had submitted to NYU during the process. John was ill-equipped to respond in any meaningful manner.

195.   John was surprised to see interview statements from Jane's witnesses negatively attesting to John's character.

196.   NYU's policies clearly state that it does not consider character evidence during the adjudication of Title IX matters.

197.   There is no legitimate reason why negative character evidence regarding John should have been included in the witness statements that comprised part of the Investigation Summary Report.

198.   The negative character evidence was prejudicial to John.

199.   The negative character evidence included in the Investigation Summary Report painted John in an unfavorable light that would undoubtedly impact any reader's perception of him.

200.   Still, John felt reassured by Advisor McFarlane that he was not at risk of being expelled.

201.   After he received the Investigation Summary Report, John told Inspector Hodge that his mother had information that would be helpful to John regarding the nature of his relationship with Jane.

202.   The information that John's mother possessed directly contradicted testimony and evidence that Jane Doe provided to NYU.

203.   NYU did not seek to interview John's mother despite the knowledge that she had

{1231192.1 }                                              26

information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

204.    NYU did not interview John's mother despite the knowledge that she had information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

205.    NYU scheduled a hearing for all charges on November 19, 2018.

206.    Initially, NYU scheduled the hearing to begin at 2:00 a.m. Australia time on a day when John had classes and his internship later that morning.

207.    The hearing date and time would place a significant personal hardship on John and his academics, which caused John to contact NYU for a change to the hearing schedule.

208.    NYU's Assistant Director of Student Conduct and Community Standards, Colleen Maeder ("Assistant Director Maeder") was in charge of scheduling the hearing.

209.    In response to John's pleas to change the hearing date and time, Assistant Director Maeder offered to contact John's internship to "have him excused".

210.    But the internship was not affiliated with NYU in any way. Assistant Director Maeder's offer was not feasible and would only cause more damages to John if his internship learned he was under investigation for Title IX violations at NYU.

211.    John's NYU Sydney advisor, Lauren Stahl, also contacted Assistant Director Maeder to reschedule the hearing due to John's academic schedule. NYU changed the start time from 2:00 am to 5:00 am.  However, NYU did not seem concerned with the hardship occasioned on John's academic schedule.

212.    NYU expected John to appear at the hearing scheduled just six days before his final exams.

213.    Additionally, NYU expected John to appear at the hearing via Skype in his dormitory room where his three roommates could overhear the entire proceeding.

214.    Again, John asked Assistant Director Maeder to reschedule the hearing for a time and date when he was back in New York to avoid the drastic time zone conflict (16-hour difference), academic conflict, and Skype appearance regarding such an important matter that would decide John's academic fate. Assistant Director Maeder refused to change the hearing time or date and stated that her decision was "final."

215.    On behalf of John, Advisor McFarlane asked Assistant Director Maeder to reschedule the hearing time and date in light of these issues.  Assistant Director Maeder refused.

216.    John's mother also asked Assistant Director Maeder to reschedule the hearing time and date. Assistant Director Maeder finally agreed to move the start time of the hearing from 5:00 a.m. Sydney time to 8:00 a.m. Sydney time at a later date in December.

217.    John made an additional plea for accommodations regarding the location of his Skype appearance. Assistant Director Maeder finally found a room on NYU Sydney's campus to accommodate John's Skype appearance for the hearing to ensure his privacy.

218.    NYU's reluctance to make accommodations for John regarding the hearing time and date represented a stark contrast to NYU's willingness to schedule the hearing at a time and date convenient for Jane.

219.    While Jane was able to attend the hearing in person, NYU affirmatively denied

John the ability to do so.

220. On December 10, 2018, NYU held a 9-hour hearing before a single adjudicator, Craig Jolley ("Adjudicator Jolley").

221. During the hearing, NYU did not provide John with a hard copy of the 336-page Investigation Summary Report.

222. During the hearing, NYU provided Jane with a hard copy of the Investigation Summary Report.

223. During the hearing, NYU provided every other person involved in the hearing located in New York with a paper copy of the Investigation Summary Report.

224. Because he did not have a hard copy of the Investigation Summary Report, John had to use his laptop to access the Investigation Summary Report during the hearing.

225. Using his laptop to access the Investigation Summary Report during the hearing made it difficult for John to fully participate in the hearing.

226. John often became confused during the hearing because he needed to switch between the copy of the Investigation Summary Report and the Skype application on his laptop.

227. John was unable to follow the references that Adjudicator Jolley made to the Investigation Summary Report because he was not provided with a paper copy of the Investigation Summary Report and needed to refer to the version on his laptop.

228. On multiple occasions, John became lost when Adjudicator Jolley was referencing specific page numbers in the Investigation Summary Report and consequently did not know what Adjudicator Jolley was talking about.

229.    Stahl observed John struggling to follow the hearing because he needed to constantly switch back and forth between the Investigation Summary Report and the Skype application on his laptop.

230.    After the hearing had ended, John realized that he answered certain questions posed by Adjudicator Jolley incorrectly because he was looking at the wrong page of the Investigation Summary Report as a result of the confusion caused by having to switch between the Investigation Summary Report and the Skype application on his laptop.

231.    Technological issues also prevented John from fully participating in the hearing.

232.    There were problems with the audio making it difficult for John to hear the proceeding.

233.    The audio difficulties were noted by Advisor McFarlane and Stahl.

234.    NYU made no effort to rectify the audio difficulties.

235.    NYU did not adjourn the hearing despite the noted audio difficulties that John was experiencing.

236.    There were also video difficulties during the hearing.

237.    NYU made no effort to rectify the video difficulties.

238.    NYU did not adjourn the hearing despite of the video difficulties that John was experiencing.

239.    Instead, for a large portion of the hearing and at Adjudicator Jolley's direction, the video feed at NYU was turned off, and John could not see what was going on at the hearing.

