UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2021

------------------------------------------------------------X

JOHN DOE,                                              :
                                                       :
                              Plaintiff,               :
                                                       :              1:20-cv-01343-GHW
             -against-                                 :
                                                       :              MEMORANDUM OPINION
NEW YORK UNIVERSITY,                                   :              AND ORDER
                                                       :
                              Defendant.               :
------------------------------------------------------------ :X
-

GREGORY H. WOODS, District Judge:

        Jane Roe and Plaintiff John Doe were both students at Defendant New York University.

They dated, but soon the relationship turned toxic.  Jane filed a complaint against Plaintiff for

various violations of NYU's gender-based misconduct policy.  In response to the complaint, NYU

began a disciplinary process against Plaintiff.  Early in the process, an advisor appointed by NYU

told Plaintiff that he would not be expelled as a result of the disciplinary proceeding.  As a result,

Plaintiff did not approach the disciplinary process as seriously as he might have otherwise—he

chose not to retain a lawyer, and decided to defend himself from Australia, where he was studying at

the time.

        The disciplinary hearing took place by remote means, with Plaintiff in Australia and the

remainder of the participants in New York.  Plaintiff had issues with the technology.  He had

trouble seeing and hearing what was happening at times.  The adjudicator ultimately found Plaintiff

"not responsible" for sexual assault, but found him "responsible" for stalking, sexual harassment,

and sexual exploitation.  Notwithstanding his advisor's promise, he was expelled from NYU.

        Plaintiff then filed this lawsuit, bringing claims under Title IX of the Education

Amendments of 1972 and the New York City Human Rights Law.  The crux of Plaintiff's Title IX

and NYCHRL claims is that NYU discriminated against him in the investigation and adjudication of

Jane's complaint because of his gender.  Because Plaintiff has alleged procedural concerns that may have affected the outcome of his disciplinary hearing and circumstances giving rise to a plausible inference of discriminatory intent by NYU, Plaintiff has stated an erroneous outcome claim.  And Plaintiff has stated a selective enforcement claim because he was not permitted to file complaints against Jane while Jane was permitted to file a complaint against him for similar violations of NYU's gender-based misconduct policy.  Accordingly, NYU's motion to dismiss is DENIED as to Plaintiff's Tile IX and NYCHRL claims.

Plaintiff also asserts a claim of promissory estoppel against NYU based on his advisor's promises that he would not be expelled and a separate promise he would be able to file a Title IX claim against Jane after her claim against him was resolved.  Because Plaintiff has shown that he reasonably and deleteriously relied on the promise that he would not be expelled, NYU's motion is DENIED as to that promise.  But NYU's motion is GRANTED as to Plaintiff's claim based on the promise that he could file a complaint against Jane, because Plaintiff has not adequately pleaded reliance or a resulting unconscionable injury.

# I. BACKGROUND

## A. Facts[1]

### 1. Plaintiff's Relationship with Jane Roe

Plaintiff John Doe ("Plaintiff" or "John") and Jane Roe ("Jane") have a long history.  They met in 2015 in the summer prior to their senior year of high school while attending an internship program in Connecticut.  Amended Complaint ("Am. Compl."), Dkt. No. 27, ¶ 18.  They began a long-distance relationship.  *Id.* ¶ 21.  Because Jane's parents did not approve, their relationship was

---

[1] The facts are drawn from the Amended Complaint, Dkt. No. 27, and are accepted as true for the purposes of this motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The parties dispute whether the attachments to Defendant's motion to dismiss are properly before the Court on a motion to dismiss.  The Court will consider some of NYU's exhibits but not others, for the reasons explained in Section II.B *infra*.

secret.  Plaintiff and Jane primarily communicated through social media, using aliases.  *Id.* ¶¶ 23, 26–

30.  In December of 2015, Jane told Plaintiff that she had been sexually assaulted by a family

member as a child.  *Id.* ¶ 31.

In the fall of 2016, Jane began college at Defendant New York University ("Defendant" or

"NYU") and Plaintiff began college at a university in Connecticut.  *Id.* ¶¶ 32–34.  That October,

Plaintiff began to receive text messages from Sally Soe, who claimed to be Jane's friend.  *Id.* ¶ 38.

Both Sally and Jane told Plaintiff that Jane had recently been sexually assaulted by four NYU

students.  *Id.*  Plaintiff visited Jane at NYU four or five times during their freshman year to support

her as she dealt with that traumatic experience.  *Id.* ¶¶ 48–49.  Plaintiff encouraged Jane to report the

sexual assault to NYU and the police.  *Id.* ¶¶ 43, 46.  A few weeks later, Jane told Plaintiff that she

had reported the sexual assault to NYU and that the students who assaulted her had been expelled.

*Id.* ¶ 47.  She also told Plaintiff that the students had been tried and sent to prison.  *Id.*

Plaintiff and Jane "got along very well when the two of them were together," however

"when Jane saw people she knew, she would become distant and would physically push John away

from her."  *Id.* ¶ 50.  As a result, Plaintiff understood that Jane "still wanted to keep their

relationship secret."  *Id.* ¶ 51.  Both Jane and Sally attributed Jane's standoffishness in public to

Jane's prior experience with sexual assault and her "controlling and mean" parents.  *Id.* ¶ 52.  Jane

"became very dependent" on Plaintiff during that time.  *Id.* ¶ 57.  Plaintiff "supported Jane through

all of her panic attacks and emotional breakdowns over phone calls, text messages, WhatsApp, and

Facebook messenger."  *Id.*  During that time, Plaintiff and Jane began "a consensual intimate

relationship."  *Id.* ¶ 72.

But here the story turned strange.  Plaintiff alleges that Sally was "actually Jane utilizing a

false identity to manipulate John" and that she "used a temporary burner phone number to [contact]

John on Jane's behalf."  *Id.* ¶¶ 38–42, 61.  To get his attention, Sally "would tell John that Jane was

having a panic attack or emotional breakdown because she knew he would respond to help Jane." *Id.* ¶ 64.  Sally "involved herself in Plaintiff and Jane's relationship by encouraging John to have a sexual relationship with Jane as a way to support Jane through her multiple panic attacks."  *Id.* ¶ 68. Sally's messages, which included "explicit details about how to do this," made John uncomfortable. *Id.* ¶¶ 70–74.  Whipsawing John, Sally also "would tell John to 'F—off,' that John was not attractive or that Jane was too good for him."  *Id.* ¶ 75.  Despite repeated attempts, Plaintiff was never able to meet "Sally," and Jane eventually told Plaintiff that Sally had transferred out of NYU.  *Id.* ¶¶ 65–67, 94.

Plaintiff decided to transfer to NYU in the fall of 2017.  *Id.* ¶¶ 86, 89.  Jane "supported John's interest in applying to NYU" and "assisted John with his application essay."  *Id.* ¶ 86, 88. Jane "visited John in his dorm room nearly every day between September 2017 and March 2018" and "slept over in John's dorm room almost every night."  *Id.* ¶ 90.[2]  But Jane's behavior was "anything but consistent."  *Id.* ¶ 250.  She "denied being in a relationship with John" in front of John's friends, and Plaintiff never met any of Jane's friends.  *Id.* ¶¶ 93–94.

Plaintiff alleges that Jane treated him poorly throughout the course of their relationship. Jane sent Plaintiff "many messages to put him down and make fun of his appearance."  *Id.* ¶ 95.  She did not stop there.  Jane "physically abused" Plaintiff by "punching or slapping" him five different times during their sophomore year and she "threaten[ed] him with additional physical violence if he so much as came near her."  *Id.* ¶ 97.  Jane "demanded all passwords to John's various social media accounts;" he "complied to make Jane happy."  *Id.* ¶ 98.  Plaintiff also alleges that Jane purposefully deleted various electronic communications between them so that she could "avoid accusations of wrongdoing once she filed her Title IX complaint."  *Id.* ¶¶ 99–100.

---

[2] The visits may have lasted into April.  Plaintiff also states that "Jane continued to visit John in his room every night until late March/early April 2018."  Am. Compl. ¶ 249.

In the spring of 2018, Jane began to work to alienate Plaintiff from his friends.  She told

them not to spend time with John because he had been "doing bad things" to Jane.  *Id.* ¶¶ 101–102.

Plaintiff alleges that the statements Jane made to his friends were untrue.  Plaintiff was confused by

Jane's conduct; he believed that he had been a "supportive and devoted partner."  *Id.* ¶¶ 102–103.

Plaintiff states that his "contact with Jane during this time period was clearly in response to Jane's

behavior," and that his "messages to Jane sought answers from her about why she was making false

statements to his friends."  *Id.* ¶¶ 251–252.  Plaintiff states that he "messaged Jane to meet him in

person to discuss her actions and motivations."  *Id.* ¶ 107.  Jane would agree to meet with him, only

to fail to appear at the scheduled time.  *Id.* ¶ 108.  This "only frustrated John more" because they

had "agreed to talk about Jane's actions and their relationship."  *Id.*  During this time, Plaintiff's

friends turned against him and his grades fell.  *Id.* ¶¶ 105–111.  He "struggled to deal with his entire

social circle and romantic relationship unraveling before his eyes" and "had nobody to talk to or

confide in."  *Id.* ¶¶ 109, 112.

### 2. Jane's Title IX Complaint and NYU's Investigation

On April 22, 2018, NYU issued a no-contact directive based on a report made by Jane.  *Id.*

¶ 113.  The no-contact directive stated that an "incident" had occurred earlier that day and that

"[d]uring this incident it is alleged that [Plaintiff] ha[d] initiated multiple communications which have

made the other person uncomfortable."  *Id.* ¶ 115.  Under the no-contact directive, Plaintiff could

not contact Jane, and Jane could not contact Plaintiff.  *Id.* ¶¶ 116–117.

On May 2, 2018, another "incident" occurred in Washington Square Park.  *Id.* ¶ 273.

Plaintiff alleges that Jane, in violation of the no-contact directive, followed John to multiple

locations in and around the park and photographed him.  *Id.* ¶¶ 275–276, 356.  Plaintiff attempted to

file a report with NYU's public safety office regarding the Washington Square Park encounter.  *Id.*

¶ 354.  Plaintiff told the public safety office that Jane had been "following Plaintiff and repeatedly

photographing him while he was the subject of a Title IX investigation that she initiated." *Id.* ¶ 356. The public safety officer on duty advised Plaintiff that Jane's behavior did not constitute stalking. *Id.* ¶ 354.  Plaintiff alleges that NYU refused to investigate his report regarding Jane's behavior. *Id.* ¶ 358.

On May 22, 2018, Plaintiff learned that Jane had commenced a sexual harassment disciplinary action against him, based on events that she claimed to have taken place over the course of their relationship. *Id.* ¶¶ 121, 124.  Plaintiff was "surprised and upset" about Jane's allegations "in light of his support and devotion to her over the course of their 2.5-year relationship." *Id.* ¶ 125.

