**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

JOHN DOE,                                                    Case No. 1:20-cv-01343-GHW

              Plaintiff,

-against-

NEW YORK UNIVERSITY,

              Defendants.

-----------------------------------------------------------------------x

---

### DEFENDANT NEW YORK UNIVERSITY'S RULE 56.1 STATEMENT IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

---

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Jeffrey P. Metzler
Max A. Winograd
Melissa S. Pettit
jeffrey.metzler@pillsburylaw.com
max.winograd@pillsburylaw.com
melissa.pettit@pillsburylaw.com
31 W. 52nd St.
New York, NY 10019
(212) 858-1000

*Counsel for Defendant New York University*

Dated: New York, NY
       June 22, 2022

# TABLE OF CONTENTS

**Page**

I.      NYU's Policies and Procedures for Title IX Complaints .................................................. 1

II.     NYU Personnel Involved in Plaintiff's Disciplinary Process ............................................. 7

III.    Plaintiff's Relationship with Jane Roe Before NYU ........................................................ 8

IV.     Plaintiff Transfers to NYU ................................................................................................ 11

V.      Plaintiff Repeatedly Makes Threats to Jane Roe and Disregards Her Requests to Him to Cease Contact ........................................................................................................ 14

VI.     Jane Files a Complaint with NYU .................................................................................... 22

VII.    Plaintiff Repeatedly Violates the NCO ............................................................................ 23

VIII.   NYU Assesses Jane's Report and Receives a Further Complaint from Jane that Plaintiff Again Violated the NCO ..................................................................................... 24

IX.     NYU's Title IX Office Investigates Jane's Complaints Against Plaintiff ......................... 28

X.      OSC Coordinates the Hearing .......................................................................................... 37

XI.     The Hearing ....................................................................................................................... 40

XII.    The Decision ...................................................................................................................... 44

XIII.   Plaintiff's Appeal .............................................................................................................. 46

XIV.    Plaintiff's Post-Appeal Conduct ...................................................................................... 50

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant New York University ("NYU"), respectfully submits this statement of facts as to which there is no genuine issue to be tried.

## I.    NYU's Policies and Procedures for Title IX Complaints

1.    NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy, effective April 18, 2018 ("the Policy"), prohibits certain conduct ("Prohibited Conduct"), with the goal of maintaining "a safe learning, living, and working environment."  (Ex. 1, NYU_00009755 at -09788).[1]

2.    The Policy was specifically "designed to comply with . . .  Title IX of the Education Amendments of 1972 . . . and . . . the New York State and City human rights laws."  (*Id.*).

3.    Under the Policy, Prohibited Conduct includes "Stalking," which includes

"a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress. Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person . . . Substantial emotional distress means significant mental suffering or anguish.  Stalking includes cyber-stalking, a particular form of stalking in which electronic media such as . . . social networks, . . . cell phones, texts, or other similar … forms of contact are used."

(*Id*. at -09795; Ex. 2, NYU_00001803 at -01805).

4.    Prohibited Conduct also includes "Sexual or Gender-Based Harassment," which is defined as "any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when . . . Such conduct has the purpose or effect of unreasonably interfering with an individual's learning,

---

[1] NYU has amended the Policy several times, including over the period relevant to the Amended Complaint. However, because the amendments made during this time are not relevant to the allegations in the Amended Complaint, (*see* Ex. 2, NYU_00001803 at -01804), NYU will refer only to the April 18, 2018 version of the Policy for the sake of simplicity.

working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective – a reasonable person's view – and subjective – the Complainant's view – standard (hostile environment)."  (Ex. 1, NYU_00009755 at -09793-94; Ex. 2, NYU_00001803 at -01804).

5.    Prohibited Conduct also includes "Sexual Exploitation," which includes "non-consensual use of another individual's nudity or sexuality," such as "taking pictures . . . of another person . . . where such person has a reasonable expectation of privacy . . . without the affirmative consent of all parties."  (Ex. 1, NYU_00009755 at -09795; Ex. 2, NYU_00001803 at -01804).

6.    Under the Policy, "[v]iolating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy."  (Ex. 1, NYU_00009755 at -09791).

7.    Under the Policy, the procedures for reporting Prohibited Conduct committed by students are set forth in NYU's Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Students ("the Procedures").  (*Id.* at -09790); *see* (Ex. 3, NYU_00029043).[2]

8.    Under the Procedures, a Complainant may make a report of Prohibited Conduct committed by another student (the Respondent).  "Upon receipt of a report, the Title IX Coordinator will conduct an initial assessment . . . After the initial assessment, the Title IX Coordinator will determine whether the circumstances warrant proceeding to an investigation." (*Id.* at -29043, -29045).

---

[2]  Like the Policy, the Procedures are revised periodically.  The Procedures applicable to the allegations in the Amended Complaint have an effective date of August 25, 2017.

9. Under the Policy, all NYU students have the right to "[m]ake a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process." (Ex. 1, NYU_00009755 at -09797).

10. Under the Procedures, "[w]here possible based on the facts and circumstances, NYU will seek action consistent with the Complainant's request to maintain his/her privacy and/or not conduct further Investigation." (Ex. 3, NYU_00029043 at -29044). NYU "seeks to be sensitive to those Complainants who seek access to Confidential Resources, but may not wish to report Prohibited Conduct." (*Id*. at -29043).

11. NYU will only investigate a complaint without a Complainant requesting an investigation "[w]here the balance of factors requires that further investigation be conducted." (*Id*. at -29045). Relevant factors include "the risk that the Respondent may commit additional acts of Prohibited Conduct or other violence, taking into consideration, among other matters, any known history of arrests, violence, or other complaints . . . threats of future violence made by the Respondent, and whether multiple Respondents were involved," whether a weapon was involved or the conduct was "unusually" violent, "whether the report reveals a pattern of Prohibited Conduct," whether the Complainant is a minor, and whether "there is other relevant evidence" besides the Complainant's report. (*Id*. at -29044).

12. In practice, NYU does not "force complainants to make complaints. Generally speaking, [NYU does not] pursue an investigation without the cooperation of a complainant." (Ex. 4, Hodge Tr. 139:18-22). Only "where if somebody is a grave risk to the University community like they've brutally assaulted or attempted murder or something very serious, then there's a risk committee that the University has, they would meet and make a decision about what, if any, action should be taken in those circumstances, but ultimately complainants drive the decision-

making . . .If they don't ever express that they want an investigation, well, by its very nature we're not assessing the complaint." (*Id.* 138:14-139:10; *see also* Ex. 5, Signor Tr. 223:14-224:17 (NYU would consider continuing with an investigation "even if the aggrieved student asked you not to" if that student's "life is in danger" or if the NYU community were in danger but generally not for "[a]ny other reasons."); Ex. 6, Stabile Decl. ¶¶ 9-10 ("In general, it is very rare for NYU to proceed to an investigation of allegations absent the express request of a complainant.")).

13.     After the initial assessment, "NYU may seek a form of Administration Resolution" if both the Complainant and Respondent agree to participate. (Ex. 3, NYU_00029043 at -29046-47). "If an agreement acceptable to each of NYU, the Complainant, and the Respondent is reached," then "the matter is considered to be resolved." Such agreements can include "academic accommodations," "remedies designed to maximize the Complainant's access to educational, extracurricular, and/or employment activities," or "increased monitoring, supervision, and/or security" at certain locations or activities. (*Id.* at -29047).

14.     If the Title IX Coordinator determines "that a matter is to be investigated," she will "designate an investigator(s) from the Office of Equal Opportunity" to investigate the report. (*Id.*). The Office of Equal Opportunity's ("OEO") practice is for at least two investigators to be assigned to each Title IX investigation because "it's good practice to have more than one set of eyes and ears in an interview . . . [T]wo people collaborate and it's helpful for the investigation to have another person there." (Ex. 4, Hodge Tr. 51:7-20).

15.     During the Investigation, the Complainant and Respondent "have an equal opportunity to be heard, to submit information and corroborating evidence, and to identify witnesses." (Ex. 3, NYU_00029043 at -29047). For Investigations where the Respondent has elected to file a cross-complaint against the Complainant, NYU investigates and adjudicates the

Respondent's allegations concurrently with its investigation of the original complaint.  (Ex. 6, Stabile Decl. ¶ 11).  Relevant witnesses cannot participate unless they "have information deemed relevant to the Investigation" by the investigators.  (Ex. 3, NYU_00029043 at -29047).

16.     On multiple occasions, NYU has investigated a male respondent's cross-complaint concurrently with a female complainant's allegations.  (Ex. 6, Stabile Decl. ¶ 11).

17.     The investigators have "discretion to determine the relevance of any proffered evidence and may determine that certain types of evidence should be included or excluded in the determination of responsibility."  (Ex. 3, NYU_00029043 at -29047).

18.     "A Complainant's or Respondent's prior sexual history with persons other than the other party involved in the investigation will not be considered as evidence during an Investigation or Hearing."  (*Id*. at -29048).

19.     After the Investigation is complete, the investigators prepare a "report that summarizes the information gathered.  Both the Complainant and the Respondent will be given the opportunity to review the draft Investigation report, submit any additional comment or information to the Investigator, and identify any additional information or witnesses."  (*Id*.).  "The purpose of the draft report review period is to enable the Complainant and Respondent an opportunity to review the evidence gathered, to clarify and/or expand upon information contained in the report, and to provide additional evidence."  (*Id*.).

20.     The investigators will then "issue a determination as to whether a reasonable fact-finder . . . could determine that there is sufficient evidence to support a finding that a violation of the Policy occurred."  (*Id*.).  If so, the report is submitted to the Office of Student Conduct ("OSC").  (*Id*.).

21.     Once the report is submitted, OSC "will receive and review the Investigation report. The OSC Administrator may accept the report as rendered or may request that an Investigator conduct additional interviews or seek out other evidence as deemed to be appropriate." (*Id*. at -29049).

22.     If OSC accepts the report, the "Complainant and Respondent will be notified in writing of the date, time, and location of the hearing, the charges to be reviewed by the Adjudicator, including the date, time, location and factual allegations concerning the violation; the provisions of the Policy alleged to have been violated; and the sanctions to be imposed." (*Id*. at -29050).

23.     When an investigation report is submitted, OSC "look[s] to schedule in a timely fashion.  And we have held hearings with complainants and respondents being across the globe. [NYU] do[es] not delay until students return to NYU's main campus." (Ex. 7, Maeder Tr. 69:25-70:5).

24.     "Permission to postpone a hearing may be granted provided that the request to do so is based on a compelling emergency." (Ex. 3, NYU_00029043 at -29050).

25.     "The Adjudicator has the discretion to designate the hearing format." (*Id*. at -29051).  At the hearing, the Complainant and Respondent "will be allowed to propose questions to the Adjudicator who will screen the questions for appropriateness and relevance." (*Id*.)

26.     After the hearing, "the Adjudicator will determine whether there is sufficient information, by a preponderance of the evidence, to support a finding of responsibility for a violation of the Policy." (*Id*. at -29052).  Considerations as to the appropriate sanction will include "the impact of the conduct on the Complainant," "whether the Respondent has accepted responsibility for the conduct," and "maintenance of a safe and respectful environment conducive to learning." (*Id*.).

27.     Any student "determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU." (Ex. 1, NYU_00009755 at -09790).

28.     Both the Complainant and Respondent have the right to appeal.  (Ex. 3, NYU_00029043 at -29053).  There are three grounds for an appeal: "(1) a material procedural error, (2) previously unavailable relevant evidence that could affect the outcome; and/or (3) the sanction being substantially disproportionate to the violation." (*Id*.).  Appeal statements cannot be longer than three pages.  (*Id*.).

29.     Throughout the Title IX Investigation and Adjudication process, Complainants and Respondents have "the right to be accompanied by an advisor of his/her choice."  (*Id*. at -29048).  The advisor "may be anyone of the individual's choosing who is not otherwise a party or witness involved in the Investigation."  (*Id*.).

