**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

JOHN DOE,                                                   Case No.: 1:20-cv-01343 (GHW)

                Plaintiff,

    vs.

NEW YORK UNIVERSITY,

                Defendant.

-------------------------------------------------------- X

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Jeffrey P. Metzler
Max A. Winograd
Melissa S. Pettit
jeffrey.metzler@pillsburylaw.com
max.winograd@pillsburylaw.com
melissa.pettit@pillsburylaw.com
31 W. 52nd St.
New York, NY 10019
(212) 858-1000

*Counsel for Defendant New York University*

Dated:  New York, NY
       June 22, 2022

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.   Plaintiff's Relationship with Jane Roe ..................................................... 3

    B.   NYU Issues an NCO Which Plaintiff Immediately Violates ....................... 6

    C.   NYU's Investigation ................................................................................. 6

    D.   The Hearing ............................................................................................. 9

    E.   The Decision ............................................................................................. 10

    F.   Plaintiff's Appeal .................................................................................... 10

SUMMARY JUDGMENT STANDARD .................................................................................. 11

ARGUMENT ........................................................................................................................ 12

Point I— No Reasonable Jury Could Conclude That NYU's Decision to Discipline Plaintiff Was Motivated by His Gender ....................................................................................... 12

    A.   There Is No Evidence of Bias Based on Plaintiff's Gender ........................ 12

    B.   There Is Overwhelming Evidence Plaintiff Violated the Policy ................ 14

    C.   Plaintiff and Jane Are Not Similarly Situated ......................................... 18

Point II— Plaintiff's Promissory Estoppel Claim Should be Dismissed ..................... 20

    A.   The Alleged Statement is an Opinion, not a Clear and Unambiguous Promise ......... 20

    B.   Plaintiff Did Not Reasonably Rely on the Alleged Statement ................... 21

    C.   The Proximate Cause of Plaintiff's Expulsion Was His Misconduct, Not His Reliance on the Alleged Statement .............................................................. 23

    D.   NYU Did Not Break Any "Express and Implied Promises" ..................... 24

Point III— Plaintiff's NYCHRL Claim Fails for the Same Reasons as his Title IX Claims ....... 24

Point IV— In the Alternative, the Court Should Decline to Exercise Supplemental Jurisdiction ......................................................................................................................... 25

CONCLUSION ..................................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

Cases

*Augustine v. Cornell Univ.*,
   No. 14-CV-7807 (JPO), 2018 WL 1474402 (S.D.N.Y. Mar. 26, 2018)................................24

*Ben-Levy v. Bloomberg, L.P.*,
   518 F. App'x 17 (2d Cir. 2013) ...................................................................................24, 25

*Binkowski v. Hartford Accident & Indem. Co.*,
   60 A.D.3d 1473 (4th Dep't 2009) *abrogated on other grounds by Am. Tower Asset Sub, LLC
   v. Buffalo-Lake Erie Wireless Sys. Co.*, 104 A.D.3d 1212 (4th Dep't 2013) ..........................20

*E.E.O.C. v. Bloomberg L.P.*,
   778 F. Supp. 2d 458 (S.D.N.Y. 2011)....................................................................................13

*Bonilla-Bukhari v Berryhill*,
   357 F. Supp. 3d 341 (S.D.N.Y. 2019)............................................................................15, 16

*Chem. Bank v. City of Jamestown*,
   122 A.D.2d 530 (4th Dep't 1986) ..........................................................................................21

*Cyberchron Corp. v. Calldata Sys. Dev., Inc.*,
   47 F.3d 39 (2d Cir. 1995)........................................................................................................20

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016)...............................................................................................11, 12

*Doe v. Hobart and William Smith Colls.*,
   546 F. Supp. 3d 250 (W.D.N.Y. 2021) ..................................................................................24

*Doe v. Valencia Coll.*,
   903 F.3d 1220 (11th Cir. 2018) .............................................................................................14

*Haidak v. Univ. of Mass.-Amherst*,
   933 F.3d 56 (1st Cir. 2019).....................................................................................................18

*Harge v. City of New York*,
   No. 16-cv-5160 (LJL), 2021 WL 3855305 (S.D.N.Y. Aug. 26, 2021) ............................24, 25

*Henneberry v. Sumitomo Corp. of Am.*,
   415 F. Supp. 2d 423 (S.D.N.Y. 2006)..............................................................................22, 23

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952)...........................................................................................................15, 16

*LaMarch v. Tishman Speyer Props., L.P.*,
    No. 03 CV 5246(CBA), 2006 WL 2265086 (E.D.N.Y. Aug. 8, 2006) ...................................13

*Long v. Marubeni Am. Corp.*,
    No. 05 Civ. 0639 (GEL), 2006 WL 1716878 (S.D.N.Y. June 20, 2006) ...............................23

*MacKay v. Paesano*,
    No. 68232-14, 58 Misc.3d 1222(A), (Sup. Ct. Suffolk Cnty. Feb. 6, 2018) .........................22

*McAleenan v Mass. Bonding & Ins. Co.*,
    232 NY 199 (1921) ......................................................................................................................21

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..............................................................................................................11, 24

*Nelson v. Town of St. Johnsbury Selectboard*,
    115 A.3d 423 (Vt. 2015) ............................................................................................................21

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
    875 F.2d 365 (2d Cir. 1989)......................................................................................................13

*Ripple's of Clearview, Inc. v. Le Havre Assocs.*,
    88 A.D.2d 120 (2d Dep't 1982) ................................................................................................22

*Russell v. N.Y. Univ.*,
    No. 1:15-cv-2185-GHW, 2017 WL 3049534 (S.D.N.Y. July 17, 2017), *aff'd,* 739 F. App'x
    28 (2d Cir. 2018)......................................................................................................11, 13, 25

*Silver v. Mohasco Corp.*,
    94 A.D.2d 820 (3d Dep't 1983), *aff'd,* 62 N.Y.2d 741 (1984) ...............................................23

*Star Funding, Inc. v. Tire Ctrs., LLC*,
    717 F. App'x 38 (2d Cir. 2017) ................................................................................................21

*Vuona v. Merrill Lynch & Co., Inc.*,
    919 F. Supp. 2d 359 (S.D.N.Y. 2013)......................................................................................14

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)........................................................................................................13

*Woolley v. Stewart*,
    222 N.Y. 347 (1918) ..................................................................................................................22

*Yu v. Vassar Coll.*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2015).................................................................................14, 15

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994)..............................................................................................12, 14, 18

*Zahorik v. Cornell Univ.*,
    729 F.2d 85 (2d Cir. 1984)......................................................................................14

*Zenni v. Hard Rock Cafe Int'l, Inc. (N.Y.)*,
    903 F. Supp. 644 (S.D.N.Y. 1995) ...............................................................13, 14

*Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*,
    869 F. Supp. 2d 378 (S.D.N.Y. 2012)......................................................................14

