# Exhibit 1, Part A



**Office of Equal Opportunity**
**Office of the President**
726 Broadway, 7th Floor
New York, NY 10003

# INVESTIGATION SUMMARY REPORT

**TO:**    Craig Jolley, Director, Office of Student Conduct & Community Standards;

**Cc:**    Mary Signor, Executive Director & Title IX Coordinator, Office of Equal Opportunity

**FROM:**    Samuel Hodge, Title IX Investigator, Office of Equal Opportunity; Lauren Stabile, Deputy Title IX Coordinator, Office of Equal Opportunity; and Jacqueline Cornell, Title IX Investigator, Office of Equal Opportunity

**DATE:**    October 23, 2018

**RE:**    Complaint of Sexual Misconduct by Jane Roe against John Doe

## I.   INTRODUCTION & ALLEGATION(S) PRESENTED

This memorandum summarizes the allegation(s), factual background, and witness statements concerning a report made by student Jane Roe ("Ms. Roe "), alleging sexual misconduct in violation of NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy (see Attachment A) by student John Doe ("Mr. Doe "). Specifically, Complainant has alleged that on multiple occasions between fall 2016 and spring 2018 Respondent engaged in misconduct, including the following:

1. On, about, and between fall 2016 and spring 2018, on and off-campus, Respondent placed his lips on Complainant's face, without her affirmative consent.

2. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually exploited Complainant by taking photographs, disseminating photographs, and threatening to disseminate photographs of her nude body, without her knowledge or affirmative consent.

3. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his hand on her breasts – both over and under her clothing - without her affirmative consent.

CONFIDENTIAL STUDENT RECORD

4. On, about, and between fall 2016 and spring 2018, on multiple occasions, at the Weinstein and University Residence Halls, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his hand on her vagina - both over and under her clothing - without her affirmative consent.

5. On or about spring 2017, at the Weinstein Residence Hall, Respondent sexually assaulted Complainant by engaging in non-consensual sexual contact by placing his penis on her body, without her affirmative consent.

6. On, about, and between fall 2016 and spring 2018, on and off-campus, Respondent stalked Complainant by following Complainant and repeatedly messaging, calling and threatening Complainant, which caused Complainant to fear bodily injury and experience substantial emotional distress.

7. On, about, and between fall 2016 and spring 2018, on multiple occasions, Respondent engaged in relationship violence by threatening physical harm to himself and verbally abusing Complainant.

8. On or about April 29, 2018, at University Hall, Respondent violated the No-Contact Directive put in place on April 22, 2018, by speaking and placing his hand on Complainant.

9. On or about May 2, 2018, off-campus on a public street, Respondent violated the No-Contact Directive put in place on April 22, 2018 by following Complainant.

## II.  **INVESTIGATION SUMMARY**

The interviews noted below were conducted by Samuel Hodge, Title IX Investigator, Office of Equal Opportunity, Lauren Stabile, Deputy Title IX Coordinator, Office of Equal Opportunity and Jacqueline Cornell, Title IX Investigator, Office of Equal Opportunity (collectively, "Title IX Investigators"):

| Date: | Location: | Interviewee: |
|---|---|---|
| May 17, 2018 | 726 Broadway, rm. 723 | Jane Roe ____, Complainant (accompanied by Christine Janick, Support Person) |
| July 10, 2018 | 726 Broadway, rm. 723 | John Doe ____, Respondent (accompanied by Allen McFarlane, Advisor) |
| August 10, 2018 | 726 Broadway, rm. 723 (via Skype) | ____, Witness |
| August 21, 2018 | 726 Broadway, rm. 734 (via Skype) | ____, Witness |
| September 6, 2018 | 726 Broadway, rm. 723 | ____, Witness |

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009756

The following items are referenced in the Investigation Summary and are attached at the end of the memorandum:

A.  <u>NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy</u> (effective October 13, 2016; August 25, 2017 and April 19, 2018);

B.  Written statement and related emails/messages/images/videos (submitted by Complainant);

C.  No-Contact Directive emails to Respondent and Complainant, dated April 22, 2018;

D.  Written statement and related messages/images (submitted by Respondent);

E.  Messages and images provided to Ms. ▮▮▮▮ from the Complainant (submitted by Ms. ▮▮▮▮);

F.  Department of Public Safety Uniform Incident/Offense Report, dated April 30, 2018;

G.  Complainant's Response to the Investigation Summary Draft Report, dated October 22, 2018; and

H.  Respondent's Response to the Investigation Summary Draft Report, dated October 22, 2018.

## III.    NARRATIVE SUMMARY OF INTERVIEWS CONDUCTED

The summaries below have been assembled by allegation and, where possible, in chronological order of alleged incident.  Except where specifically noted, the dates of these incidents are approximate.  Additionally, the summaries below were compiled using the written notes taken during the course of the interviews of the parties and/or witnesses with the Title IX Investigators, and do not represent verbatim transcripts. When statements are attributed to individuals, such statements are related in general substance, unless otherwise indicated.

## A.  **Summary of Interview with** ▮Jane Roe▮ **, Complainant**

Ms. ▮Roe▮ is a junior at NYU's Gallatin School of Individualized Study and currently studying Ecological Design & Global Health.  During Ms. ▮Roe▮'s freshman year (i.e. 2016-2017), she lived at NYU's Weinstein Hall ("Weinstein") and lived in University Hall ("UHall") her sophomore year (2017-2018).

CONFIDENTIAL STUDENT RECORD



Ms. ▉Roe▉ stated that she met Mr. ▉Doe▉ in the summer of 2015 during an internship at Yale University. She stated that they lived approximately forty minutes away from each other in Connecticut, and after the internship ended continued to speak on the phone and text message. She remembered that they "developed a friendship" and "connected" talking about their similar backgrounds.

Ms. ▉Roe▉ stated that she knew by January 2016 that Mr. ▉Doe▉ "liked" her. Ms. ▉Roe▉ stated that he would ask her out "a lot." Ms. ▉Roe▉ stated that she eventually relented and "finally agreed" to go out with him. However, she characterized the development between them as "somewhat between a relationship and friendship." Ms. ▉Roe▉ stated that her parents were "very strict" and did not like that she talked to Mr. ▉Doe▉. Ms. ▉Roe▉ stated that to she created a *Facebook*[1] account using an alias, that her parents could not access, to speak with Mr. ▉Doe▉.

Ms. ▉Roe▉ recalled that during her final year of high school she met up with Mr. ▉Doe▉ at an amusement park, but otherwise did not see him much. She stated that once she moved to New York for college, Mr. ▉Doe▉, who was a freshman at University of Connecticut ("UConn"), visited occasionally on the weekends. Ms. ▉Roe▉ stated that she "did not like him coming" and sometimes told him "no," when he asked to come.

Ms. ▉Roe▉ stated that Mr. ▉Doe▉ visits to NYU have all "smushed" together in her memory. Ms. ▉Roe▉ remembered that when Mr. ▉Doe▉ did visit, he would generally sleep in the residence hall lounge, not her room. She stated that sometimes she would fall asleep with him in the lounge. They "kissed, but not much more than that." Ms. ▉Roe▉ remembered that "sometimes" she kissed back, and other times Mr. ▉Doe▉ "forced [her] to kiss him." Ms. ▉Roe▉ stated that she would "push back" away from him, but he would not stop. Ms. ▉Roe▉ stated that she would also wake up to Mr. ▉Doe▉ kissing her. She explained that sometimes he would kiss her while she slept and take pictures without her knowledge.

Ms. ▉Roe▉ stated that on several occasion she would wake up to Mr. ▉Doe▉ "touching [her] in ways [she] did not want." When asked to elaborate, Ms. ▉Roe▉ explained that Mr. ▉Doe▉ would place his hands on her breasts and vagina over and under her clothing. When Ms. ▉Roe▉ would confront Mr. ▉Doe▉, he would claim that it was an "accident."

Ms. ▉Roe▉ recounted that in early spring 2017 Mr. ▉Doe▉ "forced" her into her shower with him. She stated that he "dragged" her into the shower by her arm as she pleaded with him to stop. Mr. ▉Doe▉ repeatedly told her that "it would be okay." Ms. ▉Roe▉ stated that Mr. ▉Doe▉ had a "weird thing for wetness." She recalled that she was wearing a tank top and leggings and he was naked. Ms. ▉Roe▉ stated that Mr. ▉Doe▉ forced her to kiss him and "rubbed" his erect penis on her. Ms. ▉Roe▉

---

[1] Facebook is a social networking website that allows registered users to create profiles, upload photos and video, and send messages to other users.

stated that she repeatedly told Mr. ███ Doe ███ "I don't want to do [this]." Mr. ███ Doe ███ responded, "It's fine, you're okay. It's not a big deal."

Ms. ███ Roe ███ stated that after the shower she told Mr. ███ Doe ███ how the experience was "affecting" her and he apologized.

Ms. ███ Roe ███ maintained that her relationship with Mr. ███ Doe ███ was "more of a friendship" and that she "tried to cut it off many times." Ms. ███ Roe ███ experienced a past distressing event during her freshman year. She explained that when she attempted to break up with Mr. ███ Doe ███, he would threaten to "tell people" about what happened to her if she ended the relationship.

Ms. ███ Roe ███ stated that she "finally broke off" the relationship in March 2017. She described Mr. ███ Doe ███ as "very angry." She stated that Mr. ███ Doe ███ "created a new phone number" and contacted her mom "pretending to be a friend," telling her mother that she had gotten "drunk," was "depressed" and had "done things with people that were very concerning." Ms. ███ Roe ███ recalled that Mr. ███ Doe ███ "frequently" threatened to send photographs or call her parents and "tell them something." On more than one occasion, Mr. ███ Doe ███ sent photographs to her parents, which depicted the two of them together. She stated that her parents confronted her and were "angry" at her. Ms. ███ Roe ███ explained that her parents did not like Mr. ███ Doe ███ and did not approve of her interacting with him.

Ms. ███ Row ███ stated that after the break-up she "tried to stop talking" to Mr. ███ Doe ███ which she said was difficult because he was "going crazy" and "angry." She recalled that when they did speak he cried a lot.

In Summer 2017 they began to speak more frequently. Ms. ███ Roe ███ stated that Mr. ███ Doe ███ told her that he was going to transfer to NYU. She told him that she did not want him to transfer schools. After a discussion, Mr. ███ Doe ███ stated that he would remain at UConn.

Ms. ███ Roe ███ stated that she was surprised to learn in fall 2017 that Mr. ███ Doe ███ had transferred schools. She recalled that she was sitting in her dorm room when Mr. ███ Joe ███ "accidentally" video called her. When she answered, she observed him to be in Washington Square Park. Ms. ███ Roe ███ stated that Mr. ███ Doe ███ asked to speak to her "one last time" and told her that she could "cut him off" afterwards. Ms. ███ Roe ███ told Mr. ███ Doe ███ that she did not want to speak to him. She described herself as shocked and "angry" when she learned he transferred.

Ms. ███ Roe ███ stated that she had few interactions with Mr. ███ Doe ███ for a time, but she did not "completely" cut off talking to Mr. ███ Doe ███ She stated that they continued to exchange text messages. She explained that she was worried about what Mr. ███ Doe ███ would do if she did stop talking to him (i.e. contact her parents, send them pictures or something else).

CONFIDENTIAL STUDENT RECORD

Ms. ▮Roe▮ recalled that Mr. ▮Doe▮ "kept apologizing" and promised that he "would not do that stuff again." Ms. ▮Roe▮ stated that she relented and told him that they could be friends again. She stated that it was a "good friendship" for a while. She stated that Mr. ▮Doe▮ would be "annoyed" if she did something he did not approve. Ms. ▮Roe▮ stated that it "became too much interaction" and she attempted to cut down the amount of time they spent together, but "it didn't work." Ms. ▮Roe▮ stated that they had several mutual friends, which complicated her desire to see him less.

Ms. ▮Roe▮ stated that she would sleep over in his dorm room "frequently" but they were "not intimate." Towards the end of fall 2017, however, they were "intimate a few times." When asked by the Title IX Investigators how they were intimate, she stated that they kissed. Ms. ▮Roe▮ described their relationship as friends and it was "clear they were not in a [romantic] relationship." Ms. ▮Roe▮ stated that she slept over at Mr. ▮Doe's▮ dorm "sometimes" but it was "just kissing." She stated that when they would be "intimate" she would "zone out." Ms. ▮Roe▮ stated that Mr. ▮Doe▮ never "restrained" her or "anything." At the end of fall 2017 Ms. ▮Roe▮ "called it off" with Mr. ▮Doe▮

Ms. ▮Roe▮ stated that Mr. ▮Doe▮ was generally "manipulative" and "controlling." She learned that while she slept at his dorm room, he moved her shirt up while she slept and took photographs of her breasts without her consent. She learned about the photographs he had taken, when during an argument, he disclosed that he had them and threatened to send them to her parents. She explained that her parents had access to her email and phone messages and checked them regularly. Mr. ▮Doe▮ would email or text her, "you left clothes, socks because you were sleeping over." Ms. ▮Roe▮ stated that Mr. ▮Doe▮ knew that the messages could be seen by her parents and that they would make them angry with Ms. ▮Roe▮. Ms. ▮Roe▮ stated that she was afraid of what Mr. ▮Doe▮ would tell her parents if she did not speak with him. Ms. ▮Roe▮ stated that she felt "trapped in the situation."

