**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

JOHN DOE,                                             Case No. 1:20-cv-01343-GHW

              Plaintiff,

-against-

NEW YORK UNIVERSITY,

              Defendant.

-------------------------------------------------------------------x

---

### PLAINTIFF JOHN DOE'S RULE 56.1 COUNTER-STATEMENT IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**WARSHAW BURSTEIN, LLP**
Kimberly C. Lau
James E. Figliozzi
klau@wbny.com
jfigliozzi@wbny.com
575 Lexington Ave.
New York, NY 10022
(212) 984-7700

*Counsel for Plaintiff John Doe*

Dated: New York, NY
      July 27, 2022

{1489872.7 }

# TABLE OF CONTENTS

**Page**

I.      NYU's Policies and Procedures for Title IX Complaints ................................................... 1

II.     NYU Personnel Involved in Plaintiff's Disciplinary Process ........................................... 13

III.    Plaintiff's Relationship with Jane Roe Before NYU ....................................................... 14

IV.     Plaintiff Transfers to NYU ............................................................................................... 19

V.      Plaintiff Repeatedly Makes Threats to Jane Roe and Disregards Her Requests to Him to Cease Contact ....................................................................................................... 26

VI.     Jane Files a Complaint with NYU ................................................................................... 48

VII.    Plaintiff Repeatedly Violates the NCO ........................................................................... 49

VIII.   NYU Assesses Jane's Report and Receives a Further Complaint from Jane that Plaintiff Again Violated the NCO .................................................................................... 52

IX.     NYU's Title IX Office Investigates Jane's Complaints Against Plaintiff ....................... 59

X.      OSC Coordinates the Hearing ......................................................................................... 75

XI.     The Hearing ..................................................................................................................... 80

XII.    The Decision .................................................................................................................... 89

XIII.   Plaintiff's Appeal ............................................................................................................ 92

XIV.    Plaintiff's Post-Appeal Conduct ..................................................................................... 98

XV.     Plaintiff's Additional Statements of Undisputed Fact .................................................. 101

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff John Doe ("Plaintiff"), respectfully submits this counter-statement of facts as to which there is no genuine issue to be tried.

## I.      NYU's Policies and Procedures for Title IX Complaints

1.      NYU's Sexual Misconduct, Relationship Violence, and Stalking Policy, effective April 18, 2018 ("the Policy"), prohibits certain conduct ("Prohibited Conduct"), with the goal of maintaining "a safe learning, living, and working environment." (Ex. 1, NYU_00009755 at -09788).[1]

**Response:** Admit.

2.      The Policy was specifically "designed to comply with . . . Title IX of the Education Amendments of 1972 . . . and . . . the New York State and City human rights laws." (*Id.*).

**Response**: Admit that the Policy states it was designed to comply with Title IX and the New York State and City human rights laws, but deny that it was enforced in compliance therewith.

3.      Under the Policy, Prohibited Conduct includes "Stalking," which includes

"a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury or experience substantial emotional distress. Course of conduct means two or more acts including but not limited to unwelcome acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person . . . Substantial emotional distress means significant mental suffering or anguish. Stalking includes cyber-stalking, a particular form of stalking in which electronic media such as . . . social networks, . . . cell phones, texts, or other similar … forms of contact are used."

(*Id.* at -09795; Ex. 2, NYU_00001803 at -01805).

---

[1]  NYU has amended the Policy several times, including over the period relevant to the Amended Complaint. However, because the amendments made during this time are not relevant to the allegations in the Amended Complaint, (*see* Ex. 2, NYU_00001803 at -01804), NYU will refer only to the April 18, 2018 version of the Policy for the sake of simplicity.

**Response**: Admit.

4.      Prohibited Conduct also includes "Sexual or Gender-Based Harassment," which is defined as "any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when . . . Such conduct has the purpose or effect of unreasonably interfering with an individual's learning, working, or living environment; in other words, it is sufficiently severe, pervasive, or persistent as to create an intimidating, hostile or offensive learning, working, or living environment under both an objective – a reasonable person's view – and subjective – the Complainant's view – standard (hostile environment)."  (Ex. 1, NYU_00009755 at -09793-94; Ex. 2, NYU_00001803 at -01804).

**Response**: Admit.

5.      Prohibited Conduct also includes "Sexual Exploitation," which includes "non-consensual use of another individual's nudity or sexuality," such as "taking pictures . . . of another person . . . where such person has a reasonable expectation of privacy . . . without the affirmative consent of all parties."  (Ex. 1, NYU_00009755 at -09795; Ex. 2, NYU_00001803 at -01804).

**Response**: Admit.

6.      Under the Policy, "[v]iolating the terms of a protective measure, including but not limited to no contact, persona non grata, or other behavior-related directives, is a violation of this policy and will subject the person who violates the protective measure to additional charges and sanctions under this policy."  (Ex. 1, NYU_00009755 at -09791).

**Response**: Admit.

7.      Under the Policy, the procedures for reporting Prohibited Conduct committed by students are set forth in NYU's Reporting, Investigating, and Resolving Sexual Misconduct,

Relationship Violence, and Stalking - Complaints Against Students ("the Procedures").   (*Id.* at -09790); *see* (Ex. 3, NYU_00029043).[2]

> **Response:** Admit that the Policy sets forth procedures for reporting Prohibited Conduct. However, the term "report" is not defined by the Policy.  (Def. Ex. 3, NYU_00029043 ("…capitalized terms used in these Procedures are defined in the Policy"); Def. Ex 1, NYU_00009788-9799 (Nowhere defining "report")).  Regardless, Mary Signor testified that NYU is able to investigate instances of misconduct under the Policy even when a reporting student asks NYU not to do so.  (Pl. Ex. 8 at 223:8-224:12).

8.      Under the Procedures, a Complainant may make a report of Prohibited Conduct committed by another student (the Respondent).   "Upon receipt of a report, the Title IX Coordinator will conduct an initial assessment . . . After the initial assessment, the Title IX Coordinator will determine whether the circumstances warrant proceeding to an investigation." (*Id.* at -29043, -29045).

> **Response:** Admit that the Procedures set forth NYU's obligation to respond to a report of Prohibited Conduct.  However, the term "report" is not defined by the Procedures.  (Def. Ex. 3, NYU_00029043 ("…capitalized terms used in these Procedures are defined in the Policy"); Def. Ex 1, NYU_00009788-9799 (Nowhere defining "report")).  Regardless, Mary Signor testified that NYU is able to investigate instances of misconduct under the Policy even when a reporting student asks NYU not to do so.  (Pl. Ex. 8 at 223:8-224:12).

9.      Under the Policy, all NYU students have the right to "[m]ake a decision about whether or not to disclose a crime or violation and participate in NYU's disciplinary process." (Ex. 1, NYU_00009755 at -09797).

---

[2]  Like the Policy, the Procedures are revised periodically.  The Procedures applicable to the allegations in the Amended Complaint have an effective date of August 25, 2017.

**Response**: Admit.  Plaintiff did disclose Jane Roe's violations to NYU.  (Def. Ex. 32, NYU_00009570, 572, 574; Def. Ex. 52, NYU_00010106, NYU_00010113-114; Def. Ex. 53, NYU_00010135, NYU_00010138-139; Def. Ex. 1, NYU_00009766-768; Def. Ex. 14_00011361-365).

10.     Under the Procedures, "[w]here possible based on the facts and circumstances, NYU will seek action consistent with the Complainant's request to maintain his/her privacy and/or not conduct further Investigation."  (Ex. 3, NYU_00029043 at -29044).  NYU "seeks to be sensitive to those Complainants who seek access to Confidential Resources, but may not wish to report Prohibited Conduct."  (*Id*. at -29043).

**Response:** Admit that this is what the documents cited say but note that Plaintiff never requested that NYU not conduct a further Investigation of his allegations against Jane.  (*See* Pl. Ex. 3, Plaintiff Tr. 348:14-349:8 ("I wanted NYU to conduct a process in which they investigated my claims against Jane and sanction her for finding of responsibility, if it came to that); *see also* Def. Ex. 79 (complaint filed by Plaintiff against Jane).  Regardless, Mary Signor testified that NYU is able to investigate instances of misconduct under the Policy even when a reporting student asks NYU not to do so.  (Pl. Ex. 8 at 223:8-224:12).

11.     NYU will only investigate a complaint without a Complainant requesting an investigation "[w]here the balance of factors requires that further investigation be conducted."  (*Id*. at -29045).  Relevant factors include "the risk that the Respondent may commit additional acts of Prohibited Conduct or other violence, taking into consideration, among other matters, any known history of arrests, violence, or other complaints . . . threats of future violence made by the Respondent, and whether multiple Respondents were involved," whether a weapon was involved or the conduct was "unusually" violent, "whether the report reveals a pattern of Prohibited

Conduct," whether the Complainant is a minor, and whether "there is other relevant evidence" besides the Complainant's report.  (*Id*. at -29044).

> **Response**: Deny — Mary Signor testified that NYU is able to investigate instances of misconduct under the Policy even when a reporting student asks NYU not to do so.  (Pl. Ex. 8 at 223:8-224:12).  Additionally, Jane Roe specifically asked NYU not to investigate any potential misconduct prior to the spring of 2018.   (Plaintiff's Exhibit 1, NYU_00002984).  Notwithstanding Jane Roe's request that NYU limit its investigation, NYU investigated conduct dating as far back as fall 2016.  (Def. Ex. 1, NYU_00009755).  None of the factors listed in Paragraph 11 were present for the charges against Plaintiff.  (Def. Ex. 3 at NYU_00029044).

12.     In practice, NYU does not "force complainants to make complaints.  Generally speaking, [NYU does not] pursue an investigation without the cooperation of a complainant."  (Ex. 4, Hodge Tr. 139:18-22)  Only "where if somebody is a grave risk to the University community like they've brutally assaulted or attempted murder or something very serious, then there's a risk committee that the University has, they would meet and make a decision about what, if any, action should be taken in those circumstances, but ultimately complainants drive the decision-making . . .If they don't ever express that they want an investigation, well, by its very nature we're not assessing the complaint."  (*Id*. 138:14-139:10; *see also* Ex. 5, Signor Tr. 223:14-224:17 (NYU would consider continuing with an investigation "even if the aggrieved student asked you not to" if that student's "life is in danger" or if the NYU community were in danger but generally not for "[a]ny other reasons."); Ex. 6, Stabile Decl. ¶¶ 9-10 ("In general, it is very rare for NYU to proceed to an investigation of allegations absent the express request of a complainant.")).

**Response**: Deny — Jane Roe specifically asked NYU not to investigate any potential misconduct prior to the spring of 2018. (Pl. Ex. 1, NYU_00002984). Jane did not allege that Plaintiff brutally assaulted her, attempted to murder who, or anything of a comparable nature. (Def. Ex. 43, NYU_00029166). Notwithstanding Jane Roe's request that NYU limit its investigation, NYU investigated conduct dating as far back as fall 2016. (Def. Ex. 1, NYU_00009755).

13.     After the initial assessment, "NYU may seek a form of Administration Resolution" if both the Complainant and Respondent agree to participate. (Ex. 3, NYU_00029043 at -29046-47). "If an agreement acceptable to each of NYU, the Complainant, and the Respondent is reached," then "the matter is considered to be resolved." Such agreements can include "academic accommodations," "remedies designed to maximize the Complainant's access to educational, extracurricular, and/or employment activities," or "increased monitoring, supervision, and/or security" at certain locations or activities. (*Id.* at -29047).

**Response**: Admit the substantive aspects of Paragraph 13 but note that the quote in the first sentence should read "NYU may seek a form of Administrative Resolution." (Defendant's Ex. 3, NYU_00029046-47).

14.     If the Title IX Coordinator determines "that a matter is to be investigated," she will "designate an investigator(s) from the Office of Equal Opportunity" to investigate the report. (*Id.*). The Office of Equal Opportunity's ("OEO") practice is for at least two investigators to be assigned to each Title IX investigation because "it's good practice to have more than one set of eyes and ears in an interview . . . [T]wo people collaborate and it's helpful for the investigation to have another person there." (Ex. 4, Hodge Tr. 51:7-20).

**Response**: Admit that this language appears in the policy but deny that the Title IX Coordinator is the only individual to whom a report can be made. (Pl. Ex. 2, Hodge Tr. 318:4-9 ("by the very nature if we're aware of something, the Office of Equal Opportunity is aware of it so responsible employees, it's inherent. If we know about it, it's been reported appropriately")).

15.     During the Investigation, the Complainant and Respondent "have an equal opportunity to be heard, to submit information and corroborating evidence, and to identify witnesses." (Ex. 3, NYU_00029043 at -29047). For Investigations where the Respondent has elected to file a cross-complaint against the Complainant, NYU investigates and adjudicates the Respondent's allegations concurrently with its investigation of the original complaint. (Ex. 6, Stabile Decl. ¶ 11). Relevant witnesses cannot participate unless they "have information deemed relevant to the Investigation" by the investigators. (Ex. 3, NYU_00029043 at -29047).

**Response**: Admit that the Procedures promise the Complainant and Respondent an equal opportunity to be heard, to submit information and corroborating evidence, and to identify witnesses during the investigation. Admit that the Procedures give the investigators the power to determine which witnesses are relevant. Deny that Plaintiff was afforded an equal opportunity to be heard during the investigation because Plaintiff was not given notice of all the allegations against him (*cf.* Def. Ex. 43, NYU_00029166 (listing four allegations); *with* Def. Ex. 1, NYU_00009755-9756 (listing nine allegations)), nor was he shown and given an opportunity to respond to all of the evidence submitted against during his interview with the investigators. (Def. Ex. 14, NYU_00011367). Plaintiff was also not provided offline access to the draft investigation report, limiting his ability to review and respond to the allegations therein. (Def. Ex. 10, Plaintiff Tr. 34:15-21). NYU also failed

to investigate or interview relevant witnesses, such as "Sally Soe" who was alleged to be an alias used by Jane to manipulate Plaintiff. (Def. Ex. 14, NYU_00011362). Deny that NYU investigates and adjudicates cross-complaints concurrently with the original complaint. To the contrary, Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]." (Def. Ex. 10, Plaintiff Tr. 87:20-25).

16.     On multiple occasions, NYU has investigated a male respondent's cross-complaint concurrently with a female complainant's allegations. (Ex. 6, Stabile Decl. ¶ 11).

**Response**: Deny that any documentary evidence exists that supports this assertion. (*See* Pl. Ex. 4, NYU_00037051). Paragraph 11 of Ms. Stabile's declaration is also devoid of any reference to when these cross-complaints allegedly occurred. (Def. Ex. 6, Stabile Decl. ¶ 11). When Plaintiff sought to file a cross-complaint, he was told by Mary Signor that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]." (Def. Ex. 10, Plaintiff Tr. 87:20-25).

17.     The investigators have "discretion to determine the relevance of any proffered evidence and may determine that certain types of evidence should be included or excluded in the determination of responsibility." (Ex. 3, NYU_00029043 at -29047).

**Response**: Deny — no such quotation exists in the record at Defendant's Exhibit 3, NYU_00029047. Additionally, it is not the investigator's role to make a determination of responsibility. (Pl. Ex. 2, Hodge Tr. 263:5-17 ("I took no position on [whether Plaintiff was responsible] because it wasn't my role").

18.     "A Complainant's or Respondent's prior sexual history with persons other than the other party involved in the investigation will not be considered as evidence during an Investigation or Hearing." (*Id*. at -29048).

**Response**: Admit that paragraph 18 accurately quotes the Procedures but deny that the policy prohibits the introduction of such evidence for credibility purposes. (Def. Ex. 3 at NYU_00029048).

19.     After the Investigation is complete, the investigators prepare a "report that summarizes the information gathered.  Both the Complainant and the Respondent will be given the opportunity to review the draft Investigation report, submit any additional comment or information to the Investigator, and identify any additional information or witnesses." (*Id*.).  "The purpose of the draft report review period is to enable the Complainant and Respondent an opportunity to review the evidence gathered, to clarify and/or expand upon information contained in the report, and to provide additional evidence." (*Id*.).

**Response**: Admit that this is the language contained in the Procedures.  Deny that the draft Investigation report, as provided, enabled Plaintiff to effectively review the evidence gathered, clarify and/or expand upon information contained in the report, and to provide additional evidence.  By the time the draft Investigation report was provided, Plaintiff was in Australia, where he had limited internet access that hampered his ability to review the report, and where he had no access to his hard drive, which contained additional relevant evidence.  (Pl. Ex. 3, Plaintiff Tr. 142:8-18; *Id*. at 353:22-354:5 (stating that if the hearing had occurred after Plaintiff returned from Australia, he would have been able to access the backup of his messages with Jane).

20.     The investigators will then "issue a determination as to whether a reasonable fact-finder . . . could determine that there is sufficient evidence to support a finding that a violation of the Policy occurred." (*Id.*).  If so, the report is submitted to the Office of Student Conduct ("OSC"). (*Id.*).

**Response**: Admit that this is what the Policy states.

21.     Once the report is submitted, OSC "will receive and review the Investigation report. The OSC Administrator may accept the report as rendered or may request that an Investigator conduct additional interviews or seek out other evidence as deemed to be appropriate." (*Id.* at -29049).

**Response**: Admit that this is what the Policy states.

22.     If OSC accepts the report, the "Complainant and Respondent will be notified in writing of the date, time, and location of the hearing, the charges to be reviewed by the Adjudicator, including the date, time, location and factual allegations concerning the violation; the provisions of the Policy alleged to have been violated; and the sanctions to be imposed." (*Id.* at -29050).

**Response**: Admit that this is what the Policy states except that the final line should read: "and the sanctions that may be imposed."  Def. Ex. 3 at NYU_00029050.

23.     When an investigation report is submitted, OSC "look[s] to schedule in a timely fashion.  And we have held hearings with complainants and respondents being across the globe. [NYU] do[es] not delay until students return to NYU's main campus."  (Ex. 7, Maeder Tr. 69:25-70:5).

**Response**: Deny that Paragraph 23 is supported by the Policy.

24.     "Permission to postpone a hearing may be granted provided that the request to do so is based on a compelling emergency."  (Ex. 3, NYU_00029043 at -29050).

**Response**: Admit that this is what the Procedures state.  Plaintiff's request that the hearing

be delayed until he returned to New York so that he may attend the hearing in person was

denied.  (Pl. Ex. 3, Plaintiff Tr. 240:13-25).

25.    "The Adjudicator has the discretion to designate the hearing format."   (*Id*.

at -29051).  At the hearing, the Complainant and Respondent "will be allowed to propose questions

to the Adjudicator who will screen the questions for appropriateness and relevance."  (*Id*.)

**Response**: Admit that this is what the Procedures state.

26.    After the hearing, "the Adjudicator will determine whether there is sufficient

information, by a preponderance of the evidence, to support a finding of responsibility for a

violation of the Policy."  (*Id*. at -29052).  Considerations as to the appropriate sanction will include

"the impact of the conduct on the Complainant," "whether the Respondent has accepted

responsibility for the conduct," and "maintenance of a safe and respectful environment conducive

to learning."  (*Id*.).

**Response**: Deny to the extent that Paragraph 26 is an incomplete statement of fact.  The

full text of the provision quoted by Paragraph 26 explains that the Adjudicator will

determine the appropriate sanction by considering a number of factors, including:

· the nature of the conduct at issue, including whether it involved violence;
· the impact of the conduct on the Complainant;
· the impact or implications of the conduct on the NYU community;
· any previous conduct violations by the Respondent, both at NYU or elsewhere, as well as any criminal convictions;
· whether the Respondent has accepted responsibility for the conduct;
· maintenance of a safe and respectful environment conducive to learning; and
· any other mitigating, aggravating, or compelling circumstances to reach a just and appropriate resolution in each case.

27.     Any student "determined by NYU to have committed an act of Prohibited Conduct in violation of this policy is subject to disciplinary action, up to and including separation from NYU." (Ex. 1, NYU_00009755 at -09790).

**Response**: Admit that this statement appears in NYU's Policy.  Deny that this Policy provision applied to Plaintiff, who was specifically promised by Allen McFarlane, the Assistant Vice President for Outreach and Engagement at NYU and Plaintiff's respondent facilitator, that "there is no way you'll be expelled and the worst-case scenario will be at worst a one-semester suspension."  (Def. Ex. 10, Plaintiff Tr. 111:22-112:1).

28.     Both the Complainant and Respondent have the right to appeal.    (Ex. 3, NYU_00029043 at -29053).  There are three grounds for an appeal: "(1) a material procedural error, (2) previously unavailable relevant evidence that could affect the outcome; and/or (3) the sanction being substantially disproportionate to the violation." (*Id*.).  Appeal statements cannot be longer than three pages.  (*Id*.).

**Response**: Admit that both parties have a right to appeal based on the three grounds listed above.  Deny that appeal statements cannot be longer than three pages.  The language of the Procedures is permissive, stating that "[a]ppeal statements should be no more than three (3) pages…." (Def. Ex. 3 at NYU_00029053).

29.     Throughout the Title IX Investigation and Adjudication process, Complainants and Respondents have "the right to be accompanied by an advisor of his/her choice."  (*Id*. at -29048).  The advisor "may be anyone of the individual's choosing who is not otherwise a party or witness involved in the Investigation." (*Id*.).

**Response**: Admit that this is what the Procedures state but note that Plaintiff requested that NYU provide him with a university appointed advisor.  Def. Ex. 10, Plaintiff Tr. 122:3-11.

II.     **NYU Personnel Involved in Plaintiff's Disciplinary Process**

30.     Mary Signor, the Executive Director of the Office of Equal Opportunity ("OEO") from 2009 to 2018, is NYU's Title IX Coordinator.  She is now Assistant Vice President for OEO. (Ex. 5, Signor Tr. 17:20-18:24).

> **Response**: Admit that this reflects Signor's deposition testimony.

31.     Samuel Hodge, a Title IX Investigator, and Lauren Stabile, NYU's Title IX Coordinator II, were assigned to investigate Jane Roe's Complaint against Plaintiff John Doe ("Plaintiff").  (Ex. 4, Hodge Tr. 39:18-41:10).  Lauren Stabile replaced Jacqueline Cornell, a Title IX Investigator who participated in Jane Roe's interview but left NYU shortly thereafter.  (*Id*. at 41:15-24; 49:19-25).

> **Response**: Admit that this reflects Hodge's deposition testimony.

32.     Craig Jolley is the Director of OSC.  He was the Adjudicator for Jane Roe's Complaint against Plaintiff.  (*See generally* Ex. 2, NYU_00001803; Ex. 8, Jolley Decl. ¶1).

> **Response**: Admit.

33.     Colleen Maeder was the Assistant Director of OSC.  Her responsibilities included coordinating the adjudication process for Title IX hearings.  (Ex. 7, Maeder Tr. 20:11-21:22).  She coordinated the hearing and appeal process for Jane Roe's Complaint against Plaintiff.  (*Id*. at 41:11-16).

> **Response**: Admit that this reflects Maeder's deposition testimony.  Additionally, on January 10, 2020, Colleen Maeder emailed Mathew J. L. Shepard a spreadsheet containing hearing and appeal statistics from academic year 2015-2016 through academic year 2019-2020.  (Pl. Ex. 7, NYU_00016362).