240.    During the hearing, the camera was pointed directly at Jane even though John was

told that he wouldn't see her.

241.    John did not have adequate support during the hearing; he had no family support and he had difficulty communicating with his New York advisor, Advisor McFarlane due to technological problems.

242.    During the hearing, John brought up the issue of Jane's alleged gang rape and his support for her.  Adjudicator Jolley quickly dismissed John's statement as evidence of "prior sexual activity" and advised that he would not be considering such evidence in his decision.

243.    Following the hearing, Adjudicator Jolley found John was "not responsible" of sexual assault, but "responsible" for sexual harassment, sexual exploitation, stalking and violation of the parties' no-contact directive.

244.    As his sanction, John was expelled from NYU with a permanent notation on his transcript.

245.    When NYU issued the sanction of expulsion, Advisor McFarlane told John that he was shocked by such a harsh punishment.

246.    When NYU issued the sanction of expulsion, Stahl told John that she was shocked by such a harsh punishment.

**I.    NYU Commits Procedural Errors During the Title IX Process**

NYU Misapplied NYU's Sexual Harassment Policy

247.    Jane alleged that she attempted to break up with John in February 2018 and that all subsequent contact by John was, therefore, unwanted.

248.    However, John was unaware she was attempting to break up with him and Jane

provided no evidence supporting this.

249.    Jane continued to visit John in his room every night until late March/early April 2018.

250.    Jane's behavior toward John was anything but consistent and she always claimed her inconsistencies were due to her history of sexual assault or her overly strict parents.

251.    Also, John's contact with Jane during this time period was clearly in response to Jane's behavior, namely her spreading of lies about John to his friends on campus.

252.    John's messages to Jane sought answers from her about why she was making false statements to his friends.

253.    Under NYU's policies, "Sexual Harassment" is defined as follows:

Sexual Harassment is any unwelcome *sexual* advance, request for *sexual* favors, or other unwanted conduct of a *sexual* nature, whether verbal, non-verbal, graphic, physical, or otherwise... (emphasis added)

254.    There was nothing "sexual" about John's messages to Jane.

255.    Instead of reviewing Jane's conduct as bullying and harassment of John, NYU erroneously classified John's attempts to ask Jane to cease her behavior as "stalking" and "sexual harassment."

256.    Misapplying NYU's own policies and procedures, Adjudicator Jolley found John responsible for Sexual Harassment.

<u>NYU's Lack of Jurisdiction & Misapplication of Sexual Exploitation Policy</u>

257.    NYU's Title IX policy only applies to students enrolled at NYU for conduct that (i) occurs on NYU premises; (ii) occurs in the context of an NYU employment or education

program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or (iii) occurs outside the context of an NYU employment or education program or activity, but (a) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (b) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

258.    At the beginning of the hearing, Adjudicator Jolley stated that he would not be reviewing any conduct that allegedly took place while Plaintiff was a student at CT University, namely, before John was enrolled at NYU.

259.    Jane's allegation that John took a photograph of her cleavage while she was sleeping took place in 2016 while John was a student at CT University.

260.    Jane did not provide any evidence of the photograph itself.

261.    John was never in possession of any sexual photographs of Jane.

262.    NYU's policy on "Sexual Exploitation" states:

Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another *individual's nudity or sexuality*, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

263.    John admitted that he took photographs of Jane while she was sleeping because he wanted to show her the funny face she was making. In the Investigation Summary Report, Investigator Hodge misrepresented John's explanation of the photographs, which made it appear that John admitted to taking nude photographs of Jane. But there was no nudity or sexuality portrayed in the photograph, and no evidence supporting that there was nudity or sexuality portrayed was ever provided by Jane to NYU.

264.    Notwithstanding NYU's lack of jurisdiction and the absence of evidence supporting

such a finding, Adjudicator Jolley found John responsible for Sexual Exploitation after once again

misapplying NYU's own policies and procedures.

<u>Failure to Apply the "Reasonableness" Standard</u>

265.    NYU defines "Stalking" in the following manner:

Stalking occurs when a person engages in a course of conduct toward another
person under circumstances that would cause a *reasonable* person to fear bodily
injury or experience substantial emotional distress. (emphasis added)

266.    Jane claimed that John sent her unwelcome voicemails and messages through texts

and Facebook following her supposed dissolution of the relationship in February 2018.

267.    However, John was not aware of Jane's supposed termination of their relationship

until April 2018 because Jane continued to act as if she and John were in a relationship.

268.    Indeed, Jane continued to visit and sleep over in John's dormitory room through

early April 2018.

269.    Based on Jane's behavior, Jane did not fear bodily injury as a result of the

supposedly unwelcome voicemails and messages she claimed John sent her.

270.    Based on her own behavior, Jane did not experience substantial emotional distress

as a result of the supposedly unwelcome voicemails and messages she claimed John sent her.

271.    No reasonable person in Jane's position would fear bodily harm.

272.    No reasonable person in Jane's position would experience substantial emotional

distress.

273.    During the May 2, 2018 incident in Washington Square Park, John did not follow

Jane at any time.

274.   During the May 2, 2018 incident in Washington Square Park, John did not photograph Jane at any time.

275.   During the May 2, 2018 incident in Washington Square Park, Jane followed John to multiple locations.

276.   During the May 2, 2018 incident in Washington Square Park, Jane took multiple pictures of John at different locations.

277.   Based on her own behavior, Jane did not fear bodily harm during the May 2, 2018 incident in Washington Square Park.

278.   Based on her own behavior, Jane did not experience substantial emotional distress during the May 2, 2018 incident in Washington Square Park.