NYU appointed Samuel Hodge ("Hodge") to investigate Jane's allegations. *Id.* ¶ 122.  NYU advised Plaintiff that he was entitled to a student support facilitator. *Id.*  Plaintiff requested one, and Allen McFarlane ("McFarlane") was assigned to Plaintiff's case. *Id.*  On June 25, 2018, McFarlane met with Plaintiff. *Id.* ¶ 126.  Plaintiff alleges that during the meeting, McFarlane told him, "[u]nder no circumstances will you be expelled." *Id.*  McFarlane told Plaintiff and his mother that the "worst-case scenario" would be a one-semester suspension. *Id.* ¶¶ 128–129.

On July 10, 2018, NYU's investigator, Hodge, met with Plaintiff to discuss Jane's allegations. *Id.* ¶ 130.  Hodge "relayed Jane's allegations in a very simplistic manner" and "focused on two pieces of evidence Jane submitted to the Title IX office." *Id.* ¶ 131.  Hodge did not advise Plaintiff that Jane had submitted over 100 pages of evidence against him and did not show him the evidence. *Id.*  During the investigation process, Plaintiff told Hodge that Jane "belittled him in public because of his appearance" and "humiliated him when she said that John 'looked gay'" in front of his friends. *Id.* ¶¶ 132–133.  Plaintiff also told Hodge and NYU's Title IX Coordinator, Mary Signor ("Signor"), about the elusive "Sally," her text messages, and her role in Plaintiff's relationship with Jane. *Id.* ¶¶ 158, 160–163.  Plaintiff alleges that NYU failed to investigate that information. *Id.* ¶¶ 145–146, 159, 162, 164.  Plaintiff did not identify any witnesses with direct knowledge of the events in

question, but did identify some people with information that he thought would be helpful to his case.[3]  At some point during the Title IX process—it is not exactly clear when—Plaintiff also told Hodge about the incident in Washington Square Park, during which Jane followed him in violation of the no-contact directive.  *Id.* ¶¶ 179–180.

Plaintiff gave Hodge copies of some of his electronic conversations with Jane, photographs of Plaintiff and Jane during his trips to New York, a timeline, and some videos of conversations between him and Jane.  *Id.* ¶¶ 167–168.  At the time, Plaintiff believed that Jane had permanently deleted other evidence of their communications.  *Id.* ¶ 166.

At some point during the investigation process—Plaintiff does not specify exactly when— Plaintiff attempted to file a Title IX complaint against Jane "due to her physical assaults of John and alienation of John from his friends."  *Id.* ¶ 381.  Signor, the Title IX coordinator, advised Plaintiff that "his complaint would be handled at the end of Jane's Title IX case" so he should wait until the conclusion of Jane's Title IX complaint process before filing his Title IX complaint against Jane.  *Id.* ¶ 382.

In August 2018, Plaintiff left the United States to study in Australia.  *Id.* ¶ 169.  On October 23, 2019, Plaintiff received NYU's Investigation Summary Report (the "ISR").  The ISR outlined the charges against him, summarized the interviews conducted by the investigator, and attached evidence that had been gathered during the investigation.  *Id.* ¶ 170.  Several things about the ISR surprised Plaintiff:  "the number and scope of allegations against [Plaintiff] had more than doubled. Jane now asserted nine separate allegations against John for sexual harassment, sexual assault, sexual exploitation, stalking, and violation of a no-contact directive."  *Id.* ¶ 176.  She had also submitted

---

[3] The witnesses who Plaintiff alleges he identified for Hodge at this time included three employees of his university in Connecticut, who he states "had knowledge of the impact" of Jane's allegedly false sexual assault on him and "assisted John in obtaining academic accommodations."  Am. Compl. ¶¶ 149–153.  Plaintiff also alleges that he told Hodge that his mother "had information helpful to John."  *Id.* ¶ 155.  NYU did not interview those individuals.  *Id.* ¶¶ 149, 153–157.

additional evidence. *Id.* ¶ 177. Plaintiff was "shocked by the sheer volume of cherry-picked text messages and WhatsApp messages provided by Jane." *Id.* ¶ 170. Plaintiff alleges that the text messages in the ISR were "selectively edited by Jane to make John look bad." *Id.* ¶ 187. Plaintiff "knew there were Facebook messages and text messages that refuted Jane's evidence," but he believed that they had been deleted by Jane. *Id.* ¶ 193. Some of the photos and text messages that Jane had submitted were reproduced several times in the ISR. *Id.* ¶¶ 183–186. And there were "interview statements from Jane's witnesses negatively attesting to John's character." *Id.* ¶¶ 195–196.

After the ISR was issued, McFarlane again told Plaintiff that he would not be expelled if he was found responsible for the violations outlined in the report, and that in the worst-case scenario, he would face a one-semester suspension. *Id.* ¶¶ 171–172. Because of those representations, Plaintiff did not retain an attorney during the investigation and hearing process. *Id.* ¶ 173. He also decided to remain in Australia and to defend himself from that distant outpost.

### 3. Hearing & Decision

Because Plaintiff was studying abroad in Australia, scheduling the hearing was difficult. Initially, NYU scheduled the hearing to begin a few days prior to his final exams at 2:00 a.m. Australia time and "expected John to appear at the hearing via Skype in his dormitory room." *Id.* ¶¶ 206, 213. Plaintiff asked to reschedule the hearing when he was back in New York "to avoid the drastic time zone conflict, academic conflict, and Skype appearance regarding such an important matter." *Id.* ¶¶ 214, 493–494. NYU refused. *Id.* NYU eventually rescheduled the hearing for 8:00 a.m. at a later date and arranged for Plaintiff to appear at the hearing from a room on the NYU Sydney campus. *Id.* ¶¶ 216–217.

On December 10, 2018, NYU conducted a nine-hour hearing before adjudicator Craig Jolley ("Jolley"). *Id.* ¶ 220. Unfortunately, "technological issues . . . prevented John from fully

8

participating in the hearing." *Id.* ¶ 231.  Plaintiff had "problems with the audio[,] making it difficult for John to hear the proceeding." *Id.* ¶¶ 231–232.  Plaintiff's difficulties were noted by multiple people in the proceeding. *Id.* ¶ 233.  There were also "video difficulties" during the hearing.  *Id.* ¶ 236.  For "a large portion of the hearing" and "at Adjudicator Jolley's direction," Plaintiff "could not see what was going on at the hearing" because the video feed at NYU had been turned off.  *Id.* ¶¶ 232–239.  Plaintiff also had difficulty communicating with his assigned advisor, McFarlane, due to technological problems. *Id.* ¶ 241.

Jane and every other person involved in the hearing had the 336-page long ISR in hand.  *Id.* ¶ 221–223.  Plaintiff did not.  *Id.*  Instead, Plaintiff had to use his laptop to access the report.  *Id.* ¶ 224.  That made it difficult for Plaintiff to participate fully in the hearing.  *Id.* ¶ 225.  He often became confused switching between applications on his laptop and he was unable to follow the references that Jolley made to the ISR.  *Id.* ¶ 224–229.  After the hearing, Plaintiff realized that he had answered some of the questions incorrectly because he had been looking at the wrong page of the ISR.  *Id.* ¶ 230.

In its written decision, NYU found Plaintiff "not responsible" for sexual assault.  *Id.* ¶ 243; Decl. William Miller Supp. Def's Mot. to Dismiss ("Miller Decl."), Ex. D ("Hearing Decision"), Dkt. No. 33-7.  However, the university found him "responsible" for sexual harassment, sexual exploitation, stalking, and violation of a no-contact directive.  *Id.*  The adjudicator used the "preponderance of the evidence" standard to make the findings of fact included in the Hearing Decision.

Because of its importance to Plaintiff's allegations, the Court will describe some of the contents of the Hearing Decision.[4]  With regards to Jane's allegations of sexual harassment, stalking,

---

[4] The Hearing Decision is integral to the Amended Complaint, as described in Section II(B)(2) below.  The Court accepts as true that the Hearing Decision says what it says.  But the Court does not accept as true the statements of fact included in the Hearing Decision in evaluating Defendant's motion to dismiss.

and violation of the no-contact directive, Jolley concluded that "there is overwhelming evidence that Respondent has engaged in an extended pattern of conduct that would cause a reasonable person in the position of the Complainant to experience fear for their safety, substantial emotional distress, significant mental suffering, and anguish." Ex. D at 7.  The Hearing Decision detailed a pattern of conduct by Plaintiff that occurred between March 10, 2018 and May 2, 2018.  Jolley noted that on March 10, 2018, Plaintiff admitted to waiting outside Jane's door and following her after he became angry with how Jane had treated him in front of her friends and how she refused talk to him.  *Id.* at 5–6.  Jolley's decision also noted the contents of threatening text messages that Plaintiff sent to Jane on April 2, 2018.  *Id.* at 6.  The Decision reports that Plaintiff stated that he realized that Jane did not wish to continue the relationship with him.  *Id.*  The decision also describes an April 8, 2018 encounter between Plaintiff and Jane that was recorded, in which Plaintiff again threatened Jane.  *Id.* Jolley described more threatening messages and communications that continued on April 21, 2018, including an encounter that was videotaped by Plaintiff.  *Id.*  Jolley believed "that an objective viewer would find the words and actions of Respondent . . . unsettling and disturbing." *Id.*

Jolley noted that the no-contact directive had been put in place on April 22, 2018 and concluded that Plaintiff had admitted to violating it repeatedly.  *Id.*  Regarding the May 2, 2018 incident in Washington Square Park, Jolley wrote that "Respondent denied that he was following the Complainant and suggested that he believed it was the Complainant who was following him" around campus on May 2, 2018.  *Id.*  Jolly "d[id] not find the Respondent's explanation to be credible and believe[d] that his conduct was a continuance of a pattern of behavior that would cause a reasonable person in the position of the Complainant to fear for their safety and experience substantial emotional and mental distress." *Id.*

The Hearing Decision concluded that Plaintiff should be expelled as a result of his conduct. Plaintiff was expelled from NYU with a permanent notation on his transcript.  Am. Compl. ¶¶ 244–

246. The Hearing Decision stated that "[t]he effect of this sanction shall be held in abeyance through the completion of any appeal proceedings, if applicable." *Id.* ¶ 287.