**II.     NYU Personnel Involved in Plaintiff's Disciplinary Process**

30.     Mary Signor, the Executive Director of the Office of Equal Opportunity ("OEO") from 2009 to 2018, is NYU's Title IX Coordinator.  She is now Assistant Vice President for OEO. (Ex. 5, Signor Tr. 17:20-18:24).

31.     Samuel Hodge, a Title IX Investigator, and Lauren Stabile, NYU's Title IX Coordinator II, were assigned to investigate Jane Roe's Complaint against Plaintiff John Doe ("Plaintiff"). (Ex. 4, Hodge Tr. 39:18-41:10).  Lauren Stabile replaced Jacqueline Cornell, a Title IX Investigator who participated in Jane Roe's interview but left NYU shortly thereafter.  (*Id*. at 41:15-24; 49:19-25).

32.     Craig Jolley is the Director of OSC.  He was the Adjudicator for Jane Roe's Complaint against Plaintiff.  (*See generally* Ex. 2, NYU_00001803; Ex. 8, Jolley Decl. ¶1).

33.     Colleen Maeder was the Assistant Director of OSC.  Her responsibilities included coordinating the adjudication process for Title IX hearings.  (Ex. 7, Maeder Tr. 20:11-21:22).  She coordinated the hearing and appeal process for Jane Roe's Complaint against Plaintiff.  (*Id*. at 41:11-16).

34.     Allen McFarlane is the Assistant Vice President for Outreach and Engagement at NYU.  (Ex. 9, McFarlane Tr. 12:6-16).  He also serves as a facilitator for Respondents in NYU's disciplinary process.  (*Id.* at 24:13-25:15).  The role of a facilitator is to offer "[g]uidance related to what happens in [Title IX proceedings] in terms of the procedures, the steps, answering questions based upon information [the respondent] has received to help him make sure that he understands and gets his questions answered."  (*Id*. at 25:20-26:7).

### III.    Plaintiff's Relationship with Jane Roe Before NYU

35.     Plaintiff was a high school senior when he met Jane Roe ("Jane") while attending an internship program in August 2015.  They "began to text every day and became really close." (Ex. 1, NYU_00009755 at -10006).  At certain points between 2015 and 2018, Plaintiff and Jane were in a romantic relationship.  (Ex. 10, Plaintiff Tr. 19:21-24).

36.     Jane told Plaintiff that she came from a conservative family that would never approve of her extensive communication with Plaintiff.  (Am. Compl. ¶ 19).  Based on Jane's representations, it was Plaintiff's understanding that Jane's "parents were not supportive of their relationship" and "monitored [Jane's] phone/communications."  (Ex. 1, NYU_00009755 at -09763).

37.     Plaintiff and Jane attempted to conceal their communications from Jane's parents. Jane "created a Facebook account using an alias" to communicate with Plaintiff.  (*Id*. at -09758, -09808).  Plaintiff and Jane talked late at night or via the social media application

WhatsApp to avoid detection.  (*Id*. at -09763).  Jane "claimed that [her parents] monitored her iMessages," and Plaintiff "was under the impression that they did." (Ex. 10, Plaintiff Tr. 51:8-19).

38.     The relationship quickly became "toxic."  (Am. Compl. ¶ 2).  As early as April 30, 2016, Plaintiff threatened Jane that if she did not "have the decency to stay / Then I will force you to . . . I  will text your parents / Idc [I don't care] what they say to me / You watch out you idiot." (Ex. 11, P009355 at -09384-85).  Jane responded, "So you're going to make me stay with threats?" Plaintiff replied, "Yes." (*Id*. at -09385).

39.     The next day, Plaintiff told Jane if she did not promise to stay with Plaintiff he would "bash my head again;" when she refused he said, "Ok I'm going to go bash it." (Ex. 12, P009394 at -09407).  Jane told Plaintiff, "I don't want you hurt . . . Promise."  Plaintiff responded, "You promise." (*Id*. at -09418).  Jane agreed to promise, but said, "I'm not happy about it." Plaintiff responded, "Idc [I don't care]."  Jane told Plaintiff, "I want to go . . . But I can't now . . . You  suck." (*Id*. at -09418, 09420).

40.     Later that day, Plaintiff texted Jane , "I threatened you / I black mailed you / I said mean things / I will apologize." (*Id.* at -09459).   Jane responded, "If the same thing were to happen You'd do it again / So don't [apologize]." (*Id.*).

41.     According to Plaintiff, he learned during the 2017-2018 school year that Jane had told multiple people "that she was in a relationship with [Plaintiff] due to blackmail." (Ex. 1, NYU_00009755 at -10007; *see also* Ex. 13, Hearing Tr. 291:14-18 (Jane's friend stating that Jane's "parents did not like the fact that she was ever friends with him.  And when she was trying to cut off contact with him, he would blackmail her…")).

42.     Plaintiff and Jane graduated from different Connecticut high schools in 2016.  In the fall, Plaintiff enrolled at the University of Connecticut ("UConn") and Jane enrolled at NYU.

(Ex. 1, NYU_00009755 at -09758, -09762).  During their freshman year of college, Plaintiff visited Jane at NYU several times.  (*Id*. at -10006; Ex. 10, Plaintiff Tr. 153:12-16).

43.     In the fall of 2016, Plaintiff claims that Jane told him that she had been sexually assaulted by four NYU students.  (*See, e.g.*, Ex. 14, NYU_00011361 at -11364).  According to Plaintiff, that revelation had a great impact on him, and it "hurt [him] vicariously."  (Ex. 1, NYU_00009755 at -10079).

44.     During his freshman year, Plaintiff applied to NYU as a transfer student.  (*Id*. at -09765).  Jane reviewed his application essay for him and was open to his transfer to NYU, according to Plaintiff.  (*Id.*).

45.     Jane ended her relationship with Plaintiff in March of 2017 and told Plaintiff that "she doesn't want to be afraid of" him.  (Ex. 15, P057258 at -57374; Ex. 10, Plaintiff Tr. 21:2-13).

46.     Plaintiff learned he had gotten in at NYU as a transfer student on May 9, 2017.  (Ex. 16, P045456 at -05670).  Afterward, according to Plaintiff, Jane's "tone" about the prospect of Plaintiff transferring to NYU "very much changed" and she tried to "prevent [him] from going to NYU."  (Ex. 13, Hearing Tr. 146:21-148:25; Ex. 1, NYU_00009755 at -10006).

47.     Jane told Plaintiff, "I can't handle you being at NYU.  I don't want you there."  (Ex. 13, Hearing Tr. 148:5-24).  In messages between Plaintiff and Jane, she expressed concern that if he were at NYU, ""It'd be so easy . . . For you to get between me and my family / Do something that threatens me . . . It'd be so easy / All it'd take . . . Is you getting mad . . . And then your excuse will be . . . I'm sorry I got angry / Or / I'm sorry I was concerned about bleh bleh bleh."  (Ex. 17, P008425 at -08488-89).  Jane also told Plaintiff, "My heart legit races In fear When I text you."  (*Id.* at -08489).  Plaintiff responded, "You know if I went to uconn I'd be more likely to get in between you and your family?"  (*Id.* at -08490).

#### IV.      Plaintiff Transfers to NYU

48.      Plaintiff nevertheless decided to enroll at NYU, but he concealed his final decision from Jane.  (Ex. 1, NYU_0009755 at -09765).

49.      During the summer of 2017, Plaintiff received his housing assignment at NYU.  He switched assignments with another student for another dormitory, which he knew was the dormitory in which Jane lived.  (Ex. 13, Hearing Tr. 150:12-151:13).

50.      Plaintiff also selected Jane's major as his own, which had not been his major at UConn.  (*Id*. at 43:19-44:2).

51.      On August 30, 2017, Plaintiff initiated a video call with Jane from Washington Square Park, revealing he had transferred to NYU and would be living in the same dorm.  (*Id*. at 43:19-44:2; Ex. 1, NYU_0009755 at -09759; Ex. 18, P005421 at -05467-71).

52.      Jane was surprised and upset.  (Ex. 18, P005421 at -05467-71) ("You live in [my dorm] don't you . . . Oh my god . . . Oh my god / Oh my god . . . I hate my life / I hate everything / I'm going to live in constant fear . . . I hate everything / I hate everything / So much . . . You know where I live / YOU KNOW WHERE I LIVE . . . I hate my life . . . this year / Is going to be hell again").  Plaintiff knew at this point that Jane "didn't want to talk to me and she just wanted me gone."  (Ex. 13, Hearing Tr. 155:21-156:3).

53.      Notwithstanding, the two students eventually resumed a relationship.  Jane told NYU that she frequently slept in Plaintiff's dorm room and engaged in some intimate conduct.  (Ex. 1, NYU_00009755 at -09759-60).

54.      Jane described Plaintiff during this period as "manipulative" and "controlling." (*Id*. at -09760).  Throughout the fall 2017 semester, Plaintiff threatened to engage in self-harm, attempt suicide, or reveal details about Jane's relationship with Plaintiff to Jane's parents if she did not do

as Plaintiff demanded.  Jane frequently asked Plaintiff to stop this behavior.  (*See, e.g.*, SOF ¶¶ 55-62).

55.     On September 13, 2017, Jane messaged Plaintiff to, "Just stay away / Please . . . Stay away / I don't want to talk to you / Or see you . . . Just go away / Please / Please / I'm scared of you / You pretend to care / Just go away . . . PLEASE / please . . . why can't you take no for an answer / Please I'm scared / I can't take it / I feel like you're watching / All the time / I feel like you can do anything." (Ex. 19, P006752 at -06762-63).  Plaintiff responded, "I wish I was dead." (*Id*. at -06763).  Jane said, "Please just stay away / Please." (*Id*. at -06763-64).  Plaintiff responded, "OK / I'll go die / Bye bye." (*Id*. at -06764).  Jane sent Plaintiff dozens of additional messages that day asking him to leave her alone. (*Id.* at -06764-96).

56.     On September 24, 2017, Plaintiff asked Jane, "You excited?" Jane responded, "No, I'm thinking about the fact that someone threatens to kill themselves every time I talk about not speaking to them."  (Ex. 20, P007826 at -07885).  Plaintiff responded with over a hundred consecutive messages. (*Id* at -07885-07894).

57.     On October 14, 2017, Plaintiff messaged Jane, "I'm begging you . . . I will call public safety . . . And your parents" if she did not return to their dorm.  Jane agreed to return to their dorm. (Ex. 21, P036902 at -39788-89).

58.     On October 30, 2017, Jane predicted that Plaintiff would soon "pull the whole self harm / the whole suicide / the whole leaving thing." (*Id.* at -38808-09).  Plaintiff responded, "no suicide / just self harm / I deserve [i]t." (*Id.* at -38808).  Jane characterized Plaintiff's conduct as "BLACKMAIL." (*Id.*).  Plaintiff messaged, "i cant even hurt myself properly. it takes so much wincing to do it." (*Id*. at -38806).

59.     Also on October 30, 2017, Jane discovered that Plaintiff had taken pictures of her sleeping without her consent.  The pictures included Jane's exposed stomach and partially exposed breasts.  (*Id*. at -38896-38898; Ex. 1, NYU_00009755 at -9760).  Plaintiff apologized for taking the pictures and admitted to using them for "selfpleasure[]."  (Ex. 21, P036902 at -38895; *see also id.* at -38802-04 ("I SAW YOUR SHIRT WAS OFF . . . AND I WANTED TO PLEASURE MYSELF . . . AND I TOOK A PIC . . . AND DELETED IT . . . AND STAYED ON WHATSAPP TO PLEASURE."); Ex. 13, Hearing Tr. 169:3-170:12 (admitting to taking pictures of Jane's "cleavage" and bare stomach without her consent when he was a student at UConn and after enrolling at NYU; Ex. 10, Plaintiff Tr. 156:9-19 ("I said that there was cleavage present.  I did not use the term "excessive." And when I said – I never said that her nipple was visible, I said there may have been a possibility, and I made this representation, that the slightest, slightest part of her nipple was visible, maybe this much (indicating), if at all, and that was only because of the excessive cleavage, but it was not taken for any sexual purpose.")).