## PRELIMINARY STATEMENT

NYU expelled Plaintiff John Doe ("Plaintiff" or "John") after considering extensive evidence showing that, among other things, he made a litany of alarming threats against a fellow student, Jane Roe ("Jane").  In addition, Plaintiff continued to contact Jane after she asked him to stop and even after NYU issued a no contact directive ("NCO").  Plaintiff has not adduced and cannot adduce any evidence that NYU's disciplinary decision was based on Plaintiff's gender, rather than the overwhelming evidence – including Plaintiff's own admissions during NYU's investigation and hearing, as well as video and audio recordings, photographs, and hundreds of messages – that Plaintiff violated NYU's Sexual Misconduct, Relationship Violence and Stalking Policy ("Policy").  As a result, NYU is entitled to summary judgment on Plaintiffs' gender discrimination claims under Title IX of the Education Amendments of 1972 ("Title IX") and the New York City Human Rights Law ("NYCHRL").  NYU is also entitled to summary judgment on Plaintiff's promissory estoppel claim because Plaintiff cannot demonstrate the NYU made a clear and unambiguous promise, that Plaintiff reasonably relied on that promise, or that the alleged promise was the proximate cause of any injury Plaintiff claims to have suffered.

Plaintiff met Jane when they were seniors in high school.  In 2016, Jane enrolled at NYU and Plaintiff enrolled at the University of Connecticut.  John visited Jane several times that year and ultimately transferred to NYU.  During the fall 2017 semester, Plaintiff and Jane spent significant time together and engaged in some intimate contact.  However, sometime in February or March 2018, Jane tried to "call [the relationship] off."

Plaintiff refused to accept Jane's decision.  He sent her hundreds of messages and made various threats to get Jane to talk to him.  For example, on April 8, 2018, Plaintiff was recorded on video threatening Jane: "I'm not leaving you alone unless you promise to talk to me…You have to choose, you're either gonna talk to me or you're gonna—" at which point, Jane began crying.

That same night, Plaintiff left Jane a voicemail that ended, "So again I'm telling you, if this is how it's going to go down, and you're not going to talk to me, then be warned I'm not going to be an easy person to deal with either."

On April 21, 2018, Plaintiff "lost it" when Jane failed to acknowledge his birthday, and initiated a series of aggressive contacts, including messaging her: "if you thought what I did earlier on would cause problems / You're in for a real hell of a ride / I'll give you till 1 / After that / It'll go bad." Jane complained to NYU, which issued an NCO to both Plaintiff and Jane on April 22, 2018. Less than thirty minutes later, Plaintiff messaged Jane anyway and continued to contact her on multiple occasions thereafter, including an in-person confrontation during which he again "just lost it. I absolutely lost it."

NYU investigated Jane's complaint, held a hearing, and found Plaintiff responsible for violating the NCO, sexual harassment, sexual exploitation, and stalking. Based on "the threatening and excessive nature of [Plaintiff's] conduct, the repeated and blatant disregard of the University's no-contact directive, and most notably, the unsettling and egregious pattern of stalking behaviors," NYU expelled Plaintiff and placed a notation on his transcript.

Plaintiff's claim that NYU's investigation and disciplinary decision were the result of gender discrimination is baseless. First, there is no evidence NYU's actions were motivated by gender bias. Indeed, Plaintiff failed to seek discovery or produce any evidence relating to the allegations of gender bias pled in the Amended Complaint – a 2018 social media post, the suspension of a female NYU professor, and investigations from 2015 and 2016 by the Office for Civil Rights. Nor is there any other basis on which a reasonable juror could find gender bias.

In fact, NYU's decision was based on overwhelming evidence that Plaintiff violated the Policy and Plaintiff was not treated differently than similarly situated female students. Contrary

to the allegations in the Amended Complaint, the undisputed evidence shows Plaintiff did not file a complaint against Jane with NYU's Title IX Office until July 2019, months after he had already been expelled from NYU. As this Court has already held, Plaintiff at this point "was in a materially different position than Jane" (ECF No. 40 at 42 (quotation marks omitted)).

Finally, there is no merit to Plaintiff's promissory estoppel claim. While Plaintiff alleges that his NYU advisor "promised" Plaintiff would not be expelled, Plaintiff knew that his advisor (who could have been anyone of Plaintiff's choosing) had no power over potential sanctions. In addition, given the clear statements in the Policy and communications from NYU to Plaintiff it is no surprise that Plaintiff acknowledged repeatedly throughout the disciplinary process that he faced the possibility of expulsion without ever mentioning NYU's alleged "promise." Finally, Plaintiff's promissory estoppel claim fails because the proximate cause of Plaintiff's expulsion was his misconduct, not NYU's alleged promise.

## STATEMENT OF FACTS

### A.    Plaintiff's Relationship with Jane Roe

Plaintiff and Jane first met in 2015 as high school students. (SOF ¶ 35). In 2016, Plaintiff enrolled as a freshman at UConn and Jane enrolled at NYU. (SOF ¶ 42). Plaintiff visited Jane several times at NYU during the 2016-17 school year. (*Id.*). In 2017, he applied to NYU and was accepted as a transfer student. (SOF ¶ 44). According to Plaintiff, Jane tried "to prevent [him] from going to NYU," but he enrolled anyway without telling Jane. (SOF ¶¶ 46-48). Upon enrollment, Plaintiff changed his major to Jane's major and changed his housing assignment to Jane's dorm. (¶¶ 49-50).

During the fall 2017 semester, Jane initially "didn't want to talk to" Plaintiff and "just wanted [him] gone." (SOF ¶ 52). Eventually, however, the two students resumed a relationship that included some intimate contact. (SOF ¶ 53). Jane described Plaintiff during this period as

3

"manipulative" and "controlling" and he repeatedly sent Jane messages threatening to hurt himself or contact Jane's parents – who did not approve of their relationship – if she did not accede to various demands.  (SOF ¶¶ 54-62).

Also in fall 2017, Jane discovered that Plaintiff had taken pictures of her while she was sleeping without her consent. (SOF ¶ 59).  In at least some of the pictures, Jane's breasts or stomach were partially exposed.  (*Id.*).  Plaintiff apologized to Jane over text, admitting, "I SAW YOUR SHIRT WAS OFF…AND I WANTED TO PLEASURE MYSELF…AND I TOOK A PIC." (*Id.*) (emphasis in original).

By spring 2018, Plaintiff concedes the relationship with Jane "had deteriorated" and she was "trying to call it off."  (SOF ¶ 63).  Plaintiff was "confused and angry," and in March 2018 he initiated increasingly aggressive contacts with Jane.  (*See* SOF ¶¶ 64-67).  These included, among other things:

- On March 10, 2018, Plaintiff stood outside Jane's dorm room door and insisted that she speak with him about comments she made earlier in the evening.  He refused to leave and when a friend came to pick Jane up, Plaintiff followed them "to see how it played out." (SOF ¶¶ 65-68).