Ms. ▮Roe▮ and Mr. ▮Doe▮ shared several mutual friends. Ms. ▮Roe▮ stated that some she met through Mr. ▮Doe▮ and they "preferred" to hang out with her. When they all hung out with each other, Mr. ▮Doe▮ would send "angry texts" to Ms. ▮Roe▮ if she made or laughed at jokes at his expense or "acted too close" to one of the friends. Ms. ▮Roe▮ stated that Mr. ▮Doe▮ was jealous.

Subsequent to being interviewed by the Title IX Investigators, Ms. ▮Roe▮ submitted a statement and timeline with corresponding text messages and video files (see Attachment B). In addition to what Ms. ▮Roe▮ disclosed in her submission, she shared the following in her interview with the Title IX Investigators:

- Ms. ▮Roe▮ stated that on approximately March 10, 2018, she was with Mr. ▮Doe▮ and some friends playing games in the residence hall. Ms. ▮Roe▮ stated that she laughed at a joke about Mr. ▮Doe▮ which caused him to become "really angry." She remembered that the group had decided to go to a different residence hall, and she intended to go with them. Ms. ▮Roe▮ stated

CONFIDENTIAL STUDENT RECORD                    NYU_00009760

that Mr. ███ Doe ███ did not want her to go.  She recalled that the group of friends left and she remained in her dorm room.  She stated that Mr. ███ Doe ███ began "banging" on her dorm room door, "shaking the door handle," and texting her to open the door.  Ms. ███ Roe ███ described her state of mind in that moment as "scared" because Mr. ███ Doe ███ was "angry."  Ms. ███ Roe ███ stated that she called one of her friends to come to her dorm to pick her up.  She recalled that her friend, ███████ ███████ ("Mr. ███████") came to her door and asked her to come to Rubin Hall with her.  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ indicated that he would go too.  She stated that throughout the night, Mr. ███████ texted her "aggressively," but she ignored his messages.  Ms. ███ Roe ███ stated that afterwards she told Mr. ███ Doe ███ that she needed some "distance."  Ms. ███ Roe ███ stated that she had to tell Mr. ███ Doe ███ several times that she did not want to speak to him.

- On March 12, 2018, Mr. ███ Doe ███ took Ms. ███ Roe ███ out for dinner to celebrate her birthday.  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ paid for the meal and told her that he does "all this stuff for you and you don't appreciate me."

- On April 6, 2018, Ms. ███ Roe ███ went to Lipton Hall to "hangout" with some of her friends.  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ showed up without being invited and told Ms. ███ Roe ███ that it was "not okay" that she was socializing with others without him present.  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ sent threatening emails and messages to her.

- On April 7, 2018, Ms. ███ Roe ███ stated that she was at Lipton Hall studying with a friend.  Mr. ███ Doe ███ showed up without being invited and demanded to speak to her alone about how her actions "affected him."  He told her that it would be their "last conversation."  Ms. ███ Roe ███ stated that she had no idea how Mr. ███ Doe ███ knew where she was studying.  Ms. ███ Roe ███ stated that she spoke with Mr. ███ Doe ███ for around three hours.  Mr. ███ Doe ███ told her that she cannot stop talking to him.  Ms. ███ Roe ███ stated that he threatened her and told her that he was "going to contact [her] every day and make [her] life a living hell if [she] don't talk to me."

- On April 20, 2018, Mr. ███ Doe's ███ birthday, Ms. ███ Roe ███ was "hanging out" with some of her friends, which made Mr. ███ Doe ███ "really angry."  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ told her that he was going to make her life a "living hell— if you thought what I did before was bad…"  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ gave her an ultimatum to meet him or he would call and send photographs to her parents.  Ms. ███ Roe ███ stated that she met up with Mr. ███ Doe ███ and he was "super angry with [her]."  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ videotaped her, and she was "visibly upset."  Mr. ███ Doe ███ stared into the camera on his phone and stated, "Well, look who's here.  She's not supposed to talk to me."  Mr. ███ Doe ███ threatened to send the video to Ms. ███ Roe ███ parents.  Mr. ███ Doe ███ told Ms. ███ Roe ███ "you have to sleep over in my room."  Ms. ███ Roe ███ stated that Mr. ███ Doe ███ "got really close to [her] face," she punched

CONFIDENTIAL STUDENT RECORD

NYU_00009761

him twice and pushed him away from her.  Ms. [Roe] remembered that Mr. [Doe] was "yelling angrily in [her] face," at the time. Ms. [Roe] slept in Mr. [Doe's] room that evening, but the two were not intimate.

- On April 22, 2018, Ms. [Roe] reported her concerns about Mr. [Doe] to the Department of Public Safety and a no-contact directive ("NCD") was issued.  See Attachment C.

- Ms. [Roe] stated that after the NCD was issued she received numerous text messages and phone calls from numbers she did not recognize and received voicemails from Mr. [Doe]  See Attachment B. Ms. [Roe] stated that he [Doe] messaged her mother on *Facebook* using a new *Facebook* account. See Attachment B. Ms. [Roe] stated that Mr. [Doe] told her mother that [Jane] is under the influence of alcohol and drugs—all her friends drink and smoke too."

- On April 29, 2018, inside of UHall, Mr. [Doe] approached Ms. [Roe] from behind and tapped her on her back.  He told her that "what you did isn't right and you're going to pay for this."  Ms. [Roe] stepped away from him and he responded "okay, I'm going to follow you."  Ms. [Roe] stated that she started to gather her things to leave and he stepped on her backpack and stated, "You can't leave until we talk."  Ms. [Roe] stated that she went to NYU's Department of Public Safety office, along with Mr. [Doe] and reported that he was violating a NCD.  See Attachment F.

- On May 2, 2018, Ms. [Roe] stated that she was followed by Mr. [Doe] in Washington Square Park.  Ms. [Roe] stated that she then walked down Macdougal Street and went into a restaurant.  She stated that she observed Mr. [Doe] pacing in front of a restaurant.  See Attachment B.  Ms. [Roe] stated that she felt "stressed and anxious" about Mr. [Doe's] conduct after the NCD was issued.

B. **Summary of Interview with** [John Doe] **, Respondent**[2]

Mr. [Doe] is a junior at NYU's College of Arts and Science.  Mr. [Doe] transferred to NYU in fall 2017, after completing his first year at the University of Connecticut.  Mr. [Doe] is currently studying Global Public Health and Chemistry, and is on a "pre-med track."  During Mr. [Doe's] 's sophomore year (i.e. 2017-2018), he lived at NYU's University Hall.

---

[2] After his interview with the Title IX Investigators, Mr. [Doe] provided a written statement (Attachment D), outlining his relationship with Ms. [Roe]  This statement has been incorporated into this report by reference, and the content of said statement is further addressed in the summary of Mr. [Doe's] interview statement.

Mr. [Doe] stated that he met Ms. [Roe] in August 2015, while participating in a research internship, *Discovery to Cure*, at Yale University. Mr. [Doe] stated that, subsequently, he reached out to Ms. [Roe] regarding interest in her blog, and that they began communicating regularly from that point. Mr. [Doe] stated that, from approximately August through December 2015, he and Ms. [Roe] developed a friendship through speaking via text message. He also stated that in November 2015 they began to speak via phone. Mr. [Doe] explained that while their relationship was primarily "virtual" in nature, he saw Ms. [Roe] at a Physics competition at Yale in October 2015.

According to Mr. [Doe] on or about January 6, 2016, he asked Ms. [Roe] to begin a romantic relationship; she asked to think about it, and after a day or so, agreed. Mr. [Doe] stated that, nevertheless, their relationship remained primarily "virtual." Mr. [Doe] stated that Ms. [Roe] s parents were not supportive of their relationship and called him a "time waster," and monitored Ms. [Roe's] phone/communications. Mr. [Doe] stated that as a result, they would often speak on the phone late at night (e.g. "2 a.m."), and communicate via *WhatsApp*, so that it was less likely that they would be "caught." Mr. [Doe] stated that, despite their efforts, Ms. [Roe] parents found out that they were continuing their relationship, despite their expressed concerns, and Ms. [Roe] father called him several times and accused him of "harassing" his daughter. Mr. [Doe] stated that Ms. [Roe] followed up with him the next day, apologized for her father's actions, and told him that she loved him and wanted to maintain their relationship, despite her parents' disapproval. See Attachment D.

Mr. [Doe] stated that throughout the remainder of their senior year of high school[3], he and Ms. [Roe] continued to text one another and speak on the phone late at night, as well as regularly express that they loved one another. Then, in April 2016, two days after Mr. [Doe's] birthday (i.e. on or about April 23, 2016), Ms. [Roe] terminated their relationship, indicating that she was "bad" for him.

Mr. [Doe] stated that, nevertheless, he and Ms. [Roe] remained in contact. Mr. [Doe] stated that on or about June 1, 2016, Ms. [Roe] had a class trip to *Six Flags*, and, as it was his "Senior Skip Day," he met her there and they spent the day together. Mr. [Doe] described this day as the first time that he and Ms. [Roe] "were physically intimate" - explaining that they kissed and hugged on this occasion. Mr. [Doe] stated that, thereafter, through the Summer of 2016, they continued their relationship, spoke regularly, and remained romantic with one another.

In fall 2016, Mr. [Doe] and Ms. [Roe] each started at their respective colleges - Mr. [Doe] at University of Connecticut, and Ms. [Roe] at NYU. They stayed in touch, but, according to Mr. [Doe] during this time, Ms. [Roe] was trying to "annoy" him so that he would "break up" with her. Mr. [Doe] stated that, during this time, Ms. [Roe] experienced a distressing event that she had reported to local law

---

[3] Mr. [Doe] described that both he and Ms. [Roe] attended separate schools, both in Connecticut.

CONFIDENTIAL STUDENT RECORD

enforcement; as a result, despite her trying to get him to end their relationship, he continued to be there for her and support her in the aftermath of the distressing event.

Mr. [Doe] stated that the first time he visited Ms. [Roe] at NYU was in October 2016, and that, thereafter, over the course of this year, he visited Ms. [Roe] at NYU approximately eight or nine times. Mr. [Doe] stated that he cannot currently remember the details of all of these visits, but described the "general jist" was that they would "make out," with "clothes off" (i.e. both being in their respective underwear "at worst" - with one occasion when Ms. [Roe's] bra came off), and showered together approximately three times. Mr. [Doe] stated that, while showering together, Ms. [Roe] would leave her clothes on[4] and he would be in his underwear or nude.  He also stated that, during these showers, Ms. [Roe] would "soap" his genitals "for cleanliness purposes;" one such time, his underwear came off, after Ms. [Roe] told him that she was comfortable with this.  According to Mr. [Doe] during these visits, he and Ms. [Roe] would also sleep next to one another - sometimes in places like the laundry room, and "make out in her bed."  He also described that, at times, Ms. [Roe] would be sexually "aggressive" and that "sometimes clothes would come off," but then she would later change her persona and question her intimate actions, asking questions such as, "Did I do that?"

Additionally, Mr. [Doe] stated that, during this time, he would receive text messages from an unidentified individual/number, posing as a friend of Ms. [Roe's], who would make suggestions as to intimate acts he should try with Ms. [Roe]  During his interview with the Title IX Investigators, Mr. [Doe] expressed that, in retrospect, he now questions whether this was a third party, or Ms. [Roe] herself.[5]  Mr. [Doe] also stated that, during his visits at NYU, Ms. [Roe] would make efforts to conceal the fact that he was visiting her.  For example, she would have a friend sign him in, "never introduced" him to her friends (or even told him who her friends were), and have him hang out in public/common areas (e.g. the laundry room).  According to Mr. [Doe] Ms. [Roe] claimed that this was a continued effort to hide their relationship from her parents.  Mr. [Doe] stated that, on one occasion, after one of Ms. [Roe] friends saw his arm around Ms. [Roe] the friend texted Ms. [Roe] and asked if he was bothering her.  Mr. [Doe] stated that it was interactions like this, combined with Ms. [Roe's] efforts at "hiding" their relationship that caused him to ask her why her friends "hate [him];" she responded that, in a "moment of panic" she had told them that he "dragged [her] in the shower" and forced himself on her, and that they were not in a relationship together.