34.     Allen McFarlane is the Assistant Vice President for Outreach and Engagement at NYU.  (Ex. 9, McFarlane Tr. 12:6-16).  He also serves as a facilitator for Respondents in NYU's

disciplinary process.  (*Id*. at 24:13-25:15).  The role of a facilitator is to offer "[g]uidance related to what happens in [Title IX proceedings] in terms of the procedures, the steps, answering questions based upon information [the respondent] has received to help him make sure that he understands and gets his questions answered."  (*Id*. at 25:20-26:7).

> **Response**: Admit that this reflects McFarlane's testimony but deny that his role was limited in this way.  (Pl. Ex. 18, McFarlane Tr. 26:12-16).  McFarlane promised Plaintiff that "there is no way you'll be expelled and the worst-case scenario will be at worst a one-semester suspension."  (Def. Ex. 10, Plaintiff Tr. 111:22-112:1).

### III.    Plaintiff's Relationship with Jane Roe Before NYU

35.    Plaintiff was a high school senior when he met Jane Roe ("Jane") while attending an internship program in August 2015.  They "began to text every day and became really close." (Ex. 1, NYU_00009755 at -10006).  At certain points between 2015 and 2018, Plaintiff and Jane were in a romantic relationship.  (Ex. 10, Plaintiff Tr. 19:21-24).

> **Response**: Admit.

36.    Jane told Plaintiff that she came from a conservative family that would never approve of her extensive communication with Plaintiff.  (Am. Compl. ¶ 19).  Based on Jane's representations, it was Plaintiff's understanding that Jane's "parents were not supportive of their relationship" and "monitored [Jane's] phone/communications."  (Ex. 1, NYU_00009755 at -09763).

> **Response**: Admit.

37.    Plaintiff and Jane attempted to conceal their communications from Jane's parents. Jane "created a Facebook account using an alias" to communicate with Plaintiff.  (*Id*. at -09758, -09808).  Plaintiff and Jane talked late at night or via the social media application

WhatsApp to avoid detection.  (*Id.* at -09763).  Jane "claimed that [her parents] monitored her iMessages," and Plaintiff "was under the impression that they did."  (Ex. 10, Plaintiff Tr. 51:8-19).

**Response**: Admit that is the exhibits state but deny that Paragraph 37 contains any material facts that would assist the Court in resolving a claim or defense in this matter.

38.    The relationship quickly became "toxic."  (Am. Compl. ¶ 2).  As early as April 30, 2016, Plaintiff threatened Jane that if she did not "have the decency to stay / Then I will force you to . . . I  will text your parents / Idc [I don't care] what they say to me / You watch out you idiot."  (Ex. 11, P009355 at -09384-85).  Jane responded, "So you're going to make me stay with threats?" Plaintiff replied, "Yes."  (*Id.* at -09385).

**Response**: Admit that Plaintiff sent the messages quoted from Defendant's Exhibit 11 but deny their applicability to the present matter.  The texts in question were sent while Plaintiff was still in high school, more than 15 months before Plaintiff enrolled at NYU and were not the subject of the Title IX hearing or before the adjudicator or the appeals panel.  *See generally* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr. 23:14-17 (Craig Jolley stating that he was not going to consider conduct from before Plaintiff's enrollment at NYU because "[Jolley] can't hold [John] responsible for violation of NYU policy when he wasn't an NYU student…"); Def. Ex. 14.  Object that Paragraph 38 is not supported by admissible evidence.

39.    The next day, Plaintiff told Jane if she did not promise to stay with Plaintiff he would "bash my head again;" when she refused he said, "Ok I'm going to go bash it."  (Ex. 12, P009394 at -09407).  Jane told Plaintiff, "I don't want you hurt . . . Promise."  Plaintiff responded, "You promise."  (*Id.* at -09418).  Jane agreed to promise, but said, "I'm not happy about it."

Plaintiff responded, "Idc [I don't care]."  Jane told Plaintiff, "I want to go . . . But I can't now . . . You  suck."  (*Id*. at -09418, 09420).

> **<u>Response</u>**: Admit that Plaintiff sent the messages quoted from Defendant's Exhibit 11 but deny their applicability to the present matter.  The texts in question were sent more than 15 months before Plaintiff enrolled at NYU and were not the subject of the Title IX hearing or before the adjudicator or the appeals panel.  *See* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr. 23:14-17 (Craig Jolley stating that he was not going to consider conduct from before Plaintiff's enrollment at NYU because "[Jolley] can't hold [John] responsible for violation of NYU policy when he wasn't an NYU student…"); Def. Ex. 14.  Object that Paragraph 39 is not supported by admissible evidence.

40.    Later that day, Plaintiff texted Jane , "I threatened you / I black mailed you / I said mean things / I will apologize."  (*Id*. at -09459).   Jane responded, "If the same thing were to happen You'd do it again / So don't [apologize]."  (*Id*.).

> **<u>Response</u>**: Admit that Plaintiff sent the messages quoted from Defendant's Exhibit 11 but deny their applicability to the present matter.  The texts in question were sent more than 15 months before Plaintiff enrolled at NYU and were not the subject of the Title IX hearing or before the adjudicator or the appeals panel.  *See* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr. 23:14-17 (Craig Jolley stating that he was not going to consider conduct from before Plaintiff's enrollment at NYU because "[Jolley] can't hold [John] responsible for violation of NYU policy when he wasn't an NYU student…"); Def. Ex. 14.  Object that Paragraph 40 is not supported by admissible evidence.

41.    According to Plaintiff, he learned during the 2017-2018 school year that Jane had told multiple people "that she was in a relationship with [Plaintiff] due to blackmail."  (Ex. 1,

NYU_00009755 at -10007; *see also* Ex. 13, Hearing Tr. 291:14-18 (Jane's friend stating that Jane's "parents did not like the fact that she was ever friends with him.  And when she was trying to cut off contact with him, he would blackmail her…")).

> **Response**: Admit that Plaintiff learned Jane had told multiple people that she was in a relationship with him due to blackmail.  Deny that Plaintiff did in fact blackmail Jane.  (*See* Def. Ex. 1, NYU_00010084-090 (communications and pictures depicting Plaintiff and Jane's mutual relationship).

42.     Plaintiff and Jane graduated from different Connecticut high schools in 2016.  In the fall, Plaintiff enrolled at a university in Connecticut ("CT University") and Jane enrolled at NYU. (Ex. 1, NYU_00009755 at -09758, -09762).  During their freshman year of college, Plaintiff visited Jane at NYU several times.  (*Id*. at -10006; Ex. 10, Plaintiff Tr. 153:12-16).

> **Response**: Admit but note that Plaintiff's visits to NYU were mutual and that Jane had expressed that she was happy with Plaintiff visiting.  (Def. Ex. 13 144:15-145:1; *see also* Def. Ex. 1, NYU_00010079 (""complainant was aware of all of my visits [to NYU while he was enrolled at CT University] and it was mutually agreed at all times, at times she would even push me to stay for longer…")).

43.     In the fall of 2016, Plaintiff claims that Jane told him that she had been sexually assaulted by four NYU students.  (*See, e.g.*, Ex. 14, NYU_00011361 at -11364).  According to Plaintiff, that revelation had a great impact on him, and it "hurt [him] vicariously."  (Ex. 1, NYU_00009755 at -10079).

> **Response**: Deny to the extent Paragraph 43 characterizes Plaintiff's statement as false.  The evidence shows that Jane told Plaintiff that she had been sexually assaulted by four NYU students.  (Def. Ex. 14, NYU_00011364).  The revelation that Jane had been brutally

sexually assaulted was a key motivating factor in Plaintiff's decision to transfer to NYU; something he even wrote about in his transfer application. (Def. Ex. 14, NYU_00011364).

44.     During his freshman year, Plaintiff applied to NYU as a transfer student. (*Id.* at -09765). Jane reviewed his application essay for him and was open to his transfer to NYU, according to Plaintiff. (*Id.*).

> **Response**: Deny to the extent that Paragraph 44 characterizes Plaintiff's statement as
> anything but true. The evidence shows that Jane reviewed Plaintiff's application essay and
> had expressed support for his transfer to NYU. (Def. Ex. 1, NYU_00009765).

45.     Jane ended her relationship with Plaintiff in March of 2017 and told Plaintiff that "she doesn't want to be afraid of" him. (Ex. 15, P057258 at -57374; Ex. 10, Plaintiff Tr. 21:2-13).

> **Response**: Deny to the extent that Paragraph 45 implies that Jane was in fact afraid of
> Plaintiff, or that Plaintiff had reason to believe that Jane was afraid of him. The evidence
> shows that throughout Plaintiff's time at NYU, Jane would frequently communicate with
> Plaintiff, including by visiting him in his room. (Def. Ex. 10, Plaintiff Tr. 21:21-22:4; (*see
> also* Def. Ex. 1, NYU_00010084-090 (communications and pictures depicting Plaintiff and
> Jane's mutual relationship).

46.     Plaintiff learned he had gotten in at NYU as a transfer student on May 9, 2017. (Ex. 16, P045456 at -05670). Afterward, according to Plaintiff, Jane's "tone" about the prospect of Plaintiff transferring to NYU "very much changed" and she tried to "prevent [him] from going to NYU." (Ex. 13, Hearing Tr. 146:21-148:25; Ex. 1, NYU_00009755 at -10006).

> **Response**: Admit.

47.     Jane told Plaintiff, "I can't handle you being at NYU. I don't want you there." (Ex. 13, Hearing Tr. 148:5-24). In messages between Plaintiff and Jane, she expressed concern that if

he were at NYU, ""It'd be so easy . . . For you to get between me and my family / Do something

that threatens me . . . It'd be so easy / All it'd take . . . Is you getting mad . . . And then your excuse

will be . . . I'm sorry I got angry / Or / I'm sorry I was concerned about bleh bleh bleh."  (Ex. 17,

P008425 at -08488-89).  Jane also told Plaintiff, "My heart legit races In fear When I text you."

(*Id.* at -08489).  Plaintiff responded, "You know if I went to [CT University] I'd be more likely to

get in between you and your family?"  (*Id.* at -08490).

> **Response**: Deny that Paragraph 47 contains any material facts that would assist the Court
>
> in resolving a claim or defense in this matter; the texts in question were sent on July 25
>
> 2017, before Plaintiff enrolled at NYU, and were not were not the subject of the Title IX
>
> hearing or before the adjudicator or the appeals panel.  *See generally* Def. Ex. 1; *see also*
>
> Def. Ex. 13, Hearing Tr. 23:14-17 (Craig Jolley stating that he was not going to consider
>
> conduct from before Plaintiff's enrollment at NYU because "[Jolley] can't hold [John]
>
> responsible for violation of NYU policy when he wasn't an NYU student…"); Def. Ex. 14.

### IV.   Plaintiff Transfers to NYU

48.   Plaintiff nevertheless decided to enroll at NYU, but he concealed his final decision

from Jane.  (Ex. 1, NYU_0009755 at -09765).

> **Response**: Deny that the exhibit cited by NYU supports NYU's contention that Plaintiff
>
> "concealed" his decision to enroll at NYU.  (Def. Ex. 1 at NYU_0009765).  Plaintiff
>
> decided to enroll at NYU despite Jane's change in tone and that Plaintiff did not
>
> affirmatively tell Jane of this decision prior to his transfer.  (Def. Ex. 1 at NYU_0009765).

49.   During the summer of 2017, Plaintiff received his housing assignment at NYU.  He

switched assignments with another student for another dormitory, which he knew was the

dormitory in which Jane lived.  (Ex. 13, Hearing Tr. 150:12-151:13).

**Response**: Deny to the extent that Paragraph 49 implies that Plaintiff switched his housing assignment to be closer to Jane. Plaintiff switched dormitories with another student through NYU's roommate swap because he "didn't want to live in Lafayette, and [he] didn't want to pay $10,000 a semester for a single." (Def. Ex. 13, 150:12-16). The only person who responded to Plaintiff's request to swap housing assignments was a student from University Hall. (Def. Ex. 13, Hearing Tr. 150:17-19).

50.     Plaintiff also selected Jane's major as his own, which had not been his major at CT University. (*Id*. at 43:19-44:2).

**Response**: Deny to the extent that Paragraph 50 implies that Plaintiff changed majors after transferring to NYU to be closer to Jane. While Public Health was not Plaintiff's original major, he had been on the pre-med track and was the treasurer for a club at CT University that was primarily involved in public health. (Def. Ex. 13, Hearing Tr. 149:18-25; 138:16-139:2). Plaintiff and Jane never shared a class together, indeed, Jane's major also changed from public health to ecological design. (Def. Ex. 13, Hearing Tr. 31:22-24). Plaintiff also was enrolled in a business studies minor at NYU and went abroad to NYU Sydney during the fall 2018 semester. (Def. Ex. 13, Hearing Tr. 138:22-139:2).

51.     On August 30, 2017, Plaintiff initiated a video call with Jane from Washington Square Park, revealing he had transferred to NYU and would be living in the same dorm. (*Id*. at 43:19-44:2; Ex. 1, NYU_0009755 at -09759; Ex. 18, P005421 at -05467-71).

**Response**: Admit that Plaintiff called Jane by video and shared the news that he had enrolled at NYU and that for the reasons set forth in Plaintiff's Response to ¶ 49, Plaintiff was living in the same building as Jane during the 2017-18 school year. (Def. Ex. 13 at 43:19-44:2).

52.     Jane was surprised and upset.  (Ex. 18, P005421 at -05467-71) ("You live in [my dorm] don't you . . . Oh my god . . . Oh my god / Oh my god . . . I hate my life / I hate everything / I'm going to live in constant fear . . . I hate everything / I hate everything / So much . . . You know where I live / YOU KNOW WHERE I LIVE . . . I hate my life . . . this year / Is going to be hell again").  Plaintiff knew at this point that Jane "didn't want to talk to me and she just wanted me gone."  (Ex. 13, Hearing Tr. 155:21-156:3).

**Response**: Deny that Jane did not want to talk to Plaintiff because the evidence shows that Jane continued to communicate with Plaintiff and that the two ultimately resumed a romantic relationship.  (Ex. 1, NYU_00009759-9760 ("[Jane] stated that they continued to exchange text messages").  Jane also slept in Plaintiff's dorm room about five days a week during the fall 2017 semester.  (Def. Ex. 13, Hearing Tr. 157:14-23).  Jane continued to sleep in Plaintiff's room until the end of March 2018.  (Def. Ex. 13, Hearing Tr. 171:8-14; Pl. Ex. 16, NYU_00032902).

53.     Notwithstanding, the two students eventually resumed a relationship.  Jane told NYU that she frequently slept in Plaintiff's dorm room and engaged in some intimate conduct.  (Ex. 1, NYU_00009755 at -09759-60).

**Response**: Admit.

54.     Jane described Plaintiff during this period as "manipulative" and "controlling."  (*Id*. at -09760).  Throughout the fall 2017 semester, Plaintiff threatened to engage in self-harm, attempt suicide, or reveal details about Jane's relationship with Plaintiff to Jane's parents if she did not do as Plaintiff demanded.  Jane frequently asked Plaintiff to stop this behavior.  (*See, e.g.*, SOF ¶¶ 55-62).

**Response**: Deny the characterization of Plaintiff's conduct as "manipulative and controlling." Further deny to the extent that the messages relied upon for NYU's characterization are inapplicable to the present matter for the reasons set forth below in Plaintiff's Responses to ¶¶ 55-62. Further deny to the extent that Paragraphs 55-62 do not support NYU's contention that Plaintiff threatened to reveal details about Jane's relationship with Plaintiff to Jane's parents if she did not do as Plaintiff demanded. (*See, e.g.*, SOF ¶¶ 55-62). Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter. Object that Paragraph 54 is not supported by admissible evidence.

55.     On September 13, 2017, Jane messaged Plaintiff to, "Just stay away / Please . . . Stay away / I don't want to talk to you / Or see you . . . Just go away / Please / Please / I'm scared of you / You pretend to care / Just go away . . . PLEASE / please . . . why can't you take no for an answer / Please I'm scared / I can't take it / I feel like you're watching / All the time / I feel like you can do anything." (Ex. 19, P006752 at -06762-63). Plaintiff responded, "I wish I was dead." (*Id*. at -06763). Jane said, "Please just stay away / Please." (*Id*. at -06763-64). Plaintiff responded, "OK / I'll go die / Bye bye." (*Id*. at -06764). Jane sent Plaintiff dozens of additional messages that day asking him to leave her alone. (*Id.* at -06764-96).

**Response**: Deny the applicability of these messages to the present matter because the messages were not the subject of the Title IX hearing or before the adjudicator or the appeals panel. (*See* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr.; Def. Ex. 14). Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter. Object that Paragraph 55 is not supported by admissible evidence. Additionally, it is undisputed that Plaintiff and Jane resumed a relationship in the fall of 2017, that Jane

slept in Plaintiff's dorm room about five days a week during the fall 2017 semester, and

that the two engaged in intimate conduct.  (SOF ¶53; Def. Ex. 13, Hearing Tr. 157:14-23).

56.     On September 24, 2017, Plaintiff asked Jane, "You excited?"  Jane responded, "No,

I'm thinking about the fact that someone threatens to kill themselves every time I talk about not

speaking to them."  (Ex. 20, P007826 at -07885).  Plaintiff responded with over a hundred

consecutive messages.  (*Id* at -07885-07894).

> **<u>Response</u>**: Deny the applicability of these messages to the present matter because the
>
> messages were not the subject of the Title IX hearing or before the adjudicator or the
>
> appeals panel.  (*See* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr.; Def. Ex. 14).  Deny that
>
> these are material facts that would assist the Court in resolving a claim or defense in this
>
> matter.  Object that Paragraph 56 is not supported by admissible evidence.  Additionally,
>
> it is undisputed that Plaintiff and Jane resumed a relationship in the fall of 2017, that Jane
>
> slept in Plaintiff's dorm room about five days a week during the fall 2017 and that the two
>
> engaged in intimate conduct.  (SOF ¶53; Def. Ex. 13, Hearing Tr. 157:14-23).  Jane
>
> continued to sleep in Plaintiff's room until the end of March, 2018.  (Def. Ex. 13, Hearing
>
> Tr. 171:8-14; Pl. Ex. 16, NYU_00032902).

57.     On October 14, 2017, Plaintiff messaged Jane, "I'm begging you . . . I will call

public safety . . . And your parents" if she did not return to their dorm.  Jane agreed to return to

their dorm.  (Ex. 21, P036902 at -39788-89).

> **<u>Response</u>**: Admit that Plaintiff sent and received these messages out of concern for Jane's
>
> safety at the time because she had allegedly been brutally sexually assaulted in the past.
>
> (*See* Def. Ex. 21, P039790-792).  Further deny the applicability of these messages to the
>
> present matter because the texts in question were not the subject of the Title IX hearing or

before the adjudicator or the appeals panel.  (*See generally* Def. Ex. 1; *see also* Def. Ex. 13; Def. Ex. 14).

58.      On October 30, 2017, Jane predicted that Plaintiff would soon "pull the whole self harm / the whole suicide / the whole leaving thing."  (*Id.* at -38808-09).  Plaintiff responded, "no suicide / just self harm / I deserve [i]t."  (*Id.* at -38808.  Jane characterized Plaintiff's conduct as "BLACKMAIL."  (*Id.*).  Plaintiff messaged, "i cant even hurt myself properly. It takes so much wincing to do it."  (*Id*. at -38806).

> **Response**: Deny the applicability of these messages to the present matter because the
> messages were not the subject of the Title IX hearing or before the adjudicator or the
> appeals panel.  (*See* Def. Ex. 1; *see also* Def. Ex. 13, Hearing Tr.; Def. Ex. 14).

59.      Also on October 30, 2017, Jane discovered that Plaintiff had taken pictures of her sleeping without her consent.  The pictures included Jane's exposed stomach and partially exposed breasts.  (*Id*. at -38896-38898; Ex. 1, NYU_00009755 at -9760).  Plaintiff apologized for taking the pictures and admitted to using them for "selfpleasure[]."  (Ex. 21, P036902 at -38895; *see also id.* at -38802-04 ("I SAW YOUR SHIRT WAS OFF . . . AND I WANTED TO PLEASURE MYSELF . . . AND I TOOK A PIC . . . AND DELETED IT . . . AND STAYED ON WHATSAPP TO PLEASURE."); Ex. 13, Hearing Tr. 169:3-170:12 (admitting to taking pictures of Jane's "cleavage" and bare stomach without her consent when he was a student at CT University and after enrolling at NYU); Ex. 10, Plaintiff Tr. 156:9-19 ("I said that there was cleavage present.  I did not use the term "excessive." And when I said – I never said that her nipple was visible, I said there may have been a possibility, and I made this representation, that the slightest, slightest part of her nipple was visible, maybe this much (indicating), if at all, and that was only because of the excessive cleavage, but it was not taken for any sexual purpose.")).

**<u>Response</u>**: Deny that the photo of Jane's stomach referenced in the text above was the subject of the Title IX process.  Deny that Plaintiff took the photos at issue in the Title IX hearing while he was a student at NYU.  Further deny that Plaintiff took the photos at issue in the Title IX hearing with any sexual intent.  (Def. Ex. 13, Hearing Tr. 169:3-170:12 (denying any intent and explaining that he "very willingly let Jane delete all of [the photos]"); Def. Ex. 10, Plaintiff Tr. 156:18-23 ("it was not taken for any sexual purpose. It was taken I believe because she had put an elephant in her shirt and it was taken as a funny picture, not with any…sexual intentions whatsoever.")).  Deny the applicability of these messages to the present matter.  The messages in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel.  *See generally* Def. Ex. 1; *see also* Def. Ex. 13; Def. Ex. 14).  Deny that Jane discovered the images that were the subject of her Sexual Exploitation complaint on October 30, 2017.  Rather, Jane told NYU that she discovered the photos that were the subject of her Sexual Exploitation claim in early February of 2018.  (Def. Ex. 1, NYU_00010072).

60.     On October 31, 2017, Jane told Plaintiff, "I need to lessen interaction between us… Because it's bad for me."   (Ex. 21, P036902 at -38740).  She explained, "it's like every time you do something bad I realize just how bad it is And then you cut yourself or talk about leaving or killing yourself / And then I talk to you / And then you try to bring normalcy . . . And then I'm forced to forgive you." (*Id*. at -38738).  Plaintiff responded, apologizing, and said "I was wrong / I did something really bad." (*Id.* at -38737).  Jane told him, "Yeah you did." (*Id*.).  Plaintiff responded, "there is no reason to live / bye," and Jane pointed out, "You're doing it yet again." (*Id*.).  Plaintiff continued to threaten self harm, saying, "idc [I don't care] about my promise to you

/ i cant [stop] cutting myself." (*Id*. at -38736).  Two minutes later, he messaged, "STOP CALLING

NYU HEAKT [NYU Student Health] / ABOUT ME." (*Id*.).