279.   No reasonable person in Jane's position during the May 2, 2018 incident in Washington Square Park would fear bodily harm.

280.   No reasonable person in Jane's position during the May 2, 2018 incident in Washington Square Park would experience substantial emotional distress.

281.   Additionally, John was accused of violating the parties' mutual no-contact directive when he sent Jane's parents messages expressing his concern for Jane's well-being because she was beginning to hang out with people who abused alcohol and drugs.

282.   This was not the first time John reached out to Jane's parents out of concern for Jane's well-being.

283.   John's contact with Jane's parents did not constitute a violation of the no-contact

directive.

284.    John was communicating directly with Jane's parents; he was not attempting to contact Jane through her parents.

285.    Notwithstanding a lack of evidence, Adjudicator Jolley found John responsible for Stalking.

NYU's Failure to Enforce its Sanction Policy

286.    NYU's policies state that unless otherwise indicated by the Adjudicator, the sanction will not be imposed until after the appeal process has concluded.

287.    In the Decision, Adjudicator Jolley stated, "The effect of this sanction shall be held in abeyance through the completion of any appeal proceedings, if applicable."

288.    On December 31, 2018, John and his private advisor requested an extension of time to submit his appeal until January 25, 2019 in light of the holidays and volume and complexity of the record.

289.    On January 3, 2019, NYU granted John's extension request but advised that his sanction would now be effective immediately.

290.    NYU explained that because John's new appeal deadline now fell within the spring 2019 semester, his immediate expulsion was warranted.

291.    When John raised the unfairness of depriving him of the ability to start his spring 2019 semester before his appeal was even decided, NYU advised that it would "assist him to make up the work" if his appeal was granted. But this was an empty promise. By the time NYU would issue a decision of John's appeal, it would be well over one month into the spring 2019 semester

making it impossible for John to "make up the work" for his courses. The denial of John's appeal was a foregone conclusion.

292.    When asked why NYU refused to honor its policies, NYU advised that it was within the Adjudicator's discretion to impose the sanction during the appeal process and that Adjudicator Jolley decided to do so here.

293.    Adjudicator Jolley's immediate imposition of John's sanction contravened his own Hearing Decision.

294.    John was also retroactively awarded a failing grade for a course that he completed in Australia.

295.    NYU never informed John that he would be awarded a failing grade as a result of the sanction imposed following the conclusion of its flawed and biased disciplinary process.

**J.      John Uncovers Jane's Lies and Files His Appeal of the Hearing Decision**

296.    Following the Hearing Decision, John flew home from Australia on December 19, 2018 to be with his family and work on his appeal.

297.    John wanted to expose Jane's lies about their relationship and his actions toward her.

298.    Prompted by his newly retained attorney advisor, John discovered that his hard drives contained backups of the text messages that Jane had deleted from his cell phone.

299.    The newly discovered text messages were between John and Jane and John and Sally.

300.    The text messages refuted several areas of contention raised by Jane at the Hearing.

301.    At the Hearing, Jane claimed they never said, "I love you," but there are over a hundred text messages from Jane between 2015-2018 that said otherwise.

302.    At the Hearing, Jane claimed she was unaware why John applied to NYU and that he must've done so to "stalk" her. Again, her text messages demonstrated otherwise. Jane gave John advice about NYU's programs and even reviewed John's transfer application essay to NYU before he submitted it.

303.    Jane also claimed she never punched John hard and even if she did, it was in self-defense. However, the couple's text messages showed Jane was aware of John's objections to her unprovoked physical assaults, which caused pain to John.

304.    Jane also claimed that she did not see John often and did not want to engage in sexual intimacy with John. The text messages demonstrated that Jane visited John's dorm almost every night and that her friend, Sally, repeatedly directed John to engage in specific sexual acts with Jane to help her "relax". John's roommate and suitemates observed Jane's frequent visits to their dorm room.

305.    John's recovered text messages seriously undermined Jane's credibility on numerous areas of the couple's relationship relied upon by Jane and NYU to support the charges against him. It was telling that Jane elected not to produce such messages to NYU during the investigation.

306.    Moreover, John submitted a public records request to the New York Police Department pursuant to the Freedom of Information Act seeking records supporting Jane's alleged gang rape during her freshman year at NYU.

307.    The NYPD confirmed that "no records" existed in this regard, let alone court records to confirm that any trial was held.

308.    In light of Jane's claim that the students responsible for her alleged gang rape were "expelled" from NYU, NYU's disciplinary records could have confirmed or denied the truth of Jane's claim.

309.    There is no evidence NYU confirmed or denied the truth of Jane's claim.

310.    Finally, John raised the authenticity of Jane's friend, "Sally Soe" to NYU following his discovery that there was no record of any sexual assault against Jane reported to NYPD.

311.    The timing and pattern of Sally's communication with John, including the fact that Jane refused to introduce Sally to John, indicated that Sally was merely Jane's alter ego and not a real person.

312.    Given Sally's status as a former NYU student in Jane's freshman year, NYU's student records could have confirmed or denied Sally's existence.

313.    There is no evidence NYU confirmed or denied Sally Soe's status as a former NYU student.

314.    NYU ignored John's reports that Jane had committed violations of NYU's Title IX policy though her alter ego Sally Soe.

315.    On January 25, 2019, John submitted his appeal on the grounds of (i) new evidence, (ii) procedural issues and (iii) disproportionate punishment. John pointed to the voluminous messages, witness affidavits and the lack of any police records supporting Jane's prior rape to cast doubt on Jane's credibility regarding her allegations against John.

316.    As part of his appeal, John identified several witnesses, including his mother once again, who were able to provide information that would be helpful to John.