### 4. The Appeal

On December 19, 2018, Plaintiff returned from Australia. *Id.* ¶ 296. He returned with a mission. Plaintiff "wanted to expose Jane's lies about their relationship and his actions towards her." *Id.* ¶ 297. He retained an attorney. And he discovered that his hard drives contained backups of text messages that Jane had deleted from his phone between him, Jane, and Sally. *Id.* ¶¶ 298–299. Plaintiff alleges that those text messages "refuted several areas of contention raised by Jane at the Hearing." *Id.* ¶¶ 300–305. For instance, the text messages refuted claims Jane made at the hearing that "she never punched John hard and even if she did, it was in self-defense." *Id.* ¶ 303. Plaintiff asserts that the recovered text messages undermined Jane's claims that she did not want to engage in a sexual relationship with Plaintiff because they proved that she had visited his dormitory frequently and that she, through her alter-ego Sally, had directed Plaintiff to engage in specific sexual acts with Jane. *Id.* ¶ 304. Plaintiff also submitted a public records request to the NYPD regarding Jane's alleged sexual assault her freshman year, but the NYPD confirmed that no records about it existed. *Id.* ¶¶ 306–307.

On January 25, 2019, Plaintiff appealed the hearing decision, arguing that there was new evidence, that the hearing and investigation were frayed by procedural issues, and that his punishment was disproportionate to his asserted offenses. *Id.* ¶ 315; Miller Decl.., Ex. E, Dkt. No. 33-8. In his appeal, Plaintiff pointed to voluminous messages, witness affidavits, and the lack of police records supporting Jane's alleged prior sexual assault in order to cast doubt on Jane's credibility. Am. Compl. ¶¶ 315, 349–350. Plaintiff provided sworn statements from several witnesses. *Id.* ¶¶ 317, 328. Plaintiff alleges that two of those witnesses would have been able to provide information regarding the incident in Washington Square Park on May 2, 2018, and that

NYU failed to interview them.  *Id.* ¶¶ 318–326.  Plaintiff also alleges that he identified another NYU student who "possessed information helpful to John regarding the nature of John's relationship with Jane" that "directly contradicted testimony and evidence that Jane provided to NYU."  *Id.* ¶ 344–345.  NYU also did not interview this witness.  *Id.* ¶ 348.

The bulk of the "new evidence" section of Plaintiff's appeal is evidence intended to support Plaintiff's claims that Jane bullied and physically abused him.  From Plaintiff's view, this evidence shows that any negative conduct by him toward Jane was a response to her bullying, rather than sexual harassment initiated by him.  Ex. E at 1–2.  Plaintiff's appeal states that he disagreed with Jolley's and Jane's "characterization of the events between me and Complainant from March through May 2018 . . . as being my reaction to a romantic breakup."  *Id.* at 2.  Rather, Plaintiff "consistently claimed that my actions were responsive to Complainant's efforts to bully me and socially isolate me from my social group, all of which constitute violations of NYU's bullying policy."  *Id.*  The "new evidence" section also repeats the assertions that Plaintiff made in the hearing to the effect that Jane was the one stalking Plaintiff on May 2, 2018, not that he was stalking her.  *Id.* at 1.  Plaintiff also asserts that Sally was Plaintiff's alter ego.  *Id.*  at 2.  Plaintiff makes the same argument in the "procedural issues" section of the appeal, arguing that Jolley misapplied NYU policies by characterizing his conduct toward Jane as sexual harassment and failing to apply the reasonableness standard with regards to the allegations of stalking.  *Id.* at 5–7.  Plaintiff's appeal does not mention the audio or video difficulties that allegedly plagued Plaintiff during the hearing.

A panel met on February 26, 2019 to review Plaintiff's appeal.  On March 8, 2019, NYU issued its decision in the appeal (the "Appeal Decision").  The panel confirmed the Hearing Decision.  Am. Compl. ¶ 351; Miller Decl., Ex. F, Dkt. No. 33-9.  Plaintiff alleges that in doing so, NYU "completely ignored the new evidence provided by John that discredited Jane."  Am. Compl. ¶¶ 352–353.

The Appeal Decision states that "[a]fter a careful review of the hearing report, the investigative report, the hearing audio, and the Complainant's and Respondent's respective appeal statements, the Appeals Panel does not find that any material procedural errors occurred, that the Respondent has presented previously unavailable relevant information that could affect the outcome, or that the imposed sanction was substantially disproportionate to the violation." Ex. F at 1. The Appeal Decision explained that the new evidence Plaintiff submitted "could not have affected the outcome of the hearing in light of the overwhelming evidence supporting the Adjudicator's decision." *Id.* The Appeal Decision noted that "much of the Respondent's commentary focuses on the Respondent's differing opinion of the appropriate assessment of the evidence that was before the Adjudicator, which is not within the scope of the Appeals Panel's review." *Id.*

After the resolution of Jane's Title IX complaint against him, Plaintiff again attempted to file his Title IX complaint against Jane. Am. Compl. ¶ 383. In his Title IX complaint, he again informed NYU that Jane had assaulted and threated to assault him multiple times during the course of their relationship. *Id.* ¶¶ 384–385. He explained that Jane had required Plaintiff keep their relationship a secret to "manipulate him and control the narrative of their relationship." *Id.* ¶¶ 389–392. His Title IX complaint also informed NYU about Plaintiff's theory that Sally Soe was Jane's alter ego, that she repeatedly messaged him using new screennames after he blocked her communications, that she pressured Plaintiff to engage in a sexual relationship with Jane, and that she contacted Plaintiff over the summer of 2018 when the no-contact directive was in place. *Id.* ¶¶ 396–402. Plaintiff informed NYU that Jane harassed and ridiculed him for being "gay" and called him a "gay person" and a homophobic slur, and said that gay people "don't belong." *Id.* ¶¶ 408–409. Plaintiff provided NYU with evidence of this harassment. *Id.* ¶ 410.

Plaintiff filed his Title IX complaint with NYU's Title IX Office, Gallatin School of Individualized Study and the Office of Student Conduct and Community Standards.  *Id.* ¶ 412. NYU failed to investigate Plaintiff's allegations against Jane.  *Id.* ¶¶ 413–414.  In response to his complaint against Jane, Signor at the Title IX Office stated "this matter will not be reopened and is considered closed."  *Id.* ¶ 415.

### 6. The Environment at NYU During the Disciplinary Process

Plaintiff alleges that "NYU was under pressure to exercise more vigilance against male respondents at the time it was investigating Jane's complaint."  *Id.* ¶ 420.  In support of this broad factual assertion, Plaintiff points to a series of social media posts made around August 2018.  In those posts, a female NYU student claimed that NYU had failed to sanction two male students for sexually assaulting her.  *Id.* ¶ 421.  Plaintiff alleges that the posts were distributed to at least 1,000 people, and that women commented, "I hope these protests and riots make NYU see that what they're pulling is detrimental to the entire female student body."  *Id.* ¶ 422.  Other comments included "[a]bsolutely horrifying.  NYU is likely in for a year of protests, it's been brewing for ages. Women at our school are fed up;" and "NYU does not protect its female students . . . NYU has failed me and countless other girls, teaching us that standing up for ourselves is a complete waste of our time."  *Id.* ¶ 423.  Plaintiff did not allege that NYU was aware of these posts at the time of his disciplinary process in his complaint.

Plaintiff also alleges that "similarly situated female respondents facing allegations of sexual harassment have received more lenient sanctions than male respondents" because there was public outcry at Title IX being used against women.  *Id.* ¶¶ 424, 429.  Plaintiff highlights a lawsuit that a male graduate student filed against a female NYU professor in August of 2018 based on allegations that the professor had sexually harassed and sexually assaulted him, and that she retaliated against him after he filed a Title IX complaint against her.  *Id.* ¶¶ 425–426.  NYU ultimately found the

14

professor responsible for several years of sexual harassment against the male complainant and the professor was suspended for one academic year. *Id.* ¶ 427.  NYU's decision to institute a Title IX proceeding against a woman, rather than a man, was, according to Plaintiff, "very controversial within the academic community." *Id.* ¶¶ 428–429.  Plaintiff alleges that NYU was sensitive to criticism of its decision to institute a Title IX proceeding against a woman, and as a result, gave the professor a "lenient" sanction. *Id.* ¶¶ 432–433.  The criticism was "ongoing and significant" when Plaintiff reported Jane's Title IX violations to NYU. *Id.* ¶ 434.

Plaintiff also points to several Title IX investigations of NYU by the U.S. Department of Education's Office of Civil Rights (the "OCR"), but does not specify the gender identity of either the complainants or the respondents. *Id.* ¶ 436.  First, in an OCR complaint dated May 26, 2015, the complainant alleged that NYU had failed to respond promptly and equitably to the complainant's report of sexual assault, and, as a result, the complainant was subjected to a sexually hostile environment. *Id.* ¶ 437.  Second, in an OCR complaint dated December 20, 2016, the complainant alleged that NYU had failed to respond promptly and equitably to the complainant's report of sexual assault, and, as a result, the complainant was subject to a sexually hostile environment. *Id.* ¶ 438.  Plaintiff does not specify the outcome of these investigations, when they closed, or whether they were ongoing during his disciplinary process.  He also does not allege that they resulted in criticism of NYU.

### B. Procedural History

Plaintiff filed the complaint (the "Complaint") that initiated this case on February 14, 2020.  Dkt No. 1.  Defendant filed a motion to dismiss the Complaint on May 11, 2020.  Dkt. No. 22.  In response, Plaintiff filed the Amended Complaint on June 1, 2020.  Am. Compl., Dkt. No. 27.  The Amended Complaint asserts claims for violations of Title IX of the Education Amendments of 1972

("Title IX") and the New York City Human Rights Law ("NYCHRL"), as well as a claim of promissory estoppel under New York State law.

Defendant filed a motion to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) and a supporting memorandum of law.  Dkt. Nos. 32, 34 ("Def.'s Mem.").  Plaintiff filed his opposition to the motion to dismiss, Dkt. No. 37 ("Pl.'s Opp'n"), and Defendant filed its reply.  Dkt. No. 39 (Def.'s Reply").

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012)).  "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's

disbelief of a complaint's factual allegations." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Twombly*, 550 U.S. at 556.

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## B. Consideration of Defendants' Exhibits

NYU attached a number of exhibits in support of its motion.  *See* Dkt. Nos. 33-1–33-9 (redacted versions).  The exhibits are NYU's Procedures for Reporting Investigating, And Resolving Sexual Misconduct, Relationship Violence and Stalking—Complaints against Students (Exhibit A) (the "Procedures"); the ISR (Exhibit B); the audio recording of the hearing (Exhibit C); the Hearing Decision (Exhibit D); Plaintiff's appeal (Exhibit E); and the Appeal Decision (Exhibit F).  The ISR also contains NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy (the "Policy"). None of these documents were attached to the Amended Complaint.  As a preliminary matter, the Court must decide which, if any, of these documents to consider in resolving this motion.

### 1. Legal Standard

It is important to put this issue in broader context.  Defendant seeks to put before the Court substantially all of the raw evidence considered by NYU during the disciplinary proceedings for the

Court to evaluate in the context of this motion to dismiss, rather than reviewing the evidence in the context of a summary judgment motion under Rule 56 after the conduct of discovery.