60.     On October 31, 2017, Jane told Plaintiff, "I need to lessen interaction between us… Because it's bad for me."   (Ex. 21, P036902 at -38740).  She explained, "it's like every time you do something bad I realize just how bad it is And then you cut yourself or talk about leaving or killing yourself / And then I talk to you / And then you try to bring normalcy . . . And then I'm forced to forgive you."  (*Id*. at -38738).  Plaintiff responded, apologizing, and said "I was wrong / I did something really bad."  (*Id.* at -38737).  Jane told him, "Yeah you did."  (*Id*.).  Plaintiff responded, "there is no reason to live / bye," and Jane pointed out, "You're doing it yet again."  (*Id*.).  Plaintiff continued to threaten self harm, saying, "idc [I don't care] about my promise to you / i cant [stop] cutting myself."  (*Id*. at -38736).  Two minutes later, he messaged, "STOP CALLING NYU HEAKT [NYU Student Health] / ABOUT ME."  (*Id*.).

13

61.     Later on October 31, 2017, Plaintiff sent over 60 straight messages, finishing by saying, "Where the fuck are you / I'm worried / I'm gonna call your dad / In 7 minutes." (*Id*. at -38691).

62.     On November 1, 2017, Jane told Plaintiff he "had no right" to "start talking about self harm every time I try to distance myself." (*Id*. at -38627-28).

### V.     Plaintiff Repeatedly Makes Threats to Jane Roe and Disregards Her Requests to Him to Cease Contact

63.     By spring 2018, Plaintiff acknowledged his relationship with Jane "had deteriorated" and he understood she was "trying to call it off." (Ex. 13, Hearing Tr. 171:15-20).

64.     Plaintiff was "confused and angry with Jane." (Am. Compl. ¶ 103; *see also* Ex. 10, Plaintiff Tr. 41:5-42:7).

65.     On March 10, 2018, Plaintiff "kind of got angry" when Jane declined to talk to him about remarks she had made earlier in the evening. (Ex. 13, Hearing Tr. 176:4-15).

66.     During the Hearing NYU conducted on December 10, 2018, to adjudicate Jane's allegations (the "Hearing"), Jane told NYU that Plaintiff "stayed at my door and said – he was basically banging on it saying, like, don't dare to, like, go with [other friends].… Like, just, I think, threats to come in and… MR. JOLLEY: Did he come in? [JANE]: No, he didn't, because I left the door locked." (*Id*. at 65:14-23).

67.     Plaintiff admitted that during this incident he "got a little angry. I never, like, banged on her door. I did knock. Maybe it was a little more aggressive, but my intention was not to bang. And, you know, I just wanted – I wanted to talk to her, basically. Because I just felt really hurt by what had happened." (*Id.* at 177:6-13).

68.     Another NYU student came to get Jane and when they left Jane's dorm, Plaintiff followed them "to see how it played out." (*Id.* at 182:12-183:8).

69.     On March 23, 2018, Jane messaged Plaintiff, "I also don't really want to hang out with you" and "I do think we should put more distance / Between each other."   (Ex. 1, NYU_00009755 at -09892).   Plaintiff responded "Ok" on the condition that Jane "won't contact any of" the friends to whom he had introduced Jane, because "They're not your friends / They're mine."   (*Id.*).   Jane refused.   (*Id.*).

70.     That same day, Jane wrote Plaintiff "My assaulter doesn't get to talk to me / When I don't want to."   (*Id.* at -09883).   Plaintiff initially denied assaulting Jane, but later wrote, "I did once kind of…. I squeezed your brea[s]ts / I got you in the shower / I put my hands places they shouldn't go / And I'm sorry [that I] assaulted you / It just sucks."   (*Id.* at -09893); (*see id.* at -09894 ("I'm sorry / I said I didn't assault you / I did / I hurt you / I bullied you / And I assaulted you")).

71.     On March 31, 2018, Plaintiff messaged Jane, "I've given up . . . / I tried overdosing on pills two weeks ago / I tried choking myself by crushing my throat / I just / I can't do this anymore / I'm sorry."   (*Id.* at -09899).   He reiterated that he was, "sorry for everything I've done . . . Lying to you assaulting you.   Making you cry threatening you bullying you and everything . . . ." (*Id*).

72.     On April 2, 2018, Plaintiff contacted Jane's parents, ostensibly to express concern for Jane's well-being.   (Ex. 13, Hearing Tr. 189:13-190:10; *see also* Ex. 1, NYU_0009755 at -09903).   However, Jane told NYU that Plaintiff knew the messages would make her parents extremely upset and that Plaintiff sent them in retaliation for Jane's failure to respond to messages he had sent to her.   (Ex. 1, NYU_0009755 at -09903).

73.     On or around the same night, Plaintiff messaged Jane "Maybe I should call the suicide hotline . . . You scare me as much as I scare you / Sometimes / Because I know that in your hand / You can say something / That will actually make me kill myself / Just out of shame / It's

not even a threat . . . You could do something / Where my instinct / is just to kill myself / I'd rather die than you have everyone know [I] assaulted you . . ." (*Id*. at -09904).

74.     Plaintiff also messaged Jane that he "overdosed on purpose / You tell me I'm fucked up for threatening / How fucked up it is / That you never asked if I'm ok." (*Id*. at -09905). Plaintiff continued to message Jane, "You know I told someone what I'd [done to you] lol / Even that I assaulted you." (*Id*.).

75.     Plaintiff went to see Jane to "sort things out" at 4 AM.  (Ex. 13, Hearing Tr. 193:15-194:10).

76.     Upon discovering Jane was not where she had said she would be,[3] "there was a lot of anger.  It's like you're, again, avoiding to meet with me, the person who you're directly involved in." (*Id*. at 195:18-25).

77.     Plaintiff messaged Jane: "Bitch / I FUCKING HATE YOU . . . I WALKED HERE / AND YOU WALKED BACK / NOGEY [sic] THE FUCK UP / OR I WILL TEXT YOU / THE NORMAL WAY / YOU BITCH / YOU ABSOLUTE BITCH[4] . . . I will call you / Until you talk to me . . . I will tell [Jane's roommate] / every fucking thing / If you don['t] wake up / And talk to me / In 10 minutes . . . I'm giving you 5 minutes / and [Jane's roommate] will kno[w] everything / Your parents will know everything / Press charges against me / I don't give a fuck."  (Ex. 1, NYU_0009755 at -09906) (emphasis in original).

78.     Plaintiff told NYU that by April 2, 2018, he "understood that, you know, she didn't want a friendship anymore," and that she "did not want to be in communication with [Plaintiff] or continue the relationship."  (Ex. 13, Hearing Tr. 200:6-14).

---

[3] Jane admitted that she had lied to Plaintiff about where she was "because [she] was afraid he was going to get angry and find" her.  (Ex. 1, NYU_0009755 at -09904).

[4] Plaintiff later explained that texting "the normal way" meant via iMessage, and not via another medium.  Plaintiff was communicating to Jane that her parents would see his messages.  (Ex. 13, Hearing Tr. 270:2-16).

79.     On April 7, 2018, Plaintiff sent Jane several emails demanding she stop hanging out with their mutual friends: "Back out of the group chat, and back out of everyone and we will have no issue and I will not contact you.  Period.  That's final and that's the only way I will honor it." (Ex. 1, NYU_0009755 at -09910).  When Jane did not respond, he sent four emails demanding "confirmation of things or things are just going to implode among friends and with you.  If you don't want my contact then you need to comply with this because that is the only way things will work." (*Id.*).

80.     On April 8, 2018, Plaintiff "confronted" Jane about the fact that she continued to spend time with people who he considered to have been mutual friends but had broken off contact with Plaintiff.  (Ex. 13, Hearing Tr. 203:16-204:9).

81.     According to Jane, she agreed to speak with Plaintiff "in fear that he would contact my parents otherwise, and hoping this would truly be the last conversation as he said."  (Ex. 1, NYU_0009755 at -09914).

82.     Plaintiff told NYU that Jane would repeatedly start crying during their conversation; "[i]t was a negative cycle . . .  I couldn't get anything through to her."  (Ex. 13, Hearing Tr. 204:16-205:2).

83.     Jane recorded a portion of the conversation during which Plaintiff asks, "Are you going to talk to me again?"  When Jane responded, "No."  Plaintiff says, "Alright then, I'm not leaving you alone unless you promise to talk to me . . . You have to choose, you're either gonna talk to me or you're gonna—"  At this point, Jane interrupts, crying, "But you're not finishing it, it's been so long."  (Ex. 22, NYU_00004015).

84.     Plaintiff said he wanted to keep talking, but that Jane's friends had shown up and were standing outside the room watching them.  (Ex. 13, Hearing Tr. 205:15-20).

85.     Later that day, Plaintiff left Jane a voicemail that ended, "So again I'm telling you, if this is how it's going to go down, and you're not going to talk to me, then be warned I'm not going to be an easy person to deal with." (Ex. 1, NYU_0009755 at -09915).

86.     Plaintiff also left two voicemails for Jane's mom, telling her about the nature of their relationship and complaining that he does not "appreciate being vilified." (*Id*. at -09917-18).

87.     On April 9, Plaintiff messaged Jane, "We need to talk." (*Id*. at -09920).   He messaged her dozens of times without Jane responding (*Id*. at -09920-23); she eventually told Plaintiff, "don't contact me again." (*Id*. at -09929).

88.     On the same day, Plaintiff left Jane a voicemail in which he said, "I'm not done talking . . . There's a lot more you have to hear from me.  No, not even that much more, just a little bit . . . There's a lot of cooling to do.  Won't go ballistic.  Or maybe I already am." (*Id*. at -09935).

89.     The next day, on April 10, 2018, Plaintiff repeatedly messaged Jane that "something happened / And you could be o [sic] the back lash / And if things get out / Your parents will like abandon you." (*Id*. at -09938).

90.     Plaintiff continued to message Jane on April 12, 2018, using a fake Facebook account, saying "YOU LIAR / YOU LIED / I SEE YOU ALL / IM RIGJT [sic] HERE / IM HERE / IM HERE / IM HERE / AGH / EVERYONE LIES TO ME / I DON'T GET WHY." (*Id*. at -09942) (emphasis in original).  Jane never responded, but Plaintiff continued to message Jane about her managing to lose weight, hoping her relationships with her parents improved, and gave her his Facebook password.  (*Id*. at -09943).  He continued to message her, noting, "I guess you don't want to talk to me / Who would." (*Id.*).  He messaged her on April 13, 2018, as well.  (*Id*. at -09945).

91.     On April 18, 2018, Plaintiff left Jane a voicemail asking her not to block him.  (*Id.* at -09952).

92.     On April 19, 2018, friends of Plaintiff told Jane that Plaintiff wanted her to message him; she told them to stop conveying messages for him.  (*Id.* at -09954).

93.     That same day, Plaintiff told a friend, "you know / a word of caution / I'm a decent person / But when I start to get like really close to people / I like transparency / And not secrecy / and when things go a wall [sic] / I become hella aggressive."  When Plaintiff's friend said he understood, "but I don't think that you and [Jane] are like that anymore are you?"  Plaintiff responded, "well now it's the awkward part where I become hella aggressive / especially when things go wrong".  (Ex. 23, P057933 at -57934-36).

94.     That same day, Plaintiff left three voicemails telling Jane to respond to him, the last of which indicated that if she did not respond "in the next ten minutes," then he "will have to contact you by other means. . . . I'm giving you one last opportunity so please do so.  Yeah, you really need to respond.  You really need to respond."  (Ex. 1, NYU_0009755 at -09955-56).  Plaintiff also continued sending Jane messages asking her to contact him.  (*Id*. at -09957-58).