- On April 2, 2018, Plaintiff demanded to meet Jane at 4 AM.  When she did not show, he sent her a barrage of texts calling her an "ABSOLUTE BITCH" and threatening if she did not respond in five minutes, "Your parents will know everything / Press charges against me, I don't give a fuck."  (SOF ¶¶ 75-77) (emphasis in original).

- On April 8, 2018, Plaintiff "confronted" Jane in person.  (SOF ¶¶ 80-84).  In a video of this encounter, Plaintiff tells Jane "I'm not leaving you alone unless you promise to talk to

me…You have to choose, you're either gonna talk to me or you're gonna…" At this point, Jane interrupted, crying.  (SOF ¶ 83).

- On April 8, 2018, Plaintiff left Jane a voicemail reiterating, "So again I'm telling you, if this is how it's going to go down, and you're not going to talk to me, then be warned I'm not going to be an easy person to deal with either." (SOF ¶ 85).

- On April 9, Plaintiff left Jane another voicemail: "I'm not done talking…There's a lot more you have to hear from me….Won't go ballistic.  Or maybe I already am."  (SOF ¶ 88).

- On April 21, 2018, Plaintiff "sort of lost it," as he later put it.  (SOF ¶ 95).  He texted Jane, "[I]f you thought what I did earlier on would cause problems / You're in for a real hell of a ride / I'll give you till 1 / After that / It'll go bad / I want a response on WhatsApp in 9 minutes."  (SOF ¶ 97).

- Throughout this period, Jane repeatedly asked Plaintiff to stop contacting her.  (*See, e.g.*, SOF ¶¶ 87, 111, 115; *see also* SOF ¶ 55).

- Jane eventually agreed to meet Plaintiff, who recorded part of their encounter.  The video shows Jane crying on the floor while Plaintiff speaks into the camera about how she was "supposed to stay away from me" but was

> [n]ot doing such a great job of that, are we now?…She laughed when you guys were there and I was hurt, right?  She laughed.  And now she's crying.  Where's the laughter?  It's a high-stress situation.  She's not laughing.  Why isn't she laughing?  She should be laughing, right?  Laugh, right?  Laugh.  No, she won't laugh now.  She won't laugh now.  She'll just cry.  She pities her.  Always pities her."  (SOF ¶ 103).

Later that day, Plaintiff sent Jane over 100 unanswered messages attempting to apologize and threatening self-harm and suicide.  (SOF ¶ 110).

### B.      NYU Issues an NCO Which Plaintiff Immediately Violates

On April 22, 2018, NYU issued an NCO to both Plaintiff and Jane, directing each student "not to initiate or facilitate any form of communication or interaction" with the other, "including those made through virtual means (text messages, e-mail, Facebook Twitter, other social networking websites, etc.) or by 3rd parties on your behalf."  (SOF ¶ 117).

Less than a half hour after receiving the NCO, Plaintiff sent a message to Jane.  (SOF ¶ 118).  Plaintiff violated the NCO on multiple occasions thereafter, including on April 29, 2018, when he "absolutely lost it," and confronted Jane in person.  (SOF ¶ 123).

### C.      NYU's Investigation

On April 30, 2018, NYU's Title IX Coordinator, Mary Signor, met with Jane to conduct an initial assessment of her complaint.  (SOF ¶ 126).  Signor advised Jane at this meeting that NYU could either conduct an investigation or attempt to resolve "this matter through the University's Administrative Resolution process."  (SOF ¶ 127).

Later that day, Signor and Assistant Director of the Office of Student Conduct, Colleen Maeder, met with Plaintiff. Signor and Maeder explained Plaintiff's rights under NYU's Policy and Procedures, explained that sanctions for violating the Policy included expulsion, and heard Plaintiff's perspective on Jane's allegations. (SOF ¶¶ 128-29).  Signor and Maeder also asked Plaintiff if he wanted to file a cross-complaint against Jane but he "declined because [he] did not want to distress Jane."  (SOF ¶ 131).  Plaintiff told NYU that he wanted to attempt an administrative resolution.  (SOF ¶ 133).

On May 2, Jane emailed Signor to complain that Plaintiff had again violated the NCO by following her in Washington Square Park earlier that day, noting "I am starting to feel increasingly stressed and anxious because of this.  Is there anything you can do to make him stop doing this?" In the same email, Jane told Signor that she did not "think the issue can be taken care of properly

6

via the [administrative] resolution method" because of Plaintiff's NCO violations and because "[Plaintiff] was following me even today."  (SOF ¶¶ 135-36).

On May 17, 2018, NYU investigators Samuel Hodge and Jacqueline Cornell interviewed Jane, who described her relationship with Plaintiff and the conduct that prompted her to file a complaint in April 2018.  (SOF ¶ 144).

On May 21, 2018, Plaintiff emailed Signor to ask for more information about the allegations against him and requested that Signor discuss the case with his mother.  (SOF ¶ 145). Signor responded the next day with a description of Jane's allegations.  (SOF ¶ 146).  Signor also spoke with Plaintiff's mother and told her that Plaintiff could be expelled.  (SOF ¶ 147).

Also on May 22, 2018, Hodge emailed Plaintiff to schedule an interview.  Hodge advised Plaintiff of his right to be accompanied by an advisor, sent Plaintiff a list of attorneys, and offered to connect Plaintiff with "a Respondent Facilitator through NYU."  (SOF ¶¶ 149-52, *see also* SOF ¶ 34 (a Respondent Facilitator provides "[g]uidance related to what happens in [Title IX proceedings] in terms of the procedures, the steps, answering questions based upon information [the respondent] has received to help him make sure that he understands and gets his questions answered.")).  Hodge also sent Plaintiff copies of NYU's Policies and Procedures, which Plaintiff reviewed.  (SOF ¶ 148).

Plaintiff requested an NYU Respondent Facilitator on June 5, 2018, and was later introduced to Allen McFarlane.  (SOF ¶¶ 153-54).  Plaintiff met with McFarlane for the first time on June 25, 2018.  (SOF ¶ 155).  McFarlane listened to Plaintiff's account of his relationship with Jane.  (SOF ¶ 156).  Plaintiff claims that McFarlane told him during this meeting "there is no way

you'll be expelled" and that the "worst-case scenario" would be a one-semester suspension.  (Ex. 10, Plaintiff Tr. 111:11-112:2).[1]

On July 10, 2018, Plaintiff and McFarlane met with Hodge and another Title IX Investigator.  (SOF ¶ 157).  Plaintiff spoke about his relationship with Jane and the events leading up to her April 2018 complaint.  Plaintiff admits that NYU's Title IX investigators "said [he] could file a cross complaint," but that he did not "because [he] had believed Jane had suffered many assaults and did not want to cause her distress by reporting her."  (SOF ¶ 162).  After the interview, NYU affirmatively reached out to Plaintiff multiple times to collect whatever evidence Plaintiff wanted to submit.  (SOF ¶¶ 163-64).  On August 10, before traveling to Australia for a semester abroad, Plaintiff sent NYU what would become Attachment D to the Report.  (SOF ¶ 170).