As to Ms. [Roe] instant allegations regarding an incident with Mr. [Doe] that took place in her shower, Mr. [Doe] stated that he "never" dragged her into the shower.  Mr. [Doe] stated that the closest he came to this is during the first time he showered with Ms. [Roe] when he "pulled" her in the shower (he is uncertain of the

---

[4] Mr. [Doe] stated that the reason for this was to prevent "things" from "slipping in," as both had concerns regarding pregnancy.
[5] Mr. [Doe] stated that once over the winter 2017-2018 he saw the anonymous number on Ms. [Roe's] phone, which led to "doubt" that this person existed (i.e. separate from Ms. [Roe] ).

CONFIDENTIAL STUDENT RECORD                                    NYU_00009764

date, but knows that it was sometime in fall 2016). He described that, leading up to this, Ms. ███ had "soaped" his entire body, while Mr. ███ was in the shower and she was standing outside of it. Mr. ███ stated that, after she had washed his body, he grabbed her arm and gave it "a little tug;" Mr. ███ described this as a "playful" gesture. According to Mr. ███ in response, Ms. ███ "backed away" and stated, "I don't want to do that." Mr. ███ stated that Ms. ███ seemed to be "panicked" about this, but then proceeded to shampoo his hair. Mr. ███ also stated that, subsequently, Ms. ███ joined him in the shower; Mr. ███ maintained that, other than kissing "a couple times" while in the shower, this was not a sexual act.

Mr. ███ stated that, on or about March 7th, he visited Ms. ███ at NYU, and that, shortly thereafter, she "broke up" with him over text. According to Mr. ███ Ms. ███ cited the reason for the break-up as their relationship being "too much," and expressed that she wanted them to remain friends. As such, after this conversation, they continued to call one another every day. Mr. ███ further stated that he also visited Ms. ███ in late March/early April, and that on this visit they kissed, even though they remained broken up.

Mr. ███ stated that, around this time, he applied to NYU. He stated that Ms. ███ was aware that he was applying to NYU, as she had reviewed his college admittance essay; however, as Ms. ███ was upset that he was coming to NYU (even "threatening" to not be friends with him if he transferred), he did not tell her of his ultimate decision to come to NYU.[6]

Mr. ███ also stated that, it was around this time when Ms. ███ had begun "drinking a lot." Mr. ███ stated that he was "worried" about her wellbeing, and, as a result, anonymously contacted her parents, as he "didn't know who else to reach out to"; he informed them that Ms. ███ was "struggling" and "needed support." Mr. ███ stated that, in response, Ms. ███'s parents seemed to "genuinely care,"[7] but he ultimately ceased communication with them because he "panicked." Mr. ███ stated that, one day after he contacted Ms. ███'s parents, Ms. ███ found out, and was "quite mad," "expressing that he had no right to do that." Mr. ███ stated that, despite this argument, their friendship continued, and they remained in contact over the summer, even while Ms. ███ was abroad in India.

Once at NYU, both Mr. ███ and Ms. ███ lived in UHall – Mr. ███ on the 5th floor and Ms. ███ on the 2nd floor. Mr. ███ stated that, initially, Ms. ███ was upset with him and declined his romantic gestures, such as when he left her earrings outside of her residence door. Mr. ███ stated that, shortly thereafter, she called him to help clean up her room after a glass broke and he ended up spending the night in her room; Mr. ███ clarified that he slept in Ms. ███'s room that night but does not recall if they were physically intimate. Nevertheless, according to Mr.

---

[6] Mr. ███ stated that Ms. ███ only confirmed this information two days prior to moving into NYU, when she "FaceTimed" Mr. ███ while he was standing in a New York City park.

[7] Mr. ███ stated that this was surprising to him in light of what Ms. ███ had previously shared with him about her interactions with her parents.

CONFIDENTIAL STUDENT RECORD

██ Doe ██ "things started to pick up from there," and he and Ms. ██ Roe ██ maintained an intimate relationship moving forward.

Mr. ██ Doe ██ stated that, over the next few months, on a number of occasions, Ms. ██ Roe ██ would sleep over in his bed and the two would be physically intimate. He further described that at times, Ms. ██ Roe ██ would sleep over five nights out of the week. He also stated that their intimacy increased during this time period, as they showered in their underwear together and Ms. ██ Roe ██ performed oral sex on him on multiple occasions. Mr. ██ Doe ██ also stated that he "tried to pleasure her" by rubbing her vagina with his fingers both over and under her clothing, during at least two interactions. Additionally, Mr. ██ Doe ██ stated that on two occasions he stuck his penis into Ms. ██ Roe's ██ vagina, but they did not continue as he "could not keep it up;" thereafter, both agreed to not attempt to have sexual intercourse again.

Mr. ██ Doe ██ stated that, despite their increased intimacy, Ms. ██████ continued to deny their relationship in public, and "made believe" Mr. ██ Doe ██ was bothering her when around others. Mr. ██ Doe ██ stated that he continued to "let it go" because he thought it was about maintaining privacy from her parents and he "blindly trusted her."

Mr. ██ Doe ██ stated that, on or about March 2018, their relationship began to deteriorate. Mr. ██ Doe ██ stated that the primary point of contention between them was over how Ms. ██████ interacted with Mr. ██ Doe ██ friends; specifically, Mr. ██ Doe ██ described that Ms. ██████ would share embarrassing information about him with them, that Mr. ██ Doe ██ had asked her to keep private, and would continue to misrepresent their relationship to others. Mr. ██ Doe ██ stated that he confronted Ms. ██████ about these behaviors and sent her a lot of "aggressive" text messages one evening, because he was "upset."

According to Mr. ██ Doe ██ over spring break, both apologized and attempted to reconcile. However, when they got back to school, Ms. ██ Roe ██ resumed avoiding Mr. ██ Doe ██ and they only socialized with others present. Mr. ██ Doe ██ stated that he and Ms. ██ Roe ██ ultimately agreed to stop talking on or about April 6, 2018. He stated that also around this time, his friends "dropped him" - "one by one" – as a result of his relationship issues with Ms. ██ Roe ██.

Mr. ██ Doe ██ stated that, despite the contention in their relationship, he still cared about Ms. ██ Roe ██ and expressed his affection, such as through the organization of a birthday dinner at *Max Brenner*. According to Mr. ██ Doe ██ Ms. ██ Roe ██ did not appreciate this gesture.

Mr. ██ Doe ██ stated that, subsequently, on April 21, 2018, he became very upset after Ms. ██ Roe ██ did not acknowledge his birthday. Mr. ██ Doe ██ stated that he texted Ms. ██ Roe ██ in a "fit of rage," from both his phone and anonymous numbers and this led to a "heated" in-person conversation between them at UHall. He stated that, during this altercation, he and Ms. ██ Roe ██ "locked heads" and Ms. ██ Roe ██ repeatedly punched him with her fist in his chest. According to Mr. ██ Doe ██ when he asked Ms. ██ Roe ██

CONFIDENTIAL STUDENT RECORD

why she did this, she stated that it was "self-defense –that she thought [he] was going to do something."  Mr. ████ stated that this confrontation lasted for approximately five hours, that he took two videos during their argument, and when it was over, Ms. ████ ████ was distressed and crying, so he offered for her to stay in his room.  Mr. ████ stated that Ms. ████ did stay over, and he walked Ms. ████ back to her room a few hours later and both apologized to one another.

Mr. ████ admitted that he violated the no-contact directive in place in the instant matter.  He stated that he contacted Ms. ████ parents sometime between April 22, 2018 and April 30, 2018, because he was again concerned about Ms. ████ wellbeing.  Mr. ████ also stated that on or about April 22, 2018, he "tapped" Ms. ████ on the back, when he saw her while she was in UHall.  Mr. ████ stated that his "emotions got the best of [him]" and he wanted to tell Ms. ████ that what she was doing by ending their relationship was "really wrong" and to let her know that she owed him money from things he paid for during their relationship.  Mr. ████ also acknowledged that his *WhatsApp* blurb was directed at Ms. ████, because he knew she would see it, and he wanted to communicate with her.

As to Ms. ████'s other allegations, Mr. ████ stated the following:

- He denied stalking her in Lipton Hall ("Lipton").  Mr. ████ stated that he had gone to Lipton to study and once there, saw Ms. ████ socializing with others, including ████ an "acquaintance" of Mr. ████  Mr. ████ stated that Ms. ████ was laughing at him, and when he approached her, Ms. ████ told him to leave and not to contact her.  Mr. ████ stated that, in response, he told Ms. ████ that he was not going to stop contacting her because their issues were "not resolved" and they "needed to sort [them] out."  He stated that the conversation ultimately ended when it was interrupted by their "large friend group."  Before leaving Ms. ████ Mr. ████ told her "it's not over," referring to their conversation.

- During his interview with the Title IX Investigators, Mr. ████ reviewed text messages submitted by Ms. ████ (see Attachment B), regarding "making her life hell."  Mr. ████ acknowledged that he sent them and stated that it was a "poor gesture," and that he sent these messages because he was upset about her "lying about everything."

- Mr. ████ stated that he has photos of Ms. ████ sleeping; he said that he took these after Ms. ████ feel asleep on the phone while they were talking via FaceTime.  Mr. ████ stated that he took these photos because he thought that Ms. ████ appeared "adorable" and "distressed" and wanted to show Ms. ████ how she looked.  Mr. ████ denied taking photos of Ms. ████ while she was in her bra or without a shirt on.  He further elaborated that he used to have two photos - one of Ms. ████ sleeping with her stomach exposed and the other showing "excessive cleavage" and her nipple visible - but that he deleted those photos after Ms. ████ learned of them.

CONFIDENTIAL STUDENT RECORD

- Mr. [Doe] denied touching Ms. [Roe] with his erect penis in a shower during her first year at NYU. He stated that the only thing he could think of is if his erect penis touched her in the shower "by accident" due to the small space. He distinguished this, stating that, since he has been at NYU, over the past year, Ms. [Roe] has performed oral sex on him while in the shower and rubbed her buttocks on his erect penis.

- Mr. [Doe] denied ever kissing Ms. [Roe] in her sleep and stated that she did this to him and told him that she did so.

C. **Summary of Interview with** [_____] **Witness**

Ms. [_____] is a junior at NYU's College of Arts and Science. Ms. [_____] stated that she met Ms. [Roe] during freshman Welcome Week in fall 2016. Ms. [Roe] is her "closest friend." She explained that they bonded over their shared background, movie interests, and interest in exploring the city.

Ms. [_____] stated that she met Mr. [Doe] through Ms. [Roe] She learned of Mr. [Doe] "about two weeks" after freshman week. Ms. [_____] estimated that Mr. [Doe] visited Ms. [Roe] six times in fall 2016 and spring 2017. When Mr. [Doe] visited, she mainly talked to him about cricket, and not much else.

Ms. [_____] stated that she became closer to Ms. [Roe] because of "this situation," referring to Ms. [Roe's] allegations against Mr. [Doe] When asked by the Title IX Investigators for her impressions of Mr. [Doe] Ms. [_____] stated, "To be frank, [Ms. [Roe] told me stuff about him that made me bias against him." Ms. [_____] stated that when she met Mr. [Doe] it was a "light atmosphere," without much "tension," however she remembered thinking that Ms. [Doe] seemed uncomfortable. Ms. [_____] remembered that during one of his initial visits to New York she observed Mr. [Doe] "flick" Ms. [Roe] in the face when he was annoyed, which made Ms. [_____] uncomfortable.

According to Ms. [_____] Ms. [Roe] did not want Mr. [Doe] to visit New York or come to her dorm room. She stated that Ms. [Roe] a strong student, was concerned about her school work. Ms. [_____] stated that Ms. [Roe] "did not consider [Mr. [Doe]] her boyfriend," rather she considered him someone she was "close" with.

Ms. [_____] stated that later in their freshman year, in the residence hall laundry room, she observed Mr. [Doe] "whack" Ms. [Roe] in the arm, which made her uncomfortable. Ms. [_____] stated that Ms. [Roe] "did not have a say" for when Mr. [Doe] would appear in New York. Ms. [_____] stated that Ms. [Roe] repeatedly told her that she did not want Mr. [Doe] to visit.

Page **14** of 20

CONFIDENTIAL STUDENT RECORD

Ms. ██████ never saw Ms. ██ Roe ██ and Mr. ██ Doe ██ kiss, but did see them hold hands. Ms. ██ Roe ██ told her that Mr. ██ Doe ██ had kissed her in the past and it was "not consensual or kinda [sic] not really."