> **Response**: Deny the applicability of these messages to the present matter because the
> messages were not the subject of the Title IX hearing or before the adjudicator or the
> appeals panel.  (*See generally* Def. Ex. 1; *see also* Def. Ex. 14).  Object that Paragraph 60
> is not supported by admissible evidence.

61.    Later on October 31, 2017, Plaintiff sent over 60 straight messages, finishing by

saying, "Where the fuck are you / I'm worried / I'm gonna call your dad / In 7 minutes." (*Id*.

at -38691).

> **Response**: Object that Paragraph 38 is not supported by admissible evidence and note that
> Plaintiff sent and received these messages because he was concerned for Jane's safety at
> the time because she had allegedly been sexually assaulted in the past.  (*See* Def. Ex. 21,
> P038691).  Deny their applicability to the present matter as the texts in question were not
> the subject of the Title IX hearing or before the adjudicator or the appeals panel.  (*See
> generally* Def. Ex. 1; *see also* Def. Ex. 14).

62.    On November 1, 2017, Jane told Plaintiff he "had no right" to "start talking about

self harm every time I try to distance myself." (*Id*. at -38627-28).

> **Response**: Deny the applicability of these messages to the present matter because the texts
> in question were not the subject of the Title IX hearing or before the adjudicator or the
> appeals panel.  (*See generally* Def. Ex. 1; *see also* Def. Ex. 14).

## V.    Plaintiff Repeatedly Makes Threats to Jane Roe and Disregards Her Requests to Him to Cease Contact

63.    By spring 2018, Plaintiff acknowledged his relationship with Jane "had

deteriorated" and he understood she was "trying to call it off." (Ex. 13, Hearing Tr. 171:15-20).

**<u>Response</u>**: Admit that Plaintiff's relationship had deteriorated and Jane tried to call things off in March 2018 but Jane sent mixed signals because she continued to sleep over Plaintiff's dorm room through March 2018.  (Def. Ex. 13, Hearing Tr. 171:15-20; (Def. Ex. 13 at 171:8-14; Pl. Ex. 16, NYU_00032902).

64.     Plaintiff was "confused and angry with Jane."  (Am. Compl. ¶ 103; *see also* Ex. 10, Plaintiff Tr. 41:5-42:7).

**<u>Response</u>**: Admit that Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7).  Jane would also demean and insult Plaintiff in front of her friends, claiming this was necessary to prevent her parents from finding out about their relationship.  (*See* Pl. Ex. 9, P050855-50875).

65.     On March 10, 2018, Plaintiff "kind of got angry" when Jane declined to talk to him about remarks she had made earlier in the evening.  (Ex. 13, Hearing Tr. 176:4-15).

**<u>Response</u>**: Deny to the extent Paragraph 65 implies the only reason Plaintiff was upset was the fact that Jane refused to talk to him in that moment.  Plaintiff was upset because Jane had said some "very mean things" about him to their friends, including homophobic slurs.  (Def. Ex. 13, Hearing Tr. 174:16-176:15).

66.     During the Hearing NYU conducted on December 10, 2018, to adjudicate Jane's allegations (the "Hearing"), Jane told NYU that Plaintiff "stayed at my door and said – he was basically banging on it saying, like, don't dare to, like, go with [other friends].… Like, just, I think, threats to come in and… MR. JOLLEY:  Did he come in? [JANE]:  No, he didn't, because I left the door locked."  (*Id*. at 65:14-23).

**Response**: Admit that Paragraph 66 accurately reflects Jane's testimony at the hearing but deny that Plaintiff banged on her door.  (Ex. 13, Hearing Tr. 177:6-13).

67.    Plaintiff admitted that during this incident he "got a little angry.  I never, like, banged on her door.  I did knock.  Maybe it was a little more aggressive, but my intention was not to bang.  And, you know, I just wanted – I wanted to talk to her, basically.  Because I just felt really hurt by what had happened."  (*Id.* at 177:6-13).

**Response**: Admit that the quoted text appears in the hearing transcript and note that Plaintiff was also upset with Jane for spreading malicious lies in an attempt to isolate him from his own friends.  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7).  Jane would also demean and insult Plaintiff in front of her friends, claiming this was necessary to prevent her parents from finding out about their relationship.  (*See* Pl. Ex. 9, P050855-50875)

68.    Another NYU student came to get Jane and when they left Jane's dorm, Plaintiff followed them "to see how it played out."  (*Id.* at 182:12-183:8).

**Response**: Deny —  Plaintiff had also been invited to join the group in Rubin Hall.  (Def. Ex. 13, Hearing Tr. 182:25-184:13 (Plaintiff explaining that "he asked me to go with him as well" and "it wasn't me forcing myself.  I did have an invite…").

69.    On March 23, 2018, Jane messaged Plaintiff, "I also don't really want to hang out with you" and "I do think we should put more distance / Between each other."  (Ex. 1, NYU_00009755 at -09892).  Plaintiff responded "Ok" on the condition that Jane "won't contact any of" the friends to whom he had introduced Jane, because "They're not your friends / They're mine." (*Id.*).  Jane refused.  (*Id.*).

**Response**: Deny — As part of the breakup of their relationship, Plaintiff and Jane had agreed to "cut down communication with outside friends…because…it was hurtful to see either of us hanging out with them, forcing them to…choose which one do they hang out with."  (Def. Ex. 13, Hearing Tr. 202:24-203:4).  This agreement was made between Plaintiff and Jane during an in-person conversation in Lipton Hall on April 8, 2018.  (Def. Ex. 13, Hearing Tr. 203:7-9; *Id*. at 200:18-19).

70.     That same day, Jane wrote Plaintiff "My assaulter doesn't get to talk to me / When I don't want to."  (*Id*. at -09883).  Plaintiff initially denied assaulting Jane, but later wrote, "I did once kind of.… I squeezed your brea[s]ts / I got you in the shower / I put my hands places they shouldn't go / And I'm sorry [that I] assaulted you / It just sucks."  (*Id*. at -09893); (*see id.* at -09894 ("I'm sorry / I said I didn't assault you / I did / I hurt you / I bullied you / And I assaulted you")).

**Response**: Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that these messages were sent and received by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).  These messages were also one sided, with other messages not submitted by Jane showing that she had assured Plaintiff that he did not assault her.  (Pl. Ex. 19 at P005957-P005959).

71.     On March 31, 2018, Plaintiff messaged Jane, "I've given up . . . / I tried overdosing on pills two weeks ago / I tried choking myself by crushing my throat / I just / I can't do this anymore / I'm sorry."  (*Id.* at -09899).  He reiterated that he was, "sorry for everything I've done . . .

Lying to you assaulting you.  Making you cry threatening you bullying you and everything . . . ."
(*Id*).

> **<u>Response</u>**: Deny that these are material facts that would assist the Court in resolving a
> claim or defense in this matter and note that these messages were sent by Plaintiff at a time
> that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and
> angry with Jane for spreading malicious lies in an attempt to isolate him from his own
> friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).
> Jane had also assured Plaintiff that he did not assault her.  (Pl. Ex. 19 at P005957-P005959).

72.    On April 2, 2018, Plaintiff contacted Jane's parents, ostensibly to express concern
for Jane's well-being.  (Ex. 13, Hearing Tr. 189:13-190:10; *see also* Ex. 1, NYU_0009755 at -
09903).  However, Jane told NYU that Plaintiff knew the messages would make her parents
extremely upset and that Plaintiff sent them in retaliation for Jane's failure to respond to messages
he had sent to her.  (Ex. 1, NYU_0009755 at -09903).

> **<u>Response</u>**: Admit that on April 2, 2018, Plaintiff contacted Jane's parents to express
> concern for Jane's well-being.  Deny that Plaintiff contacted Jane's parents in retaliation
> for Jane's failure to respond to messages he had sent to her.  (Def. Ex. 13, Hearing Tr.
> 189:13-190:10; *see also* Def. Ex. 1, NYU_0009755 at -09903).  The facts as stated in
> Paragraph 72 create an issue of fact on their own.  Plaintiff went on to explain at the hearing
> that his concern stemmed from the guilt he felt about not seeing Jane's text on the night
> Jane had been allegedly assaulted by the four NYU students.  (Def. Ex. 13, Hearing Tr.
> 191:6-20).

73.    On or around the same night, Plaintiff messaged Jane "Maybe I should call the
suicide hotline . . . You scare me as much as I scare you / Sometimes / Because I know that in your

hand / You can say something / That will actually make me kill myself / Just out of shame / It's not even a threat . . . You could do something / Where my instinct / is just to kill myself / I'd rather die than you have everyone know [I] assaulted you . . ." (*Id*. at -09904).

> **Response**: Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that NYU's selective quotation downplays Plaintiff's mental health concerns at the time.  For fuller context, Plaintiff texted "I'm thinking / That / Idk [I don't know] / Maybe I should call the suicide hotline / I've lost it / And instead I talked to [PII] / Fuck me / Ladoo if I call them / What if they liken / Come after me or something / You know you can spend nights in like an asylum / I don't want to do that…." (Def. Ex. 1 at NYU_00009904).

74.     Plaintiff also messaged Jane that he "overdosed on purpose / You tell me I'm fucked up for threatening / How fucked up it is / That you never asked if I'm ok."  (*Id*. at -09905). Plaintiff continued to message Jane, "You know I told someone what I'd [done to you] lol / Even that I assaulted you."  (*Id*.).

> **Response**: Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that these messages were sent and received by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).

75.     Plaintiff went to see Jane to "sort things out" at 4 AM.  (Ex. 13, Hearing Tr. 193:15-194:10).

**Response**: Admit that Plaintiff went to see Jane in Rubin Hall after she told him to come meet her there.  (Def. Ex. 13, Hearing Tr. 193:15-20).

76.     Upon discovering Jane was not where she had said she would be,[3] "there was a lot of anger.  It's like you're, again, avoiding to meet with me, the person who you're directly involved in."  (*Id*. at 195:18-25).

**Response**: Deny that this was the sole reason for why Plaintiff was upset with Jane that night.  In the weeks leading up to this night, Jane had spread malicious lies through Plaintiff's friend group, isolating him from his friends.  (Def. Ex. 13, Hearing Tr. 194:16-195:8 ("The frustration stemmed from the fact that in all our…friend group, she met with everyone to discuss the thing about me…I think five people blocked me in the span of maybe a week and a half."); *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7).

77.     Plaintiff messaged Jane: "Bitch / I FUCKING HATE YOU . . . I WALKED HERE / AND YOU WALKED BACK / NOGEY [sic] THE FUCK UP / OR I WILL TEXT YOU / THE NORMAL WAY / YOU BITCH / YOU ABSOLUTE BITCH[4] . . . I will call you / Until you talk to me . . . I will tell [Jane's roommate] / every fucking thing / If you don['t] wake up / And talk to me / In 10 minutes . . . I'm giving you 5 minutes / and [Jane's roommate] will kno[w] everything / Your parents will know everything / Press charges against me / I don't give a fuck."  (Ex. 1, NYU_0009755 at -09906) (emphasis in original).

**Response**: Admit that Plaintiff sent the above text messages because he was upset with Jane for spreading malicious lies against him to isolate him from his friends, for making homophobic slurs about him, and for lying about being in Rubin Hall after inviting him to

---

[3] Jane admitted that she had lied to Plaintiff about where she was "because [she] was afraid he was going to get angry and find" her. (Ex. 1, NYU_0009755 at -09904).

[4] Plaintiff later explained that texting "the normal way" meant via iMessage, and not via another medium.  Plaintiff was communicating to Jane that her parents would see his messages.  (Ex. 13, Hearing Tr. 270:2-16).

meet her there.  (Def. Ex. 13, Hearing Tr. 174:16-176:15; 194:16-195:8; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7).

78.     Plaintiff told NYU that by April 2, 2018, he "understood that, you know, she didn't want a friendship anymore," and that she "did not want to be in communication with [Plaintiff] or continue the relationship."  (Ex. 13, Hearing Tr. 200:6-14).

**Response**: Deny as an incomplete statement of fact as Jane agreed to talk to Plaintiff on April 8 in Lipton Hall.  (Def. Ex. 13, Hearing Tr. 204:8-9).

79.     On April 7, 2018, Plaintiff sent Jane several emails demanding she stop hanging out with their mutual friends: "Back out of the group chat, and back out of everyone and we will have no issue and I will not contact you.  Period.  That's final and that's the only way I will honor it."  (Ex. 1, NYU_0009755 at -09910).  When Jane did not respond, he sent four emails demanding "confirmation of things or things are just going to implode among friends and with you.  If you don't want my contact then you need to comply with this because that is the only way things will work."  (*Id.*).

**Response**: Admit these messages were sent and received by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4). Jane would also demean and insult Plaintiff in front of her friends, including by making homophobic slurs, claiming this was necessary to prevent her parents from finding out about their relationship. (*See* Pl. Ex. 9, P050855-50875; Def. Ex. 13, Hearing Tr. 174:16-176:15).

80.     On April 8, 2018, Plaintiff "confronted" Jane about the fact that she continued to spend time with people who he considered to have been mutual friends but had broken off contact with Plaintiff.  (Ex. 13, Hearing Tr. 203:16-204:9).

**Response**: Deny to the extent that Paragraph 80 is an incomplete statement of fact. Plaintiff's testimony was that he "confronted [Jane] about it.  And she said, okay, let's talk then."  (Def. Ex. 13, Hearing Tr. 204:8-9).  Plaintiff had introduced Jane to his friends in fall 2017.  (Def. Ex. 13, Hearing Tr. 182:6-11, 310:4-6).

81.     According to Jane, she agreed to speak with Plaintiff "in fear that he would contact my parents otherwise, and hoping this would truly be the last conversation as he said."  (Ex. 1, NYU_0009755 at -09914).

**Response**: Deny to the extent that Paragraph implies that Plaintiff threatened to contact Jane's parents if Jane did not talk to him on April 8, 2018 because this is not supported by the citation provided.  (Def. Ex. 1, NYU_00009914).

82.     Plaintiff told NYU that Jane would repeatedly start crying during their conversation; "[i]t was a negative cycle . . .  I couldn't get anything through to her."  (Ex. 13, Hearing Tr. 204:16-205:2).

**Response**: Admit that this accurately reflects a portion of Plaintiff's hearing testimony but deny that only Jane was crying; both Plaintiff and Jane were crying during this conversation.  (Def. Ex. 13, Hearing Tr. 206:2-3).

83.     Jane recorded a portion of the conversation during which Plaintiff asks, "Are you going to talk to me again?"  When Jane responded, "No."  Plaintiff says, "Alright then, I'm not leaving you alone unless you promise to talk to me . . . You have to choose, you're either gonna

talk to me or you're gonna—"  At this point, Jane interrupts, crying, "But you're not finishing it, it's been so long."  (Ex. 22, NYU_00004015).

> **<u>Response</u>**: Admit that Paragraph 83 reflects a portion of a recording Jane took — without Plaintiff's knowledge — of their April 8, 2018 conversation, and as noted in Plaintiff's Response to Paragraph 82, both Plaintiff and Jane were crying during this conversation. (Def. Ex. 13, Hearing Tr. 206:2-3).

84.     Plaintiff said he wanted to keep talking, but that Jane's friends had shown up and were standing outside the room watching them.  (Ex. 13, Hearing Tr. 205:15-20).

> **<u>Response</u>**: Admit.  Plaintiff felt that his private conversation with Jane was being treated "like a big show to everyone…."  (Def. Ex. 13, Hearing Tr. 206:3-5).

85.     Later that day, Plaintiff left Jane a voicemail that ended, "So again I'm telling you, if this is how it's going to go down, and you're not going to talk to me, then be warned I'm not going to be an easy person to deal with."  (Ex. 1, NYU_0009755 at -09915).

> **<u>Response</u>**:  Admit that Plaintiff left this voicemail for Jane at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends" (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4),and note that Jane called Plaintiff homophobic slurs and insulted him in front of his friends, and isolated Plaintiff from his friends.  (Def. Ex. 10, Plaintiff Tr. 58:10-25; Def. Ex. 13, Hearing Tr. 174:16-176:15).

86.     Plaintiff also left two voicemails for Jane's mom, telling her about the nature of their relationship and complaining that he does not "appreciate being vilified."  (*Id*. at -09917-18).

**Response**: Admit that Plaintiff was upset with how Jane had inaccurately portrayed their relationship to her friends and family, so Plaintiff was trying to provide his side of the story. (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).

87.     On April 9, Plaintiff messaged Jane, "We need to talk." (*Id*. at -09920).   He messaged her dozens of times without Jane responding (*Id*. at -09920-23); she eventually told Plaintiff, "don't contact me again." (*Id*. at -09929).

**Response**: Deny to the extent that Paragraph 87 implies that Jane's first and only response was "don't contact me again."  Plaintiff and Jane had a conversation about how Plaintiff felt Jane was giving their mutual friends misinformation that led to Plaintiff becoming isolated from their friends.  (Def. Ex. 1 at NYU_00009923-9934).  This conversation continued, at Jane's behest, even after Jane said she did not want to be contacted again. (Def. Ex. 1 at NYU_00009929-9934).

88.     On the same day, Plaintiff left Jane a voicemail in which he said, "I'm not done talking . . . There's a lot more you have to hear from me.  No, not even that much more, just a little bit . . . There's a lot of cooling to do.  Won't go ballistic.  Or maybe I already am." (*Id*. at -09935).

**Response**: Admit that on April 9, 2018, Plaintiff left Jane a voicemail.  For additional context, the voicemail continues with Plaintiff saying he wants to "make an attempt to make it better." (Def. Ex. 1 at NYU_00009935).

89.     The next day, on April 10, 2018, Plaintiff repeatedly messaged Jane that "something happened / And you could be o [sic] the back lash / And if things get out / Your parents will like abandon you." (*Id*. at -09938).

**Response**: Admit that Plaintiff sent the messages outlined in Paragraph 89 in an attempt to resolve the issue before the information got out and potentially harmed Jane.  (Def. Ex. 1 at NYU_00009938).

90.     Plaintiff continued to message Jane on April 12, 2018, using a fake Facebook account, saying "YOU LIAR / YOU LIED / I SEE YOU ALL / IM RIGJT [sic] HERE / IM HERE / IM HERE / IM HERE / AGH / EVERYONE LIES TO ME / I DON'T GET WHY."  (*Id.* at -09942) (emphasis in original).  Jane never responded, but Plaintiff continued to message Jane about her managing to lose weight, hoping her relationships with her parents improved, and gave her his Facebook password.  (*Id.* At -09943).  He continued to message her, noting, "I guess you don't want to talk to me / Who would."  (*Id.*).  He messaged her on April 13, 2018, as well.  (*Id.* at -09945).

**Response**: Admit that Plaintiff sent the messages outlined in Paragraph 90 to Jane on April 12-13, 2018 at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends" (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and note that Jane called Plaintiff homophobic slurs and insulted him in front of his friends, and isolated Plaintiff from his friends.  (Def. Ex. 10, Plaintiff Tr. 58:10-25; Def. Ex. 13, Hearing Tr. 174:16-176:15).  Further note that Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

91.     On April 18, 2018, Plaintiff left Jane a voicemail asking her not to block him.  (*Id.* at -09952).

**Response**: Deny as this is an incomplete statement of fact — Plaintiff's voicemail stated "Um, please don't block, uh, I'm just curious as to why.  Please let me know.  Um yeah, and I've been receiving calls, so I just wanted to make sure all's okay at your end.  So yeah, please let me know, if that's possible.  Bye bye."

92.    On April 19, 2018, friends of Plaintiff told Jane that Plaintiff wanted her to message him; she told them to stop conveying messages for him.  (*Id.* at -09954).

**Response**: Admit.  As outlined above, Plaintiff was attempting to contact Jane to make an attempt to fix things between them.  (*See e.g.* Plaintiff's Response to Paragraphs 88-89).

93.    That same day, Plaintiff told a friend, "you know / a word of caution / I'm a decent person / But when I start to get like really close to people / I like transparency / And not secrecy / and when things go a wall [sic] / I become hella aggressive."  When Plaintiff's friend said he understood, "but I don't think that you and [Jane] are like that anymore are you?"  Plaintiff responded, "well now it's the awkward part where I become hella aggressive / especially when things go wrong".  (Ex. 23, P057933 at -57934-36).

**Response**: Admit that Plaintiff sent these messages.  Plaintiff explained that this was in response to becoming isolated from his friends and that he was "in a state of extreme emotion" because Jane was disparaging him and actively destroying his reputation on campus.  (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).

94.    That same day, Plaintiff left three voicemails telling Jane to respond to him, the last of which indicated that if she did not respond "in the next ten minutes," then he "will have to contact you by other means. . . . I'm giving you one last opportunity so please do so.  Yeah, you really need to respond.  You really need to respond."  (Ex. 1, NYU_0009755 at -09955-56).  Plaintiff also continued sending Jane messages asking her to contact him.  (*Id*. at -09957-58).

**Response**: Admit that Plaintiff left these voicemails but deny that they constitute a violation of NYU's Policy.  As outlined above, these voice messages were left because of Jane's efforts to actively disparage Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and because Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

95.     April 21, 2018 was Plaintiff's 20th birthday.  Seeing pictures on social media of Jane and her friends "relaxing" without him, Plaintiff "sort of lost it . . . Everything that had led to that moment just all sort of came down on me and, you know, I couldn't control it."  (Ex. 13, Hearing Tr. 213:10-17).

**Response**: Admit that Plaintiff was upset because he had planned a birthday party for Jane on her birthday the month before, so he found it particularly hurtful that on his birthday "not only had she sort of completely ignored it, but on top of that she had totally isolated me from my friends.  They were not communicating with me anymore, they told me to F off, they called me a motherf'er, they had told me don't contact me again, blocked me without any context, and I just felt very isolated and alone."  (Def. Ex. 10, Plaintiff Tr. 58:10-25).

96.     At 12:10 AM, Plaintiff left a voicemail asking if Jane wanted to "come up.  Thought you might want to, maybe?  Probably not.  Kind of sucks."  (Ex. 1, NYU_0009755 at -09961).

**Response**: Admit Plaintiff left this voicemail but deny that it constitutes a violation of NYU's Policy.  As outlined above, this voicemail was left because of Jane's efforts to actively disparage Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and because Jane continued to hang out with their mutual friends

despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

97.     At 12:24 AM, Plaintiff texted Jane, "I think if you thought what I did earlier on would cause problems / You're in for a real hell of a ride / I'll give you till 1 / After that / It'll go bad / I want a response on WhatsApp in 9 minutes." (*Id.* at -09963).

> **Response**: Admit that Plaintiff sent these messages but deny that they constitute a violation of NYU's Policy.  As outlined above, these messages were sent because of Jane's efforts to actively disparage Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and because Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

98.     Jane "offered to come over" in order "to finish this once and for all."  (Ex. 13, Hearing Tr. 215:21-25).  At 12:48 AM, Plaintiff left a voicemail saying, "You have ten minutes. Respond.  That is all."  (Ex. 1, NYU_0009755 at -09961).