317.    John also provided sworn statements from some of these witnesses.

318.    One of the witnesses identified in John's appeal was a female NYU student who had information helpful to Plaintiff regarding the incident that occurred in Washington Square Park on May 2, 2018.

319.    Specifically, this female NYU student possessed information indicating that John was not stalking Jane in Washington Square Park on May 2, 2018, nor had he violated the no-contact directive on that date.

320.    Rather, the female NYU student identified in John's appeal possessed information indicating that Jane was stalking John and had violated the mutual no-contact directive on May 2, 2018 in Washington Square Park.

321.    The information possessed by the female NYU student identified in John's appeal directly contradicted testimony and evidence that Jane provided to NYU.

322.    NYU did not seek to interview the female NYU student identified in John's appeal despite the knowledge that she had information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

323.    NYU did not interview the female NYU student identified in John's appeal despite the knowledge that she had information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

324.    John's appeal also identified a male NYU student who had information helpful to

{1231192.1 }                                        40

John regarding the incident that occurred in Washington Square Park on May 2, 2018

325.    Specifically, this male NYU student possessed information indicating that was not stalking Jane in Washington Square Park on May 2, 2018, nor had he violated the no-contact directive on that date.

326.    Rather, the male NYU student possessed information indicating that Jane was stalking John and violating the no-contact directive on May 2, 2018.

327.    The male NYU student also possessed information that Jane violated the confidentiality provisions of NYU's Title IX Policy.

328.    The male NYU student provided this information in the form of a sworn statement.

329.    The information possessed by the male NYU student identified in John's appeal directly contradicted testimony and evidence that Jane provided to NYU.

330.    The information possessed by the male student identified in John's appeal only became available to John after the Hearing Decision had been issued.

331.    NYU did not seek to interview the male NYU student identified in John's appeal despite the knowledge that he had new information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

332.    NYU did not interview the male NYU student identified in John's appeal despite the knowledge that he had new information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

333.    John's appeal also noted that his father possessed information helpful to John regarding John's reasoning for transferring to NYU.

334.   John's father provided this information in the form of a sworn statement.

335.   The information possessed by John's father directly contradicted testimony that Jane provided to NYU.

336.   NYU did not seek to interview John's father despite the knowledge that he had information helpful to John, including information that directly contradicted testimony that Jane provided to NYU.

337.   NYU did not interview John's father despite the knowledge that he had information helpful to John, including information that directly contradicted testimony that Jane provided to NYU.

338.   John's appeal also noted that his mother possessed information helpful to John regarding John's reasoning for transferring to NYU.

339.   John's mother provided this information in the form of a sworn statement.

340.   The information possessed by John's mother directly contradicted testimony that Jane provided to NYU.

341.   NYU did not seek to interview John's mother despite the knowledge that she had information helpful to John, including information that directly contradicted testimony that Jane provided to NYU.

342.   NYU did not interview John's mother despite the knowledge that she had information helpful to John, including information that directly contradicted testimony that Jane provided to NYU.

343.   John had also identified his mother as an individual with information helpful to him

during the investigation stage of the disciplinary process, and NYU also failed to interview her at that time.

344.   As part of his appeal, John identified a second male NYU student who possessed information helpful to John regarding the nature of John's relationship with Jane.

345.   The information possessed by the second male NYU student directly contradicted testimony and evidence that Jane provided to NYU.

346.   The information possessed by the second male NYU student only became available to John after the Hearing Decision had been issued.

347.   NYU did not seek to interview the second male NYU student despite the knowledge that he had new information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

348.   NYU did not interview the second male NYU student despite the knowledge that he had new information helpful to John, including information that directly contradicted testimony and evidence that Jane provided to NYU.

349.   As part of his appeal, John identified and provided new evidence that directly contradicted the testimony and evidence that Jane provided to NYU.

350.   As part of his appeal, John identified and provided new evidence that strongly challenged Jane's credibility.

351.   NYU issued its appeal decision on March 8, 2019, which confirmed Adjudicator Jolley's Hearing Decision.

352.   NYU completely ignored the new evidence provided by John that indicated he was

not responsible for violating NYU's Title IX policy.

353.   NYU completely ignored the new evidence provided by John that discredited Jane.

**K.  NYU's Selective Enforcement of its Policies**

354.   John attempted to file a report with NYU's public safety and spoke to a male public safety officer regarding the incident that occurred in Washington Square Park on May 2, 2018. However, the NYU public safety officer advised John that Jane's conduct in following him in Washington Square Park did not constitute stalking because it is "normal to see people around campus."

355.   Jane's behavior on May 2, 2018 in Washington Square Park constituted Stalking under NYU's Title IX policy.

356.   Jane's actions, specifically, following Plaintiff and repeatedly photographing him while he was the subject of a Title IX investigation that she initiated, caused John emotional distress.

357.   Jane's actions, specifically, following Plaintiff and repeatedly photographing him while he was the subject of a Title IX investigation that she initiated, constituted a course of conduct that would cause a reasonable person in John's position to experience substantial emotional distress.

358.   However, NYU refused to investigate John's report of Jane's stalking behavior.

359.   NYU did not enforce its Stalking policy against Jane.

360.   Instead, NYU enforced its Stalking policy against John.

361.     NYU also offered Jane support when she falsely reported that John was stalking her, even offering to involve the New York City Police Department.

362.     NYU dismissed John's efforts to report Jane's stalking behavior and excused Jane's behavior as "normal."

363.     NYU did not offer John support when he attempted to report Jane's stalking behavior.

364.     Jane had an equal obligation to observe the mutual no-contact directive.

365.     NYU enforced the no-contact directive obligation on John but refused to enforce it against Jane.

366.     Additionally, John advised NYU about Jane's violations of NYU's policies on Sexual Harassment, Gender-Based Harassment, Stalking, Bullying, Destruction of Property, and Relationship Violence.