In the context of a motion to dismiss brought under Rule 12(b)(6), "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 76. "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

"The streamlined testing of the substantive merits, on the other hand, is more appropriately reserved for the summary judgment procedure, governed by Rule 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule." *Id.* (internal quotation marks and citations omitted). A motion for summary judgment, not a motion to dismiss, "is the proper procedural device to consider matters outside the pleadings, such as facts unearthed in discovery, depositions, affidavits, statements, and any other relevant form of evidence." *Id.*

Rule 12(d) directs that if "on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The conversion requirement of Rule 12(d)

> furthers the policies of both Rules by directing a pretrial motion to the vehicle most appropriate for its resolution, ensuring that the motion is governed by the rule specifically designed for the fair resolution of the parties' competing interests at a particular stage of the litigation. Moreover, the requirement expressly addresses and solves the major problem that arises when a court considers matters extraneous to a complaint, namely, the lack of notice to the plaintiff that outside matters would be examined. It deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence dehors the

> complaint, a plaintiff will have an opportunity to contest defendant's relied-upon
> evidence by submitting material that controverts it.  That these two motions can be
> easily confused underscores the importance of our adherence to the requirement.

*Glob. Network Commc'ns, Inc.*, 458 F.3d at 155–56 (citations omitted).  It is with this distinction in

mind that the Court turns to the question of what information can be considered by the court in the

context of a motion to dismiss that is not "outside the pleadings," requiring the conversion of a

motion to dismiss into a motion for summary judgment, and, in particular, whether all of the

evidence underlying NYU's decision can be considered by the Court now in the context of this

motion to dismiss.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a

district court may consider the facts alleged in the complaint, documents attached to the complaint

as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable*

*LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotations and citations omitted).  As the Second

Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any

'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch*,

952 F.3d at 79 (citations omitted).

A court can also consider documents that are "integral to" the complaint.  In order for a

document to meet this exception to the general principle that a court may not consider documents

outside of the pleadings without converting the motion to one for summary judgment, the

complaint must rely heavily upon its terms and effects.  *See DiFolco*, 622 F.3d at 111 ("Where a

document is not incorporated by reference, the court may nevertheless consider it where the

complaint relied heavily upon its terms and effects, thereby rendering the document integral to the

complaint.") (internal quotation marks and citation omitted).  "However, even if a document is

integral to the complaint, it must be clear on the record that no dispute exists regarding the

authenticity or accuracy of the document." *Id.*  (internal quotation marks omitted) (quoting *Faulkner*

*v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  "It also must be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *Id.*

Not all categories of documents can be treated as "integral" to a complaint.  In *Global Network*, the Second Circuit circumscribed materials considered to be integral to a complaint as follows:  "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.  The exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting."  *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157 (citation omitted).

And in its recent decision in *Lynch*, the Second Circuit concluded that a document could not be considered to be "integral" to the complaint because it was not a "written instrument."  952 F.3d at 79.  In *Lynch*, the court of appeals had to decide whether a memo book maintained by one of the defendants could be considered to be "integral" to the complaint in that case.  *Id.* at 78.  The document had been provided by the defendant to the plaintiff in limited discovery after the plaintiff filed his initial complaint.  *Id.*  The plaintiff had the document in hand when he amended his complaint, and, on appeal, he stated that one of the allegations in his amended complaint was based on an entry in that memo book.  *Id.* at 78.  So there was no question that the plaintiff had relied heavily upon the document in drafting his complaint.  But the Second Circuit concluded that the memo book was not "integral" to the complaint nonetheless, reasoning that it was not a "written instrument."  *Id.* at 79.

The Circuit's analysis started with the basics:  "It is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference.  And even if the 'plaintiff chooses not to attach' an instrument 'to the complaint or [to]

incorporate [it] by reference,' if it is one 'upon which' the plaintiff 'solely relies and which is integral to the complaint,' the court may take the document into consideration in deciding the defendant's motion to dismiss." *Id.* (alterations in original) (citations omitted).  Note that, in restating the basic rule, *Lynch* did not use the language of other decisions that refer to the treatment of "documents" as integral, but rather, limited them to instruments.[5]  From there, the court provided a description of the types of documents that can properly be considered to be "written instruments."

> The term "written instrument" generally refers to "a 'legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate[,]' Black's Law Dictionary (10th ed.2014)."  *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015).  Thus, we view "the types of exhibits incorporated within the pleadings by Rule 10(c)" as "consist[ing] largely of . . . contracts, notes, and other writing[s] on which [a party's] action or defense is based."

*Id.* (alterations in original).

The *Lynch* court then evaluated the memo book using this definition and concluded that it could not be considered to be integral to the complaint because it was not a "written instrument." The court recognized that the document was one on which the plaintiff had relied and that it would have evidentiary value for his case.  *Id.* ("Lynch might not have been aware of any conversation between Mandy and Paverman but for defendants' production of Delarosa's record, and that record would constitute some evidence that a conversation between the two occurred . . . .").  But the court in *Lynch* refused to treat the document as "integral" to the complaint because "unlike the document

---

[5] *Compare DiFolco*, 622 F.3d at 111 ("Where a *document* is not incorporated by reference, the court may nevertheless consider it where the complaint relied heavily upon its terms and effects, thereby rendering the document integral to the complaint.") (emphasis added) ( internal quotation marks and citation omitted); *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015) ("To be sure, this Court has permitted the consideration of other documents, apart from written instruments under Rule 10(c), at the motion to dismiss stage, such as documents that the plaintiffs either possessed or knew about and upon which they relied in bring the suit. . . . Further, we have explained that a court may consider an 'integral' document where the complaint 'relies heavily upon its terms and effect.'") (citation omitted); *ATSI Communications, Inc.*, 493 F.3d at 98 ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, *and* documents possessed by or know to the plaintiff and upon which it relied in bringing the suit.") (emphasis added); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (Courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, *and* documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (emphasis added) (citations omitted).

at issue in *Audiotext*—an agreement of a type that the antitrust defendant had with another party but refused to enter into with the plaintiff—the Delarosa record plainly is not an 'instrument' on which Lynch can rely as defining rights, duties, entitlements, or liabilities." *Id.* The conclusion in *Lynch* was not dicta—it was essential to the court's holding—so the Court will embrace its holding here.[6]

The only district court in our Circuit to have considered the implications of *Lynch* in this context to date has taken the same approach. *See Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2021 WL 148888, at *5 (D. Conn. Jan. 15, 2021) (holding that "it does not appear that the Circuit has sanctioned application of the exception outside the context of 'written instruments' of the type described above. In other words, the incorporation-by-reference exception is not a mechanism for responding to all situations where a plaintiff withholds damaging information from a complaint. Rather, the exception prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) only in certain situations, *e.g.*, when plaintiffs have selectively quoted from certain types of written instruments. In many circumstances, the proper recourse for a complaint that withholds other types of information is to move for summary judgment, following discovery.").

---

[6] As the Court has identified in the preceding note, a number of earlier Second Circuit decisions use broader language to describe the universe of documents that can be considered to be integral to a complaint. Many suggest that documents in addition to written instruments are to be considered. *See, e.g. Rothman*, 220 F.3d at 88 (Courts may consider "*any written instrument* attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, *and* documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (emphasis added) (citations omitted). And even a cursory review of district court decisions considering this question reveals a number of cases in which they have, in reliance on the broader language of cases prior to *Lynch* describing "documents" integral to the complaint, rather than merely "instruments," considered evidentiary materials which were not written instruments to be integral to a complaint. But *Lynch*'s conclusion was not dicta. And in reviewing the Circuit's cases evaluating whether or not a document is integral, including those cited in the note above, the Court has not identified a published opinion in which the Circuit has embraced as "integral" a document that cannot reasonably be characterized as a written instrument. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (considering stock purchase agreement, offering memorandum, and a warrant); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (considering public disclosure documents filed with the SEC); *I. Meyer Pincus & Assoc. P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) considering (prospectus); *DiFolco*, 622 F.3d at 111 (considering emails allegedly repudiating a contract for their legal effect); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995) (considering contract).

With this background in hand, the Court turns to evaluate whether all of the documents offered by NYU can be considered in the context of a motion to dismiss, or if, instead, these are the kinds of evidentiary documents that fall "outside of the pleadings," and thus, must be considered only in the context of a motion for summary judgment.

### 2. Application

Many of the documents presented by NYU for the Court to consider in connection with this motion are properly considered to be "integral" to the complaint. But the substantial evidentiary record presented by NYU for the Court's consideration is not. Defendant's purpose in presenting this volume of evidence in this context is plain—Defendant asks the Court to evaluate the evidence presented to NYU, to weigh that evidence, and to conclude that the evidence contradicts Plaintiff's allegations that the outcome of his proceeding was erroneous. Def.'s Mem. at 18 ("Here, the Amended Complaint fails to cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding because there was overwhelming and undisputed evidence that Plaintiff violated the Policy, including Plaintiff's own admissions in his written response to the ISR and at the hearing."). This is an invitation to error. *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 156 ("Not only did the district court consider external material in its ruling, it relied on those materials to make a finding of fact that controverted the plaintiff's own factual assertions set out in its complaint. At the pleadings stage this was error. Instead, the trial court was required to convert the motion into one for summary judgment pursuant to Rule 12(b) [sic]."). While some of the documents presented by Defendant are "integral" to the complaint, most are not. Instead, they are "outside of the pleadings" and should be evaluated by the Court in the context of a motion for summary judgment.

The ISR and all of the evidentiary record included in it is not "integral" to the complaint. The ISR is a written report with summaries of interviews, and the investigator's assessment of the evidence. Attached to it is a substantial volume of primary evidence, including photographs, text

messages, emails, and video recordings.  The ISR and supporting evidence weigh in at nearly 350 pages.

Plaintiff alleges that he received the ISR and the evidence attached to it; specific allegations describe the content of the ISR, and certain of its exhibits.  *See* Am. Compl. ¶¶ 146, 148, 170, 176, 178, 183–184, 186.  These references are insufficient to result in the incorporation of the document into the complaint.  But they do support the conclusion that Plaintiff relied heavily on at least the written portion of the report in his complaint; he comments on its content.  Plaintiff also refers to photographs and text messages that are part of the evidentiary record attached to the ISR, but he does not clearly rely on the content of the images or messages; he points to the number of images, or the curation of text messages, rather than their substantive content.

Plaintiff challenges the veracity of the information presented in the ISR.  Defendant argues that the documents are not presented for the truth of the facts asserted, and that the Court can evaluate the evidence presented "to determine what the documents . . . stated, and not to prove the truth of their contents."  Def.'s Reply at 4 (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).  Because of that, Defendant contends that Plaintiff's challenges to the adequacy of the fact-finding process do not call into question the documents' veracity—regardless of the process, NYU argues, the evidence ultimately presented to it was that included in the ISR.  *Id.* at 5.