95.     April 21, 2018 was Plaintiff's 20th birthday.  Seeing pictures on social media of Jane and her friends "relaxing" without him, Plaintiff "sort of lost it . . . Everything that had led to that moment just all sort of came down on me and, you know, I couldn't control it."  (Ex. 13, Hearing Tr. 213:10-17).

96.     At 12:10 AM, Plaintiff left a voicemail asking if Jane wanted to "come up.  Thought you might want to, maybe?  Probably not.  Kind of sucks."  (Ex. 1, NYU_0009755 at -09961).

97.     At 12:24 AM, Plaintiff texted Jane, "I think if you thought what I did earlier on would cause problems / You're in for a real hell of a ride / I'll give you till 1 / After that / It'll go bad / I want a response on WhatsApp in 9 minutes." (*Id.* at -09963).

98.     Jane "offered to come over" in order "to finish this once and for all." (Ex. 13, Hearing Tr. 215:21-25).  At 12:48 AM, Plaintiff left a voicemail saying, "You have ten minutes. Respond.  That is all." (Ex. 1, NYU_0009755 at -09961).

99.     Jane came over some time after 1:00 AM. (Ex. 13, Hearing Tr. 219:21-220:1).  She came to Plaintiff's bedroom "and just started crying." (*Id.* at 220:8-22).  Plaintiff was "[v]ery angry" and told her "[t]his is just so mean, uncalled for." (*Id.*).  When Plaintiff's roommate arrived, they went outside into the stairway landing and they had a huge argument. (*Id.* at 220:16-222:8).

100.    Plaintiff "leaned in" towards Jane, and she "punched" him, so he "backed away." She then said, "don't ever come close to me, [a]nd she punched [Plaintiff] twice more." (*Id.* at 222:1-7).  When Plaintiff asked why she did this, she told him it was "self-defense, that she thought he was going to do something." (Ex. 10, Plaintiff Tr. 60:6-23).

101.    Plaintiff responded, "I'd never do something like that."  He then "stood in front of her" and said, "I'm threatening you right now.  Punch me."  Jane punched Plaintiff again. (Ex. 13, Hearing Tr. 223:10-20).

102.    John later "acknowledge[d] that he was aggressive and got into [Jane's] personal space." And he admitted that he saw "how his actions could have triggered a defensive response." (Ex. 24, NYU_00001091 at -01149).

103.    Plaintiff made a video recording of part of this encounter in which Jane appears to be sitting on the floor crying while Plaintiff speaks into the camera:

> "Hello, guess who I'm with?  Say 'hi.'  Yup, 'supposed to stay away from me.'  To all the friends she has, that, you know, you all agreed, we're not all going to talk to

Ajay.  To her parents—supposed to stay away from him.  Not doing such a great job of that, are we now? . . . She laughed when you guys were there and I was hurt, right?  She laughed.  And now she's crying.  Where's the laughter?  It's a high-stress situation.  She's not laughing.  Why isn't she laughing?  She should be laughing, right?  Laugh, right?  Laugh.  No, she won't laugh now.  She won't laugh now.  She'll just cry.  She pities her.  Always pities her."  (Ex. 25, NYU_00004012).

104.    Later that morning, beginning at 8:29 AM, Plaintiff messaged Jane.  He stated, "I'm sorry I got so mad / I'm sorry I seemed crazy."  (Ex. 26, P008662 at -08665).

105.    When Jane wrote that she "didn't kick [Plaintiff] out" of his friend group, that his actions did, Plaintiff responded, "YOUFUCKING DID / AND IF YOU DON'T BELIEVE THAT . . . THEN YOURE FUCKING ACTIONS / ARE GOING[] TO RUIN YOUR RELATIONSHIP WITH YOUR PARENTS / EVEN MORE / SO FUCK OFF AND SHUT UP / AND LISTEN."  (*Id.* at -08670-71) (emphasis in original).

106.    At 9:07 AM, Plaintiff messaged Jane, "here's the solution / You cut off from everyone / Until you're ready to talk to me . . . You choose now / I'll give you five minutes / You pick / I'll ruin your friendship with them / I'll ruin your relationship with your parents / I'll do everything / You fucking choose."  (*Id.* at -08676-78).

107.    Plaintiff also sent Jane videos of Jane and Plaintiff "making out," "proof of [Jane] sleeping over", "[a]ll of it" and said he "can send everyone" these videos. (*Id.* at -98678).

108.    Plaintiff wrote, "I lost everything / I'm giving you the opportunity not to / But I blooody [sic] well will," followed by almost fifty more consecutive messages.  (*Id.* at -08679-83).

109.    Jane responded to Plaintiff, "Send friends whatever you want."  (*Id.* at -08683-84).

110.    Beginning around 10:23 AM, Plaintiff sent Jane over 100 unanswered messages, and then messaged, "I WANT TO DIE / AND IM NOT SCARED OF IT / IM NOT / I HAVE NO FEAR DOING IT / Lol / I'm going to die on 20 / Right on the dot."  (*Id.* at -08704-12) (emphasis in original).  After Jane began responding, Plaintiff messaged, "I really just want to die /

Everything is so shitty / I just can't / I've tried everything / I've tried slitting my neck / I tried overdosing on pills / Why do you think I'm commuting [sic] so much and getting ulcers / Vommiting [sic] / It's not working / It's just not." (*Id.* at -08714-15).

111.    At 11:36 AM, Jane told Plaintiff, "Stop calling / I don't want to be contacted." (*Id.* at -08734).

112.    Plaintiff responded with more threats to tell Jane's friends and family about the nature of their relationship and asked, "Why do you do these things knowing how much they anger me?" (*Id.* at -08734-36).

113.    During the afternoon of April 21, 2018, Plaintiff repeatedly called Jane and left several voicemails.  (Ex. 1, NYU_0009755 at -09962-64).  Starting at 3:17 PM, he texted Jane photos depicting their relationship.  He admitted to NYU that he "was trying to suggest to her" that he "might send them" to her friends or family.  (Ex. 13, Hearing Tr. 219:3-20; 320:16-321:4; *see also* Ex. 1, NYU_0009755 at -09963).

**VI.    Jane Files a Complaint with NYU**

114.    At approximately 6:08 PM on April 21, 2018, Jane filed a complaint against Plaintiff with NYU's Department of Public Safety ("DPS").  According to the report, "[Jane] has been accumulating texts, photos and videos sent by [Plaintiff] over several months," but "waited this long to report the harassment" because "she believed that she and [Plaintiff] could 'work it out' and that she didn't want it to 'escalate.'"  (Ex. 27, NYU_00002432 at -02435).

115.    On April 22, 2018, Plaintiff repeatedly messaged Jane and left several voicemails. (*See* Ex. 1, NYU_0009755 at -09968-74).  Jane told Plaintiff to stop contacting her.  (*Id.* at -09969-70).

116.    Plaintiff received a call from Public Safety that evening and told Jane at 7:50 PM, "I want you to respond on Facebook / By 8 / Because this has major ramifications," and begged

22

her to respond.  At 9:26 PM, he wrote, "I'm begging you, I need you to help me get out of this."
(*Id*. at -09972).  Plaintiff also left Jane multiple voicemails.  (*Id*. at -09973-75).

117.    At 10:26 PM on April 22, 2018, NYU issued a no-contact directive ("NCO") to
both Plaintiff and Jane.  Each student was instructed "not to initiate or facilitate any form of
communication or interaction" with the other, "including those made through virtual means (text
messages, e-mail, Facebook Twitter, other social networking websites, etc.) or by 3rd parties on
your behalf.  Any such attempts to do so may be construed as harassment and will subject you to
disciplinary action."  (Ex. 28, NYU_00002418 at -02418).

## VII.    Plaintiff Repeatedly Violates the NCO

118.    At 10:55 PM, less than a half hour after receiving the NCO, Plaintiff messaged
Jane, "Well / there goes the RA position."  (*See* Ex. 1, NYU_0009755 at -09988).  Plaintiff told
NYU that he understood the NCO but "couldn't take it seriously.  It just didn't register with me."
(Ex. 13, Hearing Tr. 233:21-234:9, 234:23-235:4).  "[T]here was just sort of this nature to me as
well, where I was just like no-contact directive, whatever.  Just send the text."  (*Id*. at 234:18-22).

119.    On April 26, 2018, NYU's Title IX Coordinator, Mary Signor emailed Plaintiff and
Jane separately to tell them that, following the issuance of the NCO, she would be evaluating
whether the matter fell within OEO's jurisdiction.  (Ex. 29, NYU_00002598 at -02599-600; Ex.
84, NYU_00002518 at -02520).

120.    On April 27, 2018, Plaintiff sent another message to Jane.  (*See* Ex. 1,
NYU_0009755 at -09988).

121.    On April 28, 2018, Plaintiff changed his "status" on the communication app
WhatsApp; it stated, "This could be catastrophic for you because of a mistake I made, I don't care
what's in place, you need to be aware."  (*See id.* at -09981).  Plaintiff admitted that he "intended

for [Jane] to see" this message (Ex. 10, Plaintiff Tr. 162:5-163:9); (*see also* Ex. 1, NYU_0009755 at -09767).

122.   Jane emailed OSC about Plaintiff's violations of the NCO, explaining that she "told Public Safety.  They told me not to bring it to them [Public Safety] but to let the person [at OSC] who wrote up my report know."  (Ex. 30, NYU_00002609 at -02610).

123.   On April 29, 2018, Plaintiff "saw [Jane] in the [dorm lounge] while I was trying to print something, and I just lost it.  I absolutely lost it. . . I couldn't take it.  I just – I interacted with her.  I said, like, you owe me money."   (Ex. 13, Hearing Tr. 240:21-241:14).  Plaintiff admitted during the Hearing, "I'm not going to even try and deny it. I violated the no-contact directive there directly… I didn't know how to deal with it.  I honestly still don't know how to deal with it." (*Id* at 240:21-241:1; 246:22-247:4).

124.   Also on April 29, Plaintiff called Jane multiple times, left voicemails, sent her several messages, and even called Jane's mother to say that Jane was drinking and using drugs. (*See* Ex. 1, NYU_0009755 at -09982-88).

125.   An NCO violation "is a very rare and serious violation of NYU's policies and procedures."  (Ex. 8, Jolley Decl. ¶¶ 4-5).

## VIII.   NYU Assesses Jane's Report and Receives a Further Complaint from Jane that Plaintiff Again Violated the NCO

126.   On April 30, 2018, Signor met with Jane and then separately with Plaintiff.   (Ex. 29, NYU_00002598 at -02598; Ex. 84, NYU_00002518 at -02518; s*ee* Ex. 31, NYU_00009558-67 (Signor's contemporaneous handwritten notes of meeting with Jane); *see also* Ex. 32, NYU_00009568-75 (Signor's contemporaneous handwritten notes of meeting with Plaintiff).

127.   Jane described her relationship with Plaintiff, beginning in 2015 through the date of the meeting.  (Ex. 31, NYU_00009558-67).  She told Signor she was "not sure" if she thought

she was in danger because of Plaintiff's conduct.  (*Id*. at -09567).  When Jane completed detailing her recollection, Signor asked her, "Do you want to file a complaint?"  Jane responded, "Yes." (*Id*.).  Signor advised Jane at this meeting that NYU could either conduct an investigation or attempt to resolve "this matter through the University's Administrative Resolution process."  Jane also told Signor during the meeting that she "had another sexual assault" but "she does not want to report" that assault."  (*Id*. at -09559; *see also* Ex. 4, Hodge Tr. 298:3-16 (Jane "declined to" have "the allegations [] assessed by the Title IX coordinator.")).