On October 2, 2018, Hodge sent a draft of the investigative report ("Report") to Plaintiff and Jane that included a summary of Jane's allegations, a copy of the applicable Policies, a full write-up the interviews NYU had conducted, and all of the evidence that had been submitted up to that point.  (SOF ¶ 175).  Jane and Plaintiff were asked to "Please review the draft report (including the related attachments) and provide any edits, clarification, or comments (to your statement or others), as you feel is necessary. You are also welcome to identify or provide any additional information or witnesses that you believe should be considered." (*Id.*; *see also id.* ¶ 19 ("The purpose of the draft report review period is to enable the Complainant and Respondent an opportunity to review the evidence gathered, to clarify and/or expand upon information contained in the report, and to provide additional evidence.")).  Jane and Plaintiff both submitted responses on October 22, 2018, which were included in the final Report as Attachments G and H respectively. (SOF ¶ 183).

---

[1]  NYU denies this allegation. *See* (ECF No. 47 at ¶¶ 126-29).

On October 23, 2018, Hodge and Stabile finalized the Report and sent it to Plaintiff, Jane, and OSC to schedule a hearing.  (SOF ¶ 189).

### D.     The Hearing

NYU initially scheduled the Hearing for November 19, 2018, at 10am EST.  (SOF ¶ 191). However, NYU rescheduled the Hearing after Plaintiff pointed out that 10am EST would be 2am in Sydney, where he was studying. (SOF ¶¶ 194-95).[2]  NYU also granted Plaintiff's request to have two advisors attend the Hearing – one in Sydney and one in New York – and provided Plaintiff with a private space in which he could participate in the Hearing.  (SOF ¶ 203).

The Hearing was held on December 10, 2018, 4pm in New York, which was December 11, 2018, 8am in Sydney.  The participants included Plaintiff and his advisor in Sydney, and in New York Jane, Hodge, Maeder, McFarlane, and the Adjudicator Craig Jolley.  NYU made an audio recording of the Hearing from New York.  (SOF ¶¶ 206-07).

During the Hearing, Plaintiff largely admitted to the misconduct for which NYU found him responsible.  He admitted to violating the NCO, taking pictures of Jane without her consent, threatening Jane, and continuing to confront Jane even after she no longer wanted to communicate with him.  (SOF ¶¶ 214-226).  However, Plaintiff attempted to provide context for his behavior and denied any non-consensual sexual contact.  Whenever there were technical difficulties during the Hearing, NYU took steps to address them immediately, such as repeating questions and/or clarifying testimony.  (SOF ¶ 212).  After the Hearing, Plaintiff told his Sydney counselor that "he felt confident that he stated his case to the best of his ability" and felt "quite positive" about the Hearing.  (SOF ¶¶ 233-34).

---

[2]  Maeder admitted that she "confused the time change" when setting the initial hearing time, which would have been 2am in Sydney.  (SOF ¶ 191).

### E.        The Decision

On December 18, 2018, Jolley issued a written decision (the "Decision") in which he found there was not "sufficient evidence to support a finding of sexual assault," but that Plaintiff was responsible for sexual harassment, stalking, sexual exploitation, and violation of the NCO.  (SOF ¶¶ 235-41).  Given "the totality of circumstances," including "the threatening and excessive nature of the Respondent's conduct, the repeated and blatant disregard of the University's no-contact directive, and most notably, the unsettling and egregious pattern of stalking behaviors," Jolley sanctioned Plaintiff with expulsion and a transcript notation.  (SOF ¶ 241).

### F.        Plaintiff's Appeal

On January 25, 2019, Plaintiff appealed the Decision on three grounds: (1) new evidence, (2) procedural error; and (3) disproportionate sanction (SOF ¶¶ 248-50, 252; *see also* SOF ¶ 28 (outlining grounds for appeal under NYU's Procedures)).

The "new evidence" consisted largely of affidavits from friends and family and messages that Plaintiff claimed were not accessible to him in Australia.  (SOF ¶ 249).  The "procedural issues" raised by Plaintiff were (a) that NYU's sexual harassment policy is not applicable because his conduct toward Jane after their break-up was not "sexual in nature"; (b) no "reasonable person" would have feared bodily injury or experience substantial emotional distress in response to his conduct; (c) he was the victim of bullying and other Policy violations; (d) NYU failed to "re-interview Complainant" after interviewing Plaintiff; (e) NYU had "no jurisdiction regarding the Cleavage Pictures" because they were taken while he was a student at UConn; and (f) NYU did not complete the investigation within 60 days.  (SOF ¶ 250).  Plaintiff did ***not*** claim that technical difficulties impaired his ability to meaningfully participate in the Hearing or caused him to answer any questions incorrectly.  (SOF ¶ 251).

On February 26, 2019, NYU's Appeal Panel denied Plaintiff's appeal. (SOF ¶ 256). The appeal panel did "not find that any material procedural errors occurred, that the Respondent has presented previously unavailable relevant information that could affect the outcome, or that the imposed sanction was substantially disproportionate to the violation…." (SOF ¶¶ 257-60).

Four months after his appeal was denied, on July 2019, Plaintiff filed a complaint with NYU alleging misconduct by Jane. (SOF ¶ 265).

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Russell v. N.Y. Univ.*, No. 1:15-cv-2185-GHW, 2017 WL 3049534, at *26 (S.D.N.Y. July 17, 2017), *aff'd,* 739 F. App'x 28 (2d Cir. 2018) (internal quotation marks and citations omitted). "The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." *Id.* at *27 (internal quotation marks and citation omitted).

The burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Title IX claims alleging discrimination in university disciplinary decisions. *See Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016). Under this framework, "[P]laintiff bears the initial burden of establishing a *prima facie* case of discrimination." *Russell*, 2017 WL 3049534, at *31. Next, "the burden shifts to [defendant] to offer a legitimate, non-discriminatory reason" for its action. *Id.* If the defendant is found to have done so, "the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that [defendant's] stated reasons are merely a pretext for unlawful discrimination." *Id.*

## ARGUMENT

**Point I—No Reasonable Jury Could Conclude That NYU's Decision to Discipline Plaintiff Was Motivated by His Gender**

The Amended Complaint alleges that NYU violated Title IX by discriminating against Plaintiff on the basis of gender and asserts a cause of action under both an "erroneous outcome" and "selective enforcement" theory.