Ms. ██████ stated that Ms. ██ Roe ██ told her that Mr. ██ Doe ██ was going to transfer from UConn to NYU, which upset her. Ms. ██ Roe ██ told her that she did not want him to move to New York. Ms. ██████ stated that Mr. ██ Doe ██ told Ms. ██ Roe ██ he would not transfer, but once he did that's when, according to Ms. ██████ "things started to go downhill." Ms. ██████ stated that Ms. ██ Roe ██ got "quite upset" when she learned Mr. ██ Doe ██ transferred and "did not want anything to do with him."

Ms. ██████ stated that it was hard for Ms. ██ Roe ██ to separate herself from him because they shared the same friend group, he joined the same clubs and changed his major to have similar courses as her. Ms. ██████ stated that Ms. ██ Roe ██ "tried her best" to not interact with him, but she wanted the relationship to be "cordial," not "hostile."

Ms. ██████ stated that during their sophomore year there were a lot of "rumors" about Ms. ██ Roe ██ and Mr. ██ Doe ██ Ms. ██████ stated that Mr. ██ Doe ██ told friends that he was "dating" Ms. ██ Roe ██ and the two were "boyfriend and girlfriend." Ms. ██████ stated that Mr. ██ Doe ██ was "spreading lies," which made Ms. ██ Roe ██ "angry and annoyed."

In March 2018, Ms. ██████ along with several other friends, Ms. ██ Roe ██ and Mr. ██ Doe ██ went out to celebrate Ms. ██ Roe's ██ birthday. Ms. ██████ stated that there was "tension" between Ms. ██ Roe ██ and Mr. ██ Doe ██ She recalled that Mr. ██ Doe ██ "kept trying to talk" to Ms. ██ Roe ██ Ms. ██████ stated that it "took a lot of effort" to get Mr. ██ Doe ██ away from Ms. ██ Roe ██ that evening.

Ms. ██████ stated that Mr. ██ Doe ██ was "getting more and more desperate to talk to ██ Jane ██ and make sure she listen[ed] to him" after the birthday party. Ms. ██ Roe ██ told Ms. ██████ about an incident where Mr. ██ Doe ██ came to her dorm room and "banged on the door repeatedly and sat outside" waiting on her to open the door.

Ms. ██████ stated that after spring break there was an "incident in Carlyle." Ms. ██ Roe ██ went to Carlyle to study. Mr. ██ Doe ██ was also present and studying at a nearby table. Ms. ██ Roe ██ told Ms. ██████ that it was "fine" that he was there, so long as he did not come to her table. Ms. ██████ stated that Mr. ██ Doe ██ did come to their table and "tried to get ██ Jane ██ to leave with him to talk. Ms. ██████ recalled Ms. ██ Roe ██ stating to Mr. ██ Doe ██ that she was leaving and Mr. ██ Doe ██ then stated that he would also leave. Ms. ██ Roe ██ stated that she would stay, and Mr. ██ Doe ██ then stated that he would stay. Ms. ██████ stated that this back and forth happened several times. Ms. ██████ stated that Ms. ██ Roe ██ tried to "sneak away" when he was distracted, but he "chased" after her. Ms. ██████ told Mr. ██ Doe ██ that he was "not respecting" Ms. ██ Roe ██ and needed to stop. Ms. ██████ recalled that that evening she "comforted" Ms. ██ Roe ██

CONFIDENTIAL STUDENT RECORD

Ms. ▮▮ stated that "maybe two weeks" before finals in spring 2018 Ms. ▮Roe▮ told her that had gotten a No Contact Directive against Mr. ▮Doe▮ Ms. ▮▮ recalled an incident where she, ▮▮ ("Mr. ▮▮"), and Ms. ▮Roe▮ were studying for finals in UHall and Mr. ▮Doe▮ approached them. She remembered that there was a printer in the room and Mr. ▮Doe▮ came in to pick something up off the printer, but rather than leave the room, he stayed and tried to talk to Ms. ▮Roe▮ Ms. ▮▮ stated that he was "quite angry" and "basically started poking" Ms. ▮Roe▮ She observed Mr. ▮Doe▮ "all tensed up." Ms. ▮▮ remembered that Mr. ▮Doe▮ told Ms. ▮Roe▮ "you can't do this to me" and then "poke[d]" her on the shoulder. Ms. ▮▮ observed Ms. ▮Roe▮ to be "nervous," "afraid," "annoyed" and "exhausted."

Ms. ▮▮ stated that Mr. ▮▮ "pretended" Mr. ▮Doe▮ was not there and that he dismissively stated "Do you hear something?" when Mr. ▮Doe▮ spoke. Ms. ▮▮ stated that she told Mr. ▮Doe▮ that they were all leaving and then walked with Ms. ▮Roe▮ to find a DPS officer. Ms. ▮▮ stated that Mr. ▮Doe▮ followed them to the DPS officer and was "pretty angry" and had an "aggressive tone of voice." See Attachment F.

Ms. ▮▮ stated that she observed Mr. ▮Doe▮ to be "manipulative" and attempt to "blackmail" Ms. ▮Roe▮ Ms. ▮▮ stated that she was aware that Mr. ▮Doe▮ had threatened to contact Ms. ▮Roe▮ parents, whom he knew did not approve of his interactions with Ms. ▮Roe▮ Ms. ▮▮ stated that she was also aware that Mr. ▮Doe▮ had sent "threatening messages," called Ms. ▮Roe▮ repeatedly from various numbers, and followed Ms. ▮Roe▮ on the street. See Attachment D.[8] Ms. ▮▮ stated that Ms. ▮Roe▮ disclosed to her that Mr. ▮Doe▮ at some point in spring 2018, physically assaulted her by shaking her "violently" and "maybe" sexually assaulted her, "but not rape." Ms. ▮▮ stated that she did not know all of the details regarding Ms. ▮Roe▮ allegations against Mr. ▮Doe▮

D. **Summary of Interview with ▮▮, ▮▮ Witness**

Mr. ▮▮ is a rising sophomore at NYU's College of Arts and Science. Mr. ▮▮ stated that he met Mr. ▮Doe▮ during Welcome Week of his sophomore year (i.e. fall semester of 2017). He stated that they played soccer together and developed a friendship, as Mr. ▮Doe▮ was "very informative" and a helpful resource to him, particularly regarding ways to save money. Mr. ▮▮ stated that he met Ms. ▮Roe▮ through Mr. ▮Doe▮ but is uncertain of when exactly they met. Mr. ▮▮ described Ms. ▮Roe▮ as a "friend" and stated that they are still in contact with one another. Mr. ▮▮ stated that he is no longer in touch with Mr. ▮Doe▮ and "cut off" their friendship, in response to the relationship issues between Ms. ▮Roe▮ and Mr. ▮Doe▮

---

[8] Ms. ▮▮ stated that Ms. ▮Roe▮ provided her with numerous photographs and screenshots of her conversations with Mr. ▮Doe▮

CONFIDENTIAL STUDENT RECORD

NYU_00009770

Mr. ███ stated that over the 2017-2018 academic year, he observed Ms. ███ Roe and Mr. ███ Doe interact with one another on several occasions. He described that he never observed them be "affectionate" with one another and described Mr. ███ Doe as "very possessive" of Ms. ███ Roe Mr. ███ specifically recalled a time in March or April of 2018 when he and Ms. ███ Roe were having a "jam session" – in which they were listening to Indian music late at night – when Mr. ███ Doe started texting Ms. ███ Roe Mr. ███ stated that he saw Mr. ███ Doe's texts on Ms. ███ Roe's phone, and they said in substance, "You don't have time for me, but you have time for jam sessions?" Mr. ███ further described that he witnessed Mr. ███ Doe yell at Ms. ███ Roe in public; he could not remember a specific incident, but recalls Mr. ███ Doe shouting at Ms. ███ Roe in his presence.

Mr. ███ stated that he believed the relationship between Ms. ███ Roe and Mr. ███ Doe to be "toxic." As a result, he and their other friends, arranged a meeting to try to intervene and create a "peaceful resolution." He stated that they all met during the Spring 2018 semester, and Ms. ███ Roe and Mr. ███ Doe confronted one another and ultimately agreed to not contact one another. According to Mr. ███ despite this agreement, Mr. ███ Doe "forcefully" joined him, Ms. ███ Roe and others at a "jam" session the next day. Mr. ███ described this as Mr. ███ Doe "disrupting the peace" in their friend group and found his behavior to be "very distrustful;" as a result, Mr. ███ stopped communicating with Mr. ███ Doe.

Mr. ███ stated that, at some point, Ms. ███ Roe shared with him that Mr. ███ Doe would "forcefully harass her" and had "physically held her" without her consent; Mr. ███ did not provide further details. According to Mr. ███ Ms. ███ Roe also shared with him and others in their friend group that Mr. ███ Doe was "stalking" her and sent photos to him and others to corroborate her suspicions.

Mr. ███ stated that approximately two weeks before finals, during the end of April, he and Ms. ███ Roe were studying with others in Lipton Hall. Then, "out of nowhere," Mr. ███ Doe approached Ms. ███ Roe Mr. ███ tried to ignore him and suggested to Ms. ███ Roe that they go somewhere else to study, but Mr. ███ Doe "forced" Ms. to have "one final conversation" with him about their relationship. Mr. ███ stated that Mr. ███ Doe and Ms. ███ Roe then proceeded to have a conversation, and he walked over to another part of the room to give them privacy. Mr. ███ stated that before he left Lipton, approximately 45 minutes after their conversation had started, he observed Ms. ███ Roe crying as she was talking to Mr. ███ Doe Mr. ███ then left and Ms. ███ Roe and Mr. ███ Doe stayed behind and continued their conversation.

Mr. ███ stated that, subsequently, while he was studying with Ms. ███ Roe in UHall, Mr. ███ Doe again approached Ms. ███ Roe Mr. ███ stated that Mr. ███ Doe walked into the room, got something off of the printer, and then approached Ms. ███ Roe Roe and tried to have a conversation with her. Mr. ███ stated that Ms. ███ Roe Roe tried to ignore Mr. ███ Doe but he persisted in trying to speak with her. Specifically, Mr. ███ observed Mr. ███ Doe step on the straps of Ms. ███ Roe's bag so that she could not put it on, while she was trying to leave and get away from him. In

CONFIDENTIAL STUDENT RECORD

NYU_00009771

response to Ms. ████ **Roe** having difficulty with her bag, Mr. ████ observed Mr. ████ **Doe** "grin." Ms. ████ **Roe** and Mr. ████ then went upstairs and reported the interaction to NYU's Department of Public Safety.  See Attachment F.


E.  **Summary of Interview with** ████.

████ is a senior, pursuing Acting in Tisch and Economics in CAS.   Mr. ████ lived in UHall during the 2017-2018 academic year, and his roommate during this time was Mr. ████ **Doe**

Mr. ████ stated that he met Mr. ████ **Doe** in fall 2017 on the day he moved into UHall. Mr. ████ stated that he and Mr. ████ **Doe** did not spend much time together, as Mr. ████ was only in their shared room approximately twice a week, and spent the remainder of his time at his girlfriend's off-campus apartment. Mr. ████ further described that, when he was in their room, he was often on his laptop or asleep; as a result he and Mr. ████ **Doe** were "not close." Mr. ████ stated that he and Mr. ████ **Doe** did not socialize together and he never met any of Mr. ████ **Doe's** friends.

Mr. ████ also stated that he and Mr. ████ **Doe** are not currently in touch with one another. Mr. ████ did, however, run into Mr. ████ **Doe** over the summer (i.e. 2017) in Washington Square Park; during this brief interaction, Mr. ████ **Doe** told Mr. ████ about the instant Title IX matter and alerted him that he may be contacted to participate in the investigation. Mr. ████ clarified that, during this conversation, Mr. ████ **Doe** did not "try to sway" him, and was apologetic for involving him in this matter.

Mr. ████ stated that the name ████ **Jane** ████ **Roe** is not familiar to him, but that he is "terrible" with names. He clarified, however, that he believes that Mr. ████ **Doe** mentioned the name ████ **Jane** to him at least once. Mr. ████ described that during the Fall 2017 semester and beginning of the Spring 2018 semester, Mr. ████ **Doe** frequently had "a girl" in their room that Mr. ████ described as an "Indian woman with black hair." Mr. ████ stated that there was "only ever one girl [that Mr. ████ **Doe** brought to the room" and Mr. ████ would see this individual there "a couple of times a week." Mr. ████ stated that, when he saw Mr. ████ **Doe** and this other individual together, they were almost always "cuddling in bed" or asleep; he further clarified that one person would always have an arm around the other. Mr. ████ stated that he knows that this other individual would sometimes have her arm around Mr. ████ **Doe** because he remembers that the first time he saw them in bed "it looked like ████ **John** had 3 arms." Mr. ████ also stated that, he does not know what "the girl" was wearing while she and Mr. ████ **Doe** were in bed together, because she was always under the covers, but that Mr. ████ **Doe** would be "shirtless a lot," (Mr. ████ stated that he could not see his lower half). Mr. ████ stated that he never observed any other intimate interactions between Mr. ████ **Doe** and this other person.