> **Response**: Admit that Jane offered to come over and that Plaintiff left Jane a voicemail but deny that it constituted a violation of NYU's Policy.  As outlined above, this voicemail was left because of Jane's efforts to actively disparage Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and because Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

99.     Jane came over some time after 1:00 AM.  (Ex. 13, Hearing Tr. 219:21-220:1).  She came to Plaintiff's bedroom "and just started crying."  (*Id.* at 220:8-22).  Plaintiff was "[v]ery

angry" and told her "[t]his is just so mean, uncalled for." (*Id*.).  When Plaintiff's roommate arrived, they went outside into the stairway landing and they had a huge argument.  (*Id*. at 220:16-222:8).

> **Response**:  Admit that Plaintiff and Jane had an argument because of the malicious lies Jane had been spreading about Plaintiff that led to Plaintiff being isolated from his friends.  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), Jane's efforts to actively disparage Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and because Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

100.    Plaintiff "leaned in" towards Jane, and she "punched" him, so he "backed away." She then said, "don't ever come close to me, [a]nd she punched [Plaintiff] twice more."  (*Id*. at 222:1-7).  When Plaintiff asked why she did this, she told him it was "self-defense, that she thought he was going to do something."  (Ex. 10, Plaintiff Tr. 60:6-23).

> **Response**:  Deny to the extent that Paragraph 101 is an incomplete statement of fact, Plaintiff's further testified that "this is someone I've never, like, laid a hand on or hit or anything," and that he stood in front of Jane with his "arms behind [his] back."  (Def. Ex. 13, Hearing Tr. 223:6-18).

101.    Plaintiff responded, "I'd never do something like that."  He then "stood in front of her" and said, "I'm threatening you right now.  Punch me."  Jane punched Plaintiff again.  (Ex. 13, Hearing Tr. 223:10-20).

> **Response**:  Deny to the extent that Paragraph 101 is an incomplete statement of fact, Plaintiff's further testified that "this is someone I've never, like, laid a hand on or hit or anything," and that he stood in front of Jane with his "arms behind [his] back."  (Def. Ex.

13, Hearing Tr. 223:6-18), and deny that Plaintiff was threatening Jane as he was standing "a distance away from her" with his "hands behind [his] back" when he made these statements.  (Pl. Ex. 3 at 60:24-61:13).

102.    John later "acknowledge[d] that he was aggressive and got into [Jane's] personal space." And he admitted that he saw "how his actions could have triggered a defensive response." (Ex. 24, NYU_00001091 at -01149).

    **Response**: Deny that Plaintiff used the term "aggressive" or that he told the Student Health Center that he got into Jane's personal space.  (Pl. Ex. 3, Plaintiff Tr. 80:2-8).

103.    Plaintiff made a video recording of part of this encounter in which Jane appears to be sitting on the floor crying while Plaintiff speaks into the camera:

> "Hello, guess who I'm with?  Say 'hi.'  Yup, 'supposed to stay away from me.'  To all the friends she has, that, you know, you all agreed, we're not all going to talk to [John].  To her parents—supposed to stay away from him.  Not doing such a great job of that, are we now? . . . She laughed when you guys were there and I was hurt, right?  She laughed.  And now she's crying.  Where's the laughter?  It's a high-stress situation.  She's not laughing.  Why isn't she laughing?  She should be laughing, right?  Laugh, right?  Laugh.  No, she won't laugh now.  She won't laugh now.  She'll just cry.  She pities her.  Always pities her."  (Ex. 25, NYU_00004012).

    **Response**: Admit that Plaintiff made a video recording of part of this encounter.  For full context, Plaintiff said:

> Not doing such a great job of that are we now? To anyone else, yeah, I'm the villain. But she's there. Let that stand. You know, today she's punched me five times. I did nothing. Today, she gets mad at me everything is my fault. And yet I didn't do everything. Some things are her fault, too. But it's my fault. She laughed when you guys were there…."

(Def. Ex. 25, NYU_00004012).  Plaintiff also explained at the hearing that part of the rationale for the video was to show that Jane had hit him five times while he did nothing.  (*See* Def. Ex. 13, Hearing Tr. 228:7-9 ("Here's a video of I'm telling you she punched me, she hit me, and she did this").

104.    Later that morning, beginning at 8:29 AM, Plaintiff messaged Jane.  He stated, "I'm sorry I got so mad / I'm sorry I seemed crazy."  (Ex. 26, P008662 at -08665).

**Response**: Admit that these messages appear in the cited document but deny to the extent that Paragraph 104 implies Plaintiff started the conversation.  (Def. Ex. 26 (showing first chat bubble under Jane's name)).  Further deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel.  (*See generally* Def. Ex. 1.)

105.    When Jane wrote that she "didn't kick [Plaintiff] out" of his friend group, that his actions did, Plaintiff responded, "YOUFUCKING DID / AND IF YOU DON'T BELIEVE THAT . . . THEN YOURE FUCKING ACTIONS / ARE GOING[] TO RUIN YOUR RELATIONSHIP WITH YOUR PARENTS / EVEN MORE / SO FUCK OFF AND SHUT UP / AND LISTEN."  (*Id.* at -08670-71) (emphasis in original).

**Response**: Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).  By this time, Plaintiff's friends were taunting, mocking, and ghosting him, (Def. Ex. 10, Plaintiff Tr. 58:10-25; Plaintiff's Response to ¶95), Jane was actively disparaging Plaintiff and isolating him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-

42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

106.    At 9:07 AM, Plaintiff messaged Jane, "here's the solution / You cut off from everyone / Until you're ready to talk to me . . . You choose now / I'll give you five minutes / You pick / I'll ruin your friendship with them / I'll ruin your relationship with your parents / I'll do everything / You fucking choose."  (*Id*. at -08676-78).

> **Response**: Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

107.    Plaintiff also sent Jane videos of Jane and Plaintiff "making out," "proof of [Jane] sleeping over", "[a]ll of it" and said he "can send everyone" these videos. (*Id*. at -98678).

> **Response**: Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent

by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).  Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).  Deny to the extent that NYU is speculating as to the content of the videos referenced in Paragraph 107.  (Def. Ex. 23, P008678).

108.    Plaintiff wrote, "I lost everything / I'm giving you the opportunity not to / But I 45loody [sic] well will," followed by almost fifty more consecutive messages.  (*Id.* at -08679-83).

**<u>Response</u>**: Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).  Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

109.    Jane responded to Plaintiff, "Send friends whatever you want."  (*Id.* at -08683-84).

**<u>Response</u>**: Admit that the cited document says this but deny that this is a material fact that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1).

110.    Beginning around 10:23 AM, Plaintiff sent Jane over 100 unanswered messages, and then messaged, "I WANT TO DIE / AND IM NOT SCARED OF IT / IM NOT / I HAVE NO FEAR DOING IT / Lol / I'm going to die on 20 / Right on the dot."  (*Id*. at -08704-12) (emphasis in original).   After Jane began responding, Plaintiff messaged, "I really just want to die / Everything is so shitty / I just can't / I've tried everything / I've tried slitting my neck / I tried overdosing on pills / Why do you think I'm commuting [sic] so much and getting ulcers / Vommiting [sic] / It's not working / It's just not."  (*Id.* at -08714-15).

**<u>Response</u>**: Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).   Jane had also threatened that she knew "how to get people arrested" and that she could get Plaintiff arrested.  (Def. Ex. 13, Hearing Tr. 209:8-14).   Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

111.     At 11:36 AM, Jane told Plaintiff, "Stop calling / I don't want to be contacted."  (*Id.* at -08734).

**Response**: Admit that the cited document says this but deny that this is a material fact that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1).

112.     Plaintiff responded with more threats to tell Jane's friends and family about the nature of their relationship and asked, "Why do you do these things knowing how much they anger me?"  (*Id.* at -08734-36).

**Response**: Deny that Plaintiff ever intended to send anything to Jane's friends and family. (Def. Ex. 13, Hearing Tr. 320:16-321:4).  Admit that the cited document says this but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter and note that the texts in question were not the subject of the Title IX hearing or before the adjudicator or the appeals panel (*See generally* Def. Ex. 1) and further note that these messages were sent by Plaintiff at a time that the couple's toxic relationship was deteriorating, and Plaintiff was "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4).  Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

113.     During the afternoon of April 21, 2018, Plaintiff repeatedly called Jane and left several voicemails.  (Ex. 1, NYU_0009755 at -09962-64).  Starting at 3:17 PM, he texted Jane

photos depicting their relationship.  He admitted to NYU that he "was trying to suggest to her" that he "might send them" to her friends or family.  (Ex. 13, Hearing Tr. 219:3-20; 320:16-321:4; *see also* Ex. 1, NYU_0009755 at -09963).

> **Response**: Deny that Plaintiff ever intended to send anything to Jane's friends and family. (Def. Ex. 13, Hearing Tr. 320:16-321:4 ("it was not something that I was going to follow through on and something that I never had that intention to do")).  The photos depicting Plaintiff and Jane's relationship were not sexual in nature.  (NYU_00009963).

## VI.    Jane Files a Complaint with NYU

114.    At approximately 6:08 PM on April 21, 2018, Jane filed a complaint against Plaintiff with NYU's Department of Public Safety ("DPS").  According to the report, "[Jane] has been accumulating texts, photos and videos sent by [Plaintiff] over several months," but "waited this long to report the harassment" because "she believed that she and [Plaintiff] could 'work it out' and that she didn't want it to 'escalate.'"  (Ex. 27, NYU_00002432 at -02435).

> **Response**: Admit Jane filed a report, and the quoted text appears in the report but note that during this time, Jane also deleted potential exculpatory evidence from Plaintiff's accounts and devices.  (Pl. Ex. 3, Plaintiff Tr. 176:10-15; 193:2-9; 331:13-16; 350:3-7; Def. Ex. 13, Hearing Tr. 214:6-14).

115.    On April 22, 2018, Plaintiff repeatedly messaged Jane and left several voicemails. (*See* Ex. 1, NYU_0009755 at -09968-74).  Jane told Plaintiff to stop contacting her.  (*Id*. at -09969-70).

> **Response**: Admit that these messages were sent by Plaintiff because he was still "confused and angry with Jane for spreading malicious lies in an attempt to isolate him from his own friends."  (Am. Compl. ¶ 103; *see also* Def. Ex. 10, Plaintiff Tr. 41:5-42:7; 46:9-48:4). Jane was actively disparaging Plaintiff and isolate him from his own friends (Def. Ex. 10,

Plaintiff Tr. 41:5-42:7; 46:9-48:4), and Jane continued to hang out with their mutual friends despite their agreement to limit such contact.  (Def. Ex. 13, Hearing Tr. 202:24-203:4; 203:7-9).

116.     Plaintiff received a call from Public Safety that evening and told Jane at 7:50 PM, "I want you to respond on Facebook / By 8 / Because this has major ramifications," and begged her to respond.  At 9:26 PM, he wrote, "I'm begging you, I need you to help me get out of this." (*Id*. at -09972).  Plaintiff also left Jane multiple voicemails.  (*Id*. at -09973-75).

> **Response**: Admit that plaintiff contacted Jane on April 22 via text and voicemail, but deny that this contact constituted a violation of NYU's Policy because Plaintiff's actions in the spring of 2018 were not sexual in nature.  (Def. Ex. 14, NYU_00011365; Def. Ex. 1, NYU_00009918, 9920-9924, 9942, 9969; Def. Ex. 13, Hearing Tr. 193:15-195:25).

117.     At 10:26 PM on April 22, 2018, NYU issued a no-contact directive ("NCO") to both Plaintiff and Jane.  Each student was instructed "not to initiate or facilitate any form of communication or interaction" with the other, "including those made through virtual means (text messages, e-mail, Facebook Twitter, other social networking websites, etc.) or by 3rd parties on your behalf.  Any such attempts to do so may be construed as harassment and will subject you to disciplinary action."  (Ex. 28, NYU_00002418 at -02418).

> **Response**: Admit that the no contact order was issued on April 22, 2018 and that the terms quoted in Paragraph 117 appear in the NCO.

## VII.     Plaintiff Repeatedly Violates the NCO

118.     At 10:55 PM, less than a half hour after receiving the NCO, Plaintiff messaged Jane, "Well / there goes the RA position."  (*See* Ex. 1, NYU_0009755 at -09988).  Plaintiff told NYU that he understood the NCO but "couldn't take it seriously.  It just didn't register with me."

(Ex. 13, Hearing Tr. 233:21-234:9, 234:23-235:4).  "[T]here was just sort of this nature to me as well, where I was just like no-contact directive, whatever.  Just send the text."  (*Id*. at 234:18-22).

> **Response**: Admit but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

119.    On April 26, 2018, NYU's Title IX Coordinator, Mary Signor emailed Plaintiff and Jane separately to tell them that, following the issuance of the NCO, she would be evaluating whether the matter fell within OEO's jurisdiction.  (Ex. 29, NYU_00002598 at -02599-600; Ex. 84, NYU_00002518 at -02520).

> **Response**: Admit but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

120.    On April 27, 2018, Plaintiff sent another message to Jane.  (*See* Ex. 1, NYU_0009755 at -09988).

> **Response**: Admit but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

121.    On April 28, 2018, Plaintiff changed his "status" on the communication app WhatsApp; it stated, "This could be catastrophic for you because of a mistake I made, I don't care what's in place, you need to be aware."  (*See id.* at -09981).  Plaintiff admitted that he "intended for [Jane] to see" this message (Ex. 10, Plaintiff Tr. 162:5-163:9); (*see also* Ex. 1, NYU_0009755 at -09767).

**Response**: Admit but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

122.    Jane emailed OSC about Plaintiff's violations of the NCO, explaining that she "told Public Safety. They told me not to bring it to them [Public Safety] but to let the person [at OSC] who wrote up my report know." (Ex. 30, NYU_00002609 at -02610).

**Response**: Admit that the cited document says this.

123.    On April 29, 2018, Plaintiff "saw [Jane] in the [dorm lounge] while I was trying to print something, and I just lost it. I absolutely lost it. . . I couldn't take it. I just – I interacted with her. I said, like, you owe me money." (Ex. 13, Hearing Tr. 240:21-241:14). Plaintiff admitted during the Hearing, "I'm not going to even try and deny it. I violated the no-contact directive there directly… I didn't know how to deal with it. I honestly still don't know how to deal with it." (*Id* at 240:21-241:1; 246:22-247:4).

**Response**: Admit but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

124.    Also on April 29, Plaintiff called Jane multiple times, left voicemails, sent her several messages, and even called Jane's mother to say that Jane was drinking and using drugs. (*See* Ex. 1, NYU_0009755 at -09982-88).

**Response**: Admit that Plaintiff sent a message to Jane's parents because he was worried that Jane had been drinking and using drugs. (Def. Ex. 13 239:6-16). Plaintiff was not trying to communicate with Jane through her parents.

125.    An NCO violation "is a very rare and serious violation of NYU's policies and procedures."  (Ex. 8, Jolley Decl. ¶¶ 4-5).

**Response**: Deny — when Plaintiff met with Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

## VIII.    NYU Assesses Jane's Report and Receives a Further Complaint from Jane that Plaintiff Again Violated the NCO

126.    On April 30, 2018, Signor met with Jane and then separately with Plaintiff.    (Ex. 29, NYU_00002598 at -02598; Ex. 84, NYU_00002518 at -02518; s*ee* Ex. 31, NYU_00009558-67 (Signor's contemporaneous handwritten notes of meeting with Jane); *see also* Ex. 32, NYU_00009568-75 (Signor's contemporaneous handwritten notes of meeting with Plaintiff).

**Response**: Admit.

127.    Jane described her relationship with Plaintiff, beginning in 2015 through the date of the meeting.  (Ex. 31, NYU_00009558-67).  She told Signor she was "not sure" if she thought she was in danger because of Plaintiff's conduct.  (*Id*. at -09567).  When Jane completed detailing her recollection, Signor asked her, "Do you want to file a complaint?"  Jane responded, "Yes."  (*Id*.).  Signor advised Jane at this meeting that NYU could either conduct an investigation or attempt to resolve "this matter through the University's Administrative Resolution process."  Jane also told Signor during the meeting that she "had another sexual assault" but "she does not want to report" that assault."  (*Id*. at -09559; *see also* Ex. 4, Hodge Tr. 298:3-16 (Jane "declined to" have "the allegations [] assessed by the Title IX coordinator.")).

**Response**: Admit that these notes reflect Signor's meeting with Jane but deny to the extent that Paragraph 127 implies that the allegations made against Plaintiff were truthful and represented a violation of NYU's Policy.  Further deny to the extent that Paragraph 127 is

an incomplete and misleading statement of fact; when Signor asked Jane if she felt she was in danger, Jane stated that Plaintiff had never physically hurt her.   (Def. Ex. 31, NYU_00009567).

128.   After meeting with Jane, Signor met with Plaintiff; Maeder attended.   (*See* Ex. 32, NYU_00009568 at -09568).

**Response**: Admit.

129.   According to Signor's notes, the meeting began with Signor and Maeder explaining "their roles" and Plaintiff's "rights including right to advisor, academic assistance."   (*Id*. at -09568).   Maeder explained "the risks to [Plaintiff]."   (*Id*.).   In response to a question from Plaintiff, Maeder and Signor explained that he could not contact Jane's parents due to the NCO. (*Id*.).   Plaintiff explained his recollection of events beginning from when Plaintiff and Jane were seniors in high school.   (*Id*. at -09569-73).   He admitted to violating the NCO twice.   (*Id*. at -09571). Plaintiff told Signor and Maeder that he "knows [Jane's] hurting especially after what happened." (*Id*. at -09574).

> **Response**: Admit that this is what the documents cited state but deny that the statement that Plaintiff "knows [Jane's] hurting especially after what happened" constitutes an admission by Plaintiff that he violated NYU's Policy, (Def. Ex. 32, NYU_00009574), and note that the clarification about contacting Jane's parents occurred after Plaintiff had contacted Jane's mother because he was worried that Jane had been drinking and using drugs.   (Def. Ex. 13 239:6-16).

130.   According to Plaintiff, he told Signor and Maeder during their meeting that Jane had punched him early in the morning on April 21, 2018.   (Ex. 10, Plaintiff Tr. 87:5-14).

**Response**: Admit that this is what the documents cited state but note that Plaintiff informed Signor and Maeder that Jane had punched him in the chest 5 to 6 times.  (Def. Ex. 32, NYU_00009570).

131.     Signor told Plaintiff he "could file a cross complaint," but he "did not because [he] had believed Jane had suffered many assaults and did not want to cause her distress by reporting her."  (Ex. 33, P002929; Ex. 10, Plaintiff Tr. 290:13-291:4; *see also* Ex. 34, P002943 at -02950 ("In fact, when I met with the Title IX Coordinator, Mary Signor in May 2018 [sic] she asked me if I wanted to file a cross complaint.  I declined because I did not want to distress Jane."); (Ex. 10, Plaintiff Tr. 88:2-10 ("Mary Signor said that, you know, you could file a cross-complaint and I said I would think about it.")).

**Response**: Deny — Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).

132.     Plaintiff recalled being told his punishment "could go on [his] permanent recor[d] / and that goes all the way to expulsion / and could prevent [him] from getting into med school."  (Ex. 35, P058064 at -08836-37; *see also* Ex. 10, Plaintiff Tr. 166:14-167:7).

**Response**: Admit that Plaintiff was told the range of possible sanctions under NYU's policy during his initial meeting with Signor and Maeder.  (Def. Ex. 10, Plaintiff Tr. 166:14-167:7).  However, Plaintiff was subsequently told by his advisor that although the policy allowed for a sanction up to expulsion, given the allegations against Plaintiff, there was "no way" Plaintiff would be expelled, and "the worst-case scenario will be at worst a one-semester suspension," (Def. Ex. 10, Plaintiff Tr. 111:22-112:1), and note that

Plaintiff's interpretation was that "with a suspension, provided good standing, [a transcript notation] could be removed" allowing him to pursue medical school. (Def. Ex. 10, Plaintiff Tr. 168:18-169:9).

133.   Also at that meeting, Plaintiff expressed openness to Administrative Resolution, because "at the time I believed that Jane was a victim of a serial rape case and I wanted to make this, you know, whole thing just go away easily." (Ex. 10, Plaintiff Tr. 105:17-106:11; *see also* Ex. 32, NYU_00009568 at -09574 (Plaintiff "[w]ants to attempt an administrative resolution.")).

**Response**: Admit that this was Plaintiff's perception of Jane at the time but note that the New York City Police Department confirmed that there is no record of Jane ever being the victim of such crime. (Pl. Ex. 10 P003035; Def. Ex. 14, NYU_00011364-365).

134.   On May 2, 2018, Plaintiff and Jane encountered each other in Washington Square Park. Plaintiff's "biggest concern was that she was trying to goa[d] me into violating [the NCO], because it was something that, you know, I could definitely fall for if, you know, the opportunity arises by acting on emotion." (Ex. 13, Hearing Tr. 252:10-21). Plaintiff described the incident on May 10, 2018, to a friend: "I followed her a bit, she crossed pathes [sic] with me four times / And then I got curious if she was goading me / So I watched her." (Ex. 36, P061855 at -04508).

**Response**: Admit that on May 2, 2018, Plaintiff went to Public Safety to report that Jane was following him in violation of the NCO but Public Safety refused to file a report and he was told that because of the nature of NYU's campus, interactions like those between Jane and Plaintiff can happen and that Public Safety did not consider it "stalking." (Def. Ex. 13, Hearing Tr. 249:25-251:6). Further note that Plaintiff believed that Jane was following him in Washington Square Park in an attempt to goad him into violating the NCO. (Def. Ex. 13, Hearing Tr. 247:18-251:21). Plaintiff had contemporaneous text messages showing

that Jane was following him, and he was afraid Jane was doing this to get him in trouble. (Pl. Ex. 16, NYU_00011407-416).

135.    That same evening, Jane reported to Signor via email that Plaintiff "was following me at Washington Square Park today.  As I was walking, I saw him looking [at] me from a distance. . . I became uncomfortable and moved locations at the park.  Each time I moved, he changed locations to a spot where he could watch me.  He would keep his back to me, pretending he couldn't see me, but whenever he thought I looked away, he would start watching me again, as well as following me. . . When I entered a restaurant, he was pacing outside of it across the street. . . I was able to take some pictures of this happening.  I am attaching them here.  I am starting to feel increasingly stressed and anxious because of this.  Is there anything you can do to make him stop doing this?"  (Ex. 37, NYU_00002654 at -02654; *see also* Ex. 1, NYU_0009755 at -09990-92).

> **Response**: Admit that this is what the documents cited say but deny that Plaintiff was following Jane, but as noted in Plaintiff's Response to Paragraph 134, Plaintiff attempted to report that Jane was following him that day in the park.  (Def. Ex. 13, Hearing Tr. 249:25-251:6).

136.    In the same email, Jane told Signor that she did not "think the issue can be taken care of properly via the [administrative] resolution method" because of Plaintiff's NCO violations and because "[Plaintiff] was following me at Washington Square Park today."  Jane continued, "I would like to proceed with the investigation route."  (Def. Ex. 38, NYU_00002654 at -02654).

> **Response**: Admit that this is the documents cited say but deny that Plaintiff was following Jane, but as noted in Plaintiff's Response to Paragraph 134, Plaintiff attempted to report that Jane was following him that day in the park.  (Def. Ex. 13, Hearing Tr. 249:25-251:6).