367.     Jane sexually harassed John when she humiliated him regarding his "gay" appearance in front of a group of his friends.

368.     Jane committed gender-based harassment against John when she humiliated him regarding his "gay" appearance in front of a group of his friends.

369.     Jane bullied John by spreading false statements about him to his friends.

370.     Jane physically assaulted John by punching him on at least five occasions during their relationship.

371.     Jane also threatened John with further physical violence after he complained to her about her violent outbursts.

372.    Jane destroyed John's property by deleting messages from John's various social media accounts without his knowledge or consent.

373.    The deleted messages were relevant to John's defense of Jane's Title IX charges against him.

374.    NYU's Title IX policy defines Relationship Violence as "any act of violence or threatened act of violence against a person who is, or has been involved in a sexual, dating, domestic, or other intimate relationship with that person."

375.    John informed NYU that Jane physically assaulted him.

376.    Jane's physical assault of John constituted Relationship Violence under NYU's Title IX policy.

377.    NYU did not investigate John's report that Jane physically assaulted him.

378.    John informed NYU that Jane threatened to physically assault him.

379.    Jane's threats of physical assault constituted Relationship Violence under NYU's Title IX policy.

380.    NYU did not investigate John's report that Jane threatened to physically assault him.

381.    John attempted to file a Title IX complaint against Jane due to her physical assaults of John and alienation of John from his friends.

382.    NYU's Title IX Coordinator, Mary Signor, advised John that "his complaint would be handled at the end of Jane's Title IX case" so he should wait until the conclusion of Jane's Title IX complaint process before he filed his Title IX complaint against Jane.

383.    Following the outcome of Jane's Title IX complaint, John attempted to file his Title IX complaint against Jane.

384.    In his Title IX Complaint against Jane, John informed NYU that Jane assaulted him multiple times during the course of their relationship.

385.    In his Title IX complaint against Jane, John informed NYU that Jane threatened to assault him on multiple occasions during the course of their relationship.

386.    Jane's behavior constituted Relationship Violence as defined by NYU's Title IX policy.

387.    In his Title IX complaint against Jane, John also asserted that Jane engaged in Sexual Harassment, as defined by NYU's Title IX policy, when she unreasonably interfered with his living, learning, and educational environment.

388.    John asserted that Jane engaged in Sexual Harassment when she manipulated him during their relationship.

389.    John informed NYU that Jane required that John keep their relationship secret.

390.    John informed NYU that Jane required that John keep the depth and extent of their relationship secret.

391.    John informed NYU that Jane's goal was to manipulate him and control the narrative of their relationship.

392.    John informed NYU that Jane's goal was to prevent John from being able to provide an alternative narrative to whatever Jane told others about their relationship.

393.    John informed NYU that Jane used the false story about being gang raped as a

method of manipulating John's emotions and his life.

394.    Jane's behavior constituted Sexual Harassment under NYU's Title IX policy.

395.    In his Title IX complaint against Jane, John asserted that Jane engaged in Stalking, as defined by NYU's Title IX policies, through her alter ego Sally Soe.

396.    John informed NYU that Jane, as Sally, repeatedly messaged him using new screennames after he blocked her communications.

397.    John informed NYU that Jane's behavior as Sally caused him emotional distress.

398.    Jane's behavior constituted Stalking under NYU's Title IX policy.

399.    In his Title IX complaint against Jane, John asserted that Jane engaged in Sexual Harassment, as defined by NYU's Title IX policy, through her alter ego Sally Soe.

400.     John informed NYU that Jane, as Sally, pressured John to engage in a sexual relationship with Jane.

401.    John informed NYU that he was reluctant to engaged in a sexual relationship with Jane but that Jane, as Sally, continued to pressure him to do so.

402.    John informed NYU that Jane, as Sally, sent unsolicited and explicit sexual messages to John.

403.    Jane's behavior constituted Sexual Harassment under NYU's Title IX policy.

404.    In his Title IX complaint against Jane, John asserted that Jane violated the no-contact directive through her alter ego Sally Soe.

405.    John informed NYU that Jane, as Sally, contacted John in the summer of 2018 while Jane's Title IX complaint against John was pending to threaten John that Jane had more

evidence to use against him.

406.    Jane's behavior constituted a violation of the mutual no-contact directive.

407.    In his Title IX complaint against Jane, John asserted that Jane engaged in Gender-Based Harassment as defined by NYU's Title IX policy.

408.    John informed NYU that Jane harassed and ridiculed him for being "gay" and called him a "gay person" and a "fag".

409.    Jane also told John that gay people "don't belong."

410.    John provided NYU with evidence of Jane's use of homophobic slurs towards him.

411.    Jane's behavior constituted Gender-Based Harassment under NYU's Title IX policy.

412.    John filed his Title IX complaint with NYU's Title IX Office (Office of Equal Opportunity), NYU Gallatin School of Individualized Study (Jane's College at NYU) and the Office of Student Conduct and Community Standards.

413.    NYU Gallatin School of Individualized Study did not investigate John's complaint. Instead, it referred John's complaint to Signor at the Title IX Office.

414.    NYU's Title IX Office failed to investigate John's Title IX allegations against Jane, despite Signor's earlier statements.

415.    Rather, in response to John's complaint against Jane, Signor stated, "this matter will not be reopened and is considered closed."

416.    In addition to his role as the Adjudicator for Jane's complaint against John, Craig Jolley also holds the role of Director of NYU's Office of Student Conduct and Community

Standards.

417.     After refusing to consider John's complaint against Jane, Jolley cruelly stated, "I hope that you are able to put this matter behind you and I sincerely wish you well in your future endeavors."