There are several issues with this argument.  First, NYU is really asking the Court to evaluate the substance of the evidence presented, not simply to review the statements made on their face.  Again, Defendant's argument is that the complaint fails to state a claim "because there was overwhelming and undisputed evidence that Plaintiff violated the Policy, including Plaintiff's own admissions in his written response to the ISR and at the hearing."  Def.'s Mem. at 18.  This argument requires that the Court consider the facts presented in the exhibits to the ISR as true.

24

After all, if the evidence considered by the investigator was not true, it would not provide

"overwhelming" evidentiary support for the investigator's conclusions.

The issue presented here is entirely unlike that presented in *Roth*, which, read in its entirety,

does not support Defendant's argument.  *Roth* involved a claim for short swing profits.  The district

court considered factual statements made in the company's filings with the Securities and Exchange

Commission in evaluating the motion to dismiss.  The Second Circuit reversed the trial court's

decision because the court had inappropriately considered the information contained in the filings

for their truth.  *Roth*, 489 F.3d at 510.  To reach that conclusion, the court of appeals first described

circumstances in which a securities filing could be considered to be integral to a complaint.

> When a complaint alleges, for example, that a document filed with the SEC failed to
> disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6)
> motion, to examine the document to see whether or not those facts were disclosed.
> Or when the complaint alleges that such a document made a particular
> representation, the court may properly look at the document to see whether that
> representation was made.  Consideration of such documents filed with the SEC is
> appropriate with respect to a nondisclosure or misrepresentation claim because "no
> serious question as to their authenticity can exist," and because the court is to
> consider them on a Rule 12(b)(6) motion "only to determine *what* the documents
> stated," and "*not to prove the truth of their contents.*"

*Roth*, 489 F.3d at 509 (emphasis in original) (internal citations omitted).  This is the portion of the

opinion that Defendant cites.

However, the court then went on to explain how the district court had misapplied those

principles.

> The district court correctly noted that SEC filings may properly be considered in
> ruling on a Rule 12(b)(6) motion to dismiss a complaint alleging claims of fraud.  But
> this is not a fraud case.  It is, rather, a § 16(b) action seeking the disgorgement of
> short-swing profits, for which an insider is to be held strictly liable.  Defendants'
> submissions of their Schedule 13D filings thus presented material that was
> inappropriate for consideration on Rule 12(b)(6) motions to dismiss a § 16(b)
> complaint that contained no allegation of a failure to disclose or of a factual
> misrepresentation.
>
> Further, even if there had been allegations of fraud, defendants' SEC filings could
> not properly be considered for the truth of their contents.  The district court's view

that "the Defendants' statements, which have been submitted to a government
agency and made public, should not be contradicted or taken as perjurious simply
because the Plaintiff, without evidence, says they are,"—although a possible
argument to a jury—was not an appropriate rationale for ruling on a motion under
Rule 12(b)(6).

*Id.* at 510 (internal citation omitted). The court distinguished the situation presented to the trial

court in *Roth* from other cases that "fall squarely within the principle that the contents of the

document are controlling where a plaintiff has alleged that the document contains, or does not

contain, certain statements." *Id.* at 511.

Here, NYU is asking that the Court accept the evidence collected in its investigation for the

truth of the matters asserted. If the evidence presented is not accurate, it does not support NYU's

decision. The opinion in *Roth*, reversing a district court because it relied on factual statements in

documents claimed to be integral in order to evaluate the sufficiency of the allegations in the

complaint, undermines Defendant's position—it does not support it. NYU's request that the Court

evaluate the evidence and conclude that it provides undisputed and "overwhelming" evidence in

support of its decision requires that the Court consider the truth of the facts contained in the

evidentiary record, not merely that they were stated there.

With this in mind, Plaintiff's challenges to the veracity of the evidence and information

contained in the ISR do limit the capacity of the Court to conclude that they are integral to the

complaint. The ISR report itself does not contain verbatim transcripts of interviews with the

witnesses interviewed by the investigator; it contains summaries of statements, the accuracy of which

can reasonably be challenged. And Plaintiff argues that the evidence presented together with the

ISR was incomplete. While he does not challenge that the documents presented to the Court are

indeed those that were included in the ISR, he can rightly challenge NYU's request that the Court

evaluate his erroneous outcome claim solely on the basis of what Plaintiff asserts to be the curated

body of evidence presented in the ISR.

Finally, the ISR and its attached exhibits are clearly not "written instruments." It is not a "legal document that defines rights, duties, entitlements or liabilities." *See Lynch*, 952 F.3d at 79 (quoting *Black's Law Dictionary*). Therefore, in light of *Lynch*, the Court cannot consider it to be incorporated by reference or integral to the complaint.

The Court also cannot consider the audio recording the disciplinary hearing because it is neither incorporated by reference into the complaint, nor is it integral to it. Although Plaintiff mentions events that transpired at the hearing, he does not refer to the recording of the hearing. The Second Circuit has found that referring to events that occurred at a hearing is not enough to incorporate the transcript of that hearing into the complaint. *Sira v. Morton*, 380 F.3d 57, 66–69 (2d Cir. 2004) ("[P]araphrasing of certain events occurring during parts of the disciplinary hearing" does not "incorporate the whole of these transcripts by reference into the complaint."). So too with respect to a recording of the hearing. Moreover, the audio recording is clearly not a "written instrument." Instead, it is the kind of evidentiary material that should properly be considered in the context of a motion for summary judgment.

On the other hand, the Policy and the Procedures are integral to the Amended Complaint because they are written instruments and Plaintiff relies heavily on their terms and effects. The Policy and the Procedures govern the conduct of the parties during the Title IX adjudication at issue here and undergird Plaintiff's promissory estoppel claim. Am. Compl. ¶¶ 509, 510 ("NYU's Title IX policies and procedures constitute unambiguous representations and promises that NYU should have reasonably expected to induce action or forbearance on the part of John."). They are thus "written instruments" that "define[] rights, duties, entitlements or liabilities." *See Lynch*, 952 F.3d at 79 (quoting *Black's Law Dictionary*). The Amended Complaint contains numerous assertions about the Policy and the Procedures. Plaintiff quotes repeatedly from the Policy in defining the scope of prohibited conduct. Am. Compl. ¶¶ 76, 134, 135, 262. Plaintiff alleges that NYU failed to follow its

own policies and procedures and that it enforced its Title IX policies and procedures against him and not against Jane. Am. Compl. ¶¶ 256, 264, 464–465, 484. Plaintiff's reliance on the Policy and the Procedures in framing his claim makes these documents "integral" to the pleading. Plaintiff does not dispute the accuracy or authenticity of these documents.

And Courts have routinely considered such policy and procedure documents on motions to dismiss in the context of Title IX claims because they are integral to the complaint. *See, e.g.*, *Feibleman v. Trustees of Columbia Univ.*, No. 19-cv-4327 (VEC), 2020 WL 882429, at *11 (S.D.N.Y. Feb. 24, 2020) ("Although the Complaint does not include the [Gender Based Misconduct Policy] as an attachment or expressly incorporate it by reference, the Court may nonetheless consider it because Plaintiff's reliance on the GBMP throughout the Complaint made it 'integral' to the pleading."); *B.B. v. The New School*, No. 17 Civ. 8347 (AT), 2018 WL 2316342, at *1–2, n. 3 (S.D.N.Y. Apr. 30, 2018) (considering The New School's Sexual Misconduct & Violence Policy because the complaint "quotes from and relies on it").

The Court will also consider the Hearing Decision, Appeal, and Appeal Decision because they are written instruments that are integral to the Amended Complaint and are incorporated by reference. These documents embody the conclusions that Plaintiff challenges as discriminatory; they are "writing[s] on which [Plaintiff's] action or defense is based." *See Lynch*, 952 F.3d at 79. And Plaintiff relied heavily on these documents in drafting the Amended Complaint. *See* Am. Compl. ¶¶ 243, 244, 255, 256, 264, 285, 287–291, 293, 470, 531, 470 (Hearing Decision); *id.* ¶¶ 291, 296, 315–350 (Appeal); *id.* ¶¶ 5, 351–353 (Appeal Decision).

As NYU points out, courts routinely consider these types of documents in deciding a motion to dismiss a Title IX challenge to a school disciplinary proceeding. *See, e.g.*, *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013) (considering the written decision expelling plaintiff, plaintiff's appeal, and the decision denying the appeal); *Doe v. Syracuse Univ.*, 404 F. Supp. 2d

158, 173–74 (N.D.N.Y. 2020) (considering the university conduct board's opinion and the university appeal panel's opinion).

Plaintiff argues that because the Hearing Decision was "based on the faulty ISR" and because "NYU failed to consider all of the evidence and witnesses provided by Plaintiff" in drafting the Appeal Decision, the Amended Complaint "cast[s] doubt on the authenticity or veracity" of these documents. Pl.'s Opp'n at 11 (quoting *B.B. v. The New Sch.*, 2018 WL 2316342, at *16).  While Plaintiff has presented allegations that conflict with the conclusions in the Hearing Decision and Appeal Decision, he does not dispute that these documents are what they purport to be—NYU's written determinations after the hearing and after the appeal process.  Plaintiff has alleged that these documents contain the statements that are at the heart of his action.  Unlike the ISR and its associated exhibits, the Court can consider those documents in this motion for the fact of the statements made in them without accepting their description of the underlying facts for the truth of the matter.

## III. Discussion

### A. Title IX

#### 1. Legal Standard

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of gender in educational programs and activities that receive federal funds.  The statute provides, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and universities."  *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016).  As a result, "[c]ourts have

interpreted Title IX by looking to . . . caselaw interpreting Title VII." *Id.* at 55 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

Title IX "bar[s] the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* at 53 (quoting *Yusuf*, 35 F.3d at 715). "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Yusuf*, 35 F.3d at 715. "In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* "In the second category, the plaintiff alleges selective enforcement. Such a claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* "In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent." *Id.* at 713.

"Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* at 715. "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.* "However, the pleading burden in this regard is not heavy." *Id.* "For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Id.* "A complaint may also allege particular procedural flaws affecting the proof." *Id.* "A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

In order to state a selective enforcement claim, a plaintiff must allege "that a school treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently" and "plead[] specific facts that support a minimal

plausible inference of discrimination.'" *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 182 (S.D.N.Y. 2020) (citations omitted); *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) ("To support a claim of selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University.") (alteration in original) (quoting *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 641 (6th Cir. 2003)).

A complaint under Title IX "alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination." *Columbia*, 831 F.3d at 56. "[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (emphasis in original).