128.    After meeting with Jane, Signor met with Plaintiff; Maeder attended.  (*See* Ex. 32, NYU_00009568 at -09568).

129.    According to Signor's notes, the meeting began with Signor and Maeder explaining "their roles" and Plaintiff's "rights including right to advisor, academic assistance."  (*Id*. at -09568).  Maeder explained "the risks to [Plaintiff]."  (*Id*.).  In response to a question from Plaintiff, Maeder and Signor explained that he could not contact Jane's parents due to the NCO. (*Id*.).  Plaintiff explained his recollection of events beginning from when Plaintiff and Jane were seniors in high school.  (*Id*. at -09569-73).  He admitted to violating the NCO twice.  (*Id*. at -09571). Plaintiff told Signor and Maeder that he "knows [Jane's] hurting especially after what happened." (*Id*. at -09574).

130.    According to Plaintiff, he told Signor and Maeder during their meeting that Jane had punched him early in the morning on April 21, 2018.  (Ex. 10, Plaintiff Tr. 87:5-14).

131.    Signor told Plaintiff he "could file a cross complaint," but he "did not because [he] had believed Jane had suffered many assaults and did not want to cause her distress by reporting her."  (Ex. 33, P002929; Ex. 10, Plaintiff Tr. 290:13-291:4; *see also* Ex. 34, P002943 at -02950 ("In fact, when I met with the Title IX Coordinator, Mary Signor in May 2018 [sic] she asked me

if I wanted to file a cross complaint.  I declined because I did not want to distress Jane."); (Ex. 10, Plaintiff Tr. 88:2-10 ("Mary Signor said that, you know, you could file a cross-complaint and I said I would think about it.")).

132.    Plaintiff recalled being told his punishment "could go on [his] permanent recor[d] / and that goes all the way to expulsion / and could prevent [him] from getting into med school." (Ex. 35, P058064 at -08836-37; *see also* Ex. 10, Plaintiff Tr. 166:14-167:7).

133.    Also at that meeting, Plaintiff expressed openness to Administrative Resolution, because "at the time I believed that Jane was a victim of a serial rape case and I wanted to make this, you know, whole thing just go away easily."  (Ex. 10, Plaintiff Tr. 105:17-106:11; *see also* Ex. 32, NYU_00009568 at -09574 (Plaintiff "[w]ants to attempt an administrative resolution.")).

134.    On May 2, 2018, Plaintiff and Jane encountered each other in Washington Square Park.  Plaintiff's "biggest concern was that she was trying to goa[d] me into violating [the NCO], because it was something that, you know, I could definitely fall for if, you know, the opportunity arises by acting on emotion."  (Ex. 13, Hearing Tr. 252:10-21).  Plaintiff described the incident on May 10, 2018, to a friend:  "I followed her a bit, she crossed pathes [sic] with me four times / And then I got curious if she was goading me / So I watched her."  (Ex. 36, P061855 at -04508).

135.    That same evening, Jane reported to Signor via email that Plaintiff "was following me at Washington Square Park today.  As I was walking, I saw him looking [at] me from a distance. . . I became uncomfortable and moved locations at the park.  Each time I moved, he changed locations to a spot where he could watch me.  He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. . . When I entered a restaurant, he was pacing outside of it across the street. . . I was able to take some pictures of this happening.  I am attaching them here.  I am starting to feel

increasingly stressed and anxious because of this.  Is there anything you can do to make him stop

doing this?"  (Ex. 37, NYU_00002654 at -02654; *see also* Ex. 1, NYU_0009755 at -09990-92).

136.    In the same email, Jane told Signor that she did not "think the issue can be taken

care of properly via the [administrative] resolution method" because of Plaintiff's NCO violations

and because "[Plaintiff] was following me at Washington Square Park today."  Jane continued, "I

would like to proceed with the investigation route."  (Ex. 38, NYU_00002654 at -02654).

137.    The next day, May 3, 2018, Plaintiff emailed Signor "to [i]nquire if there is a no

contact directive for [Jane] towards me.  Regardless of whether there is, I find it really demeaning

that she is telling others and word is spreading that she has reported me."  (Ex. 37, NYU_00002684

at -02685).  Plaintiff did not mention the Washington Square Park encounter to Signor, either

before or after she confirmed that the NCO "applies both ways."  (*Id*.).

138.    Plaintiff also asked, "Will the no contact directive hold over the summer?  I had

presumed that nyu directives would not hold in other countries?"  (*Id*. at -02684).

139.    Signor informed Plaintiff that Jane "is asking for an investigation," not

administrative resolution.  (*Id.* at -02684).

140.    Plaintiff wrote a friend on May 3, "anything shitty [Jane's] done / there's no proof

/ I don't even want to press things against her."  (Ex. 36, P061855 at -04646-47).

141.    On May 6, 2018, Jane emailed Signor several text messages and a video that

substantiated some of her allegations against Plaintiff.  (Ex. 39, NYU_00002837 at -02838); (Ex.

1, NYU_00009755 at -09830, -09845-49).

142.    On May 8, 2018, Jane emailed Signor again and described some of Plaintiff's

violations of the NCO, concluding, "I don't think he's in the right state of mind, as he's continuing

to contact me.  I just wanted to email you and let you know of this. . . I'm not sure what the purpose

of a no-contact directive is if he can keep breaking it without any consequences, and this is causing me a great deal of stress." (*Id*. at -09808).

143.    On May 10, 2018, Jane informed Signor that Plaintiff "sent me the email that he was sending to his professor regarding struggling with Organic Chemistry and personal issues," attaching a screenshot.  (Ex. 39, NYU_00002837 at -02837; *see also* Ex. 1, NYU_00009755 at -09994).  Jane stated that Plaintiff has tried to "guilt me into talking to [him] in the past by telling me he's academic[ly] struggling," and stated that he's "just repeating this again." (*Id.* at -09850).

**IX.    NYU's Title IX Office Investigates Jane's Complaints Against Plaintiff**

144.    On May 14, 2018, NYU Investigator Sam Hodge, emailed Jane to set up the investigation's first interview.  (Ex. 40, NYU_00002850 at -02850).  Jane's interview was three days later, on May 17, 2018.  (Ex. 1, NYU_00009755 at -09756).  Present at that interview were Hodge, Jacqueline Cornell (another Investigator), Jane, and Jane's "Support Person" Christine Janick.  Jane recounted her relationship with Plaintiff dating back to 2016, and the conduct that prompted her to file a complaint in April 2018. (*See generally id*. at -09756, 09757-62 (Investigative Report summary of interview); *see also* Ex. 41, NYU_00010191-10205 (Hodge's contemporaneous handwritten notes of interview); Ex. 42, NYU_00010206-10224 (Cornell's contemporaneous handwritten notes of interview)).

145.    On May 21, 2018, Plaintiff emailed Signor asking if his mother could discuss his case with Signor and asking for more details about the allegations against him.  (Ex. 43, NYU_00029166 at -29166).  Plaintiff's mother is a lawyer.  (Ex. 24, NYU_00001091 at -01123).

146.    The following morning, on May 22, 2018, Signor emailed Plaintiff that she would speak with his mother about Jane's complaint, and listed four allegations:  First, Jane alleged that Plaintiff "took photographs of her breasts and kissed her while she was sleeping, without her consent."  Second, Jane alleged that Plaintiff "would regularly threaten to send photographs or

message her parents about your relationship with her if she would not see or speak with [him]." Third, Jane alleged that Plaintiff "dragged her into the shower and pressed [his] exposed penis against her."   Fourth, Jane alleged that Plaintiff "would follower her, appear suddenly and repeatedly message her," including after the NCO was issued.  (*Id.*).

147.    That same day, Signor and Plaintiff's mother spoke on the phone.  According to Signor's notes, Plaintiff's mother asked if the "worst case scenario is that he is expelled," to which Signor responded, "Yes."  (Ex. 44, NYU_00009555).

148.    Shortly after Signor spoke to Plaintiff's mother, Hodge emailed Plaintiff to schedule an interview with him as part of NYU's investigation.  (Ex. 45, NYU_00003093).  Hodge also included the Procedures and the Policy as attachments to his email, which apprised Plaintiff of his rights.  (*See generally id.*; Ex. 4, Hodge Tr. 161:24-162:9).   Plaintiff and his mother both reviewed the Procedures and Policy.  (Ex. 10, Plaintiff Tr. 110:9-16; Ex. 46, JD Mother Tr. 46:17-19).

149.    Plaintiff responded to Hodge's email on May 25, 2018, (Ex. 47, NYU_00003149 at -03149), and again on June 1, 2018 (Ex. 48, NYU_00003180 at -03180).  On the latter date, Plaintiff asked "whether NYU has staff that would act as an advisor to me, or if I would have to find someone on my own."  (*Id.*).  He also asked if his interview with the investigators could take place in July, in person.  (*Id.*).

150.    Also on June 1, 2018, Hodge responded that Plaintiff is "welcome to have an advisor of choice accompany you to our meeting (so long as this individual is not also a potential witness to this matter).  If you would like to be connected to a Respondent Facilitator through NYU that can be arranged."  Hodge also told Plaintiff that "[w]e would prefer to meet with you as soon as possible."  (*Id.*).

151.    After receiving Hodge's June 1, 2018 email, Plaintiff understood that, except for potential witnesses, his advisor "could be anyone [he] wanted." (Ex. 10, Plaintiff Tr. 114:16-22). Plaintiff further understood that his advisor "would [not] play a role in making…a determination on the facts of the case" nor would his advisor "make a determination on the sanctions." (*Id*. at 119:22-120:18).

152.    Hodge's June 1, 2018 email also included a list of attorney referrals. (Ex. 48, NYU_00003180 at -03180). Plaintiff and his mother did not contact any of them; they spoke with a friend who was an attorney, but because she did not have any knowledge about Title IX, they did not "take it any further." (Ex. 46, JD Mother Tr. 54:12-55:18; Ex. 10, Plaintiff Tr. 121:11-20). According to Plaintiff's mother, she did not know "anyone who could help" Plaintiff." (Ex. 46, JD Mother Tr. 54:12-55:18).

153.    On June 5, 2018, Hodge informed Plaintiff that OEO was "in the process of procuring an adviser for you." (Ex. 49, NYU_00003333 at -03333). Because of this, and before Plaintiff ever met with any advisor, Plaintiff's mother claimed that she decided not to "make any other efforts to contact a lawyer to be an advisor for [Plaintiff]." (Ex. 46, JD Mother Tr. 64:7-15).

154.    On June 19, 2018, Signor introduced Plaintiff via email to his NYU Respondent Facilitator, Allen McFarlane. (Ex. 50, NYU_00003473).

155.    Plaintiff and McFarlane met via Skype on June 25, 2018. (Ex. 51, NYU_00000009; Ex. 10, Plaintiff Tr. 121:24-122:2).

156.    During the June 25, 2018 meeting, McFarlane learned from Plaintiff his account of the facts of his case for the first time. (Ex. 10, Plaintiff Tr. 130:3-16). Plaintiff did not show him any documents, "[i]t was just [his] verbal explanation of the facts." (*Id*. at 132:2-10).

157.    On July 10, 2018, Plaintiff and McFarlane met with Hodge and another Investigator for Plaintiff's investigation interview.  (*See* Ex. 1, NYU_00009755 at -09762-68 (Investigative Report summary of interview); Ex. 52, NYU_00010096-10119 (Stabile's contemporaneous handwritten notes of interview); Ex. 53, NYU_00010120-10142 (Hodge's contemporaneous handwritten notes of interview)).

158.    Among other things, Plaintiff admitted during the interview that he had multiple photos on his phone of Jane (before she made him delete them), including one in which "there was cleavage present."  (Ex. 10, Plaintiff Tr. 155:22-157:5).  During his deposition, Plaintiff denied telling the Investigators the photo contained "excessive cleavage," but admitted that, "there may have been a possibility" that "the slightest, slightest part of her nipple was visible," because "of the excessive cleavage."  (*Id.*).  Another photo showed "Ms. Roe sleeping with her stomach exposed."  (*Id.*; *see also* Ex. 1, NYU_00009755 at -09767).

159.    Plaintiff also admitted during the interview to violating the NCO.  (Ex. 10, Plaintiff Tr. 162:13-163:9; *see* Ex. 1, NYU_00009755 at -09767).