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." (ECF No. 40 at 30 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Under an erroneous outcome theory, Plaintiff must prove at trial that he "was innocent and wrongly found to have committed an offense." (ECF No. 40 at 30). Under a selective enforcement theory, Plaintiff must demonstrate that "regardless of [Plaintiff's] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender," and that NYU "treated similarly situated members of the opposite sex—that is, members of the opposite sex facing comparable disciplinary charges—differently." (*Id.* at 30-31 (internal quotation marks and citations omitted)). Evidence of bias alone is not enough; Plaintiff must show "bias *on account of sex*." *Columbia*, 831 F.3d at 57 (emphasis added); *see* (ECF No. 40 at 36 ("Plaintiff must next allege facts supporting a plausible inference that the bias against Plaintiff was based on gender.")))

### A.     There Is No Evidence of Bias Based on Plaintiff's Gender

In denying NYU's motion to dismiss, this Court cited two allegations from the Amended Complaint that, if true, would have created a minimal plausible inference that NYU was biased against Plaintiff based on his gender: (1) August 2018 social media posts by a female NYU student and (2) the suspension of a female professor for sexual harassment. (ECF No. 40 at 36-37). However, Plaintiff neither sought nor produced any evidence during discovery to support either

allegation.  (May 23 Pre-Mot. Conf. Hearing Tr. at 11:9-12:1 (*see* ECF No. 83)).[3]  Plaintiff's

assertion that no discovery was necessary to support these allegations because they "speak for

themselves," *id.*, is patently insufficient as a matter of law, *see e.g.*, *Russell*, 2017 WL 3049534,

at *27.  ("To defeat a motion for summary judgment … there must be evidence on which the jury

could reasonably find for the non-movant…. [Plaintiff] may not rely on conclusory allegations or

unsubstantiated speculation." (internal quotation marks and citations omitted)).

Plaintiff's new theory—that "female students received much more lenient sanctions than

their male counterparts" (ECF No. 79 at 1-2)—is similarly unsubstantiated.  Plaintiff has not

produced any competent evidence to support this claim, which appears to rest on nothing more

than counsel's review of a spreadsheet listing the outcomes of NYU's sexual misconduct hearings.

*See LaMarch v. Tishman Speyer Props., L.P.,* No. 03 CV 5246(CBA), 2006 WL 2265086, at *6

(E.D.N.Y. Aug. 8, 2006) (holding statistical evidence regarding discrimination "[in]admissible

because it is not supported by any expert analysis"); *see also Weinstock v. Columbia Univ.*, 224

F.3d 33, 46 (2d Cir. 2000) (affirming summary judgment for university and finding plaintiff's

reliance on raw statistical data was "little but an unsupported hypothesis providing no foundation

for the assertion that there was discrimination….") (citations omitted)); *Ottaviani v. State Univ. of

N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989) ("Before a deviation from a predicted outcome

can be considered probative, the deviation must be 'statistically significant.'").

Thus, Plaintiff cannot make out even a *prima facie* case of discrimination, *see E.E.O.C. v.

Bloomberg L.P.*, 778 F. Supp. 2d 458, 470 (S.D.N.Y. 2011) (holding plaintiff failed to make out

*prima facie* case where plaintiff failed to produce competent statistical evidence); *Zenni v. Hard*

---

[3]  Nor did Plaintiff request or produce any discovery on the third allegation of gender bias in the Amended Complaint (relating to investigations by the Office for Civil Rights ("OCR")), which the Court did not rely on in deciding the motion to dismiss.  (ECF No. 40 at 20).

*Rock Cafe Int'l, Inc., (N.Y.)*, 903 F. Supp. 644, 653 (S.D.N.Y. 1995) (holding statistical evidence unsupported by expert analysis insufficient to establish *prima facie* case), let alone demonstrate that NYU's stated reasons for sanctioning Plaintiff were pretext for unlawful discrimination, *see Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 374 (S.D.N.Y. 2013) ("Statistical analysis is rarely 'sufficient to defeat summary judgment. Although a generalized statistical analysis … can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale … is false, or that her ... gender was the real reason for her termination.'" (quoting *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395–96 (S.D.N.Y. 2012))); *see also Zenni*, 903 F. Supp. at 653 (statistical evidence of general practice insufficient to prove discrimination against a particular plaintiff) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 95 (2d Cir. 1984)).

### B.      There Is Overwhelming Evidence Plaintiff Violated the Policy

In addition to Plaintiff's inability to demonstrate bias on account of gender, his erroneous outcome claim fails because there was overwhelming evidence – including Plaintiff's own admissions, video and audio recordings, and text messages – that Plaintiff violated the Policy.  *See Yusuf*, 35 F.3d at 715 ("We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming…."); *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018) (Plaintiff "admitted the underlying conduct. That conduct met the school's definition of stalking. Stalking was punishable by suspension under the Code of Conduct. It's as simple as that." (applying *Yusuf*, 35 F.3d at 715)); *see also Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 477 (S.D.N.Y. 2015) ("Absent some

indication…[of] gender bias, the Court cannot second-guess the [university panel's] credibility determinations and overall evaluation of the evidence.").

Plaintiff's erroneous outcome claim rests on allegations that: (1) his ability to participate meaningfully in the hearing was impaired by technical issues; (2) the evidence NYU relied on in the Hearing Decision and Appeal was neither credible nor complete; and (3) NYU misapplied its policies in finding him responsible for sexual exploitation, stalking, and sexual harassment.  These arguments have no merit.

First, based on the audio recording and transcript of the Hearing, no reasonable jury could conclude that technical issues prevented Plaintiff from participating meaningfully in the Hearing. While there are instances in which the audio was imperfect, NYU consistently addressed the issue by going back over any substantive questions or testimony.  (SOF ¶ 212).  Indeed, Plaintiff was unable at his deposition to identify a single question from the Hearing he answered incorrectly because of the alleged difficulties.  (SOF ¶ 230).  As Plaintiff stated at the end of the Hearing, NYU conducted "a fair hearing" in which Plaintiff "had a fair opportunity at telling [his] story." (SOF ¶ 232; *see also* SOF ¶ 233 (Plaintiff "felt confident that he stated his case to the best of his ability.").

Moreover, Plaintiff did not even mention the alleged technical issues in his Appeal, let alone claim that he had been unable to meaningfully participate.  (SOF ¶ 251).  As the Supreme Court has noted, "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see also Bonilla-Bukhari v Berryhill*, 357 F. Supp. 3d 341, 352 (S.D.N.Y. 2019)

("Regularly permitting unsuccessful claimants to raise … challenges for the first time on judicial review, especially when the arguments underlying those challenges were available at the administrative level, would 'encourage the practice of 'sandbagging….'") (citation omitted)).