CONFIDENTIAL STUDENT RECORD                                                    NYU_00009772

Mr. ███████ later stated that he believes that he met this guest of Mr. ██Doe██ on one occasion, but believes that they just had "introductions" and exchanged "pleasantries." Mr. ███████ described that "some time in" the first semester (i.e. fall 2017), after he asked Mr. ██Doe██ "who is that girl who is always in your bed," Mr. ██Doe██ told him that they "used to date, but broke up, and then got together again." According to Mr. ███████ during this conversation, Mr. ██Doe██ also told him that their relationship was "secret;" Mr. ███████ could not remember further details, but believes that Mr. ██Doe██ had shared that the relationship was secret because the female's parents and/or friends "hated" Mr. ██Doe██

Mr. ███████ also recalled a conversation with Mr. ██Doe██ during the middle of the second semester (i.e. spring 2018). Mr. ███████ described, that in the context of talking about why Mr. ██Doe██ had had a "shit day," Mr. ██Doe██ told him that all of his friends were mad at him for something that "she" did to him, and that "she" would not talk about it with Mr. ██Doe██

## IV.   REVIEW PERIOD

In accordance with the University's procedures with regard to investigations under the Sexual Misconduct, Relationship Violence, and Stalking Policy, the parties had the opportunity to review the Investigation Summary Draft Report, were invited to submit any additional comments, edits, or amendments, and told that they could identify any further witnesses or information, for consideration by the Title IX Investigators.

During the review period, Ms. ██Roe██ provided a response (via email) annexed hereto as Attachment G and Mr. ██Doe██ provided a response (via email) annexed hereto as Attachment H.

## V.   APPLICABLE POLICY & STANDARD OF REVIEW

The current policy in effect (Sexual Misconduct, Relationship Violence, and Stalking Policy, effective date April 19, 2018) holds that the issue of whether there was a violation will be determined under the policy or policies in effect at the time the alleged conduct occurred. Accordingly, all of the applicable polices for this matter are contained (collectively) in Attachment A.

Additionally, under the applicable procedures, the Title IX Investigators are required to make a determination as to whether there is "sufficient evidence" to be considered by an adjudicator. This initial determination is not a finding as to whether a Policy violation has occurred, is not an ultimate credibility assessment of the parties and/or witnesses (if applicable), nor is it a "charging" decision for purposes of an adjudication of the matter (if applicable); these later assessments are made at the consideration and discretion of NYU's Office of Student Conduct and Community Standards ("OSCCS"). Instead, the instant determination solely addresses the issue of whether a reasonable fact-finder (i.e.

CONFIDENTIAL STUDENT RECORD                    NYU_00009773

the person serving as the Adjudicator at the hearing) could determine that there is sufficient evidence to support a finding that a violation of the Policy has occurred.

## VI.    DETERMINATION

**After a thorough investigation, careful review of the testimonial and documentary evidence, and consideration of the totality of circumstances, the Title IX Investigators, in consultation with other University administrators, have determined that there is sufficient evidence to be considered by an adjudicator as to whether Mr.** <span>Doe</span> **violated the University's Sexual Misconduct, Relationship Violence, and Stalking Policy.**

Accordingly, this matter is being referred to the Office of Student Conduct & Community Standards for further action, in accordance with the applicable University policy and procedures.

CONFIDENTIAL STUDENT RECORD

1

# ATTACHMENT A

CONFIDENTIAL STUDENT RECORD

NYU_00009775

## New York University
### UNIVERSITY POLICIES

| | |
|---|---|
| **Title:** | Sexual Misconduct, Relationship Violence, and Stalking Policy |
| **Effective Date:** | October 13, 2016 |
| **Supersedes:** | Sexual Misconduct, Relationship Violence, and Stalking Policy dated September 30, 2015 |
| **Issuing Authority:** | Deputy Chief of Staff, Office of the President<br>Senior Vice President for Student Affairs |
| **Responsible Officers:** | Director of the Office of Student Conduct and Community Standards<br>Title IX Coordinator |

## I.   STATEMENT OF POLICY

New York University, including its Schools and other units, Global Network University sites, and all University Affiliates (together, "NYU") seeks to maintain a safe learning, living, and working environment. To that end, this policy prohibits Sexual Misconduct, which includes Sexual or Gender Based Harassment, Sexual Assault, and Sexual Exploitation. This policy also prohibits Relationship Violence, Stalking, and Retaliation against an individual for making a good faith report of conduct prohibited under this policy. These prohibited forms of conduct are unlawful, undermine the character and purpose of NYU, and will not be tolerated.

NYU adopts this policy with a commitment to: (1) preventing Sexual Misconduct, Relationship Violence, Stalking, and Retaliation (together, "Prohibited Conduct"); (2) fostering a community in which such conduct is not tolerated; (3) cultivating a climate where all individuals are well-informed and comfortable in reporting Prohibited Conduct; and (4) identifying the standards by which violations of this policy will be evaluated. This policy defines Prohibited Conduct; outlines available resources and reporting options available to students and employees; and references the applicable investigative and disciplinary procedures. NYU will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and address its effects. NYU also conducts prevention, awareness, and training programs for students and employees to facilitate the goals of this policy.

NYU does not discriminate on the basis of sex or gender in its education or employment programs and activities.

This policy is designed to comply with applicable legal requirements including Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"); and, in New York with the New York State and City human rights laws.

This policy applies to all Prohibited Conduct occurring on or after the effective date of this policy. In the case of Prohibited Conduct occurring before the effective date of this policy where either (a) the report of such Prohibited Conduct is made on or after the effective date of this policy or (b) the report was made before the effective date of this policy but the report has not resolved as of the effective date of the policy,

CONFIDENTIAL STUDENT RECORD

NYU_00009776

**3**

the issue of whether there was a violation of NYU policy will be determined under the policy or policies in effect at the time the conduct occurred but the procedures under this policy will apply (except that the procedures in effect immediately prior to the effective date will apply where a hearing had been scheduled prior to the effective date).

## II.    TO WHOM THE POLICY APPLIES

This policy applies to NYU students ("Students"); NYU employees, including faculty and visiting faculty, professional staff, and administrators ("Employees"); contractors, vendors, or other third parties within NYU's control ("Third Parties"); and visitors or guests of NYU (together, "Covered Persons"). This policy pertains to acts of Prohibited Conduct committed by Students, Employees and Third Parties when:

(1)  the conduct occurs on NYU premises;

(2)  the conduct occurs in the context of an NYU employment or education program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or

(3)  the conduct occurs outside the context of an NYU employment or education program or activity, but (i) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (ii) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

Other forms of discrimination, including discrimination based on race, religion, and disability, as well as any other form of sex-based discrimination not covered by this policy, are addressed by: (1) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees, (2) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students, and (3) the Compliance Complaint Policy. This policy supersedes any conflicting information contained in those policies with respect to the definitions or procedures relating to Prohibited Conduct.  A Covered Person who has a question about which policy applies in a specific instance can contact NYU's Title IX Coordinator (212-998-2352).

This policy and its related procedures may also, at NYU's discretion, apply to alleged violations by the Respondent of other NYU policies if, in NYU's judgment, those other allegations are directly related to the reported Prohibited Conduct.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific investigative and disciplinary procedures for Prohibited Conduct under this policy are based on the status of the Respondent.  Each set of procedures is guided by the principles of fairness and respect for a Complainant and a Respondent.  Where a Respondent is both a Student and an Employee, (a) the Student-Respondent procedures will apply if the Respondent is a full-time Student but not a full-time Employee, (b) the Employee-Respondent Procedures will apply if the Respondent is a full-time Employee but not a full-time Student, or (c) NYU's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates and the role most applicable in the incident). However, irrespective of which of the Student-Respondent or Employee-Respondent procedures applies in such cases, either of the sanctions applicable to Students or Employees can be imposed.  Please note that the NYU Langone Medical Center has its own procedures and the procedures below do not apply to NYULMC.

NYU applies the preponderance of the evidence standard when determining whether this policy has been violated.

2

**4**

| Procedures for Reports of Prohibited Conduct Committed by Students | Procedures for Reports of Prohibited Conduct Committed by Employees | Procedures for Reports of Prohibited Conduct Committed by Third Parties |
|---|---|---|
| See **Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Students** | See **Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Employees** | Contact NYU's Title IX Coordinator who will identify the appropriate procedures that apply based on the role of the Third Party and the nature of any contractual relationship with NYU. |

## IV.    ENFORCEMENT

A Student or Employee determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU. Third Parties who violate this policy may have their relationship with NYU terminated and/or their privilege of being on NYU premises withdrawn. NYU reserves the right to take action against a Covered Person who commits an act of Prohibited Conduct outside the scope of this policy.

## V.    TITLE IX COORDINATOR

The Executive Director of the Office of Equal Opportunity serves as NYU's Title IX Coordinator. The Title IX Coordinator is charged with monitoring compliance with Title IX; providing education, training, and notifications; overseeing complaints; and coordinating NYU's investigation, response, and resolution of all reports under this policy. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures.

Concerns about NYU's application of Title IX, the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Clery Act; and, in New York, the New York State and City human rights laws under this policy may be addressed to NYU's Title IX Coordinator, the NYU Office of Equal Opportunity, the United States Department of Education, Clery Act Compliance Division, or the United States Department of Education, Office for Civil Rights, at OCR@ed.gov or (800) 421-3481.

## VI.    RESOURCES AND REPORTING OPTIONS

NYU offers resources for both Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the investigation and resolution of a report of Prohibited Conduct. For comprehensive information on emergency assistance; hospitals; on-campus, community, Portal Campus and Study Away Site Confidential Resources; and available support with academics, housing, and work:

- Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

- Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

- Third Parties should contact the Title IX Coordinator to discuss available campus resources and reasonably available assistance.

CONFIDENTIAL STUDENT RECORD                                    NYU_00009778

## A. PROTECTIVE MEASURES AND ACCOMMODATIONS:

Upon receipt of a report involving a Student or Employee Complainant, NYU will take and/or make available reasonable and appropriate measures to protect the Complainant and the Complainant's access to NYU employment or education programs and activities, prevent retaliation, and avoid an ongoing hostile environment, which may include protective measures before the final outcome of an investigation.   Such protective measures and accommodations, which may be temporary or permanent, may include separation orders, residence modifications, academic accommodations or assistance, work schedule modifications, transportation assistance, and other reasonable and appropriate measures.   Reasonable and appropriate protective measures and accommodations are available for Student and Employee Complainants regardless of whether an investigation under the applicable procedures is pursued. NYU also will take and/or make available such measures and accommodations for Student and Employee Respondents where reasonable and appropriate under the circumstances.  NYU will maintain the privacy of any accommodations or protective measures provided under this policy to the extent practicable.

For Third Party Complainants, NYU will provide reasonable protective measures as appropriate and available, based on consideration of the role of the Third Party and the nature of any contractual relationship with NYU.

Violating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy.

## B. PRIVACY AND CONFIDENTIALITY:

NYU is committed to protecting the privacy of Covered Persons involved in a report under this policy.  NYU also is committed to providing assistance to help Covered Persons make informed choices. With any report under this policy, NYU will make reasonable efforts to protect the privacy interests of Covered Persons involved in a manner consistent with the need for a careful assessment of the allegation and reasonable steps available to eliminate the reported conduct, prevent its recurrence, and address its effects.

Privacy and confidentiality have distinct meanings under this policy.

**Privacy:** Privacy generally means that information related to a report of misconduct will be shared with a limited circle of individuals who "need to know" in order to assist in the active review, investigation, resolution of the report, and related issues. All NYU employees who are involved in NYU's Title IX response receive specific training and guidance about safeguarding private information in accordance with applicable laws.

The privacy of Student education records will be protected in accordance with NYU's Guidelines for Compliance with the Family Educational Rights and Privacy Act (FERPA).  The privacy of an individual's medical and related records generally are protected in the United States by the Health Insurance Portability and Accountability Act (HIPAA), excepting health records protected by FERPA.  Access to personnel records in New York is restricted in accordance with NYU's Policy on Employee Files.  Laws in other relevant jurisdictions may provide privacy protections.

**Confidentiality:** Confidentiality means that information shared by an individual with designated campus or community professionals cannot be revealed to any other individual without express permission of the individual, or as otherwise permitted by law. Those campus and community

4

NYU_00009779

professionals include medical providers, mental health providers, counselors in the Center for Sexual Misconduct Support Services, and ordained clergy, all of whom normally have privileged confidentiality that is recognized by New York State law. These individuals are prohibited from breaking confidentiality unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18, or (iv) as otherwise required or permitted by law or court order. Laws in other relevant jurisdictions may provide confidentiality protections.