137.    The next day, May 3, 2018, Plaintiff emailed Signor "to [i]nquire if there is a no contact directive for [Jane] towards me.  Regardless of whether there is, I find it really demeaning that she is telling others and word is spreading that she has reported me."  (Ex. 37, NYU_00002684 at -02685).  Plaintiff did not mention the Washington Square Park encounter to Signor, either before or after she confirmed that the NCO "applies both ways."  (*Id.*).

> **<u>Response</u>**: Admit that Plaintiff emailed Signor to confirm the parameters of the NCO, but as outlined in Plaintiff's Response to Paragraph 134, when he previously tried to report the Washington Square Park Incident, Plaintiff had been told by Public Safety that the incident did not amount to "stalking."  (Def. Ex. 13, Hearing Tr. 250:13-25).

138.    Plaintiff also asked, "Will the no contact directive hold over the summer?  I had presumed that nyu directives would not hold in other countries?"  (*Id.* at -02684).

> **<u>Response</u>**: Admit that Plaintiff sought further clarification of the NCO.  (Def. Ex. 10, Plaintiff Tr. 100:4-16).

139.    Signor informed Plaintiff that Jane "is asking for an investigation," not administrative resolution.  (*Id.* at -02684).

> **<u>Response</u>**: Admit that this is what the documents cited say but deny that this is a material fact that would assist the Court in resolving a claim or defense in this matter.

140.    Plaintiff wrote a friend on May 3, "anything shitty [Jane's] done / there's no proof / I don't even want to press things against her."  (Ex. 36, P061855 at -04646-47).

> **<u>Response</u>**: Admit that this is what the message says but deny to the extent that NYU seeks to argue that the message shows that Plaintiff failed to make a report.  (*See* Pl. Ex. 3, Plaintiff Tr. 348:14-349:8 ("I wanted NYU to conduct a process in which they investigated my claims against Jane and sanction her for finding of responsibility, if it came to that);

*see also* Def. Ex. 79 (complaint filed by Plaintiff against Jane).  Note that Jane had deleted potential exculpatory evidence from Plaintiff's accounts and devices.  (Pl. Ex. 3, Plaintiff Tr. 176:10-15; 193:2-9; 331:13-16; 350:3-7; Def. Ex. 13, Hearing Tr. 214:6-14).

141.    On May 6, 2018, Jane emailed Signor several text messages and a video that substantiated some of her allegations against Plaintiff.  (Ex. 39, NYU_00002837 at -02838); (Ex. 1, NYU_00009755 at -09830, -09845-49).

**Response**: Deny to the extent that it characterizes the evidence submitted as proof that Plaintiff violated NYU's Policy because as outlined in Plaintiff's Response to Paragraph 134, Plaintiff believed that Jane was following him in Washington Square Park on May 2, 2018.

142.    On May 8, 2018, Jane emailed Signor again and described some of Plaintiff's violations of the NCO, concluding, "I don't think he's in the right state of mind, as he's continuing to contact me.  I just wanted to email you and let you know of this. . . I'm not sure what the purpose of a no-contact directive is if he can keep breaking it without any consequences, and this is causing me a great deal of stress."  (*Id*. at -09808).

**Response**: Admit that this is what the documents state but note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

143.    On May 10, 2018, Jane informed Signor that Plaintiff "sent me the email that he was sending to his professor regarding struggling with Organic Chemistry and personal issues," attaching a screenshot.  (Ex. 39, NYU_00002837 at -02837; *see also* Ex. 1, NYU_00009755 at -09994).  Jane stated that Plaintiff has tried to "guilt me into talking to [him] in the past by telling me he's academic[ly] struggling," and stated that he's "just repeating this again."  (*Id.* at -09850).

**Response**: Deny that Plaintiff sent the email to Jane on purpose and note that Plaintiff accidentally sent an email that was intended for his professor to a mutual account Jane and Plaintiff shared.  (Def. Ex. 1, NYU_ 00010079).

## IX.   NYU's Title IX Office Investigates Jane's Complaints Against Plaintiff

144.   On May 14, 2018, NYU Investigator Sam Hodge, emailed Jane to set up the investigation's first interview.  (Ex. 40, NYU_00002850 at -02850).  Jane's interview was three days later, on May 17, 2018.  (Ex. 1, NYU_00009755 at -09756).  Present at that interview were Hodge, Jacqueline Cornell (another Investigator), Jane, and Jane's "Support Person" Christine Janick.  Jane recounted her relationship with Plaintiff dating back to 2016, and the conduct that prompted her to file a complaint in April 2018.   (*See generally id.* at -09756, 09757-62 (Investigative Report summary of interview); *see also* Ex. 41, NYU_00010191-10205 (Hodge's contemporaneous handwritten notes of interview); Ex. 42, NYU_00010206-10224 (Cornell's contemporaneous handwritten notes of interview)).

**Response**: Admit this is what the documents cited say but deny these are material facts that would assist the Court in resolving a claim or defense in this matter.

145.   On May 21, 2018, Plaintiff emailed Signor asking if his mother could discuss his case with Signor and asking for more details about the allegations against him.  (Ex. 43, NYU_00029166 at -29166).  Plaintiff's mother is a lawyer.  (Ex. 24, NYU_00001091 at -01123).

**Response**: Admit that on May 21, 2018, Plaintiff emailed Signor asking if his mother could discuss his case with Signor and asking for more details about the allegations against him but deny that Plaintiff's mother is a lawyer — Plaintiff's mother has a law degree but does not practice law.  (Pl. Ex. 11, JD Mother Tr. 24:19-21, 237:11-14).

146.   The following morning, on May 22, 2018, Signor emailed Plaintiff that she would speak with his mother about Jane's complaint, and listed four allegations:  First, Jane alleged that

Plaintiff "took photographs of her breasts and kissed her while she was sleeping, without her consent."  Second, Jane alleged that Plaintiff "would regularly threaten to send photographs or message her parents about your relationship with her if she would not see or speak with [him]."  Third, Jane alleged that Plaintiff "dragged her into the shower and pressed [his] exposed penis against her."  Fourth, Jane alleged that Plaintiff "would follower her, appear suddenly and repeatedly message her," including after the NCO was issued.  (*Id.*).

> **Response**: Admit that this is what the document says and note that NYU *sua sponte* increased the charges to nine alleged policy violations.  Def. Ex. 1, NYU_00009755-9756 (listing nine allegations)).

147.    That same day, Signor and Plaintiff's mother spoke on the phone.  According to Signor's notes, Plaintiff's mother asked if the "worst case scenario is that he is expelled," to which Signor responded, "Yes."  (Ex. 44, NYU_00009555).

> **Response**: Admit that what Signor's notes say but note that Plaintiff was subsequently told by his advisor that although the policy allowed for a sanction up to expulsion, given the allegations against Plaintiff, there was "no way" Plaintiff would be expelled, and "the worst-case scenario will be at worst a one-semester suspension."  (Def. Ex. 10, Plaintiff Tr. 111:22-112:1).  McFarlane also explained that expulsions only occur where a weapon was used or there was non-consensual sexual intercourse.  (Pl. Ex. 3, Plaintiff Tr. 111:11-112:2).

148.    Shortly after Signor spoke to Plaintiff's mother, Hodge emailed Plaintiff to schedule an interview with him as part of NYU's investigation.  (Ex. 45, NYU_00003093).  Hodge also included the Procedures and the Policy as attachments to his email, which apprised Plaintiff of his rights.  (*See generally id.*; Ex. 4, Hodge Tr. 161:24-162:9).  Plaintiff and his mother both

reviewed the Procedures and Policy.  (Ex. 10, Plaintiff Tr. 110:9-16; Ex. 46, JD Mother Tr. 46:17-19).

> **<u>Response</u>**: Admit that this is what the cited documents say but deny any characterization that conflicts with McFarlane's promise that Plaintiff would not be expelled.  (Pl. Ex. 3, Plaintiff Tr. 111:22-112:1; Def. Ex. 63, NYU_00006516).

149.    Plaintiff responded to Hodge's email on May 25, 2018, (Ex. 47, NYU_00003149 at -03149), and again on June 1, 2018 (Ex. 48, NYU_00003180 at -03180).  On the latter date, Plaintiff asked "whether NYU has staff that would act as an advisor to me, or if I would have to find someone on my own." (*Id*.).  He also asked if his interview with the investigators could take place in July, in person.  (*Id*.).

> **<u>Response</u>**: Admit that this is what the cited documents say but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

150.    Also on June 1, 2018, Hodge responded that Plaintiff is "welcome to have an advisor of choice accompany you to our meeting (so long as this individual is not also a potential witness to this matter).  If you would like to be connected to a Respondent Facilitator through NYU that can be arranged."  Hodge also told Plaintiff that "[w]e would prefer to meet with you as soon as possible."  (*Id*.).

> **<u>Response</u>**: Admit that this is what the cited documents say but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

151.    After receiving Hodge's June 1, 2018 email, Plaintiff understood that, except for potential witnesses, his advisor "could be anyone [he] wanted." (Ex. 10, Plaintiff Tr. 114:16-22). Plaintiff further understood that his advisor "would [not] play a role in making…a determination

on the facts of the case" nor would his advisor "make a determination on the sanctions." (*Id*. at 119:22-120:18).

> **<u>Response</u>**: Deny to the extent that Paragraph 151 implies Plaintiff did not reasonably rely upon his advisor's promise that although the policy allowed for a sanction up to expulsion, given the allegations against Plaintiff, there was "no way" Plaintiff would be expelled, and "the worst-case scenario will be at worst a one-semester suspension." (Def. Ex. 10, Plaintiff Tr. 111:22-112:1).

152.    Hodge's June 1, 2018 email also included a list of attorney referrals. (Ex. 48, NYU_00003180 at -03180). Plaintiff and his mother did not contact any of them; they spoke with a friend who was an attorney, but because she did not have any knowledge about Title IX, they did not "take it any further." (Ex. 46, JD Mother Tr. 54:12-55:18; Ex. 10, Plaintiff Tr. 121:11-20). According to Plaintiff's mother, she did not know "anyone who could help" Plaintiff." (Ex. 46, JD Mother Tr. 54:12-55:18).

> **<u>Response</u>**: Admit that this is what the cited documents say but note that Plaintiff further elaborated at his deposition that he did not contact an attorney because he "requested an [advisor] from NYU who was Allen McFarlane, and then he promised me under no circumstance would I be expelled." (Def. Ex. 10, Plaintiff Tr. 122:3-11).

153.    On June 5, 2018, Hodge informed Plaintiff that OEO was "in the process of procuring an adviser for you." (Ex. 49, NYU_00003333 at -03333). Because of this, and before Plaintiff ever met with any advisor, Plaintiff's mother claimed that she decided not to "make any other efforts to contact a lawyer to be an advisor for [Plaintiff]." (Ex. 46, JD Mother Tr. 64:7-15).

> **<u>Response</u>**: Deny.  Plaintiff explained at his deposition that he "chose to meet with a respondent facilitator at that time to gain more knowledge about the process, and once I

did, Allen McFarlane told me that under no circumstance will you be expelled." (Def. Ex.

10, Plaintiff Tr. 127:2-21).

154.    On June 19, 2018, Signor introduced Plaintiff via email to his NYU Respondent

Facilitator, Allen McFarlane.  (Ex. 50, NYU_00003473).

**Response**: Admit that this is what the cited documents say but deny that these are material

facts that would assist the Court in resolving a claim or defense in this matter.

155.    Plaintiff and McFarlane met via Skype on June 25, 2018.  (Ex. 51, NYU_00000009;

Ex. 10, Plaintiff Tr. 121:24-122:2).

**Response**: Admit.

156.    During the June 25, 2018 meeting, McFarlane learned from Plaintiff his account of

the facts of his case for the first time.  (Ex. 10, Plaintiff Tr. 130:3-16).  Plaintiff did not show him

any documents, "[i]t was just [his] verbal explanation of the facts." (*Id*. at 132:2-10).

**Response**: Admit that this is what the cited document says and note that Plaintiff could not

show McFarlane any documents because Plaintiff was not given access to any evidence at

that point.  (Def. Ex. 10, Plaintiff Tr. 133:21-134:7; 136:12-13 ("When the draft ISR came

out, I now had all the evidence")).  McFarlane repeated this promise that Plaintiff would

not be expelled even after reviewing the evidence contained in the Draft Report.  (Pl. Ex.

3, Plaintiff Tr. 136:5-137:8).

157.    On July 10, 2018, Plaintiff and McFarlane met with Hodge and another Investigator

for Plaintiff's investigation interview.  (*See* Ex. 1, NYU_00009755 at -09762-68 (Investigative

Report summary of interview); Ex. 52, NYU_00010096-10119 (Stabile's contemporaneous

handwritten notes of interview); Ex. 53, NYU_00010120-10142 (Hodge's contemporaneous

handwritten notes of interview)).

**Response**: Admit.

158.     Among other things, Plaintiff admitted during the interview that he had multiple photos on his phone of Jane (before she made him delete them), including one in which "there was cleavage present."  (Ex. 10, Plaintiff Tr. 155:22-157:5).  During his deposition, Plaintiff denied telling the Investigators the photo contained "excessive cleavage," but admitted that, "there may have been a possibility" that "the slightest, slightest part of her nipple was visible," because "of the excessive cleavage."  (*Id.*).  Another photo showed "Ms. Roe sleeping with her stomach exposed."  (*Id.*; *see also* Ex. 1, NYU_00009755 at -09767).

**Response**: Deny that Plaintiff was in possession of any sexually explicit photos when Jane filed her Title IX report, and further deny that Plaintiff took the photos referenced by the investigators with any sexual intent.  (Def. Ex. 13, Hearing Tr. 169:3-170:12 (denying any intent and explaining that he "very willingly let Jane delete all of [the photos]"); Def. Ex. 10, Plaintiff Tr. 156:18-23 ("it was not taken for any sexual purpose.  It was taken I believe because she had put an elephant in her shirt and it was taken as a funny picture, not with any…sexual intentions whatsoever.")). Further deny that these pictures were taken while Plaintiff was a student at NYU.  (Def. Ex. 13, Hearing Tr. 169:3-170:12).

159.     Plaintiff also admitted during the interview to violating the NCO.  (Ex. 10, Plaintiff Tr. 162:13-163:9; *see* Ex. 1, NYU_00009755 at -09767).

**Response**: Deny that the cited documents support this claim as neither state that Plaintiff admitted to violating the NCO during his interview.  Further note that Signor and Maeder, they assured Plaintiff that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

160.    Plaintiff stated during the interview that "he would receive text messages from an unidentified individual/number, posing as a friend of [Jane's], who would make suggestions as to intimate acts he should try with [Jane]."  (Ex. 1, NYU_00009755 at -09764).

**Response**: Admit that this is what the cited documents say and note that this was actually Jane contacting Plaintiff with a false identity.  (Def. Ex. 79, P000577).

161.    At the end of the interview, Stabile and Hodge "reviewed right to file x-comp [cross complaint]" and the right to academic accommodations.  Plaintiff was instructed that he should contact Mary Signor about either if he so chose.  (Ex. 52, NYU_00010096 at -10119; *see also* Ex. 6, Stabile Decl. ¶¶ 5-6).

**Response**: Admit that this is what the cited document says but note that Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).

162.    According to Plaintiff, when the Investigators "said [he] could file a cross complaint," he did not "because [he] had believed Jane had suffered many assaults and did not want to cause her distress by reporting her."  (Ex. 33, P002929; *see also* Ex. 6, Stabile Decl. ¶ 7).

**Response**: Deny to the extent that Paragraph 162 is an incomplete statement of fact and note that Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).

163.    Three days later, on July 13, 2018, Hodge "follow[ed] up" because Plaintiff "indicated that [he] wished to provide…several pieces of evidence…and a detailed timeline that

[he] created."  Hodge asked Plaintiff to submit any evidence by July 20, 2018 (one week later).  (Ex. 54, NYU_00004169 at -04172).

> **<u>Response</u>**: Admit that this is an incomplete recounting of what the cited documents say and note that Plaintiff had not seen any evidence offered by Jane except for two photographs she had provided to NYU.  (Pl. Ex. 3 at 161:17-162:4).

164.    Plaintiff did not respond to Hodge until July 20, 2018, and asked for an extension until July 23, 2018, which was granted.  (*Id*. at -04171-72).  On July 23, 2018, Plaintiff asked for "more clarity in terms of the evidence you are looking for."  (*Id*. at -04171).  Hodge told him "if you would like us to consider additional information, for example a timeline that you created or other evidence, this is your opportunity to submit it."  (*Id*. at -04170).

> **<u>Response</u>**: Admit that this is what the cited document says and note that Plaintiff had not seen any evidence offered by Jane except for two photographs she had provided to NYU.  (Pl. Ex. 3 at 161:17-162:4).

165.    On July 25, 2018, Jane submitted additional evidence to the Investigators.  This evidence would become Attachment B in the Investigative Report.  (Ex. 1, NYU_00009755 at -09887).

> **<u>Response</u>**: Admit that this is what the document says but note that although NYU knew Plaintiff would be leaving for Australia, Plaintiff was not provided access to this or any other evidence prior to the release of the Draft Investigation Summary Report.  (Def. Ex. 10, Plaintiff Tr. 133:21-134:7; 136:12-13).

166.    The night of July 28, 2018, Plaintiff messaged Jane (in violation of the NCO), "Hi."  (Ex. 55, P008743).

**Response**: Admit the text of the document says "Hi," but deny its applicability to the present matter because the text in question was not the subject of the Title IX hearing or before the adjudicator or the appeals panel. (*See* Def. Ex. 1; Def. Ex. 13, Hearing Tr.; Def. Ex. 14).

167.   On July 30, 2018, Hodge and Stabile had a call with Jane to confirm that she "wanted to proceed w/ all allegations," and she told them she "wants full investigation" and "not AR [administrative resolution]." (Ex. 56, NYU_00009552-53).

**Response**: Admit that the documents cited say this and that Jane told NYU she wanted to proceed with the four claims identified at her only interview but deny that this constituted a further interview of Jane. (Def. Ex. 56, NYU_00009552-53).

168.   On August 9, 2018, Plaintiff apologized to Hodge and Stabile "for the delay" in submitting evidence and said he would do so by the following afternoon. (Ex. 54, NYU_00004169 at -04169).

**Response**: Admit that this is what the cited document states and note that Plaintiff explained that the delay was caused by the fact that he needed to meet with his advisor, Allen McFarlane, first. (Def. Ex. 54, NYU_00004169).

169.   In his August 9, 2018 email, Plaintiff also stated that he "received a contact from one of the complainants friends recently." Plaintiff stated he was "not sure if this was third party contact or not, however it has made me feel more cautioned about submitting things as well as threatened that she will go further if I do. I am not sure if this entails retaliation but I just wanted to let you know." ( *Id.* at -04169).

**Response**: Admit that this is what the cited document says and note that this text was actually Jane contacting Plaintiff with a false identity. (Def. Ex. 79, P000577).

170.    On August 10, 2018, Plaintiff submitted evidence would become Attachment D in the Investigative Report.  (*See* Ex. 1, NYU_00009755 at -10005-13).

**Response**: Admit but note that Plaintiff had not seen any evidence offered by Jane except for two photographs she had provided to NYU.  (Pl. Ex. 3 at 161:17-162:4).

171.    On August 13, 2018, Signor followed up with Plaintiff about his August 9 email reporting contact from one of Jane's friends: "Can you please provide me with more information and/or evidence that you may have that this individual contacted you?  For example:  name, date, time, and what was asked."  (Ex. 57, NYU_00004208 at -04208).

**Response**: Admit that this is what the cited document says.

172.    Plaintiff never responded to Mary Signor's August 13, 2018 email.  (Ex. 10, Plaintiff Tr. 186:10-16; *id.* at 190:12-20).

**Response**: Admit that Plaintiff did not respond directly to Signor's August 13, 2018 email and note that Plaintiff included the screenshots of the messages and information to Hodge during the investigation, and it was included as evidence in the Investigation Summary Report.  (Def. Ex. 10, Plaintiff Tr. 186:2-16; Def. Ex. 1 at NYU_00010091-093).

173.    On or around August 22, 2018, Plaintiff travelled to Australia for a semester abroad. (Am. Compl. ¶ 169; Ex. 53, NYU_00010120 at -10120).

**Response**: Admit.

174.    In August and September 2018, Hodge and Stabile interviewed three third-party witnesses.  (Ex. 1, NYU_00009755 at -09756).  Two were witnesses suggested by Jane and the third was suggested by Plaintiff.  (Ex. 53, NYU_00010120 at -10142).

**Response**: Admit that NYU interviewed one witness identified by Plaintiff but failed to interview an additional witness identified by Plaintiff at the time.  (Pl. Ex. 2 at 225:3-15).

175.    On October 2, 2018, Hodge sent a draft of the investigative report (the "Draft Report") to Plaintiff and Jane.  (Ex. 58, NYU_0005909 at -05909).  Plaintiff and Jane were asked to "Please review the draft report (including the related attachments) and provide any edits, clarification, or comments (to your statement or others), as you feel is necessary. You are also welcome to identify or provide any additional information or witnesses that you believe should be considered."  Their responses were due ten days later, on October 12, 2018.  (*Id.*).

**Response**: Admit that this is what the cited document says.

176.    The same day, McFarlane texted Plaintiff, "You can comment in the report!!," to which Plaintiff responded, "I understand that. . ."  (Ex. 59, NYU_00024053).

**Response**: Admit that this is what the texts say and note that the full response from Plaintiff was "I understand that, I also had a few new contact interactions with people she knew and I'd like to discuss that with you.  (Def. Ex. 59, NYU_00024053 at #12250).

177.    On October 5, 2018, Plaintiff requested an extension for the deadline to respond to the Draft Report to October 26, 2018. (Ex. 60, NYU_00000073 at -00073).  NYU granted Plaintiff an "extension to Friday, October 19, to submit your response."  (*Id.*).

**Response**: Admit that this is what the document says but note that   Plaintiff requested the extension because he had exams and papers due, and because he would be travelling with limited internet access and that Plaintiff could not download or print the Draft Report, so he could not access the files without an active internet connection.   (Def. Ex. 60, NYU_00000073; Def. Ex. 58, NYU_00005909).

178.    On October 6, 2018, Plaintiff reacted to the Draft Report while messaging with a friend, saying, "So much she put in / She's out to get me."  His friend responded, "But u don't have to do anything right?"  Plaintiff responded, "I do. . . I have to read it all [and] Correct anything

I feel necessary."  (Ex. 36, P061855 at -62717-19).  Plaintiff continued, "And then they submit to office of student conduct / And if they see it fit / I have to have a formal hearing against her."  (*Id.* at -02717).  Plaintiff's friend asked what the "hearing" was.  Plaintiff explained, "3 hour court case basically. . . They listen to both sides / And everything / And I'd have to defend I presume / For college punishment / Which can vary from probation to expulsion."  (*Id.* -02715-16).  Plaintiff added, "It kinda ruins my career if she gets anything on me / Which is panicking."  (*Id.* at -02714).