418.     NYU did not enforce its Title IX policies against Jane.

419.     NYU enforced its Title IX policies against John.

**L.   NYU's Gender Bias Against Males**

420.     NYU was under pressure to exercise more vigilance against male respondents at the time it was investigating Jane's complaint against John.

421.     In or about August 2018, a female NYU student and alleged rape victim issued a series of social media posts claiming that NYU had failed to sanction two male students for engaging in nonconsensual sex with her.

422.     The social media posts were distributed to at least 1000 people. Women commented, *inter alia*, "I hope these protests and riots make NYU see that what they're pulling is detrimental to the entire female student body."

423.     Other comments to the NYU student's social media posts included: (i) "Absolutely horrifying. NYU is likely in for a year of protests, it's been brewing for ages. Women at our school are fed up"; and (ii) "NYU does not protect its female students . . . NYU has failed me and countless other girls, teaching us that standing up for ourselves is a complete waste of our time."

424.     Additionally, similarly situated female respondents facing allegations of sexual harassment have received more lenient sanctions than male respondents.

425.     On August 16, 2018, NYU Ph.D. student, Nimrod Reitman filed a lawsuit against Professor Avital Ronell and NYU based on allegations that Ronell sexually harassed, sexually assaulted and retaliated against Reitman from Spring 2012 through the completion of Reitman's Ph.D. in 2015.

426.     Reitman alleged that Ronell continued to harm his career prospects, preventing him from getting a job in teaching.  Reitman also alleged retaliatory conduct following the filing of his Title IX complaint in mid-July 2017.  The Title IX investigation took 11 months, and Ronell was eventually suspended for the 2018-2019 academic year.

427.     While NYU ultimately found Ronell responsible of several years of sexual harassment against Reitman, Ronell, a female professor, was only suspended for one academic year.

428.     NYU's decision to institute a Title IX proceeding against Ronell was very controversial within the academic community.

429.     A vocal contingent of professors throughout the world questioned NYU's use of the Title IX process against Ronell, in part, because she was a woman.

430.     The pushback that NYU received regarding its decision to implement the Title IX process was the subject of multiple news stories in the print and online media.

431.     Some of these stories focused their vitriol solely on the fact that Ronell was a woman who happened to be a respondent in Title IX matter.

432.     NYU was cognizant of this criticism, as evidenced by the lenient sanction issued to Ronell.

433.   NYU was sensitive to this criticism, as evidenced by the lenient sanction issued to Ronell.

434.   The criticism regarding NYU's handling of the Ronell matter was ongoing and significant when John reported Jane's violations of NYU's Title IX policy.

435.   As a result of the criticism surrounding its handling of the Ronell matter, NYU refused to enforce its Title IX policies against Jane despite John's well-founded and supported allegations.

436.   Since 2015, the United States Department of Education Office for Civil Rights ("OCR") opened several investigations related to Title IX violations committed by NYU.

437.   In an OCR complaint dated May 26, 2015, the complainant alleged that NYU failed to respond promptly and equitably to the complainant's report of sexual assault, and, as a result, the complainant was subjected to a sexually hostile environment.

438.   In an OCR complaint dated December 20, 2016, the complainant alleged that NYU failed to respond promptly and equitably to the complainant's report of sexual assault, and, as a result, the complainant was subjected to a sexually hostile environment.

439.   NYU's actions during and after the Title IX process are also indicative of gender bias.

440.   NYU repeatedly refused to investigate John's potential witnesses that he had identified as sources of information that were favorable to him.

441.   NYU ignored evidence that was favorable to John in making its disciplinary determinations.

442.     NYU refused to enforce the no-contact directive against Jane.

443.     NYU refused to enforce its Title IX policies against Jane.

444.     NYU repeatedly violated its own policies.

445.     NYU failed to act in accordance with its own polices that were designed to protect accused students.

446.     NYU reached conclusions that were incorrect and contrary to the weight of the evidence.

## M. Damages

447.     As a direct and proximate result of the expulsion, John sustained damages, including, without limitation, emotional distress, reputational damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

448.     Doe's career in medicine has been jeopardized by the Decision and Sanction.

449.     NYU's actions have caused John to suffer from mental anguish, sleep disturbance, emotional distress, loss of self-esteem, loss of friends and community, loss of personal and lifelong ambitions.

450.     NYU's actions have caused significant financial damages to John and his family.

### FIRST CAUSE OF ACTION
### (VIOLATION OF TITLE IX OF THE EDUCATION
### AMENDMENTS OF 1972 – SELECTIVE ENFORCEMENT)

451.     John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

452.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

453.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

454.    NYU receives hundreds of millions of dollars in federal funding for research and development. For example, in the fiscal year ending in 2017, NYU received $391,144,000 in federal funding for research and development.

455.    John and Jane were similarly situated male and female students in the circumstances of this case.

456.    Both were junior students at the same school, subject to the same Title IX policies.

457.    Both were reported to have committed sexual misconduct violations against each other.

458.    John provided hundreds of text messages, video, and WhatsApp messages to support his claims that Jane physically assaulted him and sexually harassed him during the course of their 2.5-year relationship.

459.    John also provided evidence showing that Jane engaged in stalking and gender-based harassment against him.

460.    Unlike the typical he-said/she-said allegations, NYU possessed objective evidence in support of John's claims against Jane.

461.    However, the evidence did not favor NYU's intended outcome, so they treated the same set of facts very differently for the male and female student.

462.   NYU investigated Jane's Title IX allegations against John.

463.   NYU failed to investigate John's Title IX allegations against Jane, despite NYU's Title IX Coordinator advising John that he was required to wait until the conclusion of Jane's Title IX complaint process before he was allowed to file his Title IX complaint against Jane.