In *Columbia*, the Second Circuit concluded that the plaintiff had adequately alleged that the hearing panel were motivated in their actions by "pro-female, anti-male bias." *Columbia*, 831 F.3d at 56. "Those alleged biased attitudes were, at least in part, adopted to refute criticisms circulating in the student body and in the public press that [the university] was turning a blind eye to female students' charges of sexual assaults by male students." *Id.* at 56.

The Second Circuit summarized the allegations that established gender bias in that case as follows:

> Among the Complaint's allegations that support the inference of sex discrimination are the following. Both the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable to him. The investigator and the panel failed to act in accordance with University procedures designed to protect accused students. The investigator, the panel, and the reviewing Dean, furthermore, reached conclusions that were incorrect and contrary to the weight of the evidence. . . .
>
> [T]he Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the

31

public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.  It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.* at 56–57.

### 2. Application

#### a. Erroneous Outcome

Plaintiff challenges the allegedly erroneous result of his disciplinary proceeding—that he was wrongly found "responsible" for sexual exploitation, stalking, and sexual harassment.  Because he has alleged facts sufficient to cast some articulable doubt on the disciplinary action, and circumstances giving rise to a minimal plausible inference of discriminatory intent by NYU, Plaintiff has stated an erroneous outcome claim.

*i. Facts Sufficient to Cast Some Articulable Doubt*

Plaintiff has raised substantial concerns regarding procedural fairness of the remote hearing as well as issues regarding the credibility and completeness of the evidence NYU relied on in the Hearing Decision and the Appeal.  The facts alleged are sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding.

First, Plaintiff alleges fundamental procedural flaws with the hearing itself.  Here, the procedural flaws flow from that fact that Plaintiff was studying abroad in Australia at the time of his disciplinary hearing and thus attended remotely, while everyone else participating in the hearing attended in-person.  Plaintiff requested that NYU wait to hold the hearing until he came back to New York and could participate in-person.  Am. Compl. ¶¶ 214, 493–494.  That NYU decided to conduct the hearing remotely in and of itself does not appear to be a procedural flaw, as the Procedures explain that "a Complainant or Respondent is not required to participate in person at the hearing in order for the hearing to proceed."  Ex. A at 10.  But the Policy also provides that "all

students have the right to . . . [p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard." Dkt. No. 33-2 at 32.

As alleged, Plaintiff's ability to participate meaningfully in the hearing was impaired by technical issues. Plaintiff alleges that he had problems with the audio and video during the proceeding, which made it difficult for him to hear the proceeding. Am. Compl. ¶¶ 231–232, 236. Plaintiff's audio difficulties were noted by multiple people in the hearing. The video feed from NYU was turned off for part of the hearing, and NYU made no effort to rectify the situation or adjourn the hearing. *Id.* ¶¶ 232–239. It is hard to imagine a much more fundamental procedural flaw than an inability to hear or see what was happening. Plaintiff also takes issue with the fact that he did not have a hard copy of the ISR, while others participating in the hearing did. *Id.* ¶¶ 221–223. That Plaintiff was not provided with a hard copy of the ISR does not in and of itself appear to be problematic. It makes sense that those who attended the hearing in-person in New York received printed copies of the ISR and that Plaintiff, who participated in the hearing remotely from Australia, did not. And Plaintiff does not point to any provision of the Policy or Procedure that required NYU to provide him with a printed copy. But Plaintiff alleges that the fact that Plaintiff was accessing the report on his laptop, combined with the other technical difficulties he faced, caused him to provide incorrect responses to questions asked during the hearing. *Id.* ¶¶ 223–230. Plaintiff's inability to hear and understand questions posed to him during the remote hearing adequately pleads a procedural flaw.

NYU argues that because Plaintiff failed to raise these issues during the hearing and during his appeal, he has waived these claims. Def.'s Mem. at 20. NYU does not cite any law or refer to any NYU policies or procedures in support of this proposition. As NYU also points out, Plaintiff did not raise these claims in his initial complaint. *Id.* That does not matter. The Court must accept Plaintiff's allegations as true. Plaintiff has alleged that he was unable to hear or see what was going

on during the disciplinary hearing, and that because of this, he answered questions incorrectly and was denied the opportunity to fully participate in the hearing.  This is fundamental to Plaintiff's right to "a meaningful opportunity to be heard."

Second, Plaintiff alleges several evidentiary weaknesses that undermine NYU's findings that he was responsible for sexual exploitation, sexual harassment, and stalking.  He calls into question the completeness and credibility of the evidence considered by Jolley and alleges that Jane had a motive to lie.  Plaintiff states that the Hearing Decision was based on text messages that were "cherry-picked" and "selectively edited by Jane to make John look bad."  Am. Compl. ¶¶ 170, 186–189.  Plaintiff alleges that because he was in Australia at the time of the hearing, he did not have access to his hard drive, which would have given him access to evidence that, he alleges, refuted the facts relied on in the ISR.  *Id.* ¶ 193.  He alleges that Jane, who served as one of the primary witnesses at the hearing, had a history of lying about sexual assault, of being secretive about her relationship with Plaintiff, and of using a false identity to manipulate Plaintiff.  *Id.* ¶¶ 5, 306–312.  In his appeal, Plaintiff also identified several witnesses, who possessed information proving that he "was not stalking Jane in Washington Square Park on May 2, 2018, nor had he violated the no-contact directive on that date."  *Id.* ¶¶ 316–332.  NYU did not interview those witnesses.  *Id.*

Together, these procedural violations and evidentiary weaknesses cast "some articulable doubt on the accuracy of the outcome of the proceeding."  As the Second Circuit has emphasized, "[t]he pleading burden in this regard is not heavy," *Yusuf*, 35 F.3d at 715.  Plaintiff has met it here.

Plaintiff also argues that NYU "misapplied its policies" in finding him responsible for sexual exploitation; stalking; and sexual harassment.  In particular, Plaintiff alleges that NYU erred in finding him responsible for sexual exploitation because certain pictures that he took of Jane while she was sleeping did not feature nudity or sexuality; that NYU erred in finding him responsible for stalking because it failed to apply the reasonable person standard; and that NYU erred in finding

him responsible for sexual harassment because his messages to Jane were "not 'sexual.'"  Pl.'s Opp'n

at 20; Am. Compl. ¶¶ 483, 279–280, 254.  NYU argues that these claims are largely "disagreement[s]

with the adjudicator" regarding the outcome of the claim.  Def.'s Mem. at 20.  But the Court need

not decide these issues, because Plaintiff's allegations that, at times, he could not see or hear what

was going on in the hearing and that this caused him to answer questions incorrectly, combined with

his allegations that Jane was an unreliable witness, that NYU considered cherry-picked evidence, and

that NYU failed to interview witnesses with direct knowledge of the stalking incident, are sufficient

to cast "some articulable doubt" on the outcome of the proceeding.

### ii. Minimal Plausible Inference of Gender Bias

Plaintiff alleges procedural irregularities, evidentiary weaknesses, and that NYU was under

pressure to refute criticisms circulating in the student body and in the public press that it was turning

a blind eye to female students' charges of gender-based misconduct by male students.  Because the

allegations of bias in this case are similar to those found to be adequate in *Doe v. Columbia*, the Court

concludes that Plaintiff has plausibly alleged a minimal inference that NYU was biased during the

disciplinary proceedings, and that this bias was because of Plaintiff's gender.

Plaintiff has alleged procedural irregularities indicating that NYU was biased against Plaintiff.

Plaintiff asserts that NYU ignored evidence contradicting Jane's version of events, refused to

investigate Jane' violations of NYU's Title IX policies, failed to confirm the completeness and

accuracy of the evidence that Jane provided, and failed to enforce the no-contact order against Jane

while affirmatively enforcing it against him.  Am. Compl. ¶¶ 132–164, 186–189, 354–419.  These

procedural deficiencies are similar to those that the Second Circuit found indicative of a biased

proceeding in *Doe v. Columbia*, which included refusing to interview witnesses who could have

corroborated the plaintiff's account, ignoring the plaintiff's complaints of retaliatory behavior, and

reaching conclusions without reconciling contradictory evidence.  831 F.3d at 56–57; *see also*

*Feibleman*, 2020 WL 882429, at *9.  Thus, the alleged procedural irregularities in this case, when

viewed in the light most favorable to Plaintiff, support an inference that NYU was biased against

Plaintiff.

Plaintiff must next allege facts supporting a plausible inference that the bias against Plaintiff

was based on gender.  On this issue, Plaintiff's allegations also track those in *Doe v. Columbia*.  As in

that case, the plaintiff is a male student who was found to have committed gender-based misconduct

against a female student, and who accuses the university of adopting anti-male bias due to public

pressure.  *See Columbia*, 831 F.3d at 57–58 ("The Complaint alleges that, having been severely

criticized in the student body and in the public press for toleration of sexual assault of female

students, Columbia was motivated in this instance to accept the female's accusation of sexual assault

and reject the male's claim of consent, so as to show the student body and the public that the

University is serious about protecting female students from sexual assault by male students.").

Plaintiff broadly alleges that NYU was under this kind of public pressure.  Am. Compl.

¶ 420.  He also points to several specific factual circumstances in support of the allegation.  First,

Plaintiff points to the August 2018 social media posts by a female NYU student and alleged rape

victim, which claimed "that NYU had failed to sanction two male students for engaging in

nonconsensual sex with her."  *Id.* ¶ 421.  The Amended Complaint alleges that those social media

posts were distributed to 1,000 people.  *Id.* ¶ 422.  The Amended Complaint identifies comments on

the posts that were critical of NYU.  *Id.* at ¶¶ 423–24.  The posts contained comments such as, "I

hope these protests and riots make NYU see that what they're pulling is detrimental to the entire

female student body," and "[a]bsolutely horrifying.  NYU is likely in for a year of protests, it's been

brewing for ages.  Women at our school are fed up;" and "NYU does not protect its female

students . . .  NYU has failed me and countless other girls, teaching us that standing up for ourselves

is a complete waste of our time."  Am. Compl. ¶¶ 422–423.  As in *Columbia*, it is plausible that the

university was sensitive to this criticism and that NYU was thus motivated to favor a female complainant over a male respondent, to protect NYU from accusations that they had failed to protect female students from gender-based misconduct. *See Columbia*, 831 F.3d at 57.