160.    Plaintiff stated during the interview that "he would receive text messages from an unidentified individual/number, posing as a friend of [Jane's], who would make suggestions as to intimate acts he should try with [Jane]."  (Ex. 1, NYU_00009755 at -09764).

161.    At the end of the interview, Stabile and Hodge "reviewed right to file x-comp [cross complaint]" and the right to academic accommodations.  Plaintiff was instructed that he should contact Mary Signor about either if he so chose.  (Ex. 52, NYU_00010096 at -10119; *see also* Ex. 6, Stabile Decl. ¶¶ 5-6).

162.    According to Plaintiff, when the Investigators "said [he] could file a cross complaint," he did not "because [he] had believed Jane had suffered many assaults and did not want to cause her distress by reporting her."  (Ex. 33, P002929; *see also* Ex. 6, Stabile Decl. ¶ 7).

163.    Three days later, on July 13, 2018, Hodge "follow[ed] up" because Plaintiff "indicated that [he] wished to provide…several pieces of evidence…and a detailed timeline that [he] created."  Hodge asked Plaintiff to submit any evidence by July 20, 2018 (one week later). (Ex. 54, NYU_00004169 at -04172).

164.    Plaintiff did not respond to Hodge until July 20, 2018, and asked for an extension until July 23, 2018, which was granted.  (*Id*. at -04171-72).  On July 23, 2018, Plaintiff asked for "more clarity in terms of the evidence you are looking for."  (*Id*. at -04171).  Hodge told him "if you would like us to consider additional information, for example a timeline that you created or other evidence, this is your opportunity to submit it."  (*Id*. at -04170).

165.    On July 25, 2018, Jane submitted additional evidence to the Investigators.  This evidence would become Attachment B in the Investigative Report.  (Ex. 1, NYU_00009755 at -09887).

166.    The night of July 28, 2018, Plaintiff messaged Jane (in violation of the NCO), "Hi." (Ex. 55, P008743).

167.    On July 30, 2018, Hodge and Stabile had a call with Jane to confirm that she "wanted to proceed w/ all allegations," and she told them she "wants full investigation" and "not AR [administrative resolution]."  (Ex. 56, NYU_00009552-53).

168.    On August 9, 2018, Plaintiff apologized to Hodge and Stabile "for the delay" in submitting evidence and said he would do so by the following afternoon. (Ex. 54, NYU_00004169 at -04169).

169.    In his August 9, 2018 email, Plaintiff also stated that he "received a contact from one of the complainants friends recently."  Plaintiff stated he was "not sure if this was third party contact or not, however it has made me feel more cautioned about submitting things as well as threatened that she will go further if I do.  I am not sure if this entails retaliation but I just wanted to let you know." ( *Id.* at -04169).

170.    On August 10, 2018, Plaintiff submitted evidence would become Attachment D in the Investigative Report.  (*See* Ex. 1, NYU_00009755 at -10005-13).

171.    On August 13, 2018, Signor followed up with Plaintiff about his August 9 email reporting contact from one of Jane's friends: "Can you please provide me with more information and/or evidence that you may have that this individual contacted you?  For example:  name, date, time, and what was asked."  (Ex. 57, NYU_00004208 at -04208).

172.    Plaintiff never responded to Mary Signor's August 13, 2018 email.  (Ex. 10, Plaintiff Tr. 186:10-16; *id.* at 190:12-20).

173.    On or around August 22, 2018, Plaintiff travelled to Australia for a semester abroad. (Am. Compl. ¶ 169; Ex. 53, NYU_00010120 at -10120).

174.    In August and September 2018, Hodge and Stabile interviewed three third-party witnesses.  (Ex. 1, NYU_00009755 at -09756).  Two were witnesses suggested by Jane and the third was suggested by Plaintiff.  (Ex. 53, NYU_00010120 at -10142).

175.    On October 2, 2018, Hodge sent a draft of the investigative report (the "Draft Report") to Plaintiff and Jane.  (Ex. 58, NYU_00005909 at -05909).  Plaintiff and Jane were asked to "Please review the draft report (including the related attachments) and provide any edits, clarification, or comments (to your statement or others), as you feel is necessary. You are also

welcome to identify or provide any additional information or witnesses that you believe should be considered." Their responses were due ten days later, on October 12, 2018. (*Id*.).

176.    The same day, McFarlane texted Plaintiff, "You can comment in the report!!," to which Plaintiff responded, "I understand that. . ." (Ex. 59, NYU_00024053).

177.    On October 5, 2018, Plaintiff requested an extension for the deadline to respond to the Draft Report to October 26, 2018. (Ex. 60, NYU_00000073 at -00073).  NYU granted Plaintiff an "extension to Friday, October 19, to submit your response." (*Id*.).

178.    On October 6, 2018, Plaintiff reacted to the Draft Report while messaging with a friend, saying, "So much she put in / She's out to get me."  His friend responded, "But u don't have to do anything right?"  Plaintiff responded, "I do. . . I have to read it all [and] Correct anything I feel necessary." (Ex. 36, P061855 at -62717-19).  Plaintiff continued, "And then they submit to office of student conduct / And if they see it fit / I have to have a formal hearing against her." (*Id*. at -02717).  Plaintiff's friend asked what the "hearing" was.  Plaintiff explained, "3 hour court case basically. . . They listen to both sides / And everything / And I'd have to defend I presume / For college punishment / Which can vary from probation to expulsion." (*Id*. -02715-16).  Plaintiff added, "It kinda ruins my career if she gets anything on me / Which is panicking." (*Id*. at -02714).

179.    On October 7, 2018, Plaintiff said he did not "want to read the [Draft Report] word for word and analyze it all" because "it still hurts." (*Id.* at -02698-99).

180.    On October 8, 2018, McFarlane spoke with Plaintiff's mother, who "expressed an interest to be a witness."  In response, Hodge told McFarlane that "[Plaintiff] in his response, if he chooses to submit one, could identify witnesses he would like us to consider interviewing with a brief description as to their relevance.  Then, we would make a determination as to whether it would be appropriate to conduct said interview." (Ex. 61, NYU_00000071 at -00071-72).

181.    On October 12, 2018, McFarlane requested an additional extension for Plaintiff to respond to the Draft Report until October 22, 2018.   NYU granted the request.   (Ex. 62, NYU_00000090).

182.    On October 21, 2018, Plaintiff asked McFarlane to review his response to the Draft Report.   Plaintiff stated, "I didn't want to submit more evidence unless they asked for it."   In response, McFarlane told him, "[t]his is the opportunity to share items that you believe are important[;] not if they ask.   Consider this the ask.   Does that make sense?"   Plaintiff responded "Allright," and later, "I have included all the evidence that I found pertinent."   (Ex. 59, NYU_00024053).

183.    On October 22, 2018, Jane and Plaintiff each submitted responses to the Draft Report that were included in the final Report as Attachments G and H respectively.   (*See* Ex. 1, NYU_00009755 at -10067-93).   Plaintiff's narrative response was less than a page and a half.   (*Id*. at -10079-80).   Jane's was six pages.   (*Id*. at -10071-76).

184.    Plaintiff's response to the Draft Report did not specifically request that NYU interview any additional witnesses, but identified the following individuals with knowledge on certain topics:

- Plaintiff's mother who could testify that "complainant was aware of all of my visits [to NYU while he was enrolled at UConn] and it was mutually agreed at all times, at times she would even push me to stay for longer. . .").

- A Title IX officer at UConn, with whom he "discussed what I was going through with the complainant [prior to Plaintiff's enrollment at NYU] and how much [her 2016 sexual assault] hurt me vicariously."

- A professor and academic advisor at UConn, with whom he "discuss[ed] my relationship with the complainant and how it was affecting me in many ways."

(*Id*. at -10079).

185.    Plaintiff's response to the Draft Report also stated that in "July 2018, I received texts from the mysterious third party whose name I still do not know" and attached a screenshot of messages from a "Soupy Noodle." (*Id*. at -10080, -10092-94).

186.    NYU did not interview Plaintiff's mother because "she didn't have any relevant and pertinent information," and "[t]he fact that the two of them were in a relationship or engaged with each other for some time. . . We didn't need a witness to confirm that fact.  It was not in dispute." (Ex. 4, Hodge Tr. 229:11-230:22).

187.    NYU did not interview the UConn employees because Plaintiff "had just told them about something in the complainant's past which was not subject to this investigation so there was no reason to interview them as they didn't have relevant and pertinent information as to [Jane's] allegations against John." (*Id.* at 226:2-19).  The "sacrifices or emotional toll that [Plaintiff] had in the past prior to NYU unrelated to the investigation would just not be relevant." (*Id*. at 297:10-18).

188.    NYU did not investigate the "mysterious third party" further because "whether or not a mysterious third party who's not identified exists or doesn't exist doesn't really make it more likely or not that one of the other allegations did or did not take place." (*Id*. at 235:6-19; 252:11-253:6).

189.    On October 23, 2018, Hodge and Stabile finalized the investigative report ("the Report") and sent it to Plaintiff, Jane, and OSC.  (*See generally* Ex. 1, NYU_00009755).  Hodge

and Stabile determined that there was "sufficient evidence to be considered by an adjudicator as to whether [Plaintiff] violated" the Policy.  (*Id*. at -09774).

190.    Plaintiff does not dispute the authenticity of the videos, electronic messages, or voicemails included in the Report.  (Ex. 10, Plaintiff Tr. 40:5-19).

**X.      OSC Coordinates the Hearing**

191.    On October 29, 2018, Maeder informed Plaintiff and Jane that the Hearing would be scheduled for November 19, 2018, at 10 AM EST.   (Ex. 63, NYU_00006515 at -06515). Maeder had mistakenly scheduled the Hearing for 2 AM in Sydney, Australia, where Plaintiff was studying at the time, because she "confused the time change."  (Ex. 7, Maeder Tr. 62:3-7).

192.    Maeder's email stated that one of "[t]he potential sanctions" was "Dismissal from NYU."  (Ex. 63, NYU_00006515 at -06516).

193.    Upon receipt of Maeder's email, Plaintiff texted McFarlane, "as you probably understand, I am very worried."  (Ex. 59, NYU_00024053; Ex. 10, Plaintiff Tr. 214:25-215:7 (Plaintiff was "worried about a potential sanction.")).  At this time, Plaintiff was "trying to defend" himself "[t]o the best of [his] abilities given all the difficulties."  (Ex. 10, Plaintiff Tr. 215:8-15).

194.    On November 11, 2018, Plaintiff emailed Maeder to ask to have the time of the Hearing moved to 4 PM EST, which would be 8 AM in Sydney, and for the day to be changed from November 19 to either November 29 or November 30.  (Ex. 64, NYU_00006594 at -06596). Plaintiff also requested that his roommate participate in the Hearing.  (*Id.*).  Because McFarlane would be in New York, Plaintiff also asked if someone from NYU Sydney could be "present during the [H]earing so that there is some support for me in person."  (*Id.*).

195.    On November 13, 2018, Maeder responded to Plaintiff that the Hearing would be rescheduled to 1 PM EST (5 AM in Sydney) on November 19.  (*Id.* at -06594).  She also told Plaintiff that she had asked "all witnesses to confirm their participation," but even if his roommate

did not participate, "all statements made in the investigation report will be considered in the decision." (*Id.*). Maeder emailed Plaintiff's roommate four times in an effort to get him to participate, even though he stopped answering Maeder's emails. (*See* Ex. 65, NYU_00006847). Maeder also informed Plaintiff that she was connecting with "Wellness to make sure there is an NYU counselor on standby during the hearing for you in Sydney." (Ex. 64, NYU_00006594 at -06594).

196.    On November 14, 2018, Plaintiff's mother emailed Maeder because she did not believe the Hearing taking place at 5 AM would be fair, and because she wanted Plaintiff to have a private room to participate in the Hearing with someone from Wellness present (an issue Plaintiff had not raised in his prior email to Maeder). (Ex. 66, NYU_00031700 at -31701).