Second, Plaintiff's attack on the credibility and completeness of the evidence considered by NYU is just hollow rhetoric.  Plaintiff expressly admitted to violating the NCO on multiple occasions and did not deny the underlying conduct that NYU found to constitute violations of the Policy[4] – almost all of which is documented in the messages, videos, and voicemails that were attached to the Report.  (*See, e.g.*, SOF ¶¶ 69-74, 77, 79, 83, 85-92, 94, 96-98, 103, 113, 115-16, 118, 120-21, 124).  Plaintiff admitted at his deposition that this evidence was authentic. (SOF ¶ 190).

The additional evidence that Plaintiff proffered on appeal mainly demonstrates that (a) Plaintiff and Jane were on good terms at some point (*see, e.g.*, *id*., at -11363 (Jane "presented herself as a partner to a relationship and she slept in my suite more frequently than she wants to admit")) or (b) Jane violated the Policy (*see, e.g.*, *id*., at -11363 ("her efforts to keep our relationship secret from her parents (and friends) may have been a scheme to emotionally abuse and control me.")).  But the former was never a contested issue and the latter, even if true, does not undermine NYU's determination regarding *Plaintiff's* misconduct.

Similarly, Plaintiff's attacks on Jane's credibility (which he did not make during the Investigation or Hearing)[5] do not raise genuine doubts about the outcome of Plaintiff's misconduct proceedings, which was based on undisputed evidence from the Investigation and Plaintiff's own

---

[4]   While Plaintiff did deny Jane's allegation that he engaged in non-consensual sexual contact, NYU did not find him responsible for this allegation.  (SOF ¶¶ 70-71, 236).

[5]   During the Investigation and Hearing, Plaintiff raised the text messages from Jane's friend and Jane's prior sexual assault only as evidence that that their sexual contact had been consensual, and to demonstrate his concern for Jane's well-being.  (*See, e.g.*, SOF ¶¶ 160, 184).

admissions at the Hearing, not credibility assessments.  (SOF ¶¶ 237-38).  Indeed, with respect to the one allegation where Plaintiff and Jane gave substantially differing accounts – the allegation of non-consensual sexual conduct – NYU found there was insufficient evidence to hold Plaintiff responsible.  (SOF ¶ 236).

Moreover, even if the evidence Plaintiff submitted in his Appeal had any material value, it was not "previously unavailable" to him as required under the Policy.  (SOF ¶ 28).   Plaintiff's claim that the evidence was "unavailable," and he did not know he could recover messages from his laptop, (Am. Compl. ¶¶ 4, 193, 298-99), is contradicted by the record, which shows that he (a) was interviewed by NYU and submitted evidence *before* he left for Australia (SOF ¶¶ 157, 163-64, 168, 170, 173) and (b) knew that he had documents on his computer prior to returning to New York and engaging a lawyer (SOF ¶ 243).[6]  Therefore, NYU did not err insofar as it declined to consider this evidence on Plaintiff's Appeal.

Third, NYU did not misapply its Policies on "sexual exploitation," "sexual harassment," or "stalking."  **(A)** NYU defines "Sexual Exploitation" as the "non-consensual use of another individual's nudity or sexuality."  (SOF ¶ 4).  Plaintiff claims that he was not responsible for sexual exploitation because the pictures he took of Jane without her consent were taken before Plaintiff transferred to NYU and were not sexual in nature.  (Am. Compl. ¶¶ 479-83).  But it is undisputed that while Plaintiff was a student at NYU, he had pictures on his phone of Jane's partially exposed breasts and stomach which he used for "selfpleasure[]."  (SOF ¶ 59).  **(B)** Plaintiff's argument that his harassment of Jane was not "sexual" (Am. Compl. ¶¶ 253-54) is contradicted by the undisputed fact that Plaintiff's conduct occurred in the context of Jane's attempts to end their intimate

---

[6]  Jane also correctly noted in her response to Plaintiff's appeal that Plaintiff "had access to the Internet, and could have communicated with friends and family members while in Australia."  (SOF ¶ 253).  In discovery, Plaintiff produced thousands of pages of communications sent and received by him while studying abroad, including with individuals who assisted with his appeal.

relationship.  (*See, e.g.*, SOF ¶ 76 ("there was a lot of anger.  It's like you're, again, avoiding to meet with me, the person who you're directly involved in.")).  As Jolley explained at his deposition, "the entire motivation for [Plaintiff's] unwelcomed conduct was a product of their prior dating, intimate and sexual relationship."  (SOF ¶ 239).  **(C)** As NYU's Appeal Panel explained, Plaintiff's argument that "no reasonable person in Jane's position would fear bodily harm" or "experience substantial emotional distress" as a result of Plaintiff's conduct, (Am. Compl. ¶¶ 271-72), is simply a "challenge[]" to Jolley's "assessment of the evidence."  (SOF ¶ 258).  No reasonable jury could conclude that Jolley abused his discretion under the Policy by finding that Plaintiff's refusal to stop contacting Jane, threats of self-harm, and blackmail could cause a reasonable person in Jane's position to fear bodily harm and experience substantial emotional distress.

## C.     Plaintiff and Jane Are Not Similarly Situated

Plaintiff's selective enforcement claim should be dismissed for the independent reason that Plaintiff cannot demonstrate that NYU treated a similarly situated female student differently. (ECF No. 40 at 30-31).  Plaintiff's reliance on Jane as an appropriate comparator, (Am. Compl. ¶¶ 455-465), is unavailing because whereas Jane filed a complaint with NYU's Title IX office and requested an investigation of Plaintiff's conduct, the undisputed evidence demonstrates that Plaintiff did neither of those things until July 2019, months after he had been expelled.  (*See e.g.*, SOF ¶¶ 131, 161-62, 262-65).  At this time, Plaintiff "was in a materially different position than Jane was when she made her Title IX complaint."  (ECF No. 40 at 42 (quotation marks omitted); *see also Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019) (applying *Yusuf* and finding no selective enforcement because "[a]t most, [Plaintiff] has alleged that the university pursued [the claimant's] case instead of his because [she] made the allegation first—not because [Plaintiff's] sex influenced the university.").

The fact that during NYU's investigation of Jane's complaint, Plaintiff described conduct by Jane that might have constituted a violation of the Policy does not make the two students similarly situated.  As noted above, Plaintiff admits he did not file a cross-complaint or request an investigation of Jane's conduct during the Investigation, and NYU has cited this as the reason why it did not investigate Jane.  (*See* SOF ¶¶ 10-12 (NYU generally honors the wishes of a complainant and will not conduct an investigation unless requested), *see also* SOF ¶ 240).[7]  Indeed, when other male respondents have filed cross complaints, NYU has investigated those allegations concurrently with the original complaint.  (SOF ¶ 16).