**Employee Responsibility to Report Allegations:** It is important to understand the different responsibilities of NYU Employees who respond to disclosures of incidents of Prohibited Conduct. There are three general classifications of individuals on campus with whom a Covered Person can discuss an incident of Prohibited Conduct:

    (1)  Confidential Resources (individuals with legally-protected confidentiality);

    (2)  Reporting Options (designated offices or individuals where a report can be made); and

    (3)  Employees designated as Responsible Employees (those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees).

The respective ability of these categories of individuals to maintain a Complainant's confidentiality differs. Confidential Resources can maintain the confidentiality of a Complainant's disclosures, subject to the exceptions discussed above. While private, Reporting Options and Responsible Employees are required to immediately share all known details of incidents of Prohibited Conduct with the Title IX Coordinator. Even University officers and employees who cannot guarantee confidentiality will maintain a Complainant's privacy to the extent reasonably possible. The information provided to a non-confidential resource will be relayed only as necessary for the Title IX Coordinator to coordinate an investigation and/or seek a resolution.

**Clery Act Reporting:** Pursuant to the Clery Act, NYU includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education, but does so in an anonymized manner that does not include the specifics of the crime or any identifying information about persons involved in an incident.

## C.  CONFIDENTIAL RESOURCES:

Confidential Resources for Students include the Wellness Exchange (212-443-9999) and the Center for Sexual Misconduct Support Services (212-443-9999). For a complete list of NYU and community-based Confidential Resources for Students, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

Confidential Resources for Employees include the Employee Assistance Program (800-437-0911). For a complete list of NYU and community-based Confidential Resources for Employees, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## D.  REPORTING:

NYU strongly encourages Covered Persons who become aware of an incident of Prohibited Conduct to report the incident to local law enforcement by contacting 911 (or equivalent in other jurisdictions) and to NYU by contacting one of the following NYU Reporting Options:

CONFIDENTIAL STUDENT RECORD

NYU_00009780

| Title IX Coordinator<br>212-998-2352 | Office of Student Conduct and<br>Community Standards<br>212-998-4403 |
|---|---|
| The Office of Equal Opportunity<br>212-998-2370 | Residential Life and Housing<br>212-998-4600 |
| NYU Department of Public Safety<br>212-998-2222 | Human Resources Officer of the School<br>or Administrative Department |

There is no time limit on reporting violations of this policy, although NYU's ability to respond may be limited as evidence may be less available and memories may fade, and Respondents may no longer be affiliated with NYU.

**Student Amnesty Policy:** The health and safety of every student at NYU is of utmost importance. NYU recognizes that Students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to Relationship Violence, Stalking, or Sexual Assault, occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. NYU strongly encourages Students to report incidents of Prohibited Conduct to NYU officials. NYU will not subject a bystander, Complainant, or other individual making a report who discloses any incident of Prohibited Conduct to NYU's officials or law enforcement to disciplinary action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the Prohibited Conduct.

**Bad faith reports:** Submitting a false report or providing false or misleading information in bad faith or with a view to personal gain in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanction. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are determined not to be accurate.

## VII.   PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sexual orientation, gender, gender identity, or gender expression of the Complainant or Respondent. Prohibited Sexual Misconduct includes the following specifically defined forms of behavior: Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. Also prohibited are Relationship Violence, Stalking, and Retaliation.

Whether a Covered Person has violated this policy is determined based on all of the available facts and circumstances including but not limited to: statements of the Complainant and Respondent; statements by any witnesses to the alleged incident(s); documentary or physical evidence; the presence or absence of corroborating information; and relevant information about pre-and post-incident behavior and/or actions.

A.   **Sexual or Gender-Based Harassment: Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when one or more of the following conditions are present:

(i) Submission to or rejection of such conduct is either an explicit or implicit term or condition of an individual's employment or advancement in employment, evaluation of academic work or

CONFIDENTIAL STUDENT RECORD

NYU_00009781

advancement in an academic program, or basis for participation in any aspect of a NYU program or activity (quid pro quo);

(ii) Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual (quid pro quo); or

(iii) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective - a reasonable person's view - and subjective - the Complainant's view - standard (hostile environment).

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

Examples of conduct that may constitute Sexual or Gender-Based Harassment include but are not limited to:

- Sexual Assault, Sexual Exploitation, Relationship Violence, or Stalking as defined by this policy;

- Physical conduct, including unwelcome touching or sexual advances within the working, living, or learning environment;

- Verbal conduct, including lewd or sexually suggestive comments, jokes, or innuendoes or unwelcome comments about an individual's sexual orientation or gender identity; or

- Written conduct, including letters, notes, or electronic communications containing comments, words, jokes, or images that are lewd or sexually suggestive or relate in an unwelcome manner to an individual's sexual orientation or gender identity.

**B. Sexual Assault:**   Sexual Assault means Non-Consensual Sexual Intercourse or Non-Consensual Sexual Contact as defined below.

    1.   **Non-Consensual Sexual Intercourse:** Non-Consensual Sexual Intercourse is having or attempting to have sexual intercourse with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated.   Sexual intercourse includes anal, oral or vaginal penetration, however slight, with a body part (e.g., penis, finger, hand or tongue) or an object.

    2.   **Non-Consensual Sexual Contact:** Non-Consensual Sexual Contact is having or attempting to have sexual contact with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated.   Sexual contact includes touching, fondling or other intentional contact with the breasts, buttocks, groin, or genitals (over or under an individual's clothing) for purposes of sexual gratification or when such private body parts are otherwise touched in a sexual manner.

CONFIDENTIAL STUDENT RECORD

NYU_00009782

C. **Sexual Exploitation:**   Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another individual's nudity or sexuality, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

Examples of Sexual Exploitation include but are not limited to:

- Voyeurism (such as watching or taking pictures, videos, or audio recordings of another person engaging in a sexual act, in a state of undress, or in a place and time where such person has a reasonable expectation of privacy such as a changing room, toilet, bathroom, or shower, each without the affirmative consent of all parties);

- Disseminating, streaming, or posting pictures or video of another in a state of undress or of a sexual nature without the person's affirmative consent;

- Administering alcohol or drugs to another person for the purpose of making that person vulnerable to non-consensual sexual activity;

- Exposing one's genitals to another person without affirmative consent;

- Prostituting another individual; or

- Knowingly exposing another individual to a sexually transmitted infection or virus without the other individual's knowledge.

D. **Relationship Violence:** Relationship Violence includes any act of violence or threatened act of violence, including Sexual Misconduct, Stalking, or Physical Assault, against a person who is, or has been involved in a sexual, dating, domestic, or other intimate relationship with that person.  Physical Assault includes threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person under circumstances that reflect a direct connection to the intimate relationship in question.

E. **Stalking**:  Stalking occurs when a person engages in a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress.

Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.  Substantial emotional distress means significant mental suffering or anguish.

Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.

F. **Retaliation:**  Retaliation means any adverse action taken against an individual for making a good faith report of Prohibited Conduct or participating in any investigation or proceeding under this policy. Retaliation includes threatening, intimidating, harassing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.

CONFIDENTIAL STUDENT RECORD

NYU_00009783

VIII.   **RELATED DEFINITIONS: CONSENT, FORCE, AND INCAPACITATION:**

A. **Affirmative Consent:**  Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity.  Affirmative consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.  Silence or lack of resistance, in and of itself, does not demonstrate consent.  The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

Consent cannot be obtained: (1) through the use of force or coercion; or (2) by taking advantage of the incapacitation of another individual.  Consent also cannot be given by someone who is under the legal age to consent in the applicable jurisdiction at the time of an incident.

In evaluating whether affirmative consent was given, consideration will be given to the totality of the facts and circumstances, including but not limited to the extent to which a Complainant affirmatively gives words or actions indicating a willingness to engage in sexual activity; whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the Respondent, demonstrating an incapacity to consent.

Relying solely on nonverbal communication may result in a violation of this policy.  It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and clarifies, verbally, the willingness to continue.

Consent may be initially given, but withdrawn at any time.  When consent is withdrawn or can no longer be given, sexual activity must cease.  Prior consent does not imply current or future consent; consent to any sexual act or prior consensual sexual activity does not necessarily constitute consent to any other sexual act.  Even in the context of an ongoing relationship, consent must be freely sought and given for each instance of sexual activity.

B. **Force or Coercion:**  Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual activity.  There is no requirement that a party resists the sexual advance or request, but resistance will be viewed as a clear demonstration of non-consent.

Coercion is conduct, including intimidation and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to overcome the individual's freedom of will and to compel the individual to engage in sexual activity.

C. **Incapacitation:**  An individual who is incapacitated lacks the ability to knowingly choose to participate in sexual activity or make informed, rational judgments and thus cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, being involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring.  Mentally helpless means a person is rendered temporarily incapable of appraising or controlling one's own conduct. Physically helpless means a person is physically unable to communicate unwillingness to an act.

Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication.  The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait, combativeness, or emotional volatility.  Evaluating incapacitation also requires

9

CONFIDENTIAL STUDENT RECORD

NYU_00009784

an assessment of whether a Respondent knew or should have been aware of the Complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the Respondent's position. Being intoxicated or impaired by drugs or alcohol is never an excuse for committing Prohibited Conduct and does not diminish one's responsibility to obtain informed and freely given consent. In other words, consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

## IX. VIOLATIONS OF LAW:

Behavior that violates this policy also may violate the laws of the local jurisdiction in which the incident occurred and subject a Respondent to criminal prosecution by the presiding authority.

The New York State Penal Code describes prohibited Sex Offenses in §§ 130.00 to 130.91 and 130.95 to 130.96 and prohibited Stalking Offenses in §§ 120.45 – 120.60. Covered Persons studying, working, or engaging in other activities at one of NYU's portal campuses, Global Network University sites, or other locations outside of New York State are governed by the applicable laws regarding sexual assault and other criminal offenses implicated by this policy. NYU's education and prevention programs related to its portal campuses and Global Network University sites will include definitions of prohibited conduct and consent in the applicable jurisdiction.

Behavior that violates this policy also may subject a Respondent to civil liability.

## X. STUDENTS' BILL OF RIGHTS:

Under this policy, all students have the right to:

1. Make a report to local law enforcement and/or state police.

2. Have disclosures of Relationship Violence, Stalking, and Sexual Assault treated seriously.

3. Make a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process and/or the criminal justice process free from pressure by NYU.

4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.

5. Be treated with dignity and to receive from NYU courteous, fair, and respectful health care and counseling services, where available.

6. Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations.

7. Describe the incident to as few NYU representatives as practicable and not be required to unnecessarily repeat a description of the incident.

8. Be reasonably protected from Retaliation by NYU, any student, the Respondent, and/or their friends, family and acquaintances within NYU's jurisdiction.

9. Access to at least one level of appeal of a determination in matters involving Student conduct.

10

10. Be accompanied by an advisor of choice who may assist and advise a Complainant or Respondent throughout the disciplinary process including during all meetings and hearings related to such process.

11. Exercise civil rights and practice of religion without interference by the investigative or disciplinary process of NYU.

## XI.    CONSENSUAL RELATIONSHIPS:

Sexual behavior that is welcome or consensual by all involved parties does not constitute Prohibited Conduct. However, consensual sexual relationships in situations where one individual has power or authority over another may result in claims of Prohibited Conduct, and/or may give rise to complaints by others of disparate treatment.  Examples of such relationships may include: a professor and his/her Student, a supervisor and a subordinate Employee, or a coach and team member.  If such a consensual relationship occurs, any situation of authority should be discontinued immediately.

## XII.    PREVENTION AND AWARENESS PROGRAMS:

NYU is committed to the prevention of Prohibited Conduct through education and awareness programs. Incoming first year students and new employees are offered primary prevention and awareness programming as part of their orientation and returning staff and students are offered ongoing training and related programs. For a description of NYU's Prohibited Conduct prevention and awareness programs, including programs to minimizing the risk of incidents of Prohibited Conduct and bystander intervention, Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students, and Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## XIII.    ADDITIONAL POLICY DEFINITIONS:

"Complainant" means the Covered Person who presents as the victim of any Prohibited Conduct under the policy, regardless of whether that individual makes a report or seeks action under the policy.

"Confidential Resource" means an NYU employee or community resource with statutorily protected confidentiality.  This includes medical providers, mental health providers, rape crisis counselors, and ordained clergy.

"NYU" means the Schools and other units of NYU, NYU's Global Network University sites, and all University affiliates.

"Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

"Reporting Option" means individuals or departments designated by NYU to receive reports of Prohibited Conduct.

"Respondent" means the Covered Person(s) who has been accused of violating the policy.