> **Response**: Admit that the documents say this but deny that Plaintiff believed he could be expelled, that his career would be ruined, or that he was referring to his specific disciplinary process in these messages.  (Pl. Ex. 3, Plaintiff Tr. 198:7-202:11 ("No, I was not facing expulsion as a possible sanction. I was giving [Plaintiff's friend] a broad overview of the entire proceedings and reflecting upon, you know, what the process at NYU was like, not my specific process in which Allen McFarlane had told me that under no circumstance will you be expelled.")).

179.    On October 7, 2018, Plaintiff said he did not "want to read the [Draft Report] word for word and analyze it all" because "it still hurts." (*Id.* at -02698-99).

> **Response**: Admit that the document says this but deny to the extent Paragraph 179 implies that Plaintiff did not attempt to review and respond to the Draft Report.  (Def. Ex. 10, Plaintiff Tr. 35:3-12; *see also* Def. Ex. 1, Attachment H, NYU_00010077-093).

180.    On October 8, 2018, McFarlane spoke with Plaintiff's mother, who "expressed an interest to be a witness."  In response, Hodge told McFarlane that "[Plaintiff] in his response, if he chooses to submit one, could identify witnesses he would like us to consider interviewing with a brief description as to their relevance.  Then, we would make a determination as to whether it would be appropriate to conduct said interview."  (Ex. 61, NYU_00000071 at -00071-72).

> **Response**: Admit that the document says this and note that Plaintiff identified his mother and three individuals from CT University as a potential witness in his response to the Draft Report; NYU did not interview any of them.  (Def. Ex. 1, NYU_00010079).

181.    On October 12, 2018, McFarlane requested an additional extension for Plaintiff to respond to the Draft Report until October 22, 2018.   NYU granted the request.  (Ex. 62, NYU_00000090).

> **Response**: Admit that the documents say this and note that this additional extension was necessary because Plaintiff was travelling in a group of other NYU students where he did not have the privacy necessary to review the sensitive Draft Report.  (Def. Ex. 62, NYU_00000090).

182.    On October 21, 2018, Plaintiff asked McFarlane to review his response to the Draft Report.  Plaintiff stated, "I didn't want to submit more evidence unless they asked for it."  In response, McFarlane told him, "[t]his is the opportunity to share items that you believe are important[;] not if they ask.  Consider this the ask.  Does that make sense?"  Plaintiff responded "Allright," and later, "I have included all the evidence that I found pertinent."  (Ex. 59, NYU_00024053).

> **Response**: Admit that the documents say this but note that Plaintiff's response was based on McFarlane's promise that "under no circumstance would [Plaintiff] be expelled."  (Def. Ex. 10, Plaintiff Tr. 122:3-11).

183.    On October 22, 2018, Jane and Plaintiff each submitted responses to the Draft Report that were included in the final Report as Attachments G and H respectively.  (*See* Ex. 1, NYU_00009755 at -10067-93).  Plaintiff's narrative response was less than a page and a half.  (*Id*. at -10079-80).  Jane's was six pages.  (*Id*. at -10071-76).

**Response**: Deny — Plaintiff's response to the Draft Report included fourteen pages of responses and additional evidence. (Def. Ex. 1, NYU_00010079-093).

184. Plaintiff's response to the Draft Report did not specifically request that NYU interview any additional witnesses, but identified the following individuals with knowledge on certain topics:

- Plaintiff's mother who could testify that "complainant was aware of all of my visits [to NYU while he was enrolled at CT University] and it was mutually agreed at all times, at times she would even push me to stay for longer. . .").

- A Title IX officer at CT University, with whom he "discussed what I was going through with the complainant [prior to Plaintiff's enrollment at NYU] and how much [her 2016 sexual assault] hurt me vicariously."

- A professor and academic advisor at CT University, with whom he "discuss[ed] my relationship with the complainant and how it was affecting me in many ways."

(*Id*. at -10079).

**Response**: Deny. As outlined in Paragraph 180, Hodge knew Plaintiff wanted to him to interview his mother as a witness, and as requested by Hodge, Plaintiff identified his mother and provided a description of her relevance. (Def. Ex. 61, NYU_00000071-72; Def. Ex. 1, NYU_00010079). Plaintiff did the same for the three individuals from CT University. (Def. Ex. 1, NYU_00010079).

185. Plaintiff's response to the Draft Report also stated that in "July 2018, I received texts from the mysterious third party whose name I still do not know" and attached a screenshot of messages from a "Soupy Noodle." (*Id*. at -10080, -10092-94).

**Response**: Admit that the document says this and note that nobody at NYU followed up with Plaintiff regarding the information he provided in his response to the Draft Report. (Def. Ex. 10, Plaintiff Tr. 190:23-191:12).

186.    NYU did not interview Plaintiff's mother because "she didn't have any relevant and pertinent information," and "[t]he fact that the two of them were in a relationship or engaged with each other for some time. . . We didn't need a witness to confirm that fact.  It was not in dispute." (Ex. 4, Hodge Tr. 229:11-230:22).

**Response**: Deny — Plaintiff and Jane disputed key aspects of their relationship, making Plaintiff's mother a relevant witness, for example, Plaintiff's response to the Draft Report identified Plaintiff's mother as someone who could testify that "complainant was aware of all of my visits [to NYU while he was enrolled at CT University] and it was mutually agreed at all times, at times she would even push me to stay for longer…." (Def. Ex. 1, NYU_00010079), while Jane's response to the Draft Report stated, "I started disliking [Plaintiff] visiting," and "I told him I didn't want him to visit…."  (Def. Ex. 1, NYU_00010071).

187.    NYU did not interview the CT University employees because Plaintiff "had just told them about something in the complainant's past which was not subject to this investigation so there was no reason to interview them as they didn't have relevant and pertinent information as to [Jane's] allegations against John."   (*Id.* at 226:2-19).  The "sacrifices or emotional toll that [Plaintiff] had in the past prior to NYU unrelated to the investigation would just not be relevant." (*Id.* at 297:10-18).

**Response**: Deny — Jane had stated Plaintiff's decision to transfer to NYU as something that "shocked" her, and portrayed Plaintiff's actions as mere attempts to be closer to her

after she tried to distance herself from him, (*see* Def. Ex. 1, NYU_00010071-072) but the witnesses from Plaintiff's former school were relevant because they could have provided information and context regarding how Plaintiff was affected by the alleged rape incident Jane had told him about, the sacrifices and emotional toll this took on Plaintiff, and how this contributed to his desire to transfer to NYU.  (Def. Ex. 1, NYU_00010079).

188.    NYU did not investigate the "mysterious third party" further because "whether or not a mysterious third party who's not identified exists or doesn't exist doesn't really make it more likely or not that one of the other allegations did or did not take place."  (*Id*. at 235:6-19; 252:11-253:6).

**Response**: Deny — Plaintiff had informed NYU the messages from this individual had "made me feel more cautioned about submitting things as well as threatened that [Jane] will go further if I do.  I am not sure if this entails retaliation but I just wanted to let you know," which is an issue relevant to the integrity of the process, the credibility of Jane, and constituted a potential violation of NYU's Policy.  (Def. Ex. 54, NYU_00004169)

189.    On October 23, 2018, Hodge and Stabile finalized the investigative report ("the Report") and sent it to Plaintiff, Jane, and OSC.  (*See generally* Ex. 1, NYU_00009755).  Hodge and Stabile determined that there was "sufficient evidence to be considered by an adjudicator as to whether [Plaintiff] violated" the Policy.  (*Id*. at -09774).

**Response**: Admit that the Report was finalized on October 23, 2018, and sent to Plaintiff, Jane, and OSC, and that the investigators determined there was sufficient evidence to proceed to a hearing but deny to the extent that Paragraph 189 implies Plaintiff did in fact violate NYU's Policy.

190.    Plaintiff does not dispute the authenticity of the videos, electronic messages, or voicemails included in the Report.  (Ex. 10, Plaintiff Tr. 40:5-19).

**Response**: Admit this was Plaintiff's testimony but deny to the extent that Paragraph 190 implies Plaintiff did in fact violate NYU's Policy.

## X.    OSC Coordinates the Hearing

191.    On October 29, 2018, Maeder informed Plaintiff and Jane that the Hearing would be scheduled for November 19, 2018, at 10 AM EST.  (Ex. 63, NYU_00006515 at -06515). Maeder had mistakenly scheduled the Hearing for 2 AM in Sydney, Australia, where Plaintiff was studying at the time, because she "confused the time change."  (Ex. 7, Maeder Tr. 62:3-7).

**Response**: Admit that this reflects the originally scheduled date and time for the hearing and that Maeder testified that she was confused about the time change.

192.    Maeder's email stated that one of "[t]he potential sanctions" was "Dismissal from NYU."  (Ex. 63, NYU_00006515 at -06516).

**Response**: Deny.  Unlike McFarlane's promise that Plaintiff would not be expelled, the list of potential sanctions in Maeder's email related to any violation of NYU's Policy and was not specifically tailored to Plaintiff's case.  (Pl. Ex. 3, Plaintiff Tr. 111:22-112:1; Def. Ex. 63, NYU_00006516).

193.    Upon receipt of Maeder's email, Plaintiff texted McFarlane, "as you probably understand, I am very worried."  (Ex. 59, NYU_00024053; Ex. 10, Plaintiff Tr. 214:25-215:7 (Plaintiff was "worried about a potential sanction.")).  At this time, Plaintiff was "trying to defend" himself "[t]o the best of [his] abilities given all the difficulties."  (Ex. 10, Plaintiff Tr. 215:8-15).

**Response**: Deny to the extent that Paragraph 193 implies Plaintiff believed that if he was found responsible he would receive a sanction that was more severe than a one-semester

suspension.  (Ex. 10, Plaintiff Tr. 214:25-215:7 (Plaintiff was "worried about a potential sanction," not expulsion).

194.    On November 11, 2018, Plaintiff emailed Maeder to ask to have the time of the Hearing moved to 4 PM EST, which would be 8 AM in Sydney, and for the day to be changed from November 19 to either November 29 or November 30.  (Ex. 64, NYU_00006594 at -06596). Plaintiff also requested that his roommate participate in the Hearing.  (*Id.*).  Because McFarlane would be in New York, Plaintiff also asked if someone from NYU Sydney could be "present during the [H]earing so that there is some support for me in person."  (*Id.*).

**Response**: Admit.

195.    On November 13, 2018, Maeder responded to Plaintiff that the Hearing would be rescheduled to 1 PM EST (5 AM in Sydney) on November 19.  (*Id*. at -06594).  She also told Plaintiff that she had asked "all witnesses to confirm their participation," but even if his roommate did not participate, "all statements made in the investigation report will be considered in the decision."  (*Id.*).  Maeder emailed Plaintiff's roommate four times in an effort to get him to participate, even though he stopped answering Maeder's emails.  (*See* Ex. 65, NYU_00006847). Maeder also informed Plaintiff that she was connecting with "Wellness to make sure there is an NYU counselor on standby during the hearing for you in Sydney."  (Ex. 64, NYU_00006594 at -06594).

**Response**: Deny that Maeder sent multiple follow-up emails after Plaintiff's roommate did not respond, as Maeder's November 16, 2018 email indicated that a subsequent email would be sent once the hearing was rescheduled, requiring no response (Def. Ex. 65, NYU_00006848); Maeder's November 19, 2018 email provided the rescheduled time for

the hearing (Def. Ex. 65, NYU_00006848); and Maeder then sent one follow-up email on December 6, 2018.  (*Id*.).

196.    On November 14, 2018, Plaintiff's mother emailed Maeder because she did not believe the Hearing taking place at 5 AM would be fair, and because she wanted Plaintiff to have a private room to participate in the Hearing with someone from Wellness present (an issue Plaintiff had not raised in his prior email to Maeder).  (Ex. 66, NYU_00031700 at -31701).

**Response**: Admit.

197.    Plaintiff's mother acknowledged in this email that "the consequences for [John] can mean expulsion or losing a semester."  (*Id*.)

**Response**: Deny.  Plaintiff's mother explained at her deposition that she did not believe Plaintiff would be expelled and had only included this in an attempt to have the hearing time rescheduled to a reasonable hour after multiple earlier requests had been denied.  (Def. Ex. 46, JD Mother Tr. 259:25-260:20).

198.    Plaintiff's mother forwarded her email to Plaintiff on November 15, 2018.  (*Id*. at -31700).

**Response**: Admit.

199.    Plaintiff told his friend on the same day: "My mom said if this case doesn't go down well I don't get to go to India [over winter break] . . . [My mom's] right / if something goes on my academic record / I won't get into med school / So I'd need to go back and appeal in person and probably seek legal advice."  When his friend asked what the chances of that happening were, Plaintiff responded, "Idk [I don't know] / That's what sucks / She's just gone wild w[ith] / the amount of info she's put in."  (Ex. 36, P061855 at -62466-69).

**Response**: Admit that this is what the cited documents say but deny that Plaintiff believed a one-semester suspension — the "worst case scenario" promised by McFarlane — would prevent him from going to medical school (Def. Ex. 10, Plaintiff Tr. 111:22-112:1) and note that Plaintiff's interpretation was that "with a suspension, provided good standing, [a transcript notation] could be removed" allowing him to pursue medical school.  (Def. Ex. 10, Plaintiff Tr. 168:18-169:9).

200.    "There were moments leading up to the hearing" when Plaintiff "was concerned as any reasonable individual was. . . I felt pretty assured.  But like any person, I was worried."  (Ex. 10, Plaintiff Tr. 228:17-229:8).

**Response**: Deny as this is an incomplete characterization of Plaintiff's testimony.  Plaintiff testified that he was generally concerned, but that he "was not concerned about an expulsion" because of the promises made by his advisor.  (Def. Ex. 10, Plaintiff Tr. 228:17-229:8).

201.    Maeder informed Plaintiff on November 15, 2018, that the Hearing would be rescheduled "to a later date to accommodate the time difference. . . after Thanksgiving Break and before the end of the semester.  I will work with the Sydney staff to provide you with a private location to participate in the hearing.  I will have any update for you in the next few days regarding date and time of the hearing (most likely starting sometime between 7am – 8am Sydney time)." (Ex. 67, NYU_00000230).

**Response**: Admit.

202.    Also on November 15, 2018, when informed that the Hearing would be postponed, Jane asked if "there was any way to have the hearing before Thanksgiving" given the "numerous,

continual delays in the process with Title IX."   Maeder denied her request.   (Ex. 68, NYU_00006658 at -06658).

> **<u>Response</u>**: Admit that the cited documents partially say this and note that Maeder said "unfortunately, I am unable to reschedule the hearing prior to Thanksgiving break," and offered to assist in obtaining academic accommodations and to meet Jane in person to go over the hearing process.   (Def. Ex. 68 at NYU_00006658).

203.   On November 20, 2018, Maeder scheduled the Hearing for December 10, 2018, at 4 PM EST, 8 a.m. in Sydney.   She informed Plaintiff that she would provide him a room, that both of his advisors could attend, and that if he needed academic accommodations he should not hesitate to ask.   (Ex. 69, NYU_00006699 at -06699).

> **<u>Response</u>**: Deny that Plaintiff had two advisors, Lauren Stahl was a support person, not an advisor, (Pl. Ex. 12, Stahl Tr. 21:24-22:3) and admit that the remainder of Paragraph 203 is stated in the cited document.

204.   On November 22, 2018, Plaintiff stated that his stress about the proceeding "is made worse as he is rehashing all of the documents and looking at pictures / text messages of his time with his ex." (Ex. 24, NYU_00001091 at -01106).   On November 29, 2018, Plaintiff stated that "he and his mother have spent a lot of time this week going over questions the hearing might raise and she has been supporting him in how best to answer." (*Id*. at -01104).

> **<u>Response</u>**: Admit that that the notes from Plaintiff's therapy sessions written by Stahl say this.

205.   Plaintiff received every "academic accommodation [he requested] from NYU in connection with the Title IX process," his request was never denied, and he "did not request

accommodations to attend the hearing in person" in New York.  (Ex. 10, Plaintiff Tr. 367:15-368:2).

> **<u>Response</u>**: Deny to the extent that Plaintiff's request that the hearing be delayed until he returned to New York so that he could attend the hearing in person was denied.  (Plaintiff Tr. 240:13-25).

## XI.    The Hearing

206.    The Hearing was held on December 10, 2018, from 4 PM EST until approximately 11 PM EST in New York (December 11 in Sydney, from 8AM until approximately 3 PM).  ((*See* Ex. 13, Hearing Tr. 2:14-17, 331:11-14) (Hearing on record from 4:31 PM EST to 11:06 PM EST)); (Ex. 10, Plaintiff Tr. 240:12-241:4).

> **<u>Response</u>**: Admit.

207.     The participants included Plaintiff and his advisor in Sydney, and Jane, Jolley, Hodge, Maeder, and McFarlane in New York.  (*See* Ex. 13, Hearing Tr. 3:3-5:8).

> **<u>Response</u>**: Deny that Lauren Stahl was an advisor (Pl. Ex. 12, Stahl Tr. 21:24-22:3) and deny as an incomplete statement of fact because Will Miller, general counsel for NYU, and Christine Janick, Jane's advisor, were also present.  (Def. Ex. 13 at 3:13-16; Def. Ex. 2 at NYU_00001803).

208.    After a short introduction and overview of the Hearing process, (*Id.* at 2:4-17:12), the Adjudicator asked Hodge to provide a summary of the allegations.  (*Id*. at 17:15-29:13).  This was followed by the Adjudicator asking Jane a series of questions and an opportunity for Plaintiff to suggest additional questions for the Adjudicator to ask.  (*Id*. at 29:14-134:10).

> **<u>Response</u>**: Admit but note that Hodge's summary was inaccurate and not all of the questions that Plaintiff submitted were asked.  (Def. Ex. 13, Hearing Tr. 129:25-130:3).

209.    Next, the Adjudicator posed a series of questions to Plaintiff and provided an opportunity for Jane to suggest additional questions.  (*Id.* at 136:9-279:8).

**Response**: Admit.

210.    Two witnesses also provided testimony and both Plaintiff and Jane were given the opportunity to suggest questions for each witness.  (*Id.* at 285:3-313:7).

**Response**: Admit but note taht not all of the questions that Plaintiff submitted were asked. (Def. Ex. 13, Hearing Tr. 311:19-22).

211.    Finally, Jane and Plaintiff were given the opportunity to make closing remarks.  (*Id.* at 313:12-327:15).  The Adjudicator then concluded the Hearing.  (*Id.* at 327:18-331:21).

**Response**: Admit.

212.    A review of the transcript of the Hearing indicates that, like many remote proceedings, there were some technical difficulties.  (*See e.g., id.* at 31:1-14).  However, when there were issues, NYU would repeat page numbers, questions, and/or ensure that anything Plaintiff or Jane could not hear was repeated.  (*See, e.g.*, *id.* at 31:1-17 (fixing audio issue and confirming that Plaintiff could hear); 34:7-15 ("I want to make sure that you're able to hear everything and it doesn't cut in and out. . . I don't want you to miss something, [John]"); 74:22-23 (repeating page number), 78:13-16 (clarifying page number), 89:10-11 (asking Jane to "speak up")); *see also* Ex. 9, McFarlane Tr. 61:17-24 (audio issues were resolved immediately).

**Response**: Deny as an incomplete statement of fact because Plaintiff experienced audio and visual issues throughout the hearing process and often Jolley would turn off the video in an attempt to fix the audio.  (Def. Ex. 13, Hearing Tr. 18:2-10; 31:1-17; 33:20-34:4; 120:4-10; 137:19-138:15; 151:18-22; 200:3-5; 201:11-15; 225:25-226:6; 228:25-229:14; 270:12-16; 274:10-14; 319:13-22; 327:20-328:5; Def. Ex. 10, Plaintiff Tr. 248:18-23).

213.     During the Hearing, Plaintiff had multiple devices on which to view the Report and participate in the Hearing remotely. (Ex. 10, Plaintiff Tr. 247:17-248:5; Ex. 70, Stahl Tr. 40:11-19); (*see also id.* at 37:9-17 (Stahl did not observe Plaintiff struggling to follow testimony during the Hearing)).

**Response**: Admit that during the hearing, after observing Plaintiff struggling to simultaneously review the Report and follow the hearing, Stahl provided Plaintiff with her iPad halfway through the hearing to view the Report on.  (Def. Ex. 10, Plaintiff Tr. 247:21-249:6) but deny that Plaintiff did not struggle to follow testimony during the hearing.  (*Id*.).  Unlike everyone else who attended the hearing in New York, Plaintiff was not provided a hard copy of the Report despite his request that one be provided.  (Pl. Ex. 3, Plaintiff Tr. 143:18-144:3).

214.     During the Hearing, Plaintiff admitted that he transferred to NYU even though Jane told him she did not want him to.  (Ex. 13, Hearing Tr. 148:5-24).

**Response**: Deny — Jane reviewed Plaintiff's application essay and had expressed support for his transfer to NYU.  (Def. Ex. 1, NYU_00009765).

215.     During the Hearing, Plaintiff admitted that he switched housing assignments with another student, and that he was placed in Jane's dormitory as a result.  (*Id*. at 150:12-151:13).

**Response**: Deny — Plaintiff switched dormitories with another student through NYU's roommate swap because he "didn't want to live in Lafayette, and [he] didn't want to pay $10,000 a semester for a single" (Def. Ex. 13, 150:12-16), and the only person who responded to Plaintiff's request to swap housing assignments was a student from University Hall.  (Def. Ex. 13, Hearing Tr. 150:17-19).

216.     During the Hearing, Plaintiff admitted that he changed his major upon transfer at NYU, selecting Jane's major on his own.  (*Id*. at 43:19-44:2).

**Response**: Deny — as stated in Plaintiff's Response to Paragraph 50, while Public Health was not Plaintiff's original major, he had been on the pre-med track and was the treasurer for a club at CT University that was primarily involved in public health, which formed the bases for his choice of major.  (Def. Ex. 13, Hearing Tr. 149:18-25).

217.     During the Hearing, Plaintiff admitted that he knew "Jane didn't want to talk to [him] and she just wanted [him] gone" once she discovered he had transferred to NYU.  (*Id*. at 155:21-156:3).

**Response**: Deny — after Plaintiff transferred to NYU, Plaintiff and Jane resumed a relationship, Jane told NYU that she frequently slept in Plaintiff's dorm room, and the couple engaged in intimate conduct.  (Def. Ex. 1, NYU_000009759-760).

218.     During the Hearing, Plaintiff admitted that he took photos of Jane's "cleavage" and bare stomach without her consent when he was a student at CT University and after enrolling at NYU.  (*Id*. at 169:3-170:12).

**Response**: Deny — Plaintiff never admitted to taking any non-consensual photos of Jane, and none of the photos he took had any sexual intent.  (Def. Ex. 13, Hearing Tr. 169:3-170:12 (denying any intent and explaining that he "very willingly let Jane delete all of [the photos]"); Def. Ex. 10, Plaintiff Tr. 156:18-23 ("it was not taken for any sexual purpose. It was taken I believe because she had put an elephant in her shirt and it was taken as a funny picture, not with any…sexual intentions whatsoever.")).