464.   NYU enforced its Title IX policies and procedures against John.

465.   NYU did not enforce its Title IX policies and procedures against Jane.

466.   NYU's actions were motivated by its desire to avoid liability and bad publicity.

467.   As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

468.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION
### (VIOLATION OF TITLE IX OF THE EDUCATION
### AMENDMENTS OF 1972 – ERRONEOUS OUTCOME)

469.   John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

470.   Numerous evidentiary and procedural errors throughout NYU's investigation, hearing and appeal process resulted in an erroneous outcome based on a distorted conception of the facts.

471.   Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature.

472.   Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

473.   An erroneous outcome occurred in this case because John was innocent and wrongly found responsible for sexual exploitation, and gender bias was a motivating factor.

474.   Evidentiary weakness and procedural flaws support a claim of an erroneous outcome.

475.   NYU's Title IX policy only applies to students enrolled at NYU for conduct that (i) occurs on NYU premises; (ii) occurs in the context of an NYU employment or education program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or (iii) occurs outside the context of an NYU employment or education program or activity, but (a) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (b) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

476.   At the beginning of the hearing, Adjudicator Jolley stated that he would not be reviewing any conduct that allegedly took place while Plaintiff was a student at CT University, namely, before John was enrolled at NYU.

477.   Jane's allegation that John took a photograph of her cleavage while she was sleeping took place in 2016 while John was a student at CT University.

478.   NYU did not have jurisdiction to review any allegations of misconduct that took place before John was enrolled at NYU.

479.     NYU's decision finding John responsible of Sexual Exploitation for alleged conduct that occurred before John was enrolled at NYU constituted an erroneous outcome.

480.     Additionally, Jane did not provide any evidence of the photograph itself.

481.     While John complied with Jane's request to delete any photographs John had of Jane, John was never in possession of any photographs of a sexual nature.

482.     NYU's policy on "Sexual Exploitation" states:

Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another *individual's nudity or sexuality*, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

483.     John admitted that he took photographs of Jane while she was sleeping because he wanted to show her the funny face she was making. In the Investigation Summary Report, Investigator Hodge misrepresented John's explanation of the photographs, which made it appear that John admitted to taking nude photographs of Jane. But there was no nudity or sexuality portrayed in the photograph, and no evidence supporting that there was nudity or sexuality portrayed was ever provided by Jane to NYU.

484.     Notwithstanding NYU's lack of jurisdiction and the absence of evidence supporting such a finding, Adjudicator Jolley found John responsible for Sexual Exploitation after once again misapplying NYU's own policies and procedures.

485.     As detailed above, NYU misapplied its own policies and procedures when it found John responsible for Stalking.

486.     NYU's finding that John was responsible for Stalking in contravention of its own policies and without sufficient evidence to support such a finding constituted an erroneous

outcome.

487.    As detailed above, NYU misapplied its own policies and procedures when it found John responsible for Sexual Harassment.

488.    NYU's finding that John was responsible for Sexual Harassment in contravention of its own policies and without sufficient evidence to support such a finding constituted an erroneous outcome.

489.    As detailed above, NYU misapplied its own sanctioning policy.

490.    Allegations of a flawed proceeding support a claim of an erroneous outcome.

491.    NYU engaged in a flawed proceeding when it failed to interview the witnesses identified by John during the investigation stage who had information helpful to his defense.

492.    NYU engaged in a flawed proceeding when it failed to investigate the information John provided regarding Sally (Jane's alter ego) during the investigation stage.

493.    NYU engaged in a flawed proceeding when it refused to allow John to attend the hearing in person.

494.    NYU's refusal to allow John to attend the hearing in person prevented him from fully participating in the hearing.

495.    NYU engaged in a flawed proceeding when it continued with the hearing despite significant technological issues prevented John from fully participate in the hearing.

496.    NYU engaged in a flawed proceeding when it failed to provide John with a hard copy of the Investigation Summary Report during the hearing despite providing .

497.    NYU's failure to provide John with a hard copy of the Investigation Summary

Report prevented John from fully participating in the hearing.

498.    Because NYU's actions prevented him from fully participating in the hearing, John gave incorrect responses to questions asked by Adjudicator Jolley.

499.    NYU engaged in a flawed proceeding when it failed to interview the witnesses identified by John as part of his appeal who had information helpful to his defense.

500.    NYU engaged in a flawed proceeding when it failed to investigate the information that John provided regarding Sally (Jane's alter ego) as part of his appeal.

501.    In the years leading up to NYU's investigation of Jane's complaint against John, NYU was defending several OCR complaints filed by complainants who asserted that NYU failed to sanction their perpetrators, which created a sexually hostile environment on campus.

502.    At the time NYU was investigating Jane's complaint against John, NYU was under pressure to exercise more vigilance against male respondents.

503.    In August 2018, a female NYU student mounted public pressure against NYU through a series of social media posts alleging NYU had failed to sanction her two male perpetrators.

504.    During the same time period, a female professor at NYU was found responsible of several years of sexual harassment against her male Ph.D. student, but NYU gave her the lenient punishment of suspension for one academic year.

505.    Thus, NYU adopted a policy of bias favoring female students over male students in order to avoid liability and bad publicity.

506.    Such behavior constitutes illegal sex discrimination.

507.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION
### (STATE LAW PROMISSORY ESTOPPEL)

508.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

509.    NYU's Title IX policies and procedures constitute unambiguous representations and promises that NYU should have reasonably expected to induce action or forbearance on the part of John.

510.    NYU expected or should have expected John to accept its offer of admission and choose not to attend other universities (or remain at CT University) based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Title IX policies and procedures be heard by an impartial and objective adjudicator, to be free from discrimination, and to have complaints resolved impartially and promptly.