As NYU points, out, in *Doe v. NYU*, the district court considered these posts "insufficient to support 'even a minimal plausible inference of gender bias' because Plaintiff does not allege that these posts were circulated to the press or that the Defendants[] were aware these posts existed." 438 F. Supp. 3d at 185 (quoting *Menaker*, 935 F.3d at 33). But there is a key difference here: NYU was aware of these posts prior to the adjudication of Plaintiff's appeal. The complaint in *Doe v. NYU* was filed on January 25, 2019 and NYU appeared two days later. Case No. 1:19-cv-744 (ALC), Dkt. Nos. 1, 8. The Court takes judicial notice of the filing of the complaint in *Doe v. NYU*. *See Glob. Network Commc'ns, Inc.*, 458 F.3d at 157 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998)). The Court does not take as true the allegations in the *Doe v. NYU* complaint. Rather, the Court considers the fact of the filing of the complaint, which put NYU on notice of the possibility that such a social media post existed. Even if NYU did not know about the social media posts when they were first made, it did know about them as of January 27, 2019. This is two days after Plaintiff filed his appeal. The Court can infer that NYU knew about the social medial posts as it was considering Plaintiff's appeal, and, thus, the Court considers these social media posts in its assessment of gender bias.

Second, Plaintiff points to a Title IX investigation by NYU into conduct by a female professor that Plaintiff alleges generated significant public backlash. The male student alleged that the female professor had sexually harassed and sexually assaulted him. Am. Compl. ¶¶ 425–426. NYU's Title IX investigation into the matter resulted in a one-year suspension of the professor. *Id.*

¶ 427.  Plaintiff alleges that the decision to initiate a Title IX proceeding against the professor was "very controversial within the academic community," in part because NYU used the Title IX process against a woman.  *Id.* ¶¶ 428–429.  The "pushback" was "the subject of multiple news stories in the print and online media," some of which "focused their vitriol solely on the fact that Ronell was a woman who happened to be a respondent in [a] Title IX matter."  *Id.* ¶¶ 430–431. Plaintiff alleges that NYU was cognizant of and sensitive to the criticism that Title IX should not be used against females, and that as a result, NYU issued a more lenient sanction against the female professor than it would have against a similar male respondent.  *Id.* ¶¶ 432–433.  These facts plausibly support an inference that public pressure and criticism impacted the way NYU treated male respondents and motivated NYU to treat Plaintiff, a male respondent, more harshly.

Third, Plaintiff points to two investigations by the OCR, which opened in May 2015 and December 2016.  *Id.* at ¶¶ 436–438.  Both of those investigations were based on complaints alleging that NYU had failed to respond promptly and equitably to the complainant's report of sexual assault.  *Id.*  Plaintiff does not identify the gender of either the complainants or the respondents in those investigations.  Although the Second Circuit in *Menaker* considered a Department of Education investigation in concluding that the plaintiff had "plausibly alleged facts that suggest at least *some* pressure on [the defendant] to react more forcefully to allegations of male sexual misconduct," 935 F.3d at 34 (emphasis in original), here, the Court cannot make any such inference because Plaintiff has failed to identify the gender of the complainants and respondents.  These investigations began several years prior to the disciplinary investigation and proceeding at issue here, and Plaintiff does not make any allegations regarding whether they were ongoing at the time of Plaintiff's disciplinary proceeding.  Plaintiff also does not allege that NYU faced any criticism as a result of these OCR investigations or that they generated adverse publicity for NYU.

Taken together, though, the social media posts—and NYU's awareness of these posts as it was deciding Plaintiff's appeal—and the blowback from the Ronell investigation are evidence of public pressure on NYU to disfavor male respondents like Plaintiff during the Title IX process. "When combined with clear procedural irregularities," as it is here, even this "minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *See Menaker*, 935 F.3d at 33. Accordingly, Plaintiff has stated an erroneous outcome claim.

### b. Selective Enforcement

Plaintiff has stated a selective enforcement claim because Jane is a similarly-situated student who was treated differently and because he has alleged a minimal inference of gender bias.

#### i. Similarly-Situated Student Treated Differently

Plaintiff argues that Jane is a similarly-situated student of the opposite sex who was treated better than Plaintiff. NYU argues that Plaintiff and Jane are not similarly situated because Plaintiff does not allege that he attempted to file a Title IX complaint against Jane until after she had filed a complaint against him and because Plaintiff's allegations against Jane are materially different from Jane's allegations against Plaintiff. Def.'s Mem. at 16–17.

The parties disagree about the degree of similarity that must be pleaded at this stage in the litigation. In *Doe v. New York University*, the court stated in its opinion granting the motion to dismiss that in the context of a Title IX challenge to a school disciplinary proceeding, "similarly situated members of the opposite sex" meant "members of the opposite sex facing comparable disciplinary charges." 438 F. Supp. 3d at 182 (quoting *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397 415–16 (N.D.N.Y. 2019)). Similarly, in *Yu v. Vassar College*, the court explained that "[a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." 97 F. Supp. 3d at 480 (alteration in original) (quoting *Mallory*, 76 Fed.

Appx. at 634).  But as plaintiffs in both of these cases did not propose a comparator, neither case considers what degree of similarity is required for the plaintiff to allege "comparable disciplinary charges" or "circumstances" that are "sufficiently similar."

As there is dearth of law about this particular issue in the Title IX context in this Circuit, the Court looks to Title VII case law to determine what degree of similarity is required at this stage in the litigation.  To assert a Title VII claim, a plaintiff must allege that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  "The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance' but need not be 'identical.'"  *Id.* (quoting *Graham*, 230 F.3d at 40).  In the context of employee discipline, courts consider whether the comparators' offenses were of "comparable seriousness," which "requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated."  *Graham*, 230 F.3d at 40.  "Ordinarily, '[w]hether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss."  *Brown*, 756 F.3d at 230 (alterations in original) (quoting *Graham*, 230 F.3d at 39).  On a motion to dismiss, a court must "determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated."  *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 436 (S.D.N.Y. 2019) (quoting *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014)).

Based on the allegations in the Amended Complaint, it is plausible that a jury could determine that Jane and Plaintiff are similarly situated.  There are two instances in which Plaintiff alleges that he accused Jane of conduct violating NYU's Title IX policy and was treated differently than Jane was treated when she accused Plaintiff of violating NYU's Title IX policy:  First, Plaintiff alleges that sometime after his May 2, 2018 encounter with Jane in Washington Square Park, he

40

"attempted to file a report with NYU's public safety officer regarding the incident." Am. Compl. ¶¶ 354–357. Plaintiff alleges that NYU refused to investigate his report. *Id.* ¶ 358. Plaintiff alleges that when Jane accused him of stalking, NYU charged Plaintiff with stalking under its Title IX policy and offered to assist Jane in contacting the NYPD. *Id.* ¶¶ 360–361. These circumstances bear a reasonably close resemblance: Plaintiff and Jane both faced allegations of stalking for their conduct in and around Washington Square Park during the May 2, 2018 incident. Depending on the results of discovery, an examination of the context and surrounding circumstances in which the students' acts are evaluated could plausibly yield the conclusion that they involved sufficiently similar circumstances or that they faced comparable disciplinary charges.

Second, Plaintiff alleges that at some point during NYU's investigation of Jane's Title IX complaint, he attempted to file a complaint against Jane alleging conduct that violated the Policy, including sexual harassment, gender-based harassment, and stalking. *Id.* ¶¶ 366–367. The allegations that Plaintiff made against Jane included that she "belittled him in public because of his appearance," that she "humiliated him when she said he 'looked gay' in front of his friends," and that through her alto-ego Sally, she pressured and manipulated Plaintiff to "become more sexual with Jane" through "inappropriate messages that made John uncomfortable." *Id.* ¶¶ 39–42, 59–85, 132–134, 136–142, 145–146. Plaintiff also asserted that Jane "physically abused John by punching or slapping him on at least five occasions." *Id.* ¶ 97. Plaintiff alleges that NYU told him that he would need to wait until the conclusion of the disciplinary process against him before filing a Title IX complaint against Jane. *Id.* ¶ 382.

NYU argues that at this time, Plaintiff and Jane were not similarly situated because Plaintiff was already a respondent in an ongoing investigation and because the underlying conduct was not similar. Def.'s Mem. at 16. But one inquiry in this context is whether Plaintiff and Jane faced "similar disciplinary charges," and here, Plaintiff alleges he attempted to file charges of sexual

harassment and stalking.  These charges are similar to the charges that Plaintiff faced based on his

alleged conduct toward Jane.  Although the conduct underlying Plaintiff's charges against is not

exactly the same as the conduct underlying Jane's charges against Plaintiff, depending on the results

of discovery, it could plausibly yield the conclusion that they are comparable, and comparably

serious.  At this stage of the case, that is sufficient.

Plaintiff also argues that he was similarly situated to Jane when he attempted to file a Title

IX complaint against Jane after the completion of the disciplinary proceedings against him and was

not permitted to do so.  *Id.* ¶¶ 383, 388–403.  NYU's arguments that he and Jane were not similarly

situated are more convincing here.  The Court agrees that at this time, Plaintiff was in a materially

different position than Jane was when she made her Title IX complaint against Plaintiff.  This is

because at the time that he made this complaint, Plaintiff had already brought his accusations against

Jane to NYU's attention; they are detailed in his Appeal.  Ex. E.  This also makes Plaintiff very

differently situated from Jane, who brought her complaint regarding conduct that had not already

been the resolved through a disciplinary proceeding.  But because Plaintiff has alleged two other

instances where he was similarly situated to Jane and was treated worse, he has stated a selective

enforcement claim.

*ii. Minimal Plausible Inference of Gender Bias*

For the reasons discuss in Section III(A)(2)(a)(ii), Plaintiff has stated a minimal plausible

inference of gender bias.

**B. Promissory Estoppel**

Plaintiff has stated a claim for promissory estoppel based on his reasonable reliance on

McFarlane's promise that the most severe sanction he would face would be a one-semester

suspension.  However, Plaintiff has not stated a claim for promissory estoppel as to Signor's

promise that he could file a Title IX complaint against Jane after Jane's complaint against Plaintiff was adjudicated because he has failed to allege injury by reason of his reliance on the promise.

### 1. Legal Standard

The doctrine of promissory estoppel "allows for the enforcement of a promise in the absence of bargained-for consideration." *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994) (citing Restatement (Second) of Contracts § 90 (1981)).  "In New York, promissory estoppel has three elements:  'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'"  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir.1989)).

### 2. Application

Plaintiff sets forth three bases for this promissory estoppel claim:  McFarlane's promise that he would not be expelled; Signor's promise that Plaintiff could file his Title IX complaint against Jane after her complaint against Plaintiff was adjudicated; and NYU's "express and implied promises" to all its students.[7]  Am. Compl. ¶¶ 510–538.  NYU contends that his reliance on McFarlane's promise that he could not be expelled is unreasonable because it is inconsistent with the written terms of the Policy and the Procedure and that NYU's refusal to open an investigation against Jane did not injure Plaintiff.  Def.'s Mem. at 23; Def.'s Reply at 10.