197.    Plaintiff's mother acknowledged in this email that "the consequences for [John] can mean expulsion or losing a semester." (*Id.*)

198.    Plaintiff's mother forwarded her email to Plaintiff on November 15, 2018. (*Id.* at -31700).

199.    Plaintiff told his friend on the same day: "My mom said if this case doesn't go down well I don't get to go to India [over winter break] . . . [My mom's] right / if something goes on my academic record / I won't get into med school / So I'd need to go back and appeal in person and probably seek legal advice." When his friend asked what the chances of that happening were, Plaintiff responded, "Idk [I don't know] / That's what sucks / She's just gone wild w[ith] / the amount of info she's put in." (Ex. 36, P061855 at -62466-69).

200.    "There were moments leading up to the hearing" when Plaintiff "was concerned as any reasonable individual was. . . I felt pretty assured.  But like any person, I was worried." (Ex. 10, Plaintiff Tr. 228:17-229:8).

201.    Maeder informed Plaintiff on November 15, 2018, that the Hearing would be rescheduled "to a later date to accommodate the time difference. . . after Thanksgiving Break and before the end of the semester.  I will work with the Sydney staff to provide you with a private location to participate in the hearing.  I will have any update for you in the next few days regarding date and time of the hearing (most likely starting sometime between 7am – 8am Sydney time)." (Ex. 67, NYU_00000230).

202.    Also on November 15, 2018, when informed that the Hearing would be postponed, Jane asked if "there was any way to have the hearing before Thanksgiving" given the "numerous, continual delays in the process with Title IX."   Maeder denied her request.   (Ex. 68, NYU_00006658 at -06658).

203.    On November 20, 2018, Maeder scheduled the Hearing for December 10, 2018, at 4 PM EST, 8 a.m. in Sydney.  She informed Plaintiff that she would provide him a room, that both of his advisors could attend, and that if he needed academic accommodations he should not hesitate to ask.  (Ex. 69, NYU_00006699 at -06699).

204.    On November 22, 2018, Plaintiff stated that his stress about the proceeding "is made worse as he is rehashing all of the documents and looking at pictures / text messages of his time with his ex." (Ex. 24, NYU_00001091 at -01106).  On November 29, 2018, Plaintiff stated that "he and his mother have spent a lot of time this week going over questions the hearing might raise and she has been supporting him in how best to answer."  (*Id*. at -01104).

205.    Plaintiff received every "academic accommodation [he requested] from NYU in connection with the Title IX process," his request was never denied, and he "did not request accommodations to attend the hearing in person" in New York.  (Ex. 10, Plaintiff Tr. 367:15-368:2).

### XI.    The Hearing

206.    The Hearing was held on December 10, 2018, from 4 PM EST until approximately 11 PM EST in New York (December 11 in Sydney, from 8AM until approximately 3 PM).  ((*See* Ex. 13, Hearing Tr. 2:14-17, 331:11-14) (Hearing on record from 4:31 PM EST to 11:06 PM EST)); (Ex. 10, Plaintiff Tr. 240:12-241:4).

207.    The participants included Plaintiff and his advisor in Sydney, and Jane, Jolley, Hodge, Maeder, and McFarlane in New York.  (*See* Ex. 13, Hearing Tr. 3:3-5:8).

208.    After a short introduction and overview of the Hearing process, (*Id.* at 2:4-17:12), the Adjudicator asked Hodge to provide a summary of the allegations.  (*Id*. at 17:15-29:13).  This was followed by the Adjudicator asking Jane a series of questions and an opportunity for Plaintiff to suggest additional questions for the Adjudicator to ask.  (*Id*. at 29:14-134:10).

209.    Next, the Adjudicator posed a series of questions to Plaintiff and provided an opportunity for Jane to suggest additional questions.  (*Id.* at 136:9-279:8).

210.    Two witnesses also provided testimony and both Plaintiff and Jane were given the opportunity to suggest questions for each witness.  (*Id*. at 285:3-313:7).

211.    Finally, Jane and Plaintiff were given the opportunity to make closing remarks.  (*Id*. at 313:12-327:15).  The Adjudicator then concluded the Hearing.  (*Id*. at 327:18-331:21).

212.    A review of the transcript of the Hearing indicates that, like many remote proceedings, there were some technical difficulties.  (*See e.g., id.* at 31:1-14).  However, when there were issues, NYU would repeat page numbers, questions, and/or ensure that anything Plaintiff or Jane could not hear was repeated.  (*See, e.g.*, *id.* at 31:1-17 (fixing audio issue and confirming that Plaintiff could hear); 34:7-15 ("I want to make sure that you're able to hear everything and it doesn't cut in and out. . . I don't want you to miss something, [John]"); 74:22-23

(repeating page number), 78:13-16 (clarifying page number), 89:10-11 (asking Jane to "speak up")); *see also* Ex. 9, McFarlane Tr. 61:17-24 (audio issues were resolved immediately).

213.    During the Hearing, Plaintiff had multiple devices on which to view the Report and participate in the Hearing remotely. (Ex. 10, Plaintiff Tr. 247:17-248:5; Ex. 70, Stahl Tr. 40:11-19); (*see also id.* at 37:9-17 (Stahl did not observe Plaintiff struggling to follow testimony during the Hearing)).

214.    During the Hearing, Plaintiff admitted that he transferred to NYU even though Jane told him she did not want him to.  (Ex. 13, Hearing Tr. 148:5-24).

215.    During the Hearing, Plaintiff admitted that he switched housing assignments with another student, and that he was placed in Jane's dormitory as a result.  (*Id*. at 150:12-151:13).

216.    During the Hearing, Plaintiff admitted that he changed his major upon transfer at NYU, selecting Jane's major on his own.  (*Id*. at 43:19-44:2).

217.    During the Hearing, Plaintiff admitted that he knew "Jane didn't want to talk to [him] and she just wanted [him] gone" once she discovered he had transferred to NYU.  (*Id*. at 155:21-156:3).

218.    During the Hearing, Plaintiff admitted that he took photos of Jane's "cleavage" and bare stomach without her consent when he was a student at UConn and after enrolling at NYU.  (*Id*. at 169:3-170:12).

219.    During the Hearing, Plaintiff admitted that by March 2018, "things had deteriorated" between him and Jane, and she was "trying to call it off."  (*Id*. at 171:15-20).

220.    During the Hearing, Plaintiff admitted that he "kind of got angry" on March 10, 2018, when Jane declined to talk to him about remarks made earlier in the evening, and that he "did knock" on her door "a little more aggressive[ly]" because he "got a little angry" when she

would not let him into her room.  (*Id*. at 176:4-15, 177:6-13).  When Jane left her room with another student who had come to get her, Plaintiff admitted that he followed them "to see how it played out."  (*Id*. at 182:12-183:8).

221.    During the Hearing, Plaintiff admitted that he "understood that" Jane "didn't want a friendship" and "did not want to be in communication with [him] or continue the relationship as of April 2, 2018.  (*Id*. at 200:6-14).

222.    During the Hearing, Plaintiff admitted that he "confronted" Jane in person on April 8, 2018 and that Jane kept crying during their conversation.  (*Id*. at 203:16-204:9 ("It was a negative cycle . . . I couldn't get anything through to her.").  Plaintiff further admitted that even though he nor Jane were "calm enough" to continue speaking, he "wanted to keep talking."  (*Id*. at 205:15-20.)  According to Plaintiff, the confrontation only ended because Jane's friends started "watching us."  (*Id.*).

223.    During the Hearing, Plaintiff admitted that he "sort of lost it" on April 21, 2018, and that "Everything that had led to that moment just all sort of came down on me and, you know, I couldn't control it."  (*Id*. at 214:10-17).

224.    During the Hearing, Plaintiff admitted that when he and Jane spoke early that morning, he leaned in" towards Jane, and she "punched" him, so he "backed away."  (*Id*. at 222:1-7).  After Jane told him it was "self-defense," Plaintiff said, "I'd never do something like that."  He then "stood in front of her" and said, "I'm threatening you right now.  Punch me."  (*Id*. at 223:10-20).

225.    During the Hearing, Plaintiff admitted that some of his subsequent messages later that day were meant "to suggest to [Jane] that he "might send" photographs to Jane's friends or family that depicted their relationship.  (*Id*. at 219:3-20; 320:16-321:4).

226.     During the Hearing, Plaintiff admitted that he received the NCO on April 22 and understood it. (*Id.* at 232:22-233:10; 234:23-235:2).

227.     During the Hearing, Plaintiff admitted that he nevertheless sent Jane a Facebook message 23 minutes after receiving the NCO. (*Id.* at 233:11-18).  Plaintiff explained this conduct by saying "[w]hen I got the [NCO] I just – I couldn't take it seriously … I was just like no-contact directive, whatever.  Just send the text." (*Id*. at 234:5-22).

228.     During the Hearing, Plaintiff admitted that he left Jane five voicemail messages after the NCO. (*Id.* at 235:11-22).

229.     During the Hearing, Plaintiff admitted that on April 29, 2018, he confronted Jane in person, stating, "I'm not going to even try and deny it. I violated the no-contact directive there directly… I didn't know how to deal with it.  I honestly still don't know how to deal with it." (Ex. 13, Hearing Tr. 240:21-241:1; 246:22-247:4; *see also id*. at 240:21-241:14 ("I absolutely lost it…I couldn't take it.").

230.     Plaintiff could not identify any questions he answered incorrectly during the Hearing.  (Ex. 10, Plaintiff Tr. 253:19-254:2).

231.     Plaintiff never requested that the Hearing be adjourned because of technical difficulties. (*Id*.).

232.     At the end of the Hearing, Plaintiff concluded "by thanking everyone in the room for accommodating [] my time difference in NYU Sydney. . . I really appreciate it and making this a fair hearing, you know, for me as well.  Also, you, Craig Jolley, Colleen Maeder, and everyone who responded and made sure that I, you know, had a fair opportunity at telling my story." (Ex. 13, Hearing Tr. 327:4-13).

233.    After the Hearing, Plaintiff told his Sydney counselor that "he felt confident that he stated his case to the best of his ability."  (Ex. 24, NYU_00001091 at -01098).

234.    On December 12, 2018, Plaintiff told his Sydney counselor that he was feeling "quite positive" about the Hearing.  (*Id*. at -01101).

**XII.    The Decision**

235.    On December 18, 2018, Maeder sent the Adjudicator's decision (the "Decision") to Plaintiff and Jane.  (*See* Ex. 71, NYU_00007055).   The Adjudicator, Craig Jolley, found "overwhelming evidence that the Respondent has engaged in an extended pattern of conduct that would cause a reasonable person in the position of the Complainant to experience fear for their safety, substantial emotional distress, significant mental suffering, and anguish. This behavior has included sexual harassment, sexual exploitation and stalking as defined under the [Policy]." (Ex. 2, NYU_00001803 at -01808).

236.    Jolley found that there was not "sufficient evidence to support a finding of sexual assault." (*Id.* at -01805).

237.    Jolley found that because Plaintiff himself "acknowledged that he did take photos of Complainant while she slept" and "that some of the photos may have shown 'cleavage,'" that he found "it more likely than not that Plaintiff engaged in sexual exploitation." (*Id*. at -01805-06). Even if pictures were taken when Plaintiff "was not enrolled at NYU," he was still responsible for sexual exploitation at NYU "[d]epending on how [Plaintiff] used it while [he was] a student at NYU." (Ex. 72, Jolley Tr. 137:11-23).

238.    Jolley found that Plaintiff "intentionally attempted to create circumstances where he could control and manipulate the Complainant's life," that "repeated unwelcome conduct from [Plaintiff]" constituted "unwelcome conduct of a sexual nature," and that "a reasonable person in the position of the Complainant" would "fear for their safety and experience substantial emotional

and mental distress." (Ex. 2, NYU_00001803 at -01806-07).  As a result, Jolley found "that there is overwhelming evidence that the Respondent has engaged in an extended pattern of conduct that would cause a reasonable person in the position of the Complainant to experience fear for their safety, substantial emotional distress, significant mental suffering, and anguish." (*Id*. at -01808). Jolley cited the "hundreds of messages that the Respondent sent the Complainant expressing his desire to remain in contact" with her "[d]espite the Complainant repeatedly communicating her desire to end the relationship." (*Id*. at -01806).  Jolley also cited Plaintiff's statements during the Hearing and videos included in the Report. (*Id*. at -01806-07).  Jolley also stated: "The respondent denied that he was following the Complainant and suggested that he believed it was the Complainant who was following him.  I do not find the Respondent's explanation to be credible and believe that his conduct was a continuance of a pattern of behavior…" (*Id*. at -01807).

239.    Jolley explained during his deposition that Plaintiff's harassment of Jane was sexual in nature because "the entire motivation for [Plaintiff's] unwelcomed conduct was a product of their prior dating, intimate and sexual relationship." (Ex. 72, Jolley Tr. 197:18-21, 198:4-10).

240.    Jolley did not consider whether or not any of Jane's actions constituted violations of the Policy because Plaintiff had not brought a cross-complaint against Jane. (*Id.* at 142:21-144:8).

241.    Based on "the totality of circumstances, the threatening and excessive nature of the Respondent's conduct, the repeated and blatant disregard of the University's no-contact directive, and most notably, the unsettling and egregious pattern of stalking behaviors," Jolley sanctioned Plaintiff with expulsion and a transcript notation. (Ex. 2, NYU_00001803 at -01808; *see* Ex. 8, Jolley Decl. ¶ 4-5 (explaining the rare and serious nature of violating an NCO and that Plaintiff

"purposely [and] repeatedly ignored NYU directives" was "a significant factor" in his decision to expel Plaintiff).

242.    Plaintiff's expulsion was "held in abeyance through the completion of any appeal proceedings, if applicable." (Ex. 2, NYU_00001803 at -01808).

**XIII.   Plaintiff's Appeal**

243.    Shortly after receiving the Decision, Plaintiff messaged a friend, "I'm gonna get my old laptop at home, I remember having stuff on there."  (Ex. 35, P058064 at -08316).  Plaintiff sent this message before he returned home and before he retained an attorney for his appeal.

244.    On December 21, 2018, Plaintiff requested an extension of time to file an appeal, until January 11, 2019.  NYU granted Plaintiff's request.  (Ex. 73, NYU_00007112).

245.    On January 3, 2019, after Plaintiff retained a lawyer, he made a second request for an extension, until January 25, 2019.  (Ex. 74, NYU_00000691).  NYU also granted this request, but because the "appeals process will now intersect with the start of the Spring semester," NYU "determined that the expulsion sanction, which was held in abeyance through the completion of the appeal proceedings, will go into effect immediately."  (*Id*.).

246.    Jolley decided to have the expulsion go into effect immediately upon the second semester because he was only "comfortable with the sanctions being stayed" while "neither student would be on campus."  Once it was clear that "the appeal process would not be resolved by the time both students returned to campus," Jolley "felt we would grant the extension but the sanctions would have to go into effect immediately."  (Ex. 72, Jolley Tr. 213:18-214:14).

247.    NYU (and specifically Jolley) has previously implemented sanctions while the appeal process is pending in multiple cases other than Plaintiff's, including in cases where the respondent was female.  (*Id*. at 215:25-218:13).

248.   On January 25, 2019, Plaintiff served his appeal.   (*See generally* Ex. 14, NYU_00011361).

249.   *New Evidence.*   Plaintiff offered as "previously unavailable" evidence under the Procedures several affidavits from friends and family and messages that he had not submitted during the investigation.   He also submitted the results of a Freedom of Information Act request that he made to the New York Police Department regarding Jane's 2016 sexual assault.   Plaintiff argued that his evidence was new "in that it was not accessible" while he was in Australia."   (*Id*. at -11361).

250.   *Procedural Error.*   Plaintiff argued that the finding that he committed sexual harassment was a procedural error because his conduct toward Jane after their break-up was not "sexual in nature" and he "in no way made any sexual advance or request to Complainant during the relevant time period," arguing instead he "was responding" to Jane's "bullying." (*Id*. at -11366).   Plaintiff also argued that the finding he stalked the Complainant was a procedural error because his actions were "not stalking," but instead "reasonable and justified," and so they would not cause a "reasonable person" to fear bodily injury or experience substantial emotional duress. (*Id*.).   Plaintiff argued that NYU's failure to recognize Plaintiff was a victim of NYU policy violations was a procedural error, and that NYU failed to "re-interview Complainant" after interviewing Plaintiff.   (*Id*. at -11367).   Plaintiff argued it was procedural error for NYU to fail to be thorough, fair, and impartial.   (*Id.*  at 11367-68).   Plaintiff also argued that because he took pictures of Jane's cleavage while a student at UConn, NYU had "no jurisdiction regarding the Cleavage Pictures."   (*Id.* at -11368).   Finally, Plaintiff argued that NYU erred by failing to complete the investigation within 60 days.   (*Id.* at -11369).

251.   Plaintiff's appeal did not mention any technical difficulties during the Hearing, and he did not claim that technical difficulties impaired his ability to meaningfully participate in the Hearing or cause him to answer any questions incorrectly.   (*See generally id*).

252.   *Disproportionate Punishment.*  Plaintiff also argued that his punishment was too harsh.  (*Id.* at -11369).

253.   Jane submitted a response to Plaintiff's appeal statement.  (*See generally* Ex. 75, NYU_00011506).  She stated that Plaintiff "presumably had access to the Internet, and could have communicated with friends and family members while in Australia," so the evidence he offered was not "previously unavailable."  (*Id*. at -11506).  She stated that the evidence he offered was "irrelevant."  (*Id.* at -11506-13).  She stated that NYU "correctly applied the reasonableness standard."  (*Id*. at -11513).  She stated that Plaintiff's appeal was not the appropriate forum to allege violations of NYU's Policy by *Jane*.  (*Id*.).  She stated that NYU had jurisdiction over her allegations of sexual exploitation, noting that she found photos of her "breasts, stomach, and face" taken "both prior and post [Plaintiff's] matriculation at NYU."  (*Id*. at -11514).  Finally, she stated that NYU was fair in both its findings and its sanction of Plaintiff.  (*Id*. at -11514-15).

254.   Plaintiff's appeal was considered by a panel of three NYU administrators: Christopher Bledsoe, Thomas Ellett, and Leah Lattimore (the "Appeal Panel").  (Ex. 76, NYU_00007876 at -07876).  The Appeal Panel met in person to consider Plaintiff's appeal.  (Ex. 77, Lattimore Tr. 35:3-10).  During that meeting, "[e]ach person would share their assessment and would discuss those assessments, if there were any differences, and then decide…if the grounds for the appeal should be granted."  (*Id*. at 40:16-41:5).

255.   The Appeal Panel also reviewed all of the materials submitted by the parties, including the Hearing audio, the Report, and Plaintiff's appeal.  (*Id*. at 43:3-23; Ex. 78, Ellett Tr.

96:2-10), despite the fact that Plaintiff's Appeal far exceeded the three-page limit set in NYU's Procedures, *see supra* ¶ 28).

256.   On February 26, 2019, Plaintiff's appeal was denied.   (*See generally* Ex. 76, NYU_00007876 at -07876).  The Appeal Panel did "not find that any material procedural errors occurred, that the Respondent has presented previously unavailable relevant information that could affect the outcome, or that the imposed sanction was substantially disproportionate to the violation. . ." (*Id.*).

257.   The Appeal Panel found that "[t]here is no basis to find that the Respondent was incapable of collecting and/or directing the investigators toward this evidence during the investigation," nor that it "could have affected the outcome of the hearing in light of the overwhelming evidence supporting the Adjudicator's decision."  (*Id.*).

258.   The Appeal Panel found that most of Plaintiff's purported "procedural errors" were in fact "challenges" to Jolley's "assessment of the evidence."  (*Id.*).  Where Plaintiff had identified a point of procedure that was "questionable," the Appeal Panel noted "there is no question the conduct found to have occurred in this matter meets the definitions of conduct prohibited under the Policy."  (*Id.*).

259.   The Appeal Panel noted that "there is no procedural requirement that a respondent be shown all evidence prior to being interviewed nor is there a requirement that a complainant be re-interviewed. . . Instead, both parties (Respondent and Complainant) are given the opportunity to review the draft report and provide comments to the Title IX investigators, which is what occurred in this case."  (*Id*. at -07876-77).

260.    The Appeal Panel also found that given the "long standing pervasive nature of Respondent's conduct, the Respondent's repeated and blatant violation of the no contact directive, and the impact on the Complainant," the sanction was "more than appropriate." (*Id*. at -07877).

## XIV.   Plaintiff's Post-Appeal Conduct

261.    After his appeal was denied, Plaintiff began the process of seeking admission to another university by retaining an admissions consultant, Sam Sneed. (Ex. 46, JD Mother Tr. 220:24-221:16). In connection with that process, he worked with Sneed to draft an "Explanation of his Expulsion" from NYU that he submitted to universities. (Ex. 34, P002943 at -02943).

262.    On March 24, 2019, Plaintiff sent Sneed a draft of his Explanation stating, "when I met with the Title IX Coordinator, Mary Signor in May 2018 [sic] she asked me if I wanted to file a cross complaint. I declined because I did not want to distress Jane." (*See id.* at -02950).

263.    On March 29, 2019, Plaintiff reiterated in an email to Sneed, "Mary Signor title ix coordinator and the investigator [] both said I could file a cross complaint. I did not because I had believed Jane had suffered many assaults and did not want to cause her distress by reporting her." (Ex. 33, P002929).

264.    Plaintiff confirmed at his deposition that these were true statements and as of March 2019 he "had not filed a complaint against Jane." (Ex. 10, Plaintiff Tr. 290:13-291:10; *see also id.* at 93:15-19 (Plaintiff "did not submit a written complaint prior to [the] summer of 2019")).

265.    In July 2019, several months after Plaintiff was expelled from NYU, he sent NYU a complaint against Jane. (Ex. 79, P000575).

266.    NYU did not accept Plaintiff's complaint because NYU has "never accepted a complaint from an expelled student against a current student." (Ex. 5, Signor Tr. 188:20-189:9 (explaining that the expelled student "had an opportunity to file a complaint" while a student at NYU)).

267.    In February 2020, Plaintiff filed complaints with NYU against three friends of Jane's, including one who testified as a witness in Plaintiff's misconduct proceeding and one who submitted a statement as part of Jane's response to Plaintiff's appeal.  (Ex. 80, P000555), (Ex. 81, P000556); (Ex. 82, P000565).

268.    On May 13, 2021, Plaintiff sent a blank email to Jane.  (Ex. 83, P000025).

269.    After being expelled from NYU, Plaintiff enrolled at CUNY Hunter College.  (Ex. 10, Plaintiff Tr. 305:12-19).  He graduated in 2020.  (*Id*. at 310:4-6).

270.    After graduating from college, he received a Master's in Public Health from Imperial College London.  (*Id*. at 309:20-24, 310:7-9).

271.    During the 2021-2022 application cycle, Plaintiff applied to law school.  (*Id*. at 314:4-16).  He has been admitted to The Washington University School of Law.  (*Id*. at 314:19-22).

Dated: June 22, 2022                              Respectfully submitted,


                                        **PILLSBURY WINTHROP SHAW PITTMAN LLP**

                                            /s/ *Jeffrey P. Metzler*
                                            Jeffrey P. Metzler
                                            Max A. Winograd
                                            Melissa S. Pettit
                                            jeffrey.metzler@pillsburylaw.com
                                            max.winograd@pillsburylaw.com
                                            melissa.pettit@pillsburylaw.com
                                            31 W. 52nd St.
                                            New York, NY 10019
                                            (212) 858-1000

                                            *Counsel for Defendant New York
                                            University*