Plaintiff's failure to file a complaint against Jane also accounts for NYU's treatment of the May 2, 2018 encounter in Washington Square Park.  Whereas Jane emailed Signor about the incident as further evidence that Plaintiff was violating the NCO (SOF ¶¶ 135-36), Plaintiff did not.  In fact, when Plaintiff emailed Signor on May 3, he complained that Jane was telling friends that she had reported him, but *failed to mention* the May 2 encounter.  (SOF ¶ 137).[8]  Both students were also given the same opportunity during the Investigation and Hearing to provide their account of the incident, (*see* SOF ¶¶ 144, 157, 165, 170, 208-09), and the Adjudicator's conclusion that Plaintiff was following Jane was not based on his gender, but on Plaintiff's admissions to having violated the NCO on multiple occasions.  (SOF ¶ 238) ("The respondent denied that he was following the Complainant and suggested that he believed it was the Complainant who was following him.  I do not find the Respondent's explanation to be credible and believe that his conduct was a continuance of a pattern of behavior…").[9]

---

[7]  This policy was, in fact, applied to Jane in the same manner it was applied to Plaintiff as NYU did not investigate Jane's claim that she was sexually assaulted in 2016 because, although she told the Title IX coordinator about them, "[s]he declined to" have "the allegations [] assessed by the Title IX coordinator."  (SOF ¶ 127).

[8]  To the extent Plaintiff told NYU's Department of Public Safety about the incident, but they declined to follow-up (*see* Am. Compl. ¶ 354), Jane was treated similarly with regard to her own report of an incident.  (SOF ¶ 122).

[9]  In fact, Plaintiff had admitted to a friend eight days after the incident, "I followed her a bit."  (SOF ¶ 134).

19

In sum, there is no evidence on which a reasonable juror could conclude that NYU's stated reasons for sanctioning Plaintiff are pretext for unlawful discrimination.

**Point II—Plaintiff's Promissory Estoppel Claim Should be Dismissed**

Under New York law, "promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quotation marks omitted).  Plaintiff's allegation that NYU's Respondent Facilitator told Plaintiff and his mother, "under no circumstance will you be expelled, and the worst-case scenario will be a one-semester suspension."  (Ex. 10, Plaintiff Tr. 131:13-25) (the "Alleged Statement"), fails as a matter of law because (i) the Alleged Statement was not a clear and unambiguous promise; (ii) Plaintiff did not reasonably rely on it; and (iii) even if he had, Plaintiff has not suffered an injury "by reason of the reliance."

### A.   The Alleged Statement is an Opinion, not a Clear and Unambiguous Promise

As initial matter, NYU denies McFarlane made the Alleged Statement.  (ECF No. 47 at ¶¶ 126-29).  New York courts have held that this alone is enough to defeat a promissory estoppel claim.  *See Binkowski v. Hartford Accident & Indem. Co.*, 60 A.D.3d 1473 (4th Dep't 2009) *abrogated on other grounds by Am. Tower Asset Sub, LLC v. Buffalo-Lake Erie Wireless Sys. Co.*, 104 A.D.3d 1212 (4th Dep't 2013) ("In light of defendant's denial of the alleged promise, plaintiff has failed to establish the existence of a clear and unambiguous promise and thus the doctrine of promissory estoppel does not apply." (citations omitted)).

Furthermore, even assuming *arguendo*, McFarlane did make the Alleged Statement, it was not an enforceable promise because Plaintiff understood that McFarlane "would [not] play a role in making…a determination on the facts of the case" or "a determination on the sanctions." (SOF ¶ 151).  Thus, Plaintiff could not reasonably have interpreted the Alleged Statement as an actional

promise by NYU, as opposed to McFarlane's opinion or prediction.[10]  *See Chem. Bank v. City of Jamestown,* 122 A.D.2d 530, 530 (4th Dep't 1986) (holding that where plaintiff knew future event to be beyond defendants' power to ensure, "[w]hat plaintiff sought and received … were more expressions of opinion which cannot form the basis for an estoppel." (citing *McAleenan v Mass. Bonding & Ins. Co.*, 232 NY 199, 206 (1921)); *see also Star Funding, Inc. v. Tire Ctrs., LLC*, 717 F. App'x 38, 43 (2d Cir. 2017) (summary order) (affirming summary judgment dismissing promissory estoppel claim where plaintiff failed to show that actions gave rise to the appearance and belief that agent possessed authority to enter into the transaction (citations omitted)); *Nelson v. Town of St. Johnsbury Selectboard*, 115 A.3d 423, 439 (Vt. 2015) (holding that statement by town's attorney that candidate for position of town manager could be terminated only "with cause" did not constitute a promise: "At best, the attorney was expressing his legal opinion…. [T]he attorney never purported to speak on behalf of the board.").

## B.    Plaintiff Did Not Reasonably Rely on the Alleged Statement

In addition, even if Plaintiff understood the Alleged Statement as a promise, he did not reasonably rely on it.

In addition to the statement in the Policy that students found responsible for violations are "subject to disciplinary action, up to and including separation from NYU," (SOF ¶ 27), NYU advised Plaintiff repeatedly throughout the disciplinary process that he faced the possibility of expulsion.  *See* (SOF ¶ 132 (April 2018 meeting with Title IX Coordinator), SOF ¶ 192 (October

---

[10] Plaintiff's own description of his discussions with McFarlane confirm that he understood McFarlane was just giving his opinion, not making an enforceable promise.  (Ex. 10, Plaintiff Tr. 136:6-18 ("Q. … Other than at the June 25, 2018 conversation that you had with Mr. McFarlane, did he repeat the statement to you that under no circumstances will you be expelled? A.    He did repeat that statement to me.  When the draft ISR came out, I now had all the evidence and granted, he had access to that document.  And I said, after reviewing the allegations in that document and the evidence, *do you still think it will not be an expulsion*, and he maintained the same stance …" (emphasis added); (*id.* 136:23-137:8 (McFarlane "*believed* there would be no expulsion." (emphasis added); *id.* 172:16-18 ("my question to Allen McFarlane was do you think this could lead to an expulsion[?]")).

2018 notice of Hearing); *see also* SOF ¶ 147 (May 2018 call between Title IX Coordinator and Plaintiff's mother)).  Statements made by Plaintiff (and his mother) throughout the disciplinary process confirm that they understood he was facing the possibility of severe sanctions, including expulsion.  (SOF ¶¶ 132, 178, 197-99; *see also* SOF ¶ 200).  By contrast, there is not a single document – no email, text, or other message – in which Plaintiff or his mother ever so much as mention the Alleged Statement, let alone suggest that they relied on it an any way.

Additionally, Plaintiff cannot demonstrate that his decision not to hire an attorney was "unequivocally referable" to the Alleged Statement.  *See Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 444 (S.D.N.Y. 2006) (citing *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120 (2d Dep't 1982); *Woolley v. Stewart*, 222 N.Y. 347 (1918)); *MacKay v. Paesano*, No. 68232-14, 58 Misc.3d 1222(A), at *4 (Sup. Ct. Suffolk Cnty. Feb. 6, 2018) ("It is not sufficient that the oral agreement gives significance to the plaintiff's actions….the actions alone must be unintelligible, or at least extraordinary, and explainable only with reference to the oral agreement. In sum, the plaintiff's actions must be inconsistent with any other explanation." (citation omitted)).

Hodge sent Plaintiff a list of attorney referrals on June 1, 2018.  (SOF ¶ 152).  Plaintiff and his mother did not contact any of them.  Instead, they spoke with a friend who was an attorney, but because she did not have any knowledge about Title IX, they did not "take it any further." (*Id.*).  Instead, Plaintiff asked NYU to suggest an advisor, who made the Alleged Statement on June 25, 2018, based solely on Plaintiff's description of the facts.  (SOF ¶ 156).  Indeed, Plaintiff himself testified only that he "probably" would have sought an attorney.  (Ex. 10, Plaintiff Tr. 230:24-231:21).  In short, given Plaintiff's decision not to hire an attorney before even speaking with McFarlane, he cannot demonstrate his decision was "unequivocally referable" to the Alleged Statement.  *Henneberry*, 415 F. Supp. 2d at 444.

Finally, given Plaintiff's stated desire to attend medical school, and his understanding that any sanction – including the one-semester suspension that McFarlane allegedly described as the "worst case scenario" – would seriously impact his chances of getting into medical school, (SOF ¶ 199), it would not have been reasonable for him not to do everything he could to defend himself. And indeed, Plaintiff admitted at his deposition that he did just that. (SOF ¶ 193).

### C.    The Proximate Cause of Plaintiff's Expulsion Was His Misconduct, Not His Reliance on the Alleged Statement

Any injury stemming from reliance on a promise must be "caused by [defendant's] failure to keep the alleged promise." *Silver v. Mohasco Corp.*, 94 A.D.2d 820, 822 (3d Dep't 1983), *aff'd*, 62 N.Y.2d 741 (1984).  In other words, "[A] promissory estoppel claim must allege an injury *by reason of* plaintiff's reliance on defendant's promise." *Long v. Marubeni Am. Corp.*, No. 05 Civ. 0639 (GEL), 2006 WL 1716878, at *2 (S.D.N.Y. June 20, 2006) (emphasis added and internal quotation marks and citation omitted)).

Here, the proximate cause of Plaintiff's alleged injury – his expulsion from NYU – is his own undisputed conduct, which constituted multiple violations of the Policy.  *See Long,* 2006 WL 1716878, at *2 ("[T]he promissory estoppel claim fails because the alleged injuries did not result from plaintiffs' reliance on a promise. Rather, the injuries resulted from defendant's alleged unlawful conduct….").  Given the overwhelming evidence that Plaintiff violated the Policy, it is highly speculative that hiring an attorney would have had any impact on the outcome of the disciplinary process.  Indeed, not only was Plaintiff's mother (who is an attorney (SOF ¶ 145)) involved in the disciplinary process from the very beginning, but his Appeal – which was prepared by an attorney, and which is what Plaintiff would have submitted during the Investigation, but for the Alleged Statement (*See* Ex. 10, Plaintiff Tr. 39:6-18) – provides no basis for concluding that Plaintiff would not have been expelled if he had hired an attorney earlier in the process.

### D.    NYU Did Not Break Any "Express and Implied Promises"

Finally, NYU did break any "express and implied promises" to Plaintiff.  (*See* Am. Compl. ¶ 510).  Although Plaintiff failed to develop this claim beyond the conclusory allegations in the Amended Complaint, the record is clear that Plaintiff's "opportunity to attain his educational objectives" was conditional on his adherence to the Policy, (*see* SOF ¶ 27), and whose claims were "heard by an impartial adjudicator … free from discrimination," *see supra* Point I.[11]  Indeed, to the extent Plaintiff is alleging NYU breached an express or implied contract, this fatally undermines his promissory estoppel claim. *See Doe v. Hobart and William Smith Colls.*, 546 F. Supp. 3d 250, 274 (W.D.N.Y. 2021) (dismissing promissory estoppel claim).

### Point III—Plaintiff's NYCHRL Claim Fails for the Same Reasons as his Title IX Claims

"The NYCHRL analysis…mirrors the *McDonnell Douglas* framework, but accords Plaintiff a lesser burden of showing only that Defendants' actions were based, in part, on discrimination." *Augustine v. Cornell Univ.*, No. 14-CV-7807 (JPO), 2018 WL 1474402, at *5 (S.D.N.Y. Mar. 26, 2018) (internal quotation marks and citations omitted).  Plaintiff "must introduce sufficient evidence to show that" NYU treated him "less well…at least in part for a discriminatory reason." *Id*. (quotation marks omitted).  Despite the lesser burden, the NYCHRL "still requires a showing of some evidence from which discrimination can be inferred." *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19-20 (2d Cir. 2013) (summary order); *see also Harge v. City of New York*, No. 16-cv-5160 (LJL), 2021 WL 3855305, at *15 (S.D.N.Y. Aug. 26, 2021) ("While claims under the NYCHRL are more liberally construed than claims under Title VII, the

---

[11] As Plaintiff admitted he did not file a complaint until he was no longer NYU student, (*see* SOF ¶ 264), the allegation concerning an express or implied promise "to have complaints resolved impartially or promptly" (Am. Compl. ¶ 510) is inapplicable.

NYCHRL does not alter the kind, quality, or nature of evidence that is necessary to support or defeat a motion for summary judgment" (internal quotation marks and citations omitted)).

Here, Plaintiff's NYCHRL claim is "indistinguishable from" his Title IX claims because, for the reasons stated above, he "fails to point to any evidence from a which a reasonable jury could conclude that [NYU] was motivated by discrimination." *Ben-Levy*, 518 F. App'x at 20.

**Point IV—In the Alternative, the Court Should Decline to Exercise Supplemental Jurisdiction**

If the Court dismisses Plaintiff's federal claims but concludes there is a genuine dispute of material fact with respect to Plaintiff's state law claims, the Court should decline to exercise supplemental jurisdiction and dismiss Plaintiff's state law claims without prejudice. *See, e.g.*, *Russell*, 2017 WL 3049534, at *39-40.

## CONCLUSION

For the foregoing reasons, NYU respectfully requests that its motion for summary judgment as to all claims be granted and that Plaintiff's complaint be dismissed with prejudice.

Dated: June 22, 2022                                       Respectfully submitted,

                                       PILLSBURY WINTHROP SHAW PITTMAN LLP

                                       _____ /s/ *Jeffrey P. Metzler* _____
                                       Jeffrey P. Metzler
                                       Max A. Winograd
                                       Melissa S. Pettit
                                       jeffrey.metzler@pillsburylaw.com
                                       max.winograd@pillsburylaw.com
                                       melissa.pettit@pillsburylaw.com
                                       31 W. 52nd St.
                                       New York, NY 10019
                                       (212) 858-1000
                                       *Counsel for Defendant New York University*