"Responsible Employee" means those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees.  This includes the NYU Title IX Coordinator; Public Safety Officers; senior staff members in Residence Life, Student Affairs, Student Activities, and Athletics; administrators in the Office of Community Standards; senior administrators in each of the Schools within NYU; Resident Assistants (RAs); and athletic team coaches.

CONFIDENTIAL STUDENT RECORD                                                                                                    NYU_00009786

"School" for purposes of this policy means each NYU school, college and institute that functions similarly to a school or college (e.g., IFA, ISAW, Courant, and CUSP), each NYU portal campus (e.g., New York and Abu Dhabi), and other global sites as designated by the Provost.

## XIV.   RELATED POLICIES:

Bullying, Threatening, and Other Disruptive Behavior Guidelines

Code of Ethical Conduct

Compliance Complaint Policy

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students

CONFIDENTIAL STUDENT RECORD

NYU_00009787

**14**

**NEW YORK UNIVERSITY**
**UNIVERSITY POLICIES**

| | |
|---|---|
| **Title:** | Sexual Misconduct, Relationship Violence, and Stalking Policy |
| **Effective Date:** | April 19, 2018 |
| **Supersedes:** | Sexual Misconduct, Relationship Violence, and Stalking Policy dated August 25, 2017 |
| **Issuing Authority:** | Deputy Chief of Staff, Office of the President<br>Senior Vice President for Student Affairs |
| **Responsible Officers:** | Director of the Office of Student Conduct and Community Standards<br>Title IX Coordinator |

## I.  STATEMENT OF POLICY

New York University, including its Schools and other units, Global Network University sites, and all University Affiliates (together, "NYU") seeks to maintain a safe learning, living, and working environment. To that end, this policy prohibits Sexual Misconduct, which includes Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. This policy also prohibits Relationship Violence, Stalking, and Retaliation against an individual for making a good faith report of conduct prohibited under this policy. These prohibited forms of conduct are unlawful, undermine the character and purpose of NYU, and will not be tolerated.

NYU adopts this policy with a commitment to: (1) preventing Sexual Misconduct, Relationship Violence, Stalking, and Retaliation (together, "Prohibited Conduct"); (2) fostering a community in which such conduct is not tolerated; (3) cultivating a climate where all individuals are well-informed and comfortable in reporting Prohibited Conduct; and (4) identifying the standards by which violations of this policy will be evaluated. This policy defines Prohibited Conduct; outlines available resources and reporting options available to students and employees; and references the applicable investigative and disciplinary procedures. NYU will take prompt and equitable action to eliminate Prohibited Conduct, prevent its recurrence, and address its effects. NYU also conducts prevention, awareness, and training programs for students and employees to facilitate the goals of this policy.

NYU does not discriminate on the basis of sex or gender in its education or employment programs and activities.

This policy is designed to comply with applicable legal requirements including Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"); and, in New York with the New York State and City human rights laws.

This policy applies to all Prohibited Conduct occurring on or after the effective date of this policy.  In the case of Prohibited Conduct occurring before the effective date of this policy where either (a) the report of such Prohibited Conduct is made on or after the effective date of this policy or (b) the report was made before the effective date of this policy but the report has not resolved as of the effective date of the policy, the issue of whether there was a violation of NYU policy will be determined under the policy or policies in effect at the time the conduct occurred but the procedures under this policy will apply (except that the procedures in effect immediately prior to the effective date will apply where a hearing had been scheduled prior to the effective date).

1

NYU_00009788

## II.     TO WHOM THE POLICY APPLIES

This policy applies to NYU students ("Students"); NYU employees, including faculty and visiting faculty, professional staff, and administrators ("Employees"); contractors, vendors, or other third parties within NYU's control ("Third Parties"); and visitors or guests of NYU (together, "Covered Persons"). This policy pertains to acts of Prohibited Conduct committed by Students, Employees and Third Parties when:

(1)  the conduct occurs on NYU premises;

(2)  the conduct occurs in the context of an NYU employment or education program or activity, including, but not limited to NYU-sponsored study abroad, research, or internship programs; or

(3)  the conduct occurs outside the context of an NYU employment or education program or activity, but (i) has continuing adverse effects on NYU premises or in any NYU employment or education program or activity or (ii) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises.

Other forms of discrimination, including discrimination based on race, religion, and disability, as well as any other form of sex-based discrimination not covered by this policy, are addressed by: (1) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees, (2) the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students, and (3) the Compliance Complaint Policy. This policy supersedes any conflicting information contained in those policies with respect to the definitions or procedures relating to Prohibited Conduct. A Covered Person who has a question about which policy applies in a specific instance can contact NYU's Title IX Coordinator (see section D below (Reporting) for Title IX Coordinator contact information).

This policy and its related procedures may also, at NYU's discretion, apply to alleged violations by the Respondent of other NYU policies if, in NYU's judgment, those other allegations are directly related to the reported Prohibited Conduct.

## III.    APPLICABLE PROCEDURES UNDER THIS POLICY

The specific investigative and disciplinary procedures for Prohibited Conduct under this policy are based on the status of the Respondent. Each set of procedures is guided by the principles of fairness and respect for a Complainant and a Respondent. Where a Respondent is both a Student and an Employee, (a) the Student-Respondent procedures will apply if the Respondent is a full-time Student but not a full-time Employee, (b) the Employee-Respondent Procedures will apply if the Respondent is a full-time Employee but not a full-time Student, or (c) NYU's Title IX Coordinator will determine which of the procedures applies based on the facts and circumstances (such as which role predominates and the role most applicable in the incident). However, irrespective of which of the Student-Respondent or Employee-Respondent procedures applies in such cases, either of the sanctions applicable to Students or Employees can be imposed. Please note that the NYU Langone Medical Center has its own procedures and the procedures below do not apply to NYULMC.

NYU applies the preponderance of the evidence standard when determining whether this policy has been violated.

2

| Procedures for Reports of Prohibited Conduct Committed by Students | Procedures for Reports of Prohibited Conduct Committed by Employees | Procedures for Reports of Prohibited Conduct Committed by Third Parties |
|---|---|---|
| See **Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Students** | See **Reporting, Investigating, And Resolving Sexual Misconduct, Relationship Violence, and Stalking - Complaints Against Employees** | Contact NYU's Title IX Coordinator who will identify the appropriate procedures that apply based on the role of the Third Party and the nature of any contractual relationship with NYU. |

## IV.    ENFORCEMENT

A Student or Employee determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU. Third Parties who violate this policy may have their relationship with NYU terminated and/or their privilege of being on NYU premises withdrawn. NYU reserves the right to take action against a Covered Person who commits an act of Prohibited Conduct outside the scope of this policy.

## V.    TITLE IX COORDINATOR

Mary Signor, the Executive Director of the Office of Equal Opportunity serves as NYU's Title IX Coordinator. The Title IX Coordinator is charged with monitoring compliance with Title IX; providing education, training, and notifications; overseeing complaints; and coordinating NYU's investigation, response, and resolution of all reports under this policy. The Title IX Coordinator is available to meet with any Student, Employee, or Third Party to discuss this policy or the accompanying procedures.

Concerns about NYU's application of Title IX and its implementing regulations; the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Clery Act; and, in New York, the New York State and City human rights laws under this policy may be addressed to NYU's Title IX Coordinator or the NYU Office of Equal Opportunity. Inquiries concerning the Violence Against Women Reauthorization Act of 2013 or the Clery Act may also be referred to the United States Department of Education, Clery Act Compliance Division, while inquiries concerning the application of Title IX and its implementing regulations may also be referred to the United States Department of Education, Assistant Secretary, Office for Civil Rights, at OCR@ed.gov or (800) 421-3481.

## VI.    RESOURCES AND REPORTING OPTIONS

NYU offers resources for both Students and Employees, whether as Complainants or Respondents, to provide support and guidance throughout the investigation and resolution of a report of Prohibited Conduct. For comprehensive information on emergency assistance; hospitals; on-campus, community, Portal Campus and Study Away Site Confidential Resources; and available support with academics, housing, and work:

- Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

- Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

- Third Parties should contact the Title IX Coordinator to discuss available campus resources and reasonably available assistance.

3

**17**

### A. PROTECTIVE MEASURES AND ACCOMMODATIONS:

Upon receipt of a report involving a Student or Employee Complainant, NYU will take and/or make available reasonable and appropriate measures to protect the Complainant and the Complainant's access to NYU employment or education programs and activities, prevent retaliation, and avoid an ongoing hostile environment, which may include protective measures before the final outcome of an investigation. Such protective measures and accommodations, which may be temporary or permanent, may include separation orders, residence modifications, academic accommodations or assistance, work schedule modifications, transportation assistance, and other reasonable and appropriate measures. Reasonable and appropriate protective measures and accommodations are available for Student and Employee Complainants regardless of whether an investigation under the applicable procedures is pursued. NYU also will take and/or make available such measures and accommodations for Student and Employee Respondents where reasonable and appropriate under the circumstances. NYU will maintain the privacy of any accommodations or protective measures provided under this policy to the extent practicable.

For Third Party Complainants, NYU will provide reasonable protective measures as appropriate and available, based on consideration of the role of the Third Party and the nature of any contractual relationship with NYU.

Violating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy. The Title IX Coordinator will determine and identify the appropriate procedures to be followed for such a violation depending on the timing and circumstances of the reported violation.

### B. PRIVACY AND CONFIDENTIALITY:

NYU is committed to protecting the privacy of Covered Persons involved in a report under this policy. NYU also is committed to providing assistance to help Covered Persons make informed choices. With any report under this policy, NYU will make reasonable efforts to protect the privacy interests of Covered Persons involved in a manner consistent with the need for a careful assessment of the allegation and reasonable steps available to eliminate the reported conduct, prevent its recurrence, and address its effects.

Privacy and confidentiality have distinct meanings under this policy.

**Privacy:** Privacy generally means that information related to a report of misconduct will be shared with a limited circle of individuals who "need to know" in order to assist in the active review, investigation, resolution of the report, and related issues. All NYU employees who are involved in NYU's Title IX response receive specific training and guidance about safeguarding private information in accordance with applicable laws.

The privacy of Student education records will be protected in accordance with NYU's Guidelines for Compliance with the Family Educational Rights and Privacy Act (FERPA). The privacy of an individual's medical and related records generally are protected in the United States by the Health Insurance Portability and Accountability Act (HIPAA), excepting health records protected by FERPA. Access to personnel records in New York is restricted in accordance with NYU's Policy on Employee Files. Laws in other relevant jurisdictions may provide privacy protections.

**Confidentiality:** Confidentiality means that information shared by an individual with designated

4

NYU_00009791

campus or community professionals cannot be revealed to any other individual without express permission of the individual, or as otherwise permitted by law. Those campus and community professionals include medical providers, mental health providers, counselors in the Center for Sexual Misconduct Support Services, and ordained clergy, all of whom normally have privileged confidentiality that is recognized by New York State law. These individuals are prohibited from breaking confidentiality unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18, or (iv) as otherwise required or permitted by law or court order. Laws in other relevant jurisdictions may provide confidentiality protections.

**Employee Responsibility to Report Allegations:** It is important to understand the different responsibilities of NYU Employees who respond to disclosures of incidents of Prohibited Conduct. There are three general classifications of individuals on campus with whom a Covered Person can discuss an incident of Prohibited Conduct:

(1) Confidential Resources (individuals with legally-protected confidentiality);

(2) Reporting Options (designated offices or individuals where a report can be made); and

(3) Employees designated as Responsible Employees (those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees).

The respective ability of these categories of individuals to maintain a Complainant's confidentiality differs. Confidential Resources can maintain the confidentiality of a Complainant's disclosures, subject to the exceptions discussed above. While private, Reporting Options and Responsible Employees are required to immediately share all known details of incidents of Prohibited Conduct with the Title IX Coordinator. Even University officers and employees who cannot guarantee confidentiality will maintain a Complainant's privacy to the extent reasonably possible. The information provided to a non-confidential resource will be relayed only as necessary for the Title IX Coordinator to coordinate an investigation and/or seek a resolution.

**Clery Act Reporting:** Pursuant to the Clery Act, NYU includes statistics about certain offenses in its annual security report and provides those statistics to the United States Department of Education, but does so in an anonymized manner that does not include the specifics of the crime or any identifying information about persons involved in an incident.

## C. CONFIDENTIAL RESOURCES:

Confidential Resources for Students include the Wellness Exchange (212-443-9999) and the Center for Sexual Misconduct Support Services (212-443-9999). For a complete list of NYU and community-based Confidential Resources for Students, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students.

Confidential Resources for Employees include the Employee Assistance Program (800-437-0911). For a complete list of NYU and community-based Confidential Resources for Employees, see the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## D. REPORTING:

NYU strongly encourages Covered Persons who become aware of an incident of Prohibited Conduct to report the incident to local law enforcement by contacting 911 (or equivalent in other jurisdictions) and to NYU by contacting one of the following NYU Reporting Options:

5

| Mary Signor<br>Title IX Coordinator<br>212-998-6807<br>726 Broadway, 7th Floor<br>New York, NY 10003<br>mary.signor@nyu.edu | **Office of Student Conduct and**<br>**Community Standards**<br>212-998-4403 |
|---|---|
| **The Office of Equal Opportunity**<br>212-998-2370 | **Residential Life and Housing**<br>212-998-4600 |
| **NYU Department of Public Safety**<br>212-998-2222 | **Human Resources Officer** of the School<br>or Administrative Department |

There is no time limit on reporting violations of this policy, although NYU's ability to respond may be limited as evidence may be less available and memories may fade, and Respondents may no longer be affiliated with NYU.

**Student Amnesty Policy:** The health and safety of every student at NYU is of utmost importance. NYU recognizes that Students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to Relationship Violence, Stalking, or Sexual Assault, occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. NYU strongly encourages Students to report incidents of Prohibited Conduct to NYU officials. NYU will not subject a bystander, Complainant, or other individual making a report who discloses any incident of Prohibited Conduct to NYU's officials or law enforcement to disciplinary action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the Prohibited Conduct.

**Bad faith reports:** Submitting a false report or providing false or misleading information in bad faith or with a view to personal gain in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanction. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are determined not to be accurate.

## VII.  PROHIBITED CONDUCT UNDER THIS POLICY

Conduct under this policy is prohibited regardless of the sexual orientation, gender, gender identity, or gender expression of the Complainant or Respondent. Prohibited Sexual Misconduct includes the following specifically defined forms of behavior: Sexual or Gender-Based Harassment, Sexual Assault, and Sexual Exploitation. Also prohibited are Relationship Violence, Stalking, and Retaliation.

Whether a Covered Person has violated this policy is determined based on all of the available facts and circumstances including but not limited to: statements of the Complainant and Respondent; statements by any witnesses to the alleged incident(s); documentary or physical evidence; the presence or absence of corroborating information; and relevant information about pre-and post-incident behavior and/or actions.

**A. Sexual or Gender-Based Harassment: Sexual Harassment** is any unwelcome sexual advance,

6

request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when one or more of the following conditions are present:

(i) Submission to or rejection of such conduct is either an explicit or implicit term or condition of an individual's employment or advancement in employment, evaluation of academic work or advancement in an academic program, or basis for participation in any aspect of a NYU program or activity (quid pro quo);

(ii) Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual (quid pro quo); or

(iii) Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective - a reasonable person's view - and subjective - the Complainant's view - standard (hostile environment).

**Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature.

Examples of conduct that may constitute Sexual or Gender-Based Harassment include but are not limited to:

- Sexual Assault, Sexual Exploitation, Relationship Violence, or Stalking as defined by this policy;

- Physical conduct, including unwelcome touching or sexual advances within the working, living, or learning environment;

- Verbal conduct, including lewd or sexually suggestive comments, jokes, or innuendoes or unwelcome comments about an individual's sexual orientation or gender identity; or

- Written conduct, including letters, notes, or electronic communications containing comments, words, jokes, or images that are lewd or sexually suggestive or relate in an unwelcome manner to an individual's sexual orientation or gender identity.

**B. Sexual Assault:**   Sexual Assault means Non-Consensual Sexual Intercourse or Non-Consensual Sexual Contact as defined below.

1.  **Non-Consensual Sexual Intercourse:** Non-Consensual Sexual Intercourse is having or attempting to have sexual intercourse with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated. Sexual intercourse includes anal, oral or vaginal penetration, however slight, with a body part (e.g., penis, finger, hand or tongue) or an object.

2.  **Non-Consensual Sexual Contact:** Non-Consensual Sexual Contact is having or attempting to have sexual contact with another individual (i) by force, threat of force, or coercive conduct; (ii) without affirmative consent; or (iii) where that individual is incapacitated. Sexual contact includes touching, fondling or other intentional contact with the breasts, buttocks, groin, or genitals (over or under an individual's clothing) for purposes of sexual gratification or when

7

such private body parts are otherwise touched in a sexual manner.

**C. Sexual Exploitation:**  Sexual Exploitation refers to specific forms of Sexual Misconduct that involve non-consensual use of another individual's nudity or sexuality, excluding behavior that constitutes one of the other Sexual Misconduct offenses.

Examples of Sexual Exploitation include but are not limited to:

- Voyeurism (such as watching or taking pictures, videos, or audio recordings of another person engaging in a sexual act, in a state of undress, or in a place and time where such person has a reasonable expectation of privacy, such as a changing room, toilet, bathroom, or shower, each without the affirmative consent of all parties);

- Disseminating, streaming, or posting pictures or video of another in a state of undress or of a sexual nature without the person's affirmative consent;

- Administering alcohol or drugs to another person for the purpose of making that person vulnerable to non-consensual sexual activity;

- Exposing one's genitals to another person without affirmative consent;

- Prostituting another individual; or

- Knowingly exposing another individual to a sexually transmitted infection or virus without the other individual's knowledge.

**D. Relationship Violence:**  Relationship Violence refers to any act of violence or threatened act of violence against a person who is, or has been involved in a sexual, dating, domestic, or other intimate relationship with that person, or who shares a child in common with that person.  Relationship Violence commonly involves violence and abuse committed by a person to exert power and control over a current or former intimate partner.  Relationship Violence may include acts of Sexual Misconduct, Physical Assault, Sexual Exploitation, or Stalking.

As used here, Physical Assault means threatening or causing physical harm or engaging in other conduct that threatens or endangers the health or safety of any person under circumstances that reflect a direct connection to the intimate relationship in question.

**E. Stalking:**  Stalking occurs when a person engages in a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress.

Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.  Substantial emotional distress means significant mental suffering or anguish.

Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.

CONFIDENTIAL STUDENT RECORD                                                                 NYU_00009795

F. **Retaliation:** Retaliation means any adverse action taken against an individual for making a good faith report of Prohibited Conduct or participating in any investigation or proceeding under this policy. Retaliation includes threatening, intimidating, harassing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.

The Title IX Coordinator will determine and identify the appropriate procedures to be followed for an allegation of Retaliation depending on the timing and circumstances of the allegation.

## VIII.  RELATED DEFINITIONS: CONSENT, FORCE, AND INCAPACITATION:

A. **Affirmative Consent:** Affirmative Consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Affirmative consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

Consent cannot be obtained: (1) through the use of force or coercion; or (2) by taking advantage of the incapacitation of another individual. Consent also cannot be given by someone who is under the legal age to consent in the applicable jurisdiction at the time of an incident.

In evaluating whether affirmative consent was given, consideration will be given to the totality of the facts and circumstances, including but not limited to the extent to which a Complainant affirmatively gives words or actions indicating a willingness to engage in sexual activity; whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the Respondent, demonstrating an incapacity to consent.

Relying solely on nonverbal communication may result in a violation of this policy. It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and clarifies, verbally, the willingness to continue.

Consent may be initially given, but withdrawn at any time. When consent is withdrawn or can no longer be given, sexual activity must cease. Prior consent does not imply current or future consent; consent to any sexual act or prior consensual sexual activity does not necessarily constitute consent to any other sexual act. Even in the context of an ongoing relationship, consent must be freely sought and given for each instance of sexual activity.

B. **Force or Coercion:** Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether or not to participate in sexual activity. There is no requirement that a party resists the sexual advance or request, but resistance will be viewed as a clear demonstration of non-consent.

Coercion is conduct, including intimidation and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to overcome the individual's freedom of will and to compel the individual to engage in sexual activity.

C. **Incapacitation:** An individual who is incapacitated lacks the ability to knowingly choose to participate in sexual activity or make informed, rational judgments and thus cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent because an individual is mentally and/or physically helpless, being involuntarily restrained, asleep, unconscious, or unaware that sexual activity is occurring. Mentally helpless means a person is rendered temporarily

9

NYU_00009796

incapable of appraising or controlling one's own conduct. Physically helpless means a person is physically unable to communicate unwillingness to an act.

Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait, combativeness, or emotional volatility. Evaluating incapacitation also requires an assessment of whether a Respondent knew or should have been aware of the Complainant's incapacitation based on objectively and reasonably apparent indications of impairment when viewed from the perspective of a sober, reasonable person in the Respondent's position. Being intoxicated or impaired by drugs or alcohol is never an excuse for committing Prohibited Conduct and does not diminish one's responsibility to obtain informed and freely given consent. In other words, consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

## IX.   VIOLATIONS OF LAW:

Behavior that violates this policy also may violate the laws of the local jurisdiction in which the incident occurred and subject a Respondent to criminal prosecution by the presiding authority.

The New York State Penal Code describes prohibited Sex Offenses in §§ 130.00 to 130.91 and 130.95 to 130.96 and prohibited Stalking Offenses in §§ 120.45 – 120.60. Covered Persons studying, working, or engaging in other activities at one of NYU's portal campuses, Global Network University sites, or other locations outside of New York State are governed by the applicable laws regarding sexual assault and other criminal offenses implicated by this policy. NYU's education and prevention programs related to its portal campuses and Global Network University sites will include definitions of prohibited conduct and consent in the applicable jurisdiction.

Behavior that violates this policy also may subject a Respondent to civil liability. Records of University proceedings under this Policy may be subpoenaed in connection with a criminal prosecution and/or civil litigation.

## X.   STUDENTS' BILL OF RIGHTS:

Under this policy, all students have the right to:

1.   Make a report to local law enforcement and/or state police.

2.   Have disclosures of Relationship Violence, Stalking, and Sexual Assault treated seriously.

3.   Make a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process and/or the criminal justice process free from pressure by NYU.

4.   Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard.

5.   Be treated with dignity and to receive from NYU courteous, fair, and respectful health care and counseling services, where available.

6.   Be free from any suggestion that the Complainant is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations.

CONFIDENTIAL STUDENT RECORD

NYU_00009797

7. Describe the incident to as few NYU representatives as practicable and not be required to unnecessarily repeat a description of the incident.

8. Be reasonably protected from Retaliation by NYU, any student, the Respondent, and/or their friends, family and acquaintances within NYU's jurisdiction.

9. Access to at least one level of appeal of a determination in matters involving Student conduct.

10. Be accompanied by an advisor of choice who may assist and advise a Complainant or Respondent throughout the disciplinary process including during all meetings and hearings related to such process.

11. Exercise civil rights and practice of religion without interference by the investigative or disciplinary process of NYU.

## XI.   CONSENSUAL RELATIONSHIPS:

Please see the University's Policy on Consensual Intimate Relationships.

## XII.   PREVENTION AND AWARENESS PROGRAMS:

NYU is committed to the prevention of Prohibited Conduct through education and awareness programs. Incoming first year students and new employees are offered primary prevention and awareness programming as part of their orientation and returning staff and students are offered ongoing training and related programs. For a description of NYU's Prohibited Conduct prevention and awareness programs, including programs on minimizing the risk of incidents of Prohibited Conduct and bystander intervention, Students should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Students, and Employees should refer to the Sexual Misconduct, Relationship Violence, and Stalking Resource Guide for Employees.

## XIII.   ADDITIONAL POLICY DEFINITIONS:

"Complainant" means the Covered Person who presents as the victim of any Prohibited Conduct under the policy, regardless of whether that individual makes a report or seeks action under the policy.

"Confidential Resource" means an NYU employee or community resource with statutorily protected confidentiality.  This includes medical providers, mental health providers, rape crisis counselors, and ordained clergy.

 "NYU" means the Schools and other units of NYU, NYU's Global Network University sites, and all University affiliates.

"Preponderance of the Evidence" means that it is more likely than not that a policy violation occurred.

"Reporting Option" means individuals or departments designated by NYU to receive reports of Prohibited Conduct.

"Respondent" means the Covered Person(s) who has been accused of violating the policy.

"Responsible Employee" means those Employees in a leadership or supervisory position, or who have significant responsibility for the welfare of Students or Employees.  This includes the NYU Title IX Coordinator; Public Safety Officers; senior staff members in Residence Life, Student Affairs, Student Activities,

11

CONFIDENTIAL STUDENT RECORD

and Athletics; administrators in the Office of Community Standards; senior administrators in each of the Schools within NYU; Resident Assistants (RAs), and athletic team coaches.

"School" for purposes of this policy means each NYU school, college and institute that functions similarly to a school or college (e.g., IFA, ISAW, Courant, and CUSP), each NYU portal campus (e.g., New York and Abu Dhabi), and other global sites as designated by the Provost.

## XIV.   RELATED POLICIES:

Bullying, Threatening, and Other Disruptive Behavior Guidelines

Code of Ethical Conduct

Compliance Complaint Policy

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees

Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students

12

CONFIDENTIAL STUDENT RECORD

NYU_00009799