219.     During the Hearing, Plaintiff admitted that by March 2018, "things had deteriorated" between him and Jane, and she was "trying to call it off."  (*Id*. at 171:15-20).

**Response**: Deny as an incomplete statement of fact as Jane was also a cause of the relationship's deterioration.  (Ex. 10, Plaintiff Tr. 41:5-42:7).

220.    During the Hearing, Plaintiff admitted that he "kind of got angry" on March 10, 2018, when Jane declined to talk to him about remarks made earlier in the evening, and that he "did knock" on her door "a little more aggressive[ly]" because he "got a little angry" when she would not let him into her room.  (*Id*. at 176:4-15, 177:6-13).  When Jane left her room with another student who had come to get her, Plaintiff admitted that he followed them "to see how it played out."  (*Id*. at 182:12-183:8).

**Response**: Deny — Plaintiff had also been invited to join the group in Rubin Hall.  (Def. Ex. 13, Hearing Tr. 182:25-184:13 (Plaintiff explaining that "he asked me to go with him as well" and "it wasn't me forcing myself.  I did have an invite…") and further deny as an incomplete statement of fact because Jane called Plaintiff homophobic slurs and insulted him in front of his friends, and isolated Plaintiff from his friends.  (Def. Ex. 10, Plaintiff Tr. 58:10-25; Def. Ex. 13, Hearing Tr. 174:16-176:15).

221.    During the Hearing, Plaintiff admitted that he "understood that" Jane "didn't want a friendship" and "did not want to be in communication with [him] or continue the relationship as of April 2, 2018.  (*Id*. at 200:6-14).

**Response**: Deny as an incomplete statement of fact as Jane agreed to talk to Plaintiff on April 8 in Lipton Hall. (Def. Ex. 13, Hearing Tr. 204:8-9).

222.    During the Hearing, Plaintiff admitted that he "confronted" Jane in person on April 8, 2018 and that Jane kept crying during their conversation.  (*Id*. at 203:16-204:9 ("It was a negative cycle . . . I couldn't get anything through to her.").  Plaintiff further admitted that even though he nor Jane were "calm enough" to continue speaking, he "wanted to keep talking."  (*Id*.

at 205:15-20.)  According to Plaintiff, the confrontation only ended because Jane's friends started "watching us."  (*Id.*).

> **Response**: Admit that Plaintiff said he "confronted [Jane] about it.  And she said, okay, let's talk then."  (Def. Ex. 13, Hearing Tr. 204:8-9; Plaintiff's Response to ¶80).  Deny that only Jane was crying; both Plaintiff and Jane were crying during this conversation.  (Def. Ex. 13, Hearing Tr. 206:2-3; Plaintiff's Response to ¶82).  Deny the conversation ended because Jane's friends started "watching us;" Plaintiff felt that his private conversation with Jane was being treated "like a big show to everyone…."  (Def. Ex. 13, Hearing Tr. 206:3-5; Plaintiff's Response to ¶84).

223.    During the Hearing, Plaintiff admitted that he "sort of lost it" on April 21, 2018, and that "Everything that had led to that moment just all sort of came down on me and, you know, I couldn't control it."  (*Id*. at 214:10-17).

> **Response**: Admit that the cited documents say this and note that Plaintiff was upset because he had planned a birthday party for Jane on her birthday the month before, so he found it particularly hurtful that on his birthday "not only had she sort of completely ignored it, but on top of that she had totally isolated me from my friends. They were not communicating with me anymore, they told me to F off, they called me a motherf'er, they had told me don't contact me again, blocked me without any context, and I just felt very isolated and alone."  (Def. Ex. 10, Plaintiff Tr. 58:10-25; Plaintiff's Response to ¶95).

224.    During the Hearing, Plaintiff admitted that when he and Jane spoke early that morning, he leaned in" towards Jane, and she "punched" him, so he "backed away."  (*Id*. at 222:1-7).  After Jane told him it was "self-defense," Plaintiff said, "I'd never do something like that."

He then "stood in front of her" and said, "I'm threatening you right now.  Punch me."  (*Id.* at 223:10-20).

> **<u>Response</u>**: Admit that the cited documents include the quoted text but deny that Plaintiff
>
> was threatening Jane as he was standing "a distance away from her" with his "hands behind
>
> [his] back" when he made these statements.  (Pl. Ex. 3 at 60:24-61:13).

225.    During the Hearing, Plaintiff admitted that some of his subsequent messages later

that day were meant "to suggest to [Jane] that he "might send" photographs to Jane's friends or

family that depicted their relationship.  (*Id.* at 219:3-20; 320:16-321:4).

> **<u>Response</u>**: Deny that Plaintiff ever intended to send anything to Jane's friends and family.
>
> (Def. Ex. 13, Hearing Tr. 320:16-321:4 ("it was not something that I was going to follow
>
> through on and something that I never had that intention to do")).

226.    During the Hearing, Plaintiff admitted that he received the NCO on April 22 and

understood it.  (*Id.* at 232:22-233:10; 234:23-235:2).

> **<u>Response</u>**: Admit.

227.    During the Hearing, Plaintiff admitted that he nevertheless sent Jane a Facebook

message 23 minutes after receiving the NCO. (*Id.* at 233:11-18).  Plaintiff explained this conduct

by saying "[w]hen I got the [NCO] I just – I couldn't take it seriously … I was just like no-contact

directive, whatever.  Just send the text."  (*Id.* at 234:5-22).

> **<u>Response</u>**: Admit that Plaintiff admitted to violating the no contact order because he
>
> wanted to apologize and fix things with Jane, (Def. Ex. 10, Plaintiff Tr. 102:21-103:8) and
>
> note that Signor and Maeder, they assured him that because he was "up front and honest,
>
> that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10,
>
> Plaintiff Tr. 86:14-87:4).

228.    During the Hearing, Plaintiff admitted that he left Jane five voicemail messages after the NCO. (*Id.* at 235:11-22).

**Response**: Deny the five voicemails from April 22, 2018, constituted violations of the NCO because they predated the issuance of the NCO, (Def. Ex. 1, NYU_00009973-975) and note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

229.    During the Hearing, Plaintiff admitted that on April 29, 2018, he confronted Jane in person, stating, "I'm not going to even try and deny it. I violated the no-contact directive there directly… I didn't know how to deal with it.  I honestly still don't know how to deal with it."  (Ex. 13, Hearing Tr. 240:21-241:1; 246:22-247:4; *see also id.* at 240:21-241:14 ("I absolutely lost it…I couldn't take it.").

**Response**: Admit that Plaintiff admitted to violating the no contact order because Plaintiff was provoked by a friend of Jane who was making derogatory comments about him, (Def. Ex. 10, Plaintiff Tr. 102:21-103:8) and note that Signor and Maeder, they assured him that because he was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings." (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

230.    Plaintiff could not identify any questions he answered incorrectly during the Hearing.  (Ex. 10, Plaintiff Tr. 253:19-254:2).

**Response**: Deny — Plaintiff did not say that he did not answer any questions incorrectly during the hearing.  (Def. Ex. 10, Plaintiff Tr. 253:19-254:2 ("I can't remember exactly right now.  I would have to…review the entire hearing again…I can't remember now exactly what it was"); *See e.g.* Def. Ex. 13 at 71:20, 192:9, 237:3).

231.    Plaintiff never requested that the Hearing be adjourned because of technical difficulties. (*Id*.).

**Response**: Deny that Defendant's Exhibit 10, Plaintiff Tr. 253:19-254:2 supports the purported fact stated in Paragraph 231.

232.    At the end of the Hearing, Plaintiff concluded "by thanking everyone in the room for accommodating [] my time difference in NYU Sydney. . . I really appreciate it and making this a fair hearing, you know, for me as well.  Also, you, Craig Jolley, Colleen Maeder, and everyone who responded and made sure that I, you know, had a fair opportunity at telling my story."  (Ex. 13, Hearing Tr. 327:4-13).

**Response**: Admit that the cited document says this and deny Plaintiff made this statement because the Hearing was in fact fair; he was in fact thanking them for moving the hearing from the original 2:00 a.m. start time.  (Pl. Ex. 3, Plaintiff Tr. 278:22-279:13).

233.    After the Hearing, Plaintiff told his Sydney counselor that "he felt confident that he stated his case to the best of his ability."  (Ex. 24, NYU_00001091 at -01098).

**Response**: Deny that Plaintiff made this statement to his counselor.  (Pl. Ex. 3, Plaintiff Tr. 283:23-285:3 ("I certainly don't recall making the express statement that I was confident").

234.    On December 12, 2018, Plaintiff told his Sydney counselor that he was feeling "quite positive" about the Hearing.  (*Id*. at -01101).

**Response**: Admit that Plaintiff felt positive at the time because of the reassurances from McFarlane and Stahl about how the hearing went, and because of McFarlane's "promise that [Plaintiff] would under no circumstances be expelled."  (Pl. Ex. 3, Plaintiff Tr. 280:8-281:7).

## XII.   The Decision

235.   On December 18, 2018, Maeder sent the Adjudicator's decision (the "Decision")

to Plaintiff and Jane.   (*See* Ex. 71, NYU_00007055).   The Adjudicator, Craig Jolley, found

"overwhelming evidence that the Respondent has engaged in an extended pattern of conduct that

would cause a reasonable person in the position of the Complainant to experience fear for their

safety, substantial emotional distress, significant mental suffering, and anguish. This behavior has

included sexual harassment, sexual exploitation and stalking as defined under the [Policy]." (Ex.

2, NYU_00001803 at -01808).

> **Response**: Admit that this was the rationale stated in Jolley's Decision .

236.   Jolley found that there was not "sufficient evidence to support a finding of sexual

assault."  (*Id.* at -01805).

> **Response**: Admit that this was the rationale stated in Jolley's Decision.

237.   Jolley found that because Plaintiff himself "acknowledged that he did take photos

of Complainant while she slept" and "that some of the photos may have shown 'cleavage,'" that

he found "it more likely than not that Plaintiff engaged in sexual exploitation." (*Id.* at -01805-06).

Even if pictures were taken when Plaintiff "was not enrolled at NYU," he was still responsible for

sexual exploitation at NYU "[d]epending on how [Plaintiff] used it while [he was] a student at

NYU." (Ex. 72, Jolley Tr. 137:11-23).

> **Response**: Admit that NYU_00001805-806 contained Jolley's rationale for finding
>
> Plaintiff responsible for sexual exploitation and deny that Jolley's deposition testimony
>
> reflects what his stated rationale was in the decision or is an accurate interpretation of
>
> NYU's definition of sexual exploitation.   (Def. Ex. 2, NYU_00001805-806;
>
> NYU_00001804).

238.    Jolley found that Plaintiff "intentionally attempted to create circumstances where he could control and manipulate the Complainant's life," that "repeated unwelcome conduct from [Plaintiff]" constituted "unwelcome conduct of a sexual nature," and that "a reasonable person in the position of the Complainant" would "fear for their safety and experience substantial emotional and mental distress."  (Ex. 2, NYU_00001803 at -01806-07).  As a result, Jolley found "that there is overwhelming evidence that the Respondent has engaged in an extended pattern of conduct that would cause a reasonable person in the position of the Complainant to experience fear for their safety, substantial emotional distress, significant mental suffering, and anguish."  (*Id*. at -01808).  Jolley cited the "hundreds of messages that the Respondent sent the Complainant expressing his desire to remain in contact" with her "[d]espite the Complainant repeatedly communicating her desire to end the relationship."  (*Id*. at -01806).  Jolley also cited Plaintiff's statements during the Hearing and videos included in the Report.  (*Id*. at -01806-07).  Jolley also stated:  "The respondent denied that he was following the Complainant and suggested that he believed it was the Complainant who was following him.  I do not find the Respondent's explanation to be credible and believe that his conduct was a continuance of a pattern of behavior…"  (*Id*. at -01807).

**Response**: Admit that Paragraph 238 accurately reflects the content of Jolley's decision.

239.    Jolley explained during his deposition that Plaintiff's harassment of Jane was sexual in nature because "the entire motivation for [Plaintiff's] unwelcomed conduct was a product of their prior dating, intimate and sexual relationship."  (Ex. 72, Jolley Tr. 197:18-21, 198:4-10).

**Response**: Admit that this was the rationale stated in Jolley's Decision but deny that Plaintiff's actions were sexual in nature as defined by the Policy.  (Ex. 13, Hearing Tr. 200:6-14).

240.    Jolley did not consider whether or not any of Jane's actions constituted violations of the Policy because Plaintiff had not brought a cross-complaint against Jane.  (*Id.* at 142:21-144:8).

> **Response**: Admit that Jolley's role was not to consider whether Jane had engaged in any violation of university policy because those charges were not before Jolley at the December 10, 2018 hearing.  (Def. Ex. 72, Jolley Tr. 142:21-144:8).

241.    Based on "the totality of circumstances, the threatening and excessive nature of the Respondent's conduct, the repeated and blatant disregard of the University's no-contact directive, and most notably, the unsettling and egregious pattern of stalking behaviors," Jolley sanctioned Plaintiff with expulsion and a transcript notation.  (Ex. 2, NYU_00001803 at -01808; *see* Ex. 8, Jolley Decl. ¶ 4-5 (explaining the rare and serious nature of violating an NCO and that Plaintiff "purposely [and] repeatedly ignored NYU directives" was "a significant factor" in his decision to expel Plaintiff).

> **Response**: Admit that the cited text reflects the content of Jolley's decision but deny the portion of Jolley's declaration referenced as accurate because it is contradicted by statements made by Signor and Maeder that because Plaintiff was "up front and honest, that [the NCO violations] shouldn't be an issue in these proceedings."  (Def. Ex. 10, Plaintiff Tr. 86:14-87:4).

242.    Plaintiff's expulsion was "held in abeyance through the completion of any appeal proceedings, if applicable." (Ex. 2, NYU_00001803 at -01808).

> **Response**: Admit.

### XIII.   Plaintiff's Appeal

243.    Shortly after receiving the Decision, Plaintiff messaged a friend, "I'm gonna get my old laptop at home, I remember having stuff on there."  (Ex. 35, P058064 at -08316).  Plaintiff sent this message before he returned home and before he retained an attorney for his appeal.

**Response**: Admit that the cited document says this, and deny that Plaintiff had access to his old laptop or hard drive while in Australia.  (Pl. Ex. 3, Plaintiff Tr. 353:2-354:5).

244.    On December 21, 2018, Plaintiff requested an extension of time to file an appeal, until January 11, 2019.  NYU granted Plaintiff's request.  (Ex. 73, NYU_00007112).

**Response**: Admit.

245.    On January 3, 2019, after Plaintiff retained a lawyer, he made a second request for an extension, until January 25, 2019.  (Ex. 74, NYU_00000691).  NYU also granted this request, but because the "appeals process will now intersect with the start of the Spring semester," NYU "determined that the expulsion sanction, which was held in abeyance through the completion of the appeal proceedings, will go into effect immediately."  (*Id.*).

**Response**: Admit that the cited document says this.

246.    Jolley decided to have the expulsion go into effect immediately upon the second semester because he was only "comfortable with the sanctions being stayed" while "neither student would be on campus."  Once it was clear that "the appeal process would not be resolved by the time both students returned to campus," Jolley "felt we would grant the extension but the sanctions would have to go into effect immediately."  (Ex. 72, Jolley Tr. 213:18-214:14).

**Response**: Admit that the cited document says this.

247.    NYU (and specifically Jolley) has previously implemented sanctions while the appeal process is pending in multiple cases other than Plaintiff's, including in cases where the respondent was female.  (*Id.* at 215:25-218:13).

**Response**: Admit Jolley said this at his deposition but deny that there is any documentary evidence to support whether Jolley has previously implemented sanctions while the appeal process was pending.  (*See* Pl. Ex. 4, NYU_00037051).

248.    On January 25, 2019, Plaintiff served his appeal.   (*See generally* Ex. 14, NYU_00011361).

**Response**: Admit that Plaintiff provided his appeal to NYU on January 25, 2019 but deny that Defendant's Exhibit 14 constitutes Plaintiff's full appeal.  For Plaintiff's full appeal, see Plaintiff's Exhibit 16.

249.    *New Evidence.*  Plaintiff offered as "previously unavailable" evidence under the Procedures several affidavits from friends and family and messages that he had not submitted during the investigation.  He also submitted the results of a Freedom of Information Act request that he made to the New York Police Department regarding Jane's 2016 sexual assault.  Plaintiff argued that his evidence was new "in that it was not accessible" while he was in Australia."  (*Id*. at -11361).

**Response**: Admit that this reflects a portion of Plaintiff's new evidence but deny as incomplete because it fails to reference additional evidence provided by Plaintiff (*see* Pl. Ex. 16), and deny NYU's characterization of the evidence.

250.    *Procedural Error.*  Plaintiff argued that the finding that he committed sexual harassment was a procedural error because his conduct toward Jane after their break-up was not "sexual in nature" and he "in no way made any sexual advance or request to Complainant during the relevant time period," arguing instead he "was responding" to Jane's "bullying."  (*Id*. at -11366).  Plaintiff also argued that the finding he stalked the Complainant was a procedural error because his actions were "not stalking," but instead "reasonable and justified," and so they would

not cause a "reasonable person" to fear bodily injury or experience substantial emotional duress. (*Id*.).  Plaintiff argued that NYU's failure to recognize Plaintiff was a victim of NYU policy violations was a procedural error, and that NYU failed to "re-interview Complainant" after interviewing Plaintiff.  (*Id*. at -11367).  Plaintiff argued it was procedural error for NYU to fail to be thorough, fair, and impartial.  (*Id.*  at 11367-68).  Plaintiff also argued that because he took pictures of Jane's cleavage while a student at CT University, NYU had "no jurisdiction regarding the Cleavage Pictures."  (*Id.* at -11368).   Finally, Plaintiff argued that NYU erred by failing to complete the investigation within 60 days.  (*Id.* at -11369).

> **Response**: Admit that this reflects a portion of Plaintiff's appeal but deny as incomplete, (*see* Pl. Ex. 16), and deny NYU's characterization of the evidence.

251.    Plaintiff's appeal did not mention any technical difficulties during the Hearing, and he did not claim that technical difficulties impaired his ability to meaningfully participate in the Hearing or cause him to answer any questions incorrectly.   (*See generally id*).

> **Response**: Admit that Plaintiff's appeal did not address the technical difficulties during the Hearing but deny that Plaintiff did not in fact experience technical difficulties during the Hearing that impaired his ability to meaningfully participate in the Hearing or cause him to answer any questions incorrectly.  (*See* Plaintiff's Response to ¶212).

252.    *Disproportionate Punishment.*  Plaintiff also argued that his punishment was too harsh.  (*Id.* at -11369).

> **Response**: Admit and note Plaintiff was one of only four students to be expelled for violation of NYU's Policy between 2015 and 2020 — all four students were male.  (Pl. Ex. 4, NYU_00037051, Complete List lines 45, 57, 64, 73), while similarly situated female

students received lesser sanctions than Plaintiff. (Pl. Ex. 4, NYU_00037051, Complete List lines 3, 14, 32, 33, 43).

253.    Jane submitted a response to Plaintiff's appeal statement. (*See generally* Ex. 75, NYU_00011506). She stated that Plaintiff "presumably had access to the Internet, and could have communicated with friends and family members while in Australia," so the evidence he offered was not "previously unavailable." (*Id.* at -11506). She stated that the evidence he offered was "irrelevant." (*Id.* at -11506-13). She stated that NYU "correctly applied the reasonableness standard." (*Id.* at -11513). She stated that Plaintiff's appeal was not the appropriate forum to allege violations of NYU's Policy by *Jane.* (*Id.*). She stated that NYU had jurisdiction over her allegations of sexual exploitation, noting that she found photos of her "breasts, stomach, and face" taken "both prior and post [Plaintiff's] matriculation at NYU." (*Id.* at -11514). Finally, she stated that NYU was fair in both its findings and its sanction of Plaintiff. (*Id.* at -11514-15).

**Response**: Admit that Paragraph 253 accurately reflects portions of Jane's response to John's appeal but deny that Jane's arguments were accurate or true.

254.    Plaintiff's appeal was considered by a panel of three NYU administrators: Christopher Bledsoe, Thomas Ellett, and Leah Lattimore (the "Appeal Panel"). (Ex. 76, NYU_00007876 at -07876). The Appeal Panel met in person to consider Plaintiff's appeal. (Ex. 77, Lattimore Tr. 35:3-10). During that meeting, "[e]ach person would share their assessment and would discuss those assessments, if there were any differences, and then decide…if the grounds for the appeal should be granted." (*Id.* at 40:16-41:5).

**Response**: Admit the cited documents accurately reflect the appeal panel members, that the appeal panel met in person, and what Lattimore's testimony was.

255.    The Appeal Panel also reviewed all of the materials submitted by the parties, including the Hearing audio, the Report, and Plaintiff's appeal.  (*Id*. at 43:3-23; Ex. 78, Ellett Tr. 96:2-10), despite the fact that Plaintiff's Appeal far exceeded the three-page limit set in NYU's Procedures, *see supra* ¶ 28).

> **<u>Response</u>**: Admit that the cited testimony says that but deny that appeal statements cannot be longer than three pages; the language of the Procedures is permissive, stating that "[a]ppeal statements should be no more than three (3) pages…."  (Def. Ex. 3 at NYU_00029053).

256.    On February 26, 2019, Plaintiff's appeal was denied.  (*See generally* Ex. 76, NYU_00007876 at -07876).  The Appeal Panel did "not find that any material procedural errors occurred, that the Respondent has presented previously unavailable relevant information that could affect the outcome, or that the imposed sanction was substantially disproportionate to the violation. . ." (*Id*.).

> **<u>Response</u>**: Admit that the appeal was denied and that the quoted text appears in the cited document but deny the accuracy of the finding.

257.    The Appeal Panel found that "[t]here is no basis to find that the Respondent was incapable of collecting and/or directing the investigators toward this evidence during the investigation," nor that it "could have affected the outcome of the hearing in light of the overwhelming evidence supporting the Adjudicator's decision."  (*Id.*).

> **<u>Response</u>**: Admit that Paragraph 257 reflects the contents of the Appeal Panel's decision but deny that Plaintiff was capable of collecting all of the new evidence provided in his appeal during the investigation — Plaintiff did not have access to any of the evidence submitted against him until the Draft Report was sent to the parties.  (Def. Ex. 10, Plaintiff

Tr. 133:21-134:7; 136:12-13 ("When the draft ISR came out, I now had all the evidence")); Plaintiff was in Australia when the Draft Report was released and remained in Australia until after the Decision (Pl. Ex. 3, Plaintiff Tr. 33:2-14);  Plaintiff's ability to review the Draft Report was hampered by the fact he could not have offline access to the Draft Report (Pl. Ex. 3, Plaintiff Tr. 33:10-34:21); Plaintiff's hard drive, which contained additional relevant evidence, was not in Australia (Pl. Ex. 3, Plaintiff Tr. 353:22-354:5); and Plaintiff identified multiple witnesses in his response to the Draft Report who were not interviewed by the investigators.  (*See* Plaintiff's Response to ¶¶ 183-184).

258.    The Appeal Panel found that most of Plaintiff's purported "procedural errors" were in fact "challenges" to Jolley's "assessment of the evidence."  (*Id*.).  Where Plaintiff had identified a point of procedure that was "questionable," the Appeal Panel noted "there is no question the conduct found to have occurred in this matter meets the definitions of conduct prohibited under the Policy."  (*Id*.).

> **<u>Response</u>**: Admit that Paragraph 258 accurately reflects the contents of of the Appeal Panel's decision but deny the accuracy of the finding and note the Appeal Panel gave no explanation how the point of procedure raised by Plaintiff was "questionable" while there was also "no question" about the same issue.  (Def. Ex. 76, NYU_00007876).

259.    The Appeal Panel noted that "there is no procedural requirement that a respondent be shown all evidence prior to being interviewed nor is there a requirement that a complainant be re-interviewed. . . Instead, both parties (Respondent and Complainant) are given the opportunity to review the draft report and provide comments to the Title IX investigators, which is what occurred in this case."  (*Id*. at -07876-77).

**Response**: Admit that Paragraph 259 accurately reflects the contents of the Appeal Panel's decision but deny the accuracy of the finding.

260.    The Appeal Panel also found that given the "long standing pervasive nature of Respondent's conduct, the Respondent's repeated and blatant violation of the no contact directive, and the impact on the Complainant," the sanction was "more than appropriate." (*Id.* at -07877).

**Response**: Admit that Paragraph 260 accurately reflects the content of the Appeal Panel's decision but deny the accuracy of the finding and note that Plaintiff's sanction was more severe than similarly situated female students. (Pl. Ex. 4, NYU_00037051, Complete List lines 3, 14, 32, 33, 43).

## XIV.   Plaintiff's Post-Appeal Conduct

261.    After his appeal was denied, Plaintiff began the process of seeking admission to another university by retaining an admissions consultant, Sam Sneed. (Ex. 46, JD Mother Tr. 220:24-221:16). In connection with that process, he worked with Sneed to draft an "Explanation of his Expulsion" from NYU that he submitted to universities. (Ex. 34, P002943 at -02943).

**Response**: Admit that the cited documents say this.

262.    On March 24, 2019, Plaintiff sent Sneed a draft of his Explanation stating, "when I met with the Title IX Coordinator, Mary Signor in May 2018 [sic] she asked me if I wanted to file a cross complaint. I declined because I did not want to distress Jane." (*See id.* at -02950).

**Response**: Admit that the cited document says this but deny as an incomplete statement o fact — Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]." (Def. Ex. 10, Plaintiff Tr. 87:20-25). The Explanation also states that Plaintiff had been protective of Jane at the time because he had been lied to and manipulated. (Def. Ex. 34, P002950).

263.     On March 29, 2019, Plaintiff reiterated in an email to Sneed, "Mary Signor title ix coordinator and the investigator [] both said I could file a cross complaint.  I did not because I had believed Jane had suffered many assaults and did not want to cause her distress by reporting her." (Ex. 33, P002929).

**<u>Response</u>**: Admit that Plaintiff sent this email to Sneed.  Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).

264.     Plaintiff confirmed at his deposition that these were true statements and as of March 2019 he "had not filed a complaint against Jane."  (Ex. 10, Plaintiff Tr. 290:13-291:10; *see also id.* at 93:15-19 (Plaintiff "did not submit a written complaint prior to [the] summer of 2019")).

**<u>Response</u>**: Deny as an incomplete statement of fact, while Plaintiff did not submit a written response complaint prior to the summer of 2019, no written complaint is required.  (Pl. Ex. 2, Hodge Tr. 318:4-9 ("by the very nature if we're aware of something, the Office of Equal Opportunity is aware of it so responsible employees, it's inherent.  If we know about it, it's been reported appropriately")).

265.     In July 2019, several months after Plaintiff was expelled from NYU, he sent NYU a complaint against Jane.  (Ex. 79, P000575).

**<u>Response</u>**: Admit.

266.     NYU did not accept Plaintiff's complaint because NYU has "never accepted a complaint from an expelled student against a current student."  (Ex. 5, Signor Tr. 188:20-189:9 (explaining that the expelled student "had an opportunity to file a complaint" while a student at NYU)).

**Response**: Deny — Former students NYU students are allowed to report current NYU students for violations of the Policy.  (Pl. Ex. 6, Jolley Tr. 85:4-9; Pl. Ex. 8 at 187:18-25; 190:15-25).  Additionally, Mary Signor told Plaintiff that any complaint he filed against Jane "would be handled at the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).  Furthermore, On July 30, 2019, Signor emailed Plaintiff and stated that she was refusing to accept his formal complaint against Jane because "[t]he matters you raised were addressed previously by the University.  As such, this matter will not be reopened and is considered closed."  (Pl. Ex. 13, NYU_00008324).

267.    In February 2020, Plaintiff filed complaints with NYU against three friends of Jane's, including one who testified as a witness in Plaintiff's misconduct proceeding and one who submitted a statement as part of Jane's response to Plaintiff's appeal.  (Ex. 80, P000555), (Ex. 81, P000556); (Ex. 82, P000565).

**Response**: Deny to the extent that Paragraph 267 implies that Plaintiff's actions were retaliatory and deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

268.    On May 13, 2021, Plaintiff sent a blank email to Jane.  (Ex. 83, P000025).

**Response**: Deny — the metadata for P000025 shows that the email was in Plaintiff's draft folder; It was never sent.    (File Path: 20210914\a0001\[Plaintiff]\Email->[Plaintiff's Email].pst->[Plaintiff's Email]->Top of Personal Folders->DRAFT).  Further deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

269.     After being expelled from NYU, Plaintiff enrolled at CUNY Hunter College.  (Ex. 10, Plaintiff Tr. 305:12-19).  He graduated in 2020.  (*Id*. at 310:4-6).

**Response**: Admit that Plaintiff enrolled at CUNY Hunter College after he was expelled and graduated in 2020 but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

270.     After graduating from college, he received a Master's in Public Health from Imperial College London.  (*Id*. at 309:20-24, 310:7-9).

**Response**: Admit that Plaintiff received a Master's in Public Health from Imperial College London but deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

271.     During the 2021-2022 application cycle, Plaintiff applied to law school.  (*Id*. at 314:4-16).  He has been admitted to The Washington University School of Law.  (*Id*. at 314:19-22).

**Response**: Admit that after being forced to abandon his goal of going to medical school because of NYU's findings, Plaintiff applied and was admitted to The Washington University School of Law.  (Def. Ex. 10, Plaintiff Tr. 315:17-318:5).  Deny that these are material facts that would assist the Court in resolving a claim or defense in this matter.

## XV.   Plaintiff's Additional Statements of Undisputed Fact

272.     The term "report" is not defined by the Policy or Procedures.  (Def. Ex. 3, NYU_00029043 ("…capitalized terms used in these Procedures are defined in the Policy"); Def. Ex 1, NYU_00009788-9799 (Nowhere defining "report")).

273.     The Policy does not state that a formal request is required for there to be an investigation.  (*See generally* Def. Ex. 1, NYU_00009788-9799; *see also* Pl. Ex. 2, Hodge Tr. 176:18-23).

274.    On January 10, 2020, Colleen Maeder emailed Mathew J. L. Shepard spreadsheets containing hearing and appeal statistics from academic year 2015-2016 through academic year 2019-2020.  (Pl. Ex. 7, NYU_00016362).  These spreadsheets were modified by NYU's counsel, at Plaintiff's request, to redact personally identifiable information and to add information regarding the gender of the parties for each case listed therein.  (Pl. Ex. 4, NYU_00037051).

275.    Based on the information contained in the spreadsheets, no female student at NYU has ever been expelled after being found responsible for a sexual misconduct violation.  (Pl. Ex. 4, NYU_00037051).

276.    Based on the information contained in the spreadsheets, the majority of female students found responsible for a sexual misconduct violation were given a sanction of probation. (*See* Pl. Ex. 4, NYU_00037051).

277.    On March 2, 2016, NYU issued a hearing decision in which a female student was found responsible for Relationship Violence under the Policy.  (Pl. Ex. 4, NYU_00037051, complete list Line 4).  This student's sanction was probation.  (*Id*.).

278.    On June 15, 2016, NYU issued a hearing decision in which a female student was found responsible for Sexual Harassment under the Policy.  (Pl. Ex. 4, NYU_00037051, Complete List at Line 14).  This student's sanction was probation.  (*Id*.).

279.    On September 7, 2017, NYU issued a hearing decision in which a female student was found responsible for Stalking and Sexual Exploitation under the Policy.  (Pl. Ex. 4, NYU_00037051, Complete List Line at 32).  This student's sanction was suspension.  (*Id.*).

280.    On October 3, 2017, NYU issued a hearing decision in which a female student was found responsible for Relationship Violence under the Policy.  (Pl. Ex. 4, NYU_00037051, Complete List at Line 33).  This student's sanction was probation.  (*Id.*).

281.    Other than Plaintiff, three other students were expelled after being found responsible for Policy violations from the 2015-16 academic year through the 2019-2020 academic year, and all of these students were male.  (Pl. Ex. 4, NYU_00037051, complete list Lines 57, 64, and 73)

282.    Mary Signor testified that NYU only generates additional charges in a Title IX process based on information obtained during NYU's interview process with a complainant.  (Pl. Ex. 8, Signor Tr. 136:6-11).

283.    NYU's interview process with Jane ended on May 17, 2018.  (*See* Def. Ex. 41, NYU_00010191; *see also* Def. Ex. 42, NYU_00010206).

284.    Jane only asked NYU to investigate four distinct allegations.  (Def. Ex. 43, NYU_00029166).

285.    On May 17, 2018, Jane Roe had explicitly told the investigators that she only wanted the investigation to focus on events that occurred in the spring of 2018, and that she did not want the investigators to look further back than that.  (Pl. Ex. 7, NYU_00002984).

286.    NYU charged Plaintiff with four Policy violations on May 22, 2018.  (Def. Ex. 43, NYU_00029166).

287.    On October 23, 2018, without any prompting from Jane Roe, NYU *sua sponte* added 5 additional charges against Plaintiff.  (Def. Ex. 1, NYU_00009755-9756; *see also* Pl.  Ex. 8 at 138:2-139:14).

288.    Sally Soe was an alias used by Jane Roe to communicate with Plaintiff without his knowledge.  (Def. Ex. 79, P000577).

289.    This was done through various accounts and phone numbers, including "soupy noodles."  (Def. Ex. 79, P000577).

290.     Sally claimed to be a student at NYU.  (Def. Ex. 79, P000583).

291.     There is no record of any student named "Sally Soe" attending NYU.  (Pl. Ex. 5, Defendant NYU's Response to Plaintiff Request for Production Number 6).

292.     Jane, as Sally, would push and bully John to become more sexual with Jane and texted him explicit details about how to do this; these messages made John uncomfortable.  (*See* Def. Ex. 79, P000586; Pl. Ex. 3, Plaintiff Tr. 346:12-20; Pl. Ex. 16, P003039-3049; Pl. Ex. 3, Plaintiff Tr. 346:12-20).

293.     In July 2018, Jane, using the alias Sally Soe, sent messages to Plaintiff that made him "feel more cautioned about submitting things as well as threatened that Jane would go further with her allegations against Plaintiff if [he did]."  (Def. Ex. 1, NYU_00010080, NYU_00010092-94; Def. Ex. 54, NYU_00004169).

294.     Jane would consistently demean and insult Plaintiff in front of her friends, claiming this was necessary to prevent her parents from finding out about their relationship.  (*See* Pl. Ex. 9, P050855-50875 ("Because if I was nice to you [Jane's friend] would tell my parents ASAP and my parents would get at you")).

295.     Jane admitted to hitting Plaintiff on multiple occasions.  (Def. Ex. 79, P000577-580).

296.     Jane had spread malicious lies through Plaintiff's friend group, isolating him from his friends.  (Def. Ex. 13, Hearing Tr. 194:16-195:8 ("The frustration stemmed from the fact that in all our…friend group, she met with everyone to discuss the thing about me…I think five people blocked me in the span of maybe a week and a half."); Def. Ex. 10, Plaintiff Tr. 41:5-42:7).

297.     Jane would lie to Plaintiff and stand him up when he went to meet with her.  (Def. Ex. 13, Hearing Tr. 193:15-20).

298.    Jane slept in Plaintiff's dorm room about five days a week during the fall 2017 semester.  (Def. Ex. 13, Hearing Tr. 157:14-23).

299.    Jane continued to sleep in Plaintiff's room until the end of March 2018.  (Def. Ex. 13, Hearing Tr. 171:8-14; Pl. Ex. 16, NYU_00032902).

300.    Certain photographs that Jane provided to NYU to support her stalking allegations show that Jane was behind Plaintiff at the time the photos were taken both within Washington Square Park and after Plaintiff left Washington Square Park.  (Def. Ex. 1, at NYU_00009811; 9813; 9820; 9822-9823).

301.    On May 2, 2018, Plaintiff went to Public Safety to report that Jane was following him in violation of the NCO but was told that because of the nature of NYU's campus, interactions like those between Jane and Plaintiff can happen and that Public Safety did not consider it "stalking."  (Def. Ex. 13, Hearing Tr. 249:25-251:6).

302.    Public Safety refused to make a report based on Plaintiff's complaint.  (Def. Ex. 13, Hearing Tr. 250:13-25).

303.    Despite Jane's claim that she was sexually assaulted in 2016 while a student at NYU and that the individuals involved were arrested, the New York City Police Department confirmed that there is no record of Jane ever being the victim of such crime.  (Pl. Ex. 10 P003035; Def. Ex. 14, NYU_00011364-365).

304.    During his April 30, 2018 meeting with Signor, Plaintiff informed her that Jane had punched him, threatened him, and disparaged him to their friends. (Def. Ex. 32, NYU_00009570, 572, 574).  NYU did not investigate these allegations.  (Pl. Ex. 2, Hodge Tr. 309:4-7).

305.    During Plaintiff's July 10, 2018 meeting with Hodge and Stabile, he informed the investigators that Jane had made homophobic comments about him to his friends, kissed him in

his sleep without his consent, punched him, threatened him, isolated him from his friends, followed

him in the park, taken a picture of him naked without consent, and had contacted his ex-girlfriend

following the issuance of the NCO.   (Def. Ex. 52, NYU_00010106, NYU_00010113-114,

NYU_00010118; Def. Ex. 53, NYU_00010135, NYU_00010138-139, NYU_00010142).

306.    NYU did not investigate these allegations.  (Pl. Ex. 2, Hodge Tr. 309:4-7).

307.    The investigators did not follow up with Plaintiff regarding the information he

provided in his response to the Draft Report.  (Def. Ex. 10, Plaintiff Tr. 190:23-191:12).

308.    In his appeal, Plaintiff again informed NYU about Jane's misconduct.  (Def. Ex.

14_00011361-365).

309.    Signor told Plaintiff that any complaint he filed against Jane "would be handled at

the end of any proceedings against [Plaintiff] and therefore [he] can and should wait until the end

of any proceedings against [him]."  (Def. Ex. 10, Plaintiff Tr. 87:20-25).

310.    Signor admitted that Jane's actions constituted potential violations of the Policy.

(Pl. Ex. 8, Signor Tr. 216:21-217:5).

311.    Signor also testified that NYU is able to investigate instances of misconduct under

the Policy even when a reporting student asks NYU not to do so.  (Pl. Ex. 8 at 223:8-224:12).

312.    Former NYU students are allowed to report current NYU students for violations of

the Policy.  (Pl. Ex. 6, Jolley Tr. 85:4-9; *see also* Pl. Ex. 8, Signor Tr. 187:18-25).

313.    NYU refused to investigate Jane's misconduct even after Plaintiff filed a formal

complaint against her.  (Pl. Ex. 2, Hodge Tr. 309:4-7).

314.    On July 30, 2019, Signor emailed Plaintiff and stated that she was refusing to accept

his formal complaint against Jane because "[t]he matters you raised were addressed previously by

the University.  As such, this matter will not be reopened and is considered closed."  (Pl. Ex. 13, NYU_00008324).

315.    At Signor's deposition, she gave a different explanation for not accepting Plaintiff's complaint, namely, that she did not accept Plaintiff's complaint because Plaintiff was no longer a student at NYU and she has never "taken a complaint from an expelled student before."  (Pl. Ex. 8, Signor Tr. 124:15-125:20).

316.    Plaintiff's allegations against Jane were not investigated by NYU.  (Def. Ex. 4, Hodge Tr. 140:15-17 (Hodge stated that Plaintiff's complaint against Jane was "separate and apart from Jane's allegations"); Pl. Ex. 2, Hodge Tr. 315:6-8 ("That's a completely separate topic than my investigation in this instance"); *see also supra* ¶240; Def. Ex. 72, Jolley Tr. 142:21-144:8)).

317.    On April 28, 2018, Jane reported receiving calls from an unknown number she suspected was Plaintiff to NYU; in response, NYU "strongly" encouraged Jane to report the incident to Public Safety and informed her that she could also file a police report.  (Def. Ex. 30, NYU_00002610).

318.    Plaintiff's allegations were not considered by Jolley at the December 10, 2018 hearing.  (Def. Ex. 72 at 142:21-144:8).

319.    Plaintiff testified that Allen McFarlane, the Assistant Vice President for Outreach and Engagement at NYU and Plaintiff's respondent facilitator, promised him that "under no circumstances, would you be expelled and the worst-case scenario is a one-semester suspension." (Pl. Ex. 3 at 126:9-12).

320.    At all times during Plaintiff's Title IX process, McFarlane understood that it was his role to serve as Plaintiff's advisor.  (Pl. Ex. 18, McFarlane Tr. 26:12-16).

321.    McFarlane has worked at NYU for thirty-eight years and had been advising male respondents in Title IX matters for six years prior to being assigned as Plaintiff's advisor.  (Pl. Ex. 18, McFarlane Tr. at 12:17-19; 20:12-17; 26:12-16; 28:19-29:11).

322.    Plaintiff's mother testified that she trusted McFarlane because he "had a lot of experience in Title IX and…he had worked at NYU for a long time."  (Pl. Ex. 11, JD Mother Tr. 67:15-25).   McFarlane promised Plaintiff and his mother that even if Plaintiff was found responsible, he would not be expelled.  (Pl. Ex. 11, JD Mother Tr. 253:18-256:13).

323.    Plaintiff was not given the opportunity to review Hodge or Stabile's notes from his meeting to ensure the accuracy of the notes.  (Pl. Ex. 2, Hodge Tr. 215:19-23).

324.    Other than the two photos that were shown to him at his meeting with the investigators, Plaintiff did not have access to any of the evidence submitted against him until the Draft Report was sent to the parties.  (Pl. Ex. 3 at 161:17-162:4; Def. Ex. 10, Plaintiff Tr. 133:21-134:7; 136:12-13 ("When the draft ISR came out, I now had all the evidence")).

325.    Plaintiff was in Australia when the Draft Report was released and remained in Australia until after the Decision.  (Pl. Ex. 3, Plaintiff Tr. 33:2-14).

326.    Plaintiff's ability to review the Draft Report was hampered by the fact he did not have offline access to the Draft Report.  (Pl. Ex. 3, Plaintiff Tr. 33:10-34:21).

327.    Plaintiff's old hard drive with additional evidence was not in Australia.  (Def. Ex. 35, P058316).

328.    During the hearing, Hodge erroneously informed Jolley that Plaintiff's testimony contained "a few new things or statements that were inconsistent," including Plaintiff's testimony that Jane's "friends were calling him and they called him a mother fucker and other language."

(*Cf.* Def. Ex. 13 at 279:21-280:16, *with* Def. Ex. 53 at NYU_00010135 (Hodge's interview notes showing that Plaintiff had informed him of the insults he was receiving).

329.    No investigator, adjudicator, or member of the Appeal Panel ever reviewed any photograph that allegedly substantiated Jane's claim of Sexual Exploitation.  (*See generally* Def. Ex. 1; *see also* Def. Ex. 72, Jolley Tr. 132:10-12).

330.    When asked how he would interpret a hypothetical photograph under NYU's policies, Jolley responded that he "can't say without looking at the specific photo…."  (Pl. Ex. 6, Jolley Tr. 184:2-3).

331.    In adjudicating the allegations against Plaintiff, Jolley found that the photographs at issue, which he never reviewed, were "content of a sexual nature."   (Def. Ex. 2, NYU_00001805).

332.    The photographs at issue during the Title IX hearing were taken while Plaintiff was a student at CT University.  (Def. Ex. 14, NYU_00011369).

333.    Under the applicable Policy, NYU did not have jurisdiction to sanction Plaintiff for conduct that occurred prior to his enrollment at NYU.  (Def. Ex. 13, Hearing Tr. 23:8-21).

334.    Plaintiff's actions in the spring of 2018 were not sexual in nature.  (Def. Ex. 14, NYU_00011365; Def. Ex. 1, NYU_00009918, 9920-9924, 9942, 9969; Def. Ex. 13, Hearing Tr. 193:15-195:25).

335.    It was Jolley's practice to take notes in preparation for and during Title IX hearings. (Pl. Ex. 6, Jolley Tr. 49:9-13; 71:20-23).

336.    Jolley's notes were destroyed after he issued his Decision.  (Pl. Ex. 6, Jolley Tr. 71:24-73:21).

337.    Lauren Stahl testified that she was surprised Plaintiff had been expelled based on what Plaintiff had told her about his conversations with McFarlane.  (Pl. Ex. 12, Stahl Tr. 43:6-45:21).

338.    The appeal panel did not have access to case precedent and did not rely on written precedent when determining whether the sanction levied by Jolley was too severe.  (Pl. Ex. 14, Ellett Tr. 66:10-67:6; Pl. Ex. 15, Bledsoe Tr. 29:22-25; Def. Ex. 77, Lattimore Tr. 34:8-35:2).

339.    There is no record or notes from the appeal panel's deliberations.  (Pl. Ex. 14, Ellett Tr. 67:7-13; Def. Ex. 77, Lattimore Tr. 35:14-36:7).

340.    Thomas Ellett, one of the members of the appeal panel, was Jolley's supervisor. (Pl. Ex. 14, Ellett Tr. 19:24-20:8).

341.    While employed by NYU, Colleen Maeder created and presented a training entitled "The Art of Working with Sexual Misconduct Respondents."  (Pl. Ex. 17, NYU_00002321-NYU_00002350).

342.    In this training, Maeder lists "Things I've heard from colleagues."  (Pl. Ex. 17, NYU_00002350).

343.    Among the negative stereotypes that Maeder heard from her colleagues are: "Kick him out;" "If he has an attorney, it's a sign of guilt;" "Our process is 'too' fair;" "Guilty until proven innocent;" "Must have a victim centered process."  (Pl. Ex. 17, NYU_00002350).

Dated:  New York, New York
            July 27, 2022

                                                    */s/  Kimberly C. Lau*_____
                                                         Kimberly C. Lau