511.    John reasonably and foreseeably relied on these express and implied promises and representations made by NYU, to his detriment.

512.    On June 25, 2018, Advisor McFarlane expressly promised John, that "under no circumstance will [John] be expelled." Advisor McFarlane also represented that expulsion only occurs when there is a weapon or rape involved.

513.    Advisor McFarlane made the same representations to John's mother and John's

private advisor.

514.    Even after the Investigation Summary Report was issued, Advisor McFarlane expressly promised John that he would not be expelled.

515.    Before and after the issuance of the Investigation Summary Report, Advisor McFarlane informed John and his mother that the worst-case scenario would be a one-semester suspension from NYU.

516.    At all relevant times, Advisor McFarlane was acting as an employee of NYU.

517.    At all relevant times, Advisor McFarlane had greater experience with and knowledge of with NYU's Title IX process, including the adjudication of claims and the issuance of sanctions, than John.

518.    John reasonably relied upon Advisor McFarlane's promise that he would not be expelled.

519.    John relied on Advisor McFarlane's promise that he would not be expelled to his detriment.

520.    Specifically, John prepared his defense based upon Advisor McFarlane's promise that he would not be expelled under any circumstances.

521.    As a result of Advisor McFarlane's representations that the worst possible punishment would be a one-semester suspension, John did not retain an attorney to assist him during the NYU disciplinary process.

522.    John's reliance on Advisor McFarlane's promise led to the preparation of an inadequate defense to the charges levied against him.

523.    As a direct result of his reliance on Advisor McFarlane's promise and his subsequent preparation of an inadequate defense based on that promise, John was expelled from NYU.

524.    In contravention of Advisor McFarlane's promise, John was expelled from NYU.

525.    Signor expressly promised John that he could file a Title IX complaint against Jane once Jane's Title IX complaint against him was resolved.

526.    At all relevant times, Signor, as NYU's Title IX Coordinator, had greater experience with and knowledge of with NYU's Title IX process, including the adjudication of claims, than John.

527.    John reasonably relied upon Signor's promise that he would be able to file a Title IX complaint against Jane once Jane's Title IX complaint against him was resolved.

528.    John relied upon Signor's promise that he would be able to file a Title IX complaint against Jane once Jane's Title IX complaint against him was resolved to his detriment.

529.    After Jane's Title IX against John was resolved, John attempted to file his Title IX complaint against Jane, as Signor promised he could.

530.    After receiving John's complaint against Jane, Signor refused to investigate John's claims and replied, "this matter will not be reopened and is considered closed" in direct contravention of her previous promise.

531.    As a direct result of his reliance on Signor's promise, John was denied the ability to meaningfully present evidence that would have exonerated him of the charges levied against him by Jane that ultimately led to his expulsion.

532.    As a direct result of his reliance on Signor's promise, John was denied the ability to participate in a fair and impartial process.

533.    As a direct result of his reliance on Signor's promise, John was denied the ability to fully participate in NYU's Title IX process.

534.    As a direct result of his reliance on Signor's promise, John was denied a meaningful opportunity to be heard.

535.    As a direct result of his reliance on Signor's promise, John's ability to exercise his civil rights was extinguished because he was unable to pursue his claims against Jane.

536.    As a direct result of his reliance on Signor's promise, John was not reasonably protected from retaliation by NYU.

537.    As a direct result of his reliance on Signor's promise, John was not reasonably protected from retaliation by Jane.

538.    As a direct result of his reliance on Signor's promise, John was not reasonably protected from retaliation by Jane's friends.

539.    As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### FOURTH CAUSE OF ACTION
### (VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW)

540.    John repeats and realleges each and every allegation hereinabove as if fully set forth herein.

541.    NYU engaged in a biased and discriminatory Title IX process against John as a

result of his male gender.

542.     NYU refused to investigate John's Title IX complaint against Jane as a result of his male gender.

543.     NYU selectively enforced its Title IX policies against John as a result of his male gender.

544.     At all times, NYU treated John less well than Jane as a result of his male gender.

545.     NYU's actions were based upon impermissible discrimination based on John's gender and therefore violated the New York City Human Rights Law (N.Y. City Administrative Code §§ 8-101, et seq.).

546.     NYU's actions have impacted John's ability to attend a comparable educational institution and have completely compromised John's future career in medicine.

547.     Based upon the foregoing, NYU discriminated against John in the terms, conditions, and privileges of his school attendance, and the rights and privileges contained therein, in violation of New York City Human Rights Law by discriminating against John because of his gender.

548.     As a direct and proximate result of this conduct, John has suffered, and continues to suffer, emotional distress, embarrassment, humiliation, damage to his reputation, and other damages in an amount to be proven at trial.

549.     John's academic career at NYU has been foreclosed and John must now start over at a new academic institution to complete his degree. John has been deprived of invaluable networking, alumni connections, and job placement opportunities concurrent with being an

alumnus of NYU.

550.    NYU's behavior constitutes willful and wanton negligence, recklessness, and a conscious disregard of John's rights in furtherance of protecting their reputation with donors and the press, for which John is entitled to an award of punitive damages in an amount of $10,000,000.

551.    John is also entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against NYU as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for state law promissory estoppel, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for violation of the New York City Human Rights Law, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional and psychological

damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and punitive damages in the amount of $10,000,000, plus post-judgment interest, attorneys' fees, expenses, costs and disbursements;  and

(v)     awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
       June 1, 2020

**WARSHAW BURSTEIN, LLP**
*Attorneys for Plaintiff*

By: _____

       Kimberly C. Lau
       James E. Figliozzi
575 Lexington Avenue
New York, New York 10022
(212) 984-7700
klau@wbny.com
jfigliozzi@wbny.com