Plaintiff has adequately pleaded each of the elements of a promissory estoppel claim with respect to the promises that McFarlane made to him.  According to the Amended Complaint, McFarlane made clear and unambiguous promises to Plaintiff:  McFarlane promised Plaintiff two times that the worst consequence he would face in the disciplinary proceeding would be a one-

---

[7] Neither party addresses NYU's "express and implied promises" to all its students in the briefs.  Because Defendant did not provide briefing in support of its motion to dismiss that aspect of Plaintiff's claim, the claim survives.

semester suspension.  Am Compl. ¶¶ 126, 128, 171–172, 512–515.  Plaintiff alleges that his reliance

on this statement "led to the preparation of an inadequate defense to the charges levied against

him."  *Id.* ¶¶ 520–522.  As described above, Plaintiff chose not to retain a lawyer to defend him, and

decided to stay in Australia to contest the charges, despite the fact that relevant evidence was back in

the United States.  He alleges that as a result of those actions taken in reliance on McFarlane's

promises, he was wrongly found responsible for stalking, sexual harassment, and sexual exploitation.

*Id.* ¶ 523.

The complaint adequately alleges that Plaintiff reasonably relied on McFarlane's promises.

Under New York law, a party cannot reasonably rely on an oral promise that is contrary to the

provisions of a written contract.  *See Lonbroso v. JP Morgan Chase & Co.*, 836 N.Y.S.2d 80 (1st Dep't

2007) (holding that plaintiff could not reasonably rely on oral promise contrary to terms of stock

purchase agreement); *PHL Variable Ins. Co. v. Mahler*, 321 F. Supp. 3d 392 (E.D.N.Y. 2018) (holding

that it was unreasonable for plaintiff to expect to retain a commission when explicit terms in

contract stated that he might have to return it).

The promise made by McFarlane was not contrary to the relevant agreement here—the

Procedures.  Rather, it was at least arguably consistent with its terms.  The Procedures provide that

"[t]he potential sanctions for a violation of the Policy . . . include[e]:  Warning, Censure, Disciplinary

Probation, Restitution, Suspension of Privilege, Suspension from NYU, No Contact Directive,

Dismissal from NYU and Transcript Notation."  Ex. A at 10.  The promise of a sanction no greater

than one-semester of suspension falls within the range of potential sanctions described in the

Procedures; it is not inconsistent with it.  In essence, McFarlane was taking off the table the more

serious sanctions listed in the menu of options permitted under the Procedures.  He did not promise

something that was not permitted under the Procedures.  In that way, this case is unlike *PHL* and

*Lonbroso*, in which the promisor committed to something that was contradicted by the terms of an

underlying agreement.  The Court does not conclude as a matter of law that Plaintiff's reliance was unreasonable for this reason.

The respective roles of Plaintiff and McFarlane provide further support for Plaintiff's assertion that his reliance was reasonable.  When McFarlane made his promises to Plaintiff, Plaintiff was an NYU undergraduate and McFarlane was an NYU administrator from the Title IX office assigned to Plaintiff specifically to assist him in navigating the Title IX process.  It is inherently reasonable that a student would rely upon the person assigned by his university to advise him through the Title IX process.

Plaintiff has not stated a claim for promissory estoppel as to Signor's promise, because he has not plausibly alleged that he was injured in a cognizable way as a result of her breach.  "A person claiming promissory estoppel must have suffered unconscionable injury, or prejudicially changed their position, as a result of their reliance on a promise."  57 N.Y. Jur. 2d *Estoppel, Etc.* § 57.  The standard for unconscionability is "demanding."  *In re Est. of Hennel*, 29 N.Y.3d 487, 495, (2017).  "[T]he doctrine of promissory estoppel is properly reserved for that limited class of cases where the circumstances are such as to render it unconscionable to deny the promise upon which the plaintiff has relied . . . ."  *Id.* (quoting *Philo Smith & Co., v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977)).  "Unconscionable injury . . . requires something beyond the expectation damages which flow naturally from the non-performance of the alleged agreement."  *Fishoff v. Coty Inc.*, 676 F. Supp. 2d 209, 220 (S.D.N.Y. 2009) (internal quotations omitted), *aff'd*, 634 F.3d 647 (2d Cir. 2011).

Plaintiff has not plausibly pleaded that he was injured as a result of Signor's faulty promise.  Plaintiff alleges he "relied upon Signor's promise that he would be able to file a Title IX complaint against Jane once Jane's Title IX complaint against him was resolved."  Am. Compl. ¶ 530.  Plaintiff alleges that he was "denied the ability to meaningfully present evidence that would have exonerated him of the charges levied against him by Jane that ultimately led to his expulsion."  *Id.* ¶¶ 530–531.

Plaintiff also alleges that he was denied "the ability to participate in a fair and impartial process," "a meaningful opportunity to be heard," and the "ability to exercise his civil rights and pursue his claims against Jane." *Id.* ¶¶ 532–538.

As NYU argues, Plaintiff's allegation that his inability to present exculpatory evidence in the disciplinary proceeding against him resulted is an injury resulting from Signor's defaulted promise faces a significant challenge: the promise was that he would be able to file the complaint against Jane *after* the close of his case. How Plaintiff's decisions regarding conduct during his case were impacted by his ability to pursue a claim against Jane afterward is not apparent from the facts pleaded in the complaint. Plaintiff does not plead facts that show that he suffered an unconscionable injury as a result of the violation of Signor's promise. For the same reason, Plaintiff has not shown how he deleteriously relied on Signor's promise in the development of the defense of his case. That leaves as the only consequence of Signor's breach the fact that John was unable to prosecute Jane—this is not an unconscionable injury; it is merely the consequences of the breach itself.

### C. Violation of New York City Human Rights Law

Because Plaintiff has sufficiently pleaded a discrimination claim under Title IX, he has similarly has adequately pleaded a corresponding claim under the NYCHRL.

#### 1. Legal Standard

In order to state a claim under the NYCHRL, a "plaintiff need only show differential treatment—that [he] is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (citing *Williams v. New York City Hous. Auth.*, 872 N.Y.S. 2d 27, 39 (1st Dep't 2009). The plaintiff must allege "that the conduct is caused by a discriminatory motive." *Id.*; *see also Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 301 (S.D.N.Y. 2019) (dismissing disability discrimination claim under the NYCHRL because the plaintiff

"fail[ed] to allege facts that lead to the inference that his disability was a motivating factor for the allegedly discriminatory conduct").

Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted). The Restoration Act established two new rules of construction for the NYCHRL. First, the NYCHRL is "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall.'" *Mihalik*, 715 F.3d at 109 (quoting *Loeffler*, 582 F.3d at 278, in turn quoting Restoration Act § 1)). Thus, "[t]he NYCHRL's standards governing discrimination claims are as or more generous to plaintiffs than those under the analogous federal statutes," so "that a claim that satisfies federal law necessarily satisfies the NYCHRL." *Estevez v. S & P Sales & Trucking LLC*, No. 17 Civ. 1733 (PAE), 2017 WL 5635933, at *3 (S.D.N.Y. Nov. 22, 2017). Second, NYCHRL provisions must "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." *Mihalik*, 715 F.3d at 109 (quoting Restoration Act § 7). That is so even if similar "federal or New York State civil and human rights laws" with "comparably-worded" provisions have been construed more narrowly. *Id.* (quoting Restoration Act § 7).

Because the NYCHRL standard is more liberal than the corresponding federal and state law standards, courts must analyze NYCHRL claims "separately and independently from any federal and state law claims." *Id.* Under the NYCHRL, it is sufficient for the plaintiff to allege that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for" her unequal treatment. *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40–41 (1st Dep't 2012) (citing *Williams*, 872 N.Y.S.2d at 40 n. 27); *see also Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112,

120 (1st Dep't 2011) ("It is not uncommon for covered entities to have multiple or mixed motives for their action, and the [NYC]HRL proscribes such 'partial' discrimination."). A plaintiff who has sufficiently pleaded a discrimination claim under Title IX similarly has adequately pleaded a corresponding claim under the NYCHRL. *See Munson v. Diamond*, No. 15-CV-00425 (DAB)(BCM), 2017 WL 4863096, at *5 (S.D.N.Y. June 1, 2017) ("A well-pled Title VII discrimination . . . claim is sufficient to support a corresponding claim under the NYSHRL, as well as under the NYCHRL") (quoting *Styka v. My Merchants Servs.* LLC, No. 14 Civ. 6198 (ENV) (VMS), 2016 WL 3866550, at *2 (E.D.N.Y. July 13, 2016) and *Columbia Univ.*, 831 F.3d at 55 (finding that the Second Circuit has "applied Title VII's framework and principles to Title IX claims").

### 2. Application

Because Plaintiff has sufficiently pleaded a discrimination claim under Title IX, he similarly has adequately pleaded a corresponding claim under the NYCHRL. The Amended Complaint asserts facts indicating that Plaintiff was treated less well than Jane. Am. Compl. ¶¶ 354–419, 540–44. Plaintiff alleges that when he attempted to file a report with NYU for stalking based on his encounter with Jane on May 2, 2018, NYU refused to investigate and he was advised that the conduct did not constitute stalking; when Jane reported this same conduct to NYU, NYU offered to involve the police and charged Plaintiff with stalking and a violation of the no-contact directive. *See* Section III(A)(2)(b) *supra*. Plaintiff also alleges that when he attempted to file a Title IX complaint against Jane for sexual harassment, stalking, and relationship violence, NYU did not investigate and refused to accept his complaint and told him that he would need to wait until after the adjudication of Jane's complaint against him; when Jane attempted to file a Title IX complaint against Plaintiff, NYU accepted the complaint and began investigating. *See id.*

Plaintiff has also alleged the existence of discriminatory intent as the reason for his allegedly inferior treatment when compared to Jane. He has alleged procedural irregularities in the

disciplinary proceedings—most fundamentally, that he had technological difficulties and could not hear or see parts of the proceeding—and evidentiary weaknesses, including that NYU failed to consider text messages that would have refuted Jane's allegations.  *See* Section III(A)(2)(a) *supra*. Plaintiff also had alleged particularized facts indicating that NYU was under pressure to crack down on gender-based misconduct on campus.  NYU was aware of social media posts criticizing its response to sexual assault by male students and was also sensitive to criticism that it used Title IX to discipline a female faculty member.  *Id.*  These allegations give rise to a minimal inference of discriminatory intent, which is sufficient to plead a discrimination claim under Title IX, and therefore also under the NYCHRL.

## IV. LEAVE TO AMEND

The Court grants Plaintiff leave to replead the dismissed promissory estoppel claim.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," those circumstances do not apply in this case.  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted).  Any amended complaint must be filed no later than fourteen days from the date of this order.

## V. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss Plaintiff's Amended Complaint is GRANTED as to Plaintiff's promissory estoppel claim regarding Signor's promise that Plaintiff could file his Title IX complaint against Jane after her complaint against Plaintiff was adjudicated;

Defendant's motion is DENIED as to all other claims.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 32.

SO ORDERED.

Dated:  March